# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **KHOLKAR VISHVESHWAR GANPAT,** | * | **CIVIL ACTION** |
| *Plaintiff,* | * | |
| | * | **NO.** |
| **VERSUS** | * | |
| | * | **JUDGE** |
| **EASTERN PACIFIC SHIPPING PTE. LTD.,** | * | |
| **d/b/a "EPS",** | * | **MAGISTRATE JUDGE** |
| *Defendant.* | * | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## COMPLAINT FOR DAMAGES

**NOW INTO COURT,** through undersigned counsel, comes Kholkar Vishveshwar Ganpat, who for his Complaint for Damages against Eastern Pacific Shipping PTE, Ltd, d/b/a EPS avers as follows:

## I. PARTIES

1.      Kholkar Vishveshwar Ganpat ("Plaintiff") is a person of the full age of majority and a resident citizen of the Republic of India.

2.      Defendant, Eastern Pacific Shipping PTE, Ltd, d/b/a EPS ("EPS") is an international ship management company whose principal place of business is located in the Republic of Singapore.

## II. FEDERAL SUBJECT MATTER JURISDICTION

3.      Federal subject matter jurisdiction is vested in this Honorable Court pursuant to:

**(a.)**      28 U.S.C. § 1331, more commonly known as "federal question jurisdiction" because Plaintiff asserts a damage claim pursuant to the Jones Act, 46 U.S.C. § 30104, *et*

*seq.*; and

**(b.)**  28 U.S.C. § 1333, more commonly known as "admiralty and maritime jurisdiction" because Plaintiff asserts seaworthiness and "cure" claims under the General Maritime Law.

## III. VENUE

**4.**  Venue is proper in the Eastern District of Louisiana pursuant to 28 U.S.C. § 1391(b)(3).

## IV. SUIT IS BROUGHT PURSUANT TO 28 U.S.C. § 1916

**5.**  The above-captioned matter is brought pursuant to 28 U.S.C. § 1916 which provides:

> "In all courts of the United States, seamen may institute and prosecute suits and appeals in their own names and for their own benefit for wages or salvage or the enforcement of laws enacted for their health or safety without prepaying fees or costs or furnishing security therefor."

## V. MATERIAL FACTS

**6.**  At all times relevant, EPS owned and operated the M/V STARGATE, IMO No. 9493212, a bulk carrier bearing a Liberian flag of convenience.

**7.**  At all times relevant, EPS was Plaintiff's Jones Act employer.

**8.**  At all times relevant, Plaintiff was an Able Body Seaman and crew member aboard the M/V STARGATE who joined the vessel's crew on or about December 23, 2016.

**9.**  The performance of Plaintiff's duties as a crew member of M/V STARGATE were under the exclusive direction and control of EPS' employees serving as the vessel's officers.

**10.**  Prior to joining the crew of M/V STARGATE, Plaintiff was cleared medically, was deemed fit for duty, and was a healthy young man with a promising career and future.

**11.**  Both before and after the events set forth in this Complaint for Damages, M/V STARGATE

and other vessels owned and/or operated by EPS regularly sailed upon the navigable waters of the State of Louisiana and in the Eastern District of Louisiana, as well as upon the navigable waters of other States and in other federal judicial districts of the United States.

12.     Both before and after the events set forth in this Complaint for Damages, EPS has had substantial contacts with the Eastern District of Louisiana and the United States through its systematic conduct of  business in and near the port of New Orleans.

13.     EPS presently owns and/or operates at least 56 vessels, and some (e.g., M/V BANDA SEA or M/V STARGATE) visit or have visited the Eastern District of Louisiana or other Judicial Districts in the United States in furtherance of EPS' commercial business interests.[1]

14.     EPS and the officers of M/V STARGATE knew that vessels "at all times must have the necessary prescription prophylactics for malaria aboard its vessel, including but not limited to Doxycycline, which must be administered daily to all crew members at least two weeks *before* traveling to an area where Malaria occurs and must be taken up to four (4) weeks *after* traveling to the country.."[2]

15.     Anti-Malaria medication is readily available in the United States, and could have easily been purchased and provided to the crew of M/V STARGATE.

16.     EPS, before M/V STARGATE departed U.S. waters, knew:

(a.)     The vessel would sail to Gabon for a port call;

(b.)     The risk of contracting Malaria is *extremely high* throughout Gabon;

(c.)     That it was necessary to have an ample supply of anti-Malarial medication aboard

---

[1]*See* Exhibit "1".

[2]*See* Exhibit "2".

M/V STARGATE *before* the vessel sailed for Gabon; and

**(d.)** That prophylactic administration of anti-Malaria medication needed to begin two (2) weeks *before* arrival at a Malaria region such as Gabon.[3]

17. EPS, which knew and controlled the vessel's prospective port arrival schedule, had ample time to acquire anti-Malaria medication for M/V STARGATE prior to the vessel's departure from Savannah, Georgia, on or about April 7, 2017.

18. EPS had ample time to begin administration of anti-Malaria medication to the crew of M/V STARGATE at least two (2) weeks before the vessel's May 7, 2017 arrival at Gabon.

19. M/V STARGATE's officers had actual knowledge that the vessel had departed U.S. waters without anti-Malaria medication.

20. M/V STARGATE's officers knew that the vessel's crew, including Plaintiff, had not been administered anti-Malaria medication for the two week period *before* the vessel's May 7, 2017 arrival at Gabon.

21. In the absence of prophylactic doses of anti-Malaria medication, it was entirely foreseeable that Plaintiff would be at risk for exposure to and/or contraction of Malaria at Gabon.

22. M/V STARGATE's 2nd Officer, Kudereyov German, was designated to act as the vessel's "medical officer" and was responsible for overseeing the crew's medical care and treatment.

23. 2nd Officer German, who had either very limited or no medical experience, was placed in charge of managing crew health matters, and critical medical supplies including anti-Malarial medication.

---

[3] *Id.,* at ¶ 4.

24. While M/V STARGATE was at Savannah, Georgia, its last U.S. port of call, Plaintiff was ordered by 2nd Officer German to take an inventory of the vessel's medical supplies.

25. At least four days *before* M/V STARGATE departed Savannah, Plaintiff discovered that there was an  inadequate supply of anti-Malaria medications and immediately reported this problem to 2nd Officer German.

26. 2nd Officer German acknowledged the shortage of anti-Malaria medication and told Plaintiff that EPS would secure sufficient medication in Georgia to proceed safely to West Africa.

27. Anti-Malaria medication was not obtained and M/V STARGATE's crew was not put on prophylactic medication before the vessel's May 7, 2017 arrival at Gabon.

28. Plaintiff specifically requested, but was not given, a course of prophylactic anti-Malaria medication either before or after the vessel's arrival at Gabon.

29. Gabon is in a region well-known for a high prevalence of Malaria, including the most virulent form.[4]

30. Thereafter, M/V STARGATE departed from Gabon to Brazil.

31. On or about May 25, 2017, about five days *before* the vessel's arrival in Brazil, Plaintiff reported symptoms of a headache and fever to 2nd Officer German.

32. Plaintiff had contracted a highly aggressive and destructive strand of Malaria,[5] and his worsening symptoms included severe fever, chills, vomiting, burning of his eyes, rigor, severe weakness, and darkening of his eyes.

33. Plaintiff repeatedly reported his complaints to 2nd Officer German and the vessel's Master,

---

[4]*Id.,* at ¶ 12.

[5]*Id.,* at ¶ 13.

Teodar Nicoli, who both disregarded Plaintiff's medical needs and ordered him to return to work.

34.   Plaintiff was not provided appropriate medical care and treatment while M/V STARGATE, sailed to Brazil, nor was Plaintiff medically evacuated.  Instead, 2nd Officer German insisted that Plaintiff had a common cold, and was a "weak person" unable to cope with its symptoms.

35.   Plaintiff's condition worsened and he became physically unable to perform his duties.

36.   When M/V STARGATE arrived in Brazil, Plaintiff repeatedly begged Captain Nicoli to be sent ashore for medical treatment, but instead  was accused of trying to avoid his job duties and was confined to quarters.

37.   On or about May 27, 2017, about seven (7) days *after* Plaintiff first reported symptoms of fever, chills and muscle aches, he was in critical condition.

38.   Plaintiff's condition further worsened, his vision failed, he was unable to move, drink or eat, and he believed he was going to die aboard the vessel alone in his quarters.

39.   Eventually, through the assistance of another crew member, and at the displeasure of the vessel's Master, Plaintiff was taken to the Medical Care International Hospital in Rio de Janeiro where he was admitted in critical condition.

40.   Plaintiff was diagnosed with the most virulent form of Malaria, complicated by gangrene, loss of eight (8) of his toes, the blackening of his skin on both feet, temporary loss of vision, blacking of his eyes, severe fever, kidney failure, respiratory dysfunction, liver damage, diminished cognitive ability, and coma for fourteen (14) days.

41.   Plaintiff was abandoned by his vessel's officers while on the brink of death, was ultimately

hospitalized for seventy-six (76) days.

42.   At no time, did EPS or the vessel officers inform  Plaintiff's family of his whereabouts, or provide medical care and treatment, and during the entire time Plaintiff was in a coma and/or intubated his family presumed he was dead.

43.   Surprisingly, Plaintiff awoke from his coma, survived his foot infections, began breathing on his own, and was thereafter reunited with his family.  However, he now has physical deformities, permanent impairments, psychological scars, and cognitive deficits.

44.   Had Plaintiff been provided with prophylactic anti-Malaria medication for two weeks *before* M/V STARGATE's arrival at Gabon, and had he received the recommended follow-up doses, he would not have contracted Malaria, would not have nearly died,  and would not now be permanently disabled.

45.   Plaintiff was finally repatriated to India where EPS ordered him to receive treatment at the Salgaocar Medical Research Centre's ("SMRC") V.M. Salgaocar Hospital in Goa, India. Moreover, EPS selected and entrusted that the Plaintiff be treated by Dr. Narendra Kumar Pathak and Dr. Anand D. Kamat.

46.   On or about August 12, 2017, Plaintiff was admitted into the hospital due to complications with his feet.  On August 17, 2017, Drs. Kamat and Pathak noted that the Plaintiff continued to suffer from vascular injuries:

"*to his toes of both feet and has been ?amputated ?self-amputated of distal phalanges of the 2nd, 3rd, 4th, 5th toes of both feet. Stump of amputations phalanges is showing bone jutting out of the stumps which requires refashioning of the same….Expense of said surgery will be around Rs. 73,000…Disability of the injury*

*is around 20-30% (Reference: Manual for Doctors to evaluate permanent physical impairment…*".[6]

47.  Although Drs. Kamat and Pathak's 'To Whomsoever It May Concern" report informed EPS that Plaintiff was *permanently disabled* between 20-30%, Plaintiff has not received any disability benefits.

48.  EPS thereafter authorized the surgical removal of more of Plaintiff's toes and to "refashion" the stumps of his amputations.

49.  After Plaintiff was discharged on August 23, 2017, following a Malaria diagnosis and foot amputations.[7] EPS did not provide Plaintiff with any further curative treatment and further aggravated matters by refusing to pay Plaintiff his appropriate medical leave payment.[8] All the while, Plaintiff was abandoned without medical leave pay and was told by EPS' Captain Bhasin to *"Relax we are with you"… "a few days more"…*[9]

50.  No medical leave pay was tendered and no curative treatment was provided.  Plaintiff was forced to text  Capt. Bhasin, writing "*sir, sory to disturb you but please inform company about my situation n please send me leave wages so I can cover me and my family expense*". Captain Bhasin replied that *"I will speak to them again*".[10]

---

[6]*See* Exhibit "3".

[7]*See* Exhibit "4".

[8]*See* Exhibit "5".

[9]*See* Exhibit "6".

[10]*Id.*

51.   Plaintiff continued to submit emails requesting his wages through January of 2018, when he hired a lawyer.

52.   On January 12, 2018, Plaintiff's counsel Peter Sotolongo, Esq. submitted to EPS Manager, Mr. William Gracias, Plaintiff's "Request for Reinstatement of Maintenance and Cure."[11] Mr. Sotolongo also made a first request for a complete copy of the Plaintiff's medical treatment, including while he was shipboard, while ashore in Brazil, and after his return to the Republic of India.  To date, EPS has refused to provide these medical records.

53.   Ms. Angela Yap of Singapore-based North P&I Club claimed in her January 29, 2018 email that Plaintiff had reached "maximum medical improvement according to Dr. Kumar" and that EPS had "full-filled its contractual obligations" to Plaintiff.[12]

54.   Mr. Sotolongo disagreed with EPS' assertion that it had satisfied its legal obligations, and on January 30, 2018 renewed his prior request for Plaintiff's medical care and treatment records and his entire personnel file.[13]  To date, EPS has refused to provide these records.

55.   Instead, EPS hired De Leo & Kuylenstierna, P.A., a maritime law firm located in Miami, Florida.  These attorneys wrote "*please be advised that we represent the owners of the M/V Stargate with respect to the above referenced crewmember claim.*"[14]

---

[11] *See* Exhibit "7".

[12] *See* Exhibit "8".

[13] *See* Exhibit "9".

[14] *See* Exhibit "10".

**56.** On March 30, 2018, Mr. Sotolongo sent another written request for medical records, personnel records and diagnostic films.[15]  Again, EPS ignored the  request.

**57.** On April 2, 2018, Plaintiff returned to Dr. Kamat, the surgeon previously selected by EPS, to obtain an opinion whether he required further curative treatment.  On April 3, 2018, Mr. Sotolongo provided EPS's Miami attorneys with a copy of Dr. Kumat's diagnosis of a "*non healing wound*" and his recommendation for curative surgery.[16]

**58.** Dr. Kumar had recommended a "*partial excision of the bone followed by primary protruding of the wound*."[17]  Therefore,  EPS was fully aware that Plaintiff was not at MMI and required immediate medical treatment because a photograph of the infected toe was enclosed.[18]

**59.** Despite knowing that the Plaintiff required "urgent medical attention", EPS  did not provide prompt, proper or adequate medical care or treatment.  Therefore on April 6, 2018, Mr. Sotolongo communicated Plaintiff's demand to see Dr. James Losito, a well-respected foot specialist at Mercy Hospital in Miami and enclosed Dr. Losito's sworn declaration confirming:

**(a.)** Plaintiff has never reached MMI;

**(b.)** Plaintiff is currently suffering from osteomyelitis; and

---

[15]*See* Exhibit "11".

[16]*See* Exhibit "12".

[17]*Id.*

[18]*See* Exhibit "13".

**(c.)**     Plaintiff requires prompt medical treatment to … prevent further deterioration and possible amputation of his hallux or even his lower leg."[19]

**60.**   On April 11, 2018, EPS' lawyers advised Mr. Sotolongo that "*our clients made immediate arrangements for your client to be seen by Dr. Anil Mehndiratta*".[20]

**61.**   Incredibly, Dr. Anil Mehndiratta was a "pulmonologist/chest physician" and not a surgeon.

**62.**   On April 11, 2018, Plaintiff arrived at his appointment with Dr. Mehndiratta and was greeted by a "Mr. Ryan" who identified himself as a representative of  North P&I Club which was acting on behalf of EPS.

**63.**   Without the Plaintiff's consent, "Mr. Ryan" attended the examination while Dr. Mehndiratta took photographs of Plaintiff's feet but  provided no medical care or treatment.  On April 13, 2018,   Plaintiff's Co-Counsel, Alejandro Gonzalez, Esquire, requested copies of Dr. Mehndiratta's report and photographs.[21]

**64.**   On April 16, 2018, Mr. Gonzalez requested that EPS and its agents refrain from making direct contact with the Plaintiff.[22]

**65.**   On April 17, 2018, Plaintiff returned to Dr. Kumat, and again Dr. Kumat ordered that Plaintiff undergo a curative surgery.

---

[19]*See* Exhibit "14".

[20]*See* Exhibit "15".

[21]*See* Exhibit "16"

[22]*See* Exhibit "17".

66.     On April 18, 2018, Mr. Gonzalez Plaintiff submitted a "*Demand for Reinstatement of Maintenance and Cure*" and requested that EPS make arrangements for the Plaintiff to undergo "*partial amputation of exposed terminal phalanx with reconstruction of flap of right leg toe*".[23]

67.     Instead of approving Dr. Kamat's proposed April 24, 2018 surgery date, on April 20, 2018 EPS' attorneys demanded that Plaintiff travel to see yet another doctor, Dr. Chatterjee.[24]

68.     EPS' demand that Plaintiff see Dr. Chatterjee required Plaintiff to travel from Goa to Calcutta, India, a journey of 2,122 kilometers (1,318 miles) over rough and difficult terrain.

69.     On April 24, 2018, the Plaintiff underwent Dr. Kamat's recommended surgery.

70.     On April 26, 2018, EPS's attorneys represented that EPS had "....provided, and are continuing to provide, treatment that goes over and above their obligations, solely on a without prejudice and *ex gratia* basis".[25]

71.     However, despite EPS' representations, Plaintiff had to personally pay for the "recommended and approved" surgery, and on April 30, 2018, Plaintiff submitted invoices in the amount of 92,663.80 Rs. which were not reimbursed until after May 2018.

---

[23]*See* Exhibit "18".

[24]See Exhibit "19".

[25]See Exhibits "19" and "20".

# VI. CLAIMS ASSERTED

## COUNT 1
## JONES ACT NEGLIGENCE

**72.**    Plaintiff adopts and re-alleges as if set forth hereafter *in extenso* the foregoing allegations of fact contained in Paragraphs 1 through 71.

**73.**    Plaintiff was injured and suffered damages due to the fault and negligence of EPS and/or its agents, servants and/or employees which included but is not limited to:

    **(a.)**    Failure to use reasonable care to provide and maintain a safe place to work for Plaintiff, fit with proper and adequate machinery, crew and equipment;

    **(b.)**    Failure to promulgate and enforce reasonable rules and regulations to ensure the safety and health of the employees and more particularly Plaintiff, while engaged in the course of his employment on M/V STARGATE;

    **(c.)**    Failure to use reasonable care to maintain the Plaintiff's work place in a safe condition;

    **(d.)**    Failure to provide trained and competent medical personnel aboard M/V STARGATE.

    **(e.)**    Failure to provide adequate training, instruction and supervision to officers, crew members and Plaintiff;

    **(f.)**    Failure to provide prompt, proper and adequate medical care which aggravated Plaintiff's injuries and caused him additional pain and disability;

    **(g.)**    Failure to secure an adequate supply of prophylactic anti-Malaria drugs for the vessel's crew, including the Plaintiff;

    **(h.)**    Failure to initiate administration of prophylactic anti-Malaria drugs to Plaintiff two (2) weeks before M/V STARGATE arrived at Gabon, and failure to continue to administer such drugs to Plaintiff for four (4) weeks arriving at Gabon;

    **(i.)**    Failure to diagnose and provide prompt and adequate treatment of Plaintiff's Malaria; and

    **(j.)**    Failure to timely supply M/V STARGATE with essential prophylactic anti-Malaria medications before the vessel entered a Malaria hazard zone;

**74.**    EPS knew of the foregoing conditions and did not correct them, or the conditions existed for a sufficient length of time so that EPS in the exercise of reasonable care should have learned of them and corrected them.

**75.**    **A**s a direct and proximate result of the negligence of EPS and its officers and managing agents, Plaintiff was caused to contract Malaria and to suffer personal injury and the resulting related damages.

## COUNT 2

## GENERAL MARITIME LAW SEAWORTHINESS CLAIM

**76.**    Plaintiff adopts and re-alleges as if set forth hereafter *in extenso* the foregoing allegations of fact contained in Paragraphs 1 through 75.

**77.**    The following conditions existed aboard M/V STARGATE despite EPS' non-delegable duty to provide a fit and seaworthy vessel, and rendered it unseaworthy:

    **(a.)**    As the vessel's "medical officer" specifically knew, no supply of prophylactic anti-Malaria drugs was aboard the vessel despite its planned travel to a well-known Malaria risk zone, and despite the opportunity to easily secure such drugs before

departing a U.S. port on April 7, 2017;

**(b.)** The vessel's "medical officer" was not trained to recognize the symptoms of a Malaria infection;

**(c.)** The vessel's "medical officer" was not trained to treat a Malaria infection;

**(d.)** The vessel's "medical officer" could not treat Plaintiff's Malaria because no anti-Malaria drugs were aboard the vessel;

**(e.)** The vessel's Master, who was not trained to recognize the symptoms of a Malaria infection, reacted to Plaintiff's report of illness by restricting him to quarters, thus demonstrating that the Master lacked fitness to command;

**(f.)** The vessel, while present in Gabon, was an unreasonably dangerous place for Plaintiff to work because no supply of prophylactic anti-Malaria drugs had been maintained aboard;

**(g.)** The vessel's 2nd Officer, who served as the vessel's "medical officer", was specifically informed by Plaintiff about the lack of anti-Malaria drugs before the vessel sailed from U.S. waters on April 7, 2017, and yet he did nothing, thus demonstrating he lacked the fitness to serve as 2nd Officer and "medical officer"; and

**(h.)** Such other conditions which rendered M/V STARGATE unseaworthy as may be revealed during discovery or proven at trial.

**78.** The foregoing conditions rendered M/V STARGATE unseaworthy.

**79.** The unseaworthiness of M/V STARGATE was a concurrent proximate cause of Plaintiff's injury and damages.

## COUNT 3

### GENERAL MARITIME LAW FAILURE
### TO PROVIDE MAINTENANCE AND CURE

80.    Plaintiff adopts and re-alleges as if set forth hereafter *in extenso* the foregoing allegations of fact contained in Paragraphs 1 through 79.

81.    Plaintiff was a Jones Act seaman and EPS was his Jones Act employer.  Under the General Maritime Law and by operation of treaty, Plaintiff was and is entitled to receive "maintenance and cure" from EPS until he was or is declared to have reached maximum medical improvement.

82.    Under the General Maritime Law, when a Jones Act seaman falls ill during his service to the vessel, his Jones Act employer is legally obliged to provide "maintenance and cure".  This obligation is not based on, or affected by, any fault on the seaman's part.  Despite its obligation, EPS has wilfully and wantonly failed to provide "maintenance and cure" to Plaintiff.

83.    Plaintiff, who fell ill during his service aboard M/V STARGATE, promptly reported his Malaria symptoms to the "medical officer" who then ignored the report.

84.    Plaintiff's Malaria symptoms became sever and life-threatening during the vessel's voyage from Gabon to Brazil, yet his repeated complaints were ignored or disregarded.

85.    Plaintiff's Malaria symptoms became sever and life-threatening during the vessel's voyage from Gabon to Brazil, yet instead of providing prompt and adequate medical case, the vessel's Master confined Plaintiff to quarters.

86.    Without the assistance of EPS or the vessel' officers, the critically ill Plaintiff was able on

his own to obtain emergency medical care for his Malaria infection in Brazil.

87.  EPS and its officers and agents abandoned Plaintiff in Brazil.

88.  Despite its General Maritime Law obligations, and its actual knowledge of Plaintiff becoming ill during his service to the vessel, EPS disregarded all duties to "maintenance and cure" to Plaintiff, including:

   **(a.)**  EPS' failure to provide prompt and adequate *pre-exposure* prophylactic anti-Malaria medication;

   **(b.)**  EPS' failure to provide prompt and adequate *post-exposure* medical care and treatment after  Plaintiff first reported his symptoms to 2nd Officer German;

   **(c.)**  EPS' failure to provide any medical care and treatment to Plaintiff in Brazil;

   **(d.)**  EPS' failure to provide medical care and treatment of Plaintiff after his repatriation to the Republic of India; and

   **(e.)**  EPS' failure to pay maintenance at any time subsequent to Plaintiff's hospitalization in Brazil or after his repatriation to the Republic of India.

89.  As a direct and proximate result of EPS' failure to provide prompt and adequate "cure", Plaintiff's Malaria infection nearly became fatal, causing dire and permanent physical consequences to Plaintiff.

### COUNT 4

### BREACH OF ARTICLE 24 DISABILITY PROVISION
### OF THE "TCC" COLLECTIVE AGREEMENT

90.  Plaintiff adopts and re-alleges as if set forth hereafter *in extenso* the foregoing allegations of fact contained in Paragraphs 1 through 89.

91.  Plaintiff, while in the service of EPS' vessel M/V STARGATE, sustained a disabling and permanent injuries.

92.  EPS has a legal obligation pursuant to the Maritime Labour Convention, 2006-ILO and explicitly afforded under the SFA contract and Annex 1, to furnish Plaintiff with disability benefits.[26]

93.  Plaintiff's disabling and permanent injuries will prevent him from obtaining future comparable employment on board a bulk carrier owned by EPS or on another owner or operator's vessel.

94.  Plaintiff's injuries have resulted in *loss of his profession* as described in the collective bargaining agreement.[27]

95.  EPS failed to adhere to and/or comply with the "without fault" disability payment provisions set forth in the collective bargaining agreement.[28]

96.  EPS, as a Shipowner, must comply with the MLC (2006) and its amendment (2014), and must provide Plaintiff with disability benefits as an injured seafarer.

97.  Under the terms of the collective bargaining agreement, Plaintiff is *contractually entitled* to the full amount of disability compensation of one hundred and two thousand, three hundred and eight dollars ($102,308.00)[29] regardless of other claims asserted.

98.  EPS, as the Shipowner, has capriciously and wantonly refused to recognize its obligations

---

[26] *See* Exhibit "21" at § 24.

[27] *Id.,* at § 24.4.

[28] *Id.,* at § 24.1.

[29] *Id.,* at § 24.3.

to Plaintiff under the collective bargaining agreement including but not limited to *immediate* medical attention,[30] hospitalization abroad at EPS' expense,[31] and medical care following repatriation.[32]

99.    EPS' failure to pay Plaintiff his entitled full compensation is a breach of their contractual obligations and constitutes a willful, arbitrary, capricious, and callous disregard for Claimant's contractual rights as a seaman.

### COUNT 5

### GENERAL MARITIME LAW PUNITIVE DAMAGE CLAIM FOR FAILURE TO PROVIDE PROMPT AND ADEQUATE *PRE-EXPOSURE* MEDICAL CARE BEFORE THE VESSEL ARRIVED AT GABON, AND FOLLOW-UP PROPHYLACTIC MEDICATION AFTER ITS ARRIVAL AT GABON

100.    Plaintiff adopts and re-alleges as if set forth hereafter *in extenso* the foregoing allegations of fact contained in Paragraphs 1 through 99.

101.    In accordance with the United States Supreme Court's decision in *Atlantic Sounding Co., Inc. v. Townsend,* 557 U.S. 404, 129 S. Ct. 2561, 174 L. Ed. 2d 382 (2009), EPS is liable in punitive damages for reason of its knowing and wilful failures to:

(**a**.)    Provide timely prophylactic anti-Malaria medication to Plaintiff beginning at least two (2) weeks *before* the vessel arrived in the Malaria risk zone at Gabon; and

(**b.**)    Provide continued prophylactic anti-Malaria medication to Plaintiff for four (4) weeks *after* the vessel arrived in the Malaria risk zone at Gabon**.**

---

[30]*Id.,* at § 21.1.

[31]*Id.,* at § 21.2.

[32]*Id.,* at § 21.3.

## COUNT 6

### GENERAL MARITIME LAW PUNITIVE DAMAGE CLAIM FOR FAILURE TO PROVIDE PROMPT AND ADEQUATE *POST-INFECTION* MEDICAL CARE

102. Plaintiff adopts and re-alleges as if set forth hereafter *in extenso* the foregoing allegations of fact contained in Paragraphs 1 through 101.

102. In accordance with the United States Supreme Court's decision in *Atlantic Sounding Co., Inc. v. Townsend,* 557 U.S. 404, 129 S. Ct. 2561, 174 L. Ed. 2d 382 (2009), EPS is liable in punitive damages for reason of its knowing and wilful failures to:

   **(a.)** Provide any medical care whatsoever to Plaintiff after the vessel departed Gabon and before it arrived at Brazil;

   **(b.)** Provide any medical care whatsoever to Plaintiff after the vessel arrived at Brazil;

   **(c.)** Medically evacuate Plaintiff to a more suitable medical facility; and

   **(d.)** Abandoning Plaintiff in Brazil without making any arrangements for his maintenance and his continued post-repatriation medical care.

## COUNT 7

### GENERAL MARITIME LAW PUNITIVE DAMAGE CLAIM FOR FAILURE TO PAY MAINTENANCE

103. Plaintiff adopts and re-alleges as if set forth hereafter *in extenso* the foregoing allegations of fact contained in Paragraphs 1 through 102.

104. In accordance with the United States Supreme Court's decision in *Atlantic Sounding Co., Inc. v. Townsend,* 557 U.S. 404, 129 S. Ct. 2561, 174 L. Ed. 2d 382 (2009), EPS is liable in punitive damages for reason of its knowing and wilful failure, despite repeated requests, to pay maintenance to the Plaintiff.

## COUNT 8

## GENERAL MARITIME LAW PUNITIVE DAMAGE CLAIM FOR
## WILLFUL MAINTENANCE OF AN UNSEAWORTHY CONDITION

105.   Plaintiff adopts and re-alleges as if set forth hereafter *in extenso* the foregoing allegations of

fact contained in Paragraphs 1 through 104.

106.   In *Batterton v. Dutra Group*, 880 F.3d 1089 (9th Cir.  2018) the U.S. Ninth Circuit expressly

disagreed with the U.S. Fifth Circuit's holding in *McBride v. Estis Well Service*, 768 F.3d

382 (5th Cir. 2014) (*en banc*) (a seaman may not recover punitive damages in connection

with a seaworthiness claim) by holding that a seaman <u>can</u> recover punitive damages in

connection with a seaworthiness claim.   On August 18, 2018, Dutra Group petitioned the

U.S. Supreme Court for a writ of certiorari[33] which proposes that the following question of

law be resolved:

> *"Whether punitive damages may be awarded to a Jones Act seaman in a*
> *personal injury suit alleging a breach of the general maritime duty to*
> *provide a sea-worthy vessel."*

107.   Plaintiff recognizes that the U.S. Fifth Circuit's *en banc* opinion *McBride* is still controlling

law in the Eastern District of Louisiana, but respectfully suggests that the U.S. Supreme

Court may heal the split in jurisprudence between the U.S. Fifth Circuit and the U.S. Ninth

Circuit by affirming *Batterton* and overruling *McBride.*

108.   Therefore, in an abundance of caution and in accordance with the United States Supreme

Court's decision in *Atlantic Sounding Co., Inc. v. Townsend,* 557 U.S. 404, 129 S. Ct. 2561,

174 L. Ed. 2d 382 (2009), Plaintiff alleges that EPS is liable in punitive damages for reason

---

[33]The case bears No. 18–266 on the Docket of the U.S. Supreme Court.

of its knowing and wilful failures to:

**(a.)**    Provide a sea-worthy vessel fit for its intended mission to Gabon by failing to provide Plaintiff with appropriate prophylactic anti-Malaria medication;

**(b.)**    Provide a sea-worthy vessel fit for its intended mission by ignoring Plaintiff's report to the 2nd Officer that the vessel's medical supplies did not include sufficient and necessary anti-Malaria medication; and

**(c.)**    Provide a sea-worthy vessel fit for its intended mission by assigning the 2nd Officer to "medical officer" duties when it was known that the 2nd Officer had no medical training, was incapable of discerning Plaintiff's developing Malaria symptoms, and was incapable of providing prompt and adequate medical care to Plaintiff.

## COUNT 9

### GENERAL MARITIME LAW PUNITIVE DAMAGE CLAIM
### FOR BREACH OF MARITIME CONTRACT

**109.**    Plaintiff adopts and re-alleges as if set forth hereafter *in extenso* the foregoing allegations of fact contained in Paragraphs 1 through 108.

**110.**    In accordance with the United States Supreme Court's decision in *Atlantic Sounding Co., Inc. v. Townsend,* 557 U.S. 404, 129 S. Ct. 2561, 174 L. Ed. 2d 382 (2009), EPS is liable in punitive damages for reason of its knowing and wilful breach of Section 24 of the governing TCC Collective Agreement.[34]

**111.**    Plaintiff suffered injury to his feet, which resulted in amputation and permanent disability while he was performing his contractual duties as an EPS employee in the service of M/V

---

[34]*Id.* at §§ 21 and 24.

STARGATE.

112.   Due to Plaintiff's inability to return to work aboard a vessel, he is entitled to the full

disability compensation provided under Section 24.3 of the collective bargaining Agreement.

This collective agreement *is a maritime contract*.  This amount due is one hundred and two

thousand, three hundred and eight dollars ($102,308.00) and is in addition to any other

damage claims Plaintiff may pursue and recover against EPS.

113.   On August 17, 2017, EPS' approved network physicians, Drs. Anand D. Kamat and

Narendra Kumar Pathak, reported that Plaintiff had a 20% to 30% permanent disability.[35]

114.   Section 24.1 of the TCC Collective Agreement contains the following mandatory language:

§24.1:  A seafarer who suffers permanent disability as a result of an accident whilst in the employment of the company regardless of fault, including accidents occurring while traveling to or from the ship, and whose ability to work as a seafarer is reduced as a result thereof, shall in addition to sick pay, be entitled to compensation according to the provisions of this Agreement.[36]

115.   Section 24.5 of the TCC Collective Agreement contains the following mandatory language:

§24.5:  Shipowners, in discharging their responsibilities to provide for safe and decent working conditions, should have effective arrangements for the payment of compensation for personal injury. When a valid claim arises, **payment should be made promptly and in full,** and there should be no pressure by the shipowner or by the representative of the insurers for a payment less than the contractual amount due under this

---

[35]*See* Exhibit "3", *supra.*

[36]*See* Exhibit "21".

> Agreement. Where the nature of the personal injury makes it difficult for the shipowner to make a full payment of the claim, consideration to be given to the payment of an interim amount so as to avoid undue hardship.[37] (Emphasis added.)

116.  Based on Drs. Kumat and Pathek's findings, EPS was and is  well-aware of Plaintiff's physical condition and his inability to return to his prior occupation of able body seafarer, yet it has done *nothing* to satisfy its contractual obligations.

### COUNT 10

### ATTORNEY FEE CLAIM

117.  Plaintiff adopts and re-alleges as if set forth hereafter *in extenso* the foregoing allegations of fact contained in Paragraphs 1 through 116.

118.  EPS failed to provide Plaintiff with maintenance and "cure".  This failure was an unreasonable, willful, arbitrary, capricious, and callous disregard of Plaintiff's rights as a seaman.  Because of EPS' misconduct, Plaintiff has had no alternative but to retain counsel to enforce his rights.

119.  In accordance with the United States Supreme Court's decision in *Atlantic Sounding Co., Inc. v. Townsend,* 557 U.S. 404, 129 S. Ct. 2561, 174 L. Ed. 2d 382 (2009), and because of its knowing and willful failure to provide "cure" as described above,  Plaintiff is entitled to an award of attorney's fees against EPS.

## VII. DAMAGES

120.  Plaintiff adopts and re-alleges as if set forth hereafter *in extenso* the foregoing allegations of

---

[37]*Id.*

fact contained in Paragraphs 1 through 119.

121.   As a direct result of EPS' negligent acts and/or omissions, and/or those of its employees and agents, the unseaworthiness of M/V STARGATE,[38] and EPS' failure to provide prompt and adequate "cure", Plaintiff has suffered damages as follows:

   **(a.)**   Past and future physical pain and suffering;

   **(b.)**   Past and future mental anguish and suffering;

   **(c.)**   Past and future permanent physical disability and disfigurement;

   **(d.)**   Past and future loss of earning capacity and/or income;

   **(e.)**   Past and future loss of enjoyment of life; and

   **(f.)**   Past and future costs of medical care and treatment.

## VIII. REQUEST FOR TRIAL BY JURY

122.   Pursuant to Fed. R. Civ. P. 38(a), the provisions of  46 U.S.C. § 30104, *et seq.*, Plaintiff requests trial by jury on his Jones Act claim, the joined General Maritime Law claims for seaworthiness and "cure", and the joined punitive damage claims arising under General Maritime Law.

## IX. PRAYER FOR RELIEF

123.   **WHEREFORE**, Plaintiff, Kholkar Vishveshwar Ganpat, prays:

That Eastern Pacific Shipping PTE, Ltd, d/b/a EPS be served with Summons and a copy of this Complaint for Damages and that it serve an answer thereto; that after due proceedings had, a Jury Trial, and the expiration of all legal delays, there be a final judgment entered

[38] *See* Exhibit "22".

holding EPS liable unto Plaintiff and awarding to him:

**(a.)**  General damages reasonable under these premises;

**(b.)**  Punitive damages for its willful and wanton failure to provide him with prompt and adequate *pre-exposure* prophylactic anti-Malaria medical care *before* M/V STARGATE sailed into the Gabon Malaria risk area and follow-up medication after the vessel's arrival at Gabon;

**(c.)**  Punitive damages for its willful and wanton failure to provide him with prompt and adequate medical care while aboard M/V STARGATE and *after* he reported symptoms of Malaria;

**(d.)**  Punitive damages for its willful and wanton failure to provide him with prompt and adequate *post-infection* medical care after he was hospitalized in Brazil and after he was repatriated to India;

**(e.)**  Punitive damages for its willful and wanton failure to pay maintenance and cure;

**(f.)**  Punitive damages for its willful and wanton maintenance of an unseaworthy vessel, including its officers and appurtenances;

**(g.)**  Punitive damages for its willful and wanton breach of its maritime disability benefits contract with him;

**(j.)**  Attorney's fees to him in connection with enforcing his General Maritime Law claims;

**(k.)**  Legal interest from date of judicial demand until all money awarded in a final judgment is fully paid;

**(l.)**  All costs allowed by Fed. R. Civ. P. 54(d)(1) and 28 U.S.C. § 1920; and

**(m.)**    Such other and further relief as the interests of justice may require.

Respectfully submitted,

*/s/ Richard M. Martin, Jr.*

Richard M. Martin, Jr., LA Bar #08998
Lamothe Law Firm, LLC
400 Poydras Street, Suite 1760
New Orleans, LA 70130
Telephone: (504) 704-1414
E-Mail: rmartin@lamothefirm.com
*Local Counsel for Plaintiff*

And:  Alejandro J. Gonzalez, TA, FL Bar # 015293
Quintairos, Prieto, Wood & Boyer, P.A.
9300 S. Dadeland Blvd. 4th Floor
Miami, FL 33156
Telephone: (305) 670-1101
E-Mail: agonzalez@qpwblaw.com
*Co-Counsel for Plaintiff*
(Admission *pro hac vice* pending)

Pedro P. Sotolongo, FL Bar #0584101
Sotolongo P.A.
44 West Flagler Street, Suite 1700
Miami, FL 33130
Telephone: (305) 415-0073
E-Mail: psotolongo@sotolongolaw.com
*Co-Counsel for Plaintiff*
(Admission *pro hac vice* pending)