# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| KHOLKAR VISHVESHWAR GANPAT,<br>   *Plaintiff,* | * | CIVIL ACTION |
| | * | |
| | * | NO.  18-13556 "E" (4) |
| VERSUS | * | |
| | * | JUDGE SUSIE MORGAN |
| EASTERN PACIFIC SHIPPING PTE. LTD., | * | |
| d/b/a "EPS", | * | CHIEF MAGISTRATE JUDGE |
|    *Defendant.* | * | KAREN WELLS ROBY |

**********************************************

**PLAINTIFF'S SUPPLEMENTAL RESPONSE TO EASTERN PACIFIC SHIPPING'S
MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST
PLAINTIFF'S JONES ACT CLAIMS AND TO STRIKE JURY DEMAND**

**MAY IT PLEASE THE COURT:**

## I.  INTRODUCTION

Kholkar Vishveshwar Ganpat ("Plaintiff") submits this supplemental response memorandum in opposition to Eastern Pacific Shipping Pte. Ltd.'s ("EPS") May 3, 2022 *"Motion for Partial Summary Judgment Against Plaintiff's Jones Act Claim and to Strike Jury Demand"*[1] because of information provided by EPS in its May 23, 2022 Answers[2] to Plaintiff's April 22, 2022 Interrogatories. This information - especially EPS' answer to Interrogatory No. 4 - bears directly on EPS' Jones Act-related motion for summary judgment and provides good and sufficient reasons why Your Honor should deny it.[3]

---

[1]See Rec. Doc. 277.

[2]See Exhibit 1.

[3]EPS' answers to interrogatories also affect the choice of law issue which the Court's January 31, 2022 Scheduling Order directed the parties to brief.  See Rec. Doc. 228 at p. 3.

## II.  EPS' ARGUMENT FOR PARTIAL SUMMARY JUDGMENT

EPS' Jones Act-related motion for partial summary judgment presents a rehash of its choice of law argument.  It goes as follows:

> "This Court should strike the Plaintiff' jury demand because his SEA[4] clearly chooses the law of Liberia. Under Title 21 of the Liberian Code of Laws of 1956, the law of Liberia incorporates the *nonstatutory* law of the United States. As such, under Liberian law, Plaintiff does not have a statutory Jones Act claim. Without the application of the Jones Act, there is no basis for Plaintiff' federal question jurisdiction."[5]

Thereafter, EPS argues that if the Jones Act does not apply, sand only non-statutory law applies, then the Jones Act's right to trial by jury on negligence claims and joined seaworthiness claims is lost.  For the reasons stated below, EPS is incorrect.

## III.  THE SUMMARY JUDGMENT STANDARD

EPS bears the initial burden of informing the Court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.[6]  It has not done so.[7]  Mr. Kholkar, however, has presented "specific facts showing there is a genuine issue for trial."[8]  In ruling on this summary judgment motion, Your Honor may not resolve

---

[4]The "SEA" is the December 22, 2016 Seafarer Employment Agreement between Plaintiff and Ventnor Navigation, Inc.

[5]See Rec. Doc. 277-1 at p. 6.

[6]*Celotex v. Catrett,* 106 S.Ct. 2548, 477 U.S 317 (1986).

[7]Most of EPS' "answers" to interrogatories are not really answers.  Instead, they are self-serving and unsupported suppositions about matters beyond the personal knowledge of Captain Singh.

[8]Fed. R. Civ. P. 56(e).

credibility issues or weigh evidence.[9]  This Court must assess the evidence, review the facts, and

draw any appropriate inferences based on the evidence *in the light most favorable to the party*

*opposing summary judgment*.[10]  Said differently, this Court must draw inferences in favor of Mr.

Kholkar "*when both parties have submitted evidence of contradictory facts.*"[11]  This Court must

assess the evidence, review the facts, and draw any appropriate inferences based on the evidence *in*

*the light most favorable to the party opposing summary judgment*.[12]

### III.  THE SEAFARERS EMPLOYMENT AGREEMENT CHOICE OF LAW PROVISION DOES NOT APPLY TO EPS

EPS' various pleadings systematically fait to recognize that the Seafarer Employment

Agreement ("SFA") applies *only* to disputes between Plaintiff and Ventnor Navigation, Inc., *because*

*they are the only parties to the Agreement*.  The SFA does not recognize much less create any third-

party rights or identify any third-party beneficiaries.   Indeed, the Court has already determined who

was a party to the SFA in a recent Order and Reasons:

> "The Court notes Eastern Pacific Singapore and EPS India allege in their filings in
> the Indian proceedings that there is a "contractual relationship" between Plaintiff and
> EPS India pursuant to the "Mumbai Employment Agreement." In reality, however,
> the  parties  to  that  agreement  are  Plaintiff  and  Ventnor  Navigation,  Inc.

---

[9]*Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008).

[10]*Tolan v. Cotton*, 572 U.S. 650, 656 (2014); *Daniels v. City of Arlington*, 246 F.3d 500, 502 (5th Cir. 2001).

[11]*Little v. Liquid Air Corp*., 37 F.3d 1069, 1075 (5th Cir. 1994) (citing *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888 (1990)).

[12]*Tolan v. Cotton*, 572 U.S. 650, 656 (2014); *Daniels v. City of Arlington*, 246 F.3d 500, 502 (5th Cir. 2001).

("Ventnor.")[13]

Plaintiff has alleged he was EPS' Jones Act employee.[14]   This material fact, asserted by the non-mover, is accepted as true for purposes of this motion.[15]   Because the SEA's provisions are not germane to this lawsuit between Plaintiff and EPS, the relevant factual inquiry instead becomes whether EPS' answers to interrogatories prove that Jones Act negligence occurred while the M/V STARGATE was present in Savannah.[16]

## IV. THE *RUIZ* FACTORS

Plaintiff's January 9, 2019 Declaration[17] shows that regardless of whether Ventnor was his *straw* Jones Act employer, a "borrowed employee" analysis under *Ruiz v. Shell Oil*[18] clearly establishes that EPS was his *actual* Jones Act employer for all times relevant.  In *Ruiz*, the Fifth Circuit set out nine factors which must be considered determining borrowed employee status:

---

[13]See the Court's April 5, 2022 Order and Reasons at pp. 4-5 (Rec. Doc. 265).  This document pre-dated EPS' May 3. 2022 motion for partial summary judgment by one month.

[14]See, *e.g.*, Rec. Doc. 1 at ¶ 81 ("Plaintiff was a Jones Act seaman and EPS was his Jones Act employer.").

[15]In ruling on a summary judgment motion, a court may not resolve credibility issues or weigh evidence. *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008).  The court must assess the evidence, review the facts, and draw any appropriate inferences based on the evidence *in the light most favorable to the party opposing summary judgment. Tolan v. Cotton*, 572 U.S. 650, 656 (2014); *Daniels v. City of Arlington*, 246 F.3d 500, 502 (5th Cir. 2001).Said differently, a court must draw inferences in favor of the non-movant "*when both parties have submitted evidence of contradictory facts.*" *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citing *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888 (1990)).

[16]Plaintiff suggests that this inquiry will also resolve the choice of law issue.

[17]Originally submitted as Rec. Doc. 27-1.  A copy is attached as Exhibit 2.

[18]*Ruiz v. Shell Oil*, 413 F.2d 310 (5th Cir. 1969).

1.      Who had control over the employee and the work he was performing, beyond mere suggestion of details or cooperation?

2.      Whose work was being performed?

3.      Was there an agreement, understanding or meeting of the minds between the original and borrowing employer?

4.      Did the employee acquiesce in the new work situation?

5.      Did the original employer terminate his relationship with the employee?

6.      Who furnished the tools and the place of performance?

7.      Was the new employment over a considerable length of time?

8.      Who had the right to discharge the employee? And,

9.      Who had the obligation to pay the employee?

The Plaintiff's Declaration, using the *Ruiz* factors, proves that he was Eastern Pacific's borrowed Jones Act employee at all relevant times, because:

1.      The Master and officers of M/V STARGATE, who reported to EPS, had exclusive direction and control over Plaintiff and the day-to-day work he performed aboard the vessel;

2.      The day-to-day work Plaintiff performed aboard M/V STARGATE related directly to its use by EPS as a bulk carrier;

3.      An agreement or understanding existed between Ventnor and EPS regarding control of Plaintiff's work aboard M/V STARGATE by the Master and Officers, as was set forth in Sections 6, 7, 20, and 21 of the SEA;

4.      An agreement or understanding existed between Ventnor and EPS regarding control of Plaintiff's work aboard M/V STARGATE by the Master and Officers, as was set forth in Sections 8, 9, and 10 of the Employer's Standard Terms;

5.      Plaintiff agreed-to and complied with the terms of his assignment as an Able Body Seaman aboard M/V STARGATE, and he worked during such hours and at such times as were ordered by the Master and his other superiors on board the vessel;

6.    Other than assist in placing Plaintiff aboard M/V STARGATE, Ventnor thereafter played no role and gave him no orders regarding the hours he worked or the tasks he performed aboard the vessel;

7.    EPS furnished Plaintiff's place to work aboard M/V STARGATE and provided all tools and equipment that he used in the performance of his assigned duties;

8.    Plaintiff was originally employed to serve as an Able Body Seaman for a period of seven (7) months, but EPS, through the Master of M/V STARGATE, had the right to terminate his employment. *See* § 20 of the SEA; and

9.    While serving aboard M/V STARGATE, Plaintiff's wages were paid by EPS.

None of the above facts, set forth in Plaintiff's January 2019 Declaration, has ever been refuted by EPS,

## V.  EPS OWN DISCOVERY RESPONSES PROVE THAT JONES ACT NEGLIGENCE OCCURRED AT SAVANNAH, GEORGIA

EPS' May 23, 2022 Answers to Interrogatories (especially No. 4) prove that Jones Act negligence occurred at Savannah, Georgia, which is not only fatal to its Jones Act-related motion for summary judgment but also would resolve the pending choice of law issue in favor of the application of U.S. law (*i.e.*, the Jones Act and the General Maritime Law).  In support of this contention, Plaintiff shows the Court the following facts which were established by EPS itself in its six-page answer to Interrogatory No. 4:[19]

*    "The Master, Teodor Nicolae Ivanoschi, joined M/V STARGATE in Savannah on April 4, 2017."[20]

_____

[19]EPS' answer to Interrogatory No. 1 identifies Director and Fleet Captain Anil Singh as the person providing the answers to interrogatories.  His knowledge is second hand with regard to the answer to Interrogatory No. 4.

[20]Exhibit 1, ¶ 4, at p. 5.

\*      "Upon joining the M/V STARGATE, the Master, Mr. Ivanoschi, met with the departing Master who mentioned that the Medical Chest Certificate was up for renewal and that he had made a request with EPS to be sent a new one *while the Vessel was in Savannah.*"[21]

\*      ***"The Master never saw the email dated March 29, 2017 with provisional instructions for loading in Colombia and discharge in Gabon***, and this was not mentioned by his predecessor during the handover meeting."[22]

\*      "The Vessel's Medical Chest Certificate is valid for a year and must be renewed."[23]

\*      "The standard process for renewal would be a few months prior to the certificate's expiration, the Second Officer prepares a full inventory of the chest's medical supplies."[24]

\*      "An Excel file of the inventory is then sent directly *to EPS' medical suppliers*."[25]

\*      "The medical suppliers would then go through the Vessel's inventory and compare it with the flag state's list of mandatory drugs and replace any missing/expired items."[26]

\*      "Should additional medical supplies be required, requisitions can be made

---

[21]*Id*.  Captain Ivanoschi joined the vessel on April 4, 2017.  The vessel sailed on April 7, 2017.  This gave Captain Ivanoschi several days to check all critical "turnover" items.

[22]*Id.*

[23]*Id.*

[24]*Id.*  See Rec. Doc. 1 at ¶ 24 (**"**While M/V STARGATE was at Savannah, Georgia, its last U.S. port of call, Plaintiff was ordered by 2nd Officer German to take an inventory of the vessel's medical supplies.")

[25]*Id.*  Plaintiff invites the Court's attention to the critical words *"to EPS' medical suppliers"* because these words prove that EPS was responsible for procuring the anti-Malaria drugs and not Ventnor or some other third-party.

[26]*Id.*

through the Vessel's computerized requisition system."[27]

* "In that case, again, the request would go straight to the medical suppliers and remain on the Vessel's system as pending until the request is completed/delivered."[28]

* "Captain Ivanoschi did not make the requisition for the Mefloquine tablets ordered on the Vessel's system on the 28th of March, so this was likely done by his predecessor."[29]

* "According to the Master, *the requisition still appeared as "pending" on the Vessel's system* when he left the Vessel at the end of his contract." [30]

* "Mefloquine is just one type of the anti-malarial drugs that was available on board and the Vessel would typically have various options."[31]

* "Delivery of the updated medical chest was scheduled during the Vessel's call in Savannah, however, *no medical supplies reached the M/V STARGATE*."[32]

* "Gulf Marine, the Vessel's suppliers attended the Vessel at about 2000 hours on April 7th (the night before the Vessel's departure) to deliver some supplies."[33]

---

[27]*Id.*  Insofar as Ventnor is likely just a mailbox in Monrovia, Liberia, EPS likely maintains this computer system.  Plaintiff will inquire at forthcoming depositions.

[28]*Id.*

[29]*Id.*  If Mefloquine tablets were ordered on March 28, 2017, this statement represents EPS' recognition of the need to have this medicine available aboard the vessel.

[30]*Id.*  This establishes that the departing captain passed the unresolved anti-Malaria medicine problem to Captain Ivanoschi.

[31]*Id.*  Why hasn't EPS identified what was onboard?  Was Mefloquine the only missing drug?  Or were Atovaquone-proguanil, Doxycycline,  or Tafenoquine also missing?  If anti-Malaria medicine was available, why did Captain Ivanoschi urge his crew to drink tonic water?

[32]*Id.* at p. 7.  This is a clear admission of fault and probably vessel unseaworthiness.

[33]*Id.*  This also seems to contradict EPS' position that it did not deal directly to local suppliers.

\*     *"The Master realized at this point that neither the medical chest nor the additional anti-malarial drugs had been delivered."*[34]

\*     *"The Master reported this to EPS* and there were still enough medical supplies onboard the Vessel including anti-malarials to reach Gabon."[35]

\*     "The M/V STARGATE left Savannah on April 8[th] and arrived at Barranquilla, Colombia for loading on 11[th] April."[36]

\*     *"The Master repeatedly advised the crew about the risks of malaria when sailing in West African countries* and made sure that insect repellent was readily available to the crew."[37]

\*     *"The Master remembers clearly that each time he went to the Mess Room he repeatedly told crew members to use insect repellent while also reminding the crew of basic prevention steps and to spread the message among other crew."*[38]

\*     "Prior to leaving Savannah, the Master had supplies of tonic water, which contains quinine which helps fighting malaria."[39]

The foregoing excerpts from EPS' answer to Interrogatory No. 4 shows, consistent with Plaintiff's original complaint, that actionable negligence occurred in Savannah, Georgia, before the M/V STARGATE sailed.   They also show that while unseaworthiness can be actionable even if it

---

[34]*Id.*  This failure to have the required medicine aboard rendered the M/V STARGATE unseaworthy.  See, *e.g.*, *Stiward v. U.S.*, 551 F.Supp.2d 478 (E.D. La. 2008).

[35]*Id.*  EPS fails to identify these anti-Malaria medicines and did not produce the report. Further having a supply of medicine sufficient only to "reach" Gabon is not enough.  Anti-malaria medication must be administered at Gabon and for at least two weeks after departure.

[36]*Id.*  There is no mention of any anti-Malaria drugs being brought aboard at this port.

[37]*Id.*  If the crew was cautioned, there was a recognized Malaria risk.

[38]*Id.*  If the crew was advised how to avoid malaria infection, there was a risk.

[39]*Id.* Is EPS trying to say that Captain Ivanoschi had tonic water delivered?  Why?

is unknown,[40] here the Captain and Second Officer were *actually aware* of the problem with the missing anti-Malaria drugs because this problem was *reported to EPS.*[41]

EPS' answer to Interrogatory No. 4 also departs from objective reality and its own prior practice of carefully documenting the administration of anti-Malaria dugs.[42]   First, EPS states that "there were still enough medical supplies onboard the Vessel including anti-malarials to reach Gabon."   If that was true, why wasn't the administration of those "still enough onboard" anti-Malaria medication carefully documented in the same manner as the vessel's preceding voyage to Abidjan, Ivory Coast, in March/April 2017?[43]  Why wasn't the administration also recorded in the vessel's medical log, as was the case with the preceding voyage?[44]

With regard to the Ivory Coast voyage (just over one month before the Gabon voyage), Exhibits 3 and 4 show that Plaintiff (and the rest of the entire 21 person crew) were given anti-Malaria medication during the weeks of January 21, 2017, January 28, 2017, February 4, 2017, February 11, 2017, February 18, 2017, February 25, 2017, April 3, 2017, April 11, 2017, and April

---

[40]Unseaworthiness requires only that a condition of the vessel makes it unreasonably risky; there is no requirement that the vessel owner knew or should have known about the condition.  *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 549 (1960).  The duty to provide a seaworthy vessel is completely independent of the duty under the Jones Act to exercise reasonable care.  *Johnson v. Offshore Express, Inc.,* 845 F.2d 1347, 1354 (5th Cir. 1988).

[41]The vessel manager/operator, EPS, thus had actual knowledge of the medical problem.

[42]Ivory Coast, just like Gabon, is a severe Malaria risk area for the most virulent form *Plasmodium falciparum*.

[43]See Exhibits 3 and 4 (Rec. Doc. 213-4 at pp. 76 and 77 of 77) which show that in connection with the M/V STARGATE's port call at the Ivory Coast, the administration of anti-Malaria medicine was carefully recorded on its own special form.

[44]See Exhibits 5 and 6 (Rec. Doc. 213-5 at pp. 1 and 1 of 114) which show that for the Ivory Coast port call this same information was recorded a second time in the vessel's medical log (Exhibits 5 and 6 are each one-half of a larger sheet).

18, 2017.  That's eight weeks in a row!

Despite this fastidious recording of anti-Malaria drug administration (which even included

crew member signatures), an abrupt "about face" was made before and during the Gabon voyage and

port visit.   In its answer to Interrogatory No,. 4, EPS made these further representations:

* ***The Second Officer kept a weekly log of the anti-malarial pills***, but it is
still very difficult for the officers to know which crew member had, or
had not, taken the pills as they may sign the log but spit out the pill
afterwards.[45]

* Due to the unseasonably dry and cool weather in Gabon at the time, local
agents advised that the risk of malaria was low.[46]

* Anti-malarial pills were therefore not required to be distributed during the
voyage to Gabon.[47]

* Neither the Plaintiff nor any other crew requested anti-malarials.[48]

### VI.  CONCLUSION

EPS admits *"Delivery of the updated medical chest was scheduled during the Vessel's call*

*in Savannah, however, no medical supplies reached the M/V STARGATE."*  However this lapse is

described - negligence, carelessness, inattention to detail, breach of maritime duty - it occurred while

the vessel was still in Savannah.  This constitutes Jones Act negligence and also proves the vessel

---

[45]Id. at p. 8.  Where are the medical logs and medicine administration summary pages
EPS claims was kept by the Second Officer?  The relevant entries would be dated April and May
2017.

[46]Id.  What is "low" in an endemic Malaria risk zone?  How does this qualify as
professional medical advice? In what HSE manual is EPS "low risk" Malaria policy set forth?

[47]Id.  Why would a record of medicine administration be kept if administration

[48]This is a falsehood.  See the Complaint, Rec. Doc. 1 at  ¶ 28 ("Plaintiff specifically
requested, but was not given, a course of prophylactic anti-Malaria medication either before or
after the vessel's arrival at Gabon.")

was unseaworthy before departing Savannah.  EPS, as reported to it by M/V STARGATE's Master,

had *actual knowledge* of this matter.  Therefore, EPS' motion for summary judgment should be

denied.

Respectfully submitted,

*/s/ Richard M. Martin, Jr.*
Richard M. Martin, Jr., LA Bar #08998
Lamothe Law Firm, LLC
400 Poydras Street, Suite 1760
New Orleans, LA 70130
Telephone: (504) 704-1414
E-Mail: rmartin@lamothefirm.com

And:  */s/ Alejandro J. Gonzalez*
Alejandro J. Gonzalez, FL Bar #015293
Law Office of Alejandro J. Gonzalez
199 E. Flagler Street, Suite 610
Miami, FL 33131
Telephone: (877) 413-4448
E-Mail: alex@agonzalezlaw.com
*Counsel for Plaintiff pro hac vice*

*/s/ Pedro P. Sotolongo*
Pedro P. Sotolongo, FL Bar #0584101
SOTOLONGO, P.A.
1000 5th Street
Suite 402
Miami Beach, FL 33139
Telephone: (305) 415-0073
E-Mail: psotolongo@sotolongolaw.colm
*Co-counsel for Plaintiff, pro hac vice*

**<u>CERTIFICATE OF SERVICE</u>**

**I HEREBY CERTIFY** that a copy of the above and foregoing pleading has this day been forwarded to the following counsel of record to this proceeding by electronic transmission, facsimile and/or by depositing same in the United States Postal Service, properly addressed and postage prepaid, this 6th day of June, 2022.

*/s/ Richard M. Martin, Jr.*
RICHARD M. MARTIN JR.