## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| VISHVESHWAR GANPAT KHOLKAR, | * | CIVIL ACTION |
| *Plaintiff*, | * | |
| | * | NO. 18-13556 SM-KWR |
| | * | |
| VERSUS | * | |
| | * | JUDGE SUSIE MORGAN |
| EASTERN PACIFIC SHIPPING PTE. LTD., | * | |
| d/b/a/ "EPS," | | |
| | * | MAG.JUDGE KAREN WELLSROBY |
| *Defendant*. | * | |

**************************************

## PLAINTIFF'S MOTION *IN LIMINE* TO EXCLUDE TRIAL TESTIMONY AND EXPERT REPORT OF SANDRA MICHEL, PSYD., PLLC

**COMES NOW**, Plaintiff, VISHVESHWAR GANPAT KHOLKAR ("Plaintiff"), by and through undersigned counsel, and pursuant to Fed. R. Evid. 403, and/or principles set forth in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), hereby moves this Honorable Court for an order excluding the trial testimony and expert report of Defendant's expert witness, Sandra Michel, PsyD., PLLC, as fully set forth in the attached Memorandum in Support.

Respectfully submitted this 30th day of September 2022.

1

Respectfully Submitted,


*/s/ Richard M. Martin, Jr.*
**Richard M. Martin, Jr. LA Bar #08998**
LAMOTHE LAW FIRM, LLC
400 Poydras Street
Suite 1760
New Orleans, Louisiana 70130
Telephone: (504) 704-1414
E-Mail: rmartin@lamothefirm.com
*Local Counsel for Plaintiff*

*/s/ Alejandro J. Gonzalez*
Alejandro J. Gonzalez, FL Bar # 015293
GONZALEZ, P.A.
19 South Krome Ave.
Homestead, FL 33030
Telephone: (786) 429-1511
E-Mail: alex@agonzalezlaw.com
*Co-Counsel for Plaintiff, pro hac vice*

*/s/ Pedro P. Sotolongo*
Pedro P. Sotolongo, FL Bar #0584101
SOTOLONGO, P.A.
1000 5th Street
Suite 402
Miami Beach, FL 33139
Telephone: (305) 415-0073
E-Mail: psotolongo@sotolongolaw.colm
*Co-counsel for Plaintiff, pro hac vice*

2

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the above and foregoing pleading has this day been forwarded to counsel of record to this proceeding by electronic transmission, facsimile and/or by depositing same in the U.S. Postal Service, properly addressed and postage prepaid, this September 30, 2022.

*/s/ Alejandro J. Gonzalez*
Alejandro J. Gonzalez, FL Bar # 015293

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| VISHVESHWAR GANPAT KHOLKAR, | * | CIVIL ACTION |
| *Plaintiff*, | * | |
| | * | NO. 18-13556 SM-KWR |
| | * | |
| VERSUS | * | |
| | * | JUDGE SUSIE MORGAN |
| EASTERN PACIFIC SHIPPING PTE. LTD., | * | |
| d/b/a/ "EPS," | | |
| | * | MAG.JUDGE KAREN WELLSROBY |
| *Defendant*. | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION *IN LIMINE* TO EXCLUDE TRIAL TESTIMONY AND EXPERT REPORT OF SANDRA MICHEL, PSYD., PLLC

Plaintiff, VISHVESHWAR GANPAT KHOLKAR, ("Plaintiff") respectfully submits this Memorandum in Support of its Motion *in Limine* to Exclude Trial Testimony and Expert Report of Sandra Michel, PsyD., PLLC. For reasons set forth below, the Court should grant Plaintiff's Motion and preclude Defendant, EPS' psychological expert, Sandra Michel ("Michel") from offering any expert opinions, or testimony of purported "*malingering,*" and/or opinions, or testimony related to the results of the August 2, 2022 tests[1] Ms. Michel administered in her telehealth evaluation over the course of 4 hours and 30 minutes.

## RELEVANT FACTS

Plaintiff was/is a resident of India and in 2017 was employed as an Able Body Seaman for Defendant, EPS aboard the M/V STARGATE.[2] In 2017, Plaintiff endured a traumatic incident

---

[1] The purported administrative tests include, but not limited to, Morel Emotional Numbing Test for PTSD (MENT), Inventory of Problems-29 (IOP-29), and the Structured Inventory of Malingering Symptomatology (SIMS).

[2] *See*, Pltf's Complaint [R. Doc. 1 ¶¶ 5-9].

while under EPS' employ, which included severe fever, chills, severe weakness and had believed that he was not going to survive the voyage or see his unborn daughter.[3] Plaintiff regained consciousness to find himself in Brazil, only to witness his toes turn black, and rot away, eventually requiring the amputation of eight (8) toes.[4]   After a difficult 76 day recovery, alone in Brazil, Plaintiff returned home only to be informed by EPS that he was on his own to address the infections in the remain toes.[5] Plaintiff filed this lawsuit, and months later, EPS, EPS India, and its agents, threatened Plaintiff to abandon his lawsuit or face criminal charges.   At one point, EPS succeed in its mission and the Plaintiff was incarcerated in a prison (exposed to mosquitos).[6] For years, Plaintiff lived with the real possibility of returning to prison proximately caused by EPS behavior. (Interestingly, Plaintiff's experiences in prison and years of threats that he was to return to prison, was not considered by Defendant's expert as traumatic events.)

Charles R. Figley, Ph.D, noted in his July 5, 2022 Report of Expert Trauma Psychology Opinion, that Plaintiff underwent a psychological evaluation. Pursuant to Dr. Figley, the Plaintiff met diagnostic criteria for "<u>PTSD, acute and chronic anxiety, a sleep disorder and Generalized Anxiety Disorder</u>".[7]

Subsequently, Defendant retained Michel to serve as its expert, in attempts to refute Dr. Figley's above referenced findings. On August 2, 2022, Michel administered tests and issued a

---

[3] *See, Id.*¶¶ 31-33, 35, 38, 41.
[4] *See, Id.*¶¶ 40, 43.
[5] *See, Id.*¶¶ 45,46.
[6] Plaintiff testified of his traumatic incidents in prison and continued threats of returning to jail during his deposition and before the Court during the evidentiary hearing.
[7] *See*, Exhibit A, August 6, 2022, Expert Report of Sandra Michel, p. 8.

written report containing her proposed opinions in this case.[8] In her report, Michel lays out twelve (12) different opinions in the form of answers to questions posed by Defendant, EPS.[9]

Michel's opinions are as follows:

Opinion 1: Mr. Kholkar's ***response pattern*** on administered test is evidence of invalid responding and overreporting, therefore no PTSD. [10]

Opinion 2: Mr. Kholkar's ***self-reporting was unreliable***, therefore no other psychological or emotional condition. [11]

Opinion 3: Mr. Kholkar does not have a psychological or emotional condition caused by malarial infection and complications.[12]

Opinion 4: Mr. Kholkar has no need for treatment because no psychological or emotional condition.[13]

Opinion 5: Mr. Kholkar can return to full-duty as a seafarer.[14]

Opinion 6: Work restrictions is not applicable as Mr. Kholkar does not have a psychological or emotional condition.[15]

---

[8] *See*, *Id.*

[9] *See*, *Id.*

[10] Opinion 1: Mr. Kholkar's "response pattern on the IOP-29 and IOP-M indicate invalid responding, inadequate effort, and over-reporting of psychopathology... [and his] SIMS responses was above the suggested cutoff score. Thus, rendering the entirety of his response profile invalid and reflective of malingered psychology...he does not satisfy criteria for PTSD. *See*, Exhibit A, p. 12-13. These are conclusory statements that are not supported by the gold standard of PTSD tests PCL-5 as referenced below.

[11] Opinion 2: Mr. Kholkar's "self-report was judged to be unreliable...this makes it difficult, if not impossible, to validly interpret his other scores or to consider his self-report to be reliable...Insufficient evidence to support a reliable diagnosis of any psychological/emotional condition." *See*, *Id.*, p. 14.

[12] *See*, *Id.*

[13] *See*, *Id.*

[14] *See*, *Id.*

[15] *See*, *Id, p. 15.*

<u>Opinion 7</u>: MMI determination is not applicable as Mr. Kholkar does not have an psychological or emotional condition.[16]

<u>Opinion 9</u>: Prognosis of a full recovery is not applicable as Mr. Kholkar does not have a psychological or emotional condition.

• Michel without any authority and well-beyond her specialty opines that "<u>the onset of physical disability is not necessarily a reduction of quality of life</u>." (Michel cites only "***research***" on the onset of a physical disability is not a reduction in the quality of life "with ongoing social support").[17]

<u>Opinion 10</u>: Mr. Kholkar exhibited signs of malingering (Michel again cites to Mr. Kholkar's ***response pattern*** and  ***"research"***)."[18]

• Michel without any authority and well-beyond her specialty opines that "<u>Research currently suggests that PTSD has become a common nexus for civil litigation, primarily because diagnostic criteria is heavily based on subjective and self-reported complaints, which makes the possibility of malingering much more likely</u>."[19]

---

[16] Michel's Opinion 8 of when MMI is projected, is duplicative of Opinion 7. *See*, *Id.*

[17] <u>Opinion 9</u>: Cites to "research" without any specification or even citing any authority. Michel's opinions as to the prognosis of a full recovery and opinion regarding physical disability not necessarily a reduction of the quality of life, and certainly does not account for the quality of life in Goa, India or the social support available in Goa, India. Michel's opinion is a conclusory statement and a legal argument under the disguise of an expert opinion. Certainly, Michel's opinion should be struck. *See*, *Id.*

[18] Michel's opinion is once again based on "Mr. Kholkar's ***response pattern*** on the various aforementioned measure was suggestive of feigned symptoms and intentional overreporting…his results should be deemed an invalid representation of his emotional, behavioral, and cognitive functioning. Specifically, Michel once again relies on Mr. Kholkar's response pattern on "IOP-29, IOP-M and SIMS" which she asserts invalidates all of his responses and is evidence of over-reporting. *See*, *Id, p. 15-16.*

[19] Michel's Opinion 10 once again cites to "***research***" as a basis for attempting to enter a conclusory statement and a legal argument under the disguise of an expert opinion. Certainly, Michel's opinion should be struck.

Opinion 11: Mr. Kholkar's desire to obtain medical treatment is not applicable as Mr. Kholkar does not have a psychological or emotional condition.[20]

Opinion 12: Mr. Kholkar has a "***secondary gain***" in that he has filed a lawsuit. "[I]t is my opinion that he has intentionally produced false or grossly exaggerated psychological symptoms in an effort to receive financial compensation."[21]

The most objectionable of those opinions are Michel's Opinions 1-5, 9-10, and 12. Michel's subjective interpretations of "*Mr. Kholkar's response pattern*" to certain questions without any consideration for the effect of cultural bias is misleading, speculative and as best characterized as pure conjecture. Moreover, Michel's subjective interpretations of Mr. Kholkar's response pattern, without any consideration of other factors (such as the presence of third parties, language barriers, cultural differences, etc.) further confirms the insufficiencies of the data and methods relied by Defendant's expert. Michel's subjective interpretations of Plaintiff's proper not a basis for the above referenced opinions, specifically Michel's "opinion" that Plaintiff's responses exhibited malingering behavior.

In essence, when EPS hired Michel it with the clear objective that Michel find that the Plaintiff is "***malingering***".[22] To accomplish this task, Michel intentionally disregarded reliable psychometric instruments (*i.e.*, PCL-5 and TSI-2), and focus on unreliable testing results (*i.e.*, IOP-29). She also utilized subjective interpretations of Mr. Kholkar's responses within these unreliable tests; while in tandem ignoring and/or accounting for (or even quantifying) the effect of the interpreter's influence throughout the testing process. To manufacture a basis for her opinions,

---

[20]

[21] Michel's opinion is once again based on the same proposed observations.

[22] Malingering, as defined in the DSM-5, is the intentional production of false or grossly exaggerated psychological symptoms, motivated by external incentives. *See*, Exhibit A, p. 16.

Michel intentionally ignored the clear linguistic and cultural discrepancies in play when administering the psychometric instruments.

In her unsubstantiated attempts to develop Opinions 1-5, 9-10 and 12, Michel exhibited a complete lack of cultural insensitivity throughout her four (4) hour and thirty (30) minute examination. Nonetheless, Michel suggests throughout her report, that Plaintiff's purported malingering behavior is attributed to his pending litigation and the potential financial compensation derived from said litigation. Michel essentially purports that every plaintiff in litigation is a malingerer.   Michel's deposition was taken on September 21, 2022.[23] During that deposition, Michel admitted that she received financial compensation (or financial gain) from Defendant, in the amount of $14,300.00 for her services as an expert.

> **Q. And then you are accusing Mr. Kholkar of malingering. So my question to you is what is your definition of malingering from a – as a psychologist?**
>
> **A. Sure. So malingering is defined as an individual who produces false or grossly exaggerated psychological or physical symptoms in order to achieve a certain reward or to evade something that's not favorable, so in this situation and civil litigation situations, its mostly for a larger incentive, such as financing…**
>
> **Q. You would agree with that having earned $14,300 in this case so far is an financial gain on your part, right?**
>
> **A. It is —**

Plaintiff contends that Michel grossly exaggerated psychological symptomatology in order to achieve the Defendant's objective of accusing Mr. Kholkar of malingering. Also, during

---

[23] *See*, Exhibit C, September 21, 2022, Deposition of Sandra Michel.

Michel's deposition, her intentional utilization of cultural bias against her assessment of the Plaintiff was apparent.   By way of example, Michel refused to consider Plaintiff's experiences in prison (at Defendant's instruction) in her assessment for PTSD or any psychological condition because during the examination, Plaintiff described the event as "*terrible*" rather than state that it was a "*traumatic*" event. Michel's failure to explore or consider that data (on the basis of semantics) in of itself is sufficient to question Michel's data and methodology in formulating her opinions.

Michel's unrelenting and rigid interpretation of Plaintiff's descriptive language further underscores the validity of her opinions. As Michel admits, she never considered Plaintiff's traumatic experiences of being placed in prison by EPS because of Plaintiff's use of the word "*terrible*".

> **Q.   "It was terrible. And he stayed with the criminals", "and endured deplorable conditions," and then you put in parenthesis, "example, a dirty and small jail cell, presence of mosquitos." Did I read that correct?**
>
> **A. That's correct.**
>
> **Q.  So he told you that was a terrible experience for him.  Why? Because he was put with criminals, because he had fear of mosquitos, and he was put in a dirty cell with other prisoners. And you didn't think that was import to include in page 3 under the "other events"?**
>
> **A. He didn't identify that as a traumatic event.**

***

**Q. Did you flush that out to see if he believed that that was one of the --- one**

**of the things that contributed to his symptoms also? Did you flush that out?**

**A. He didn't report it was one, so it was not included.**

**Q. He reported it as being "terrible", right?**

**A. Correct.**[24]

Michel's questionable principles and methods in her interpretations of Plaintiff's verbal responses are the sole basis for the above referenced opinions, including opinion 12 (*i.e., "*grossly exaggerated psychological symptoms"). Michel specifically testified that she rigidly interpreted Plaintiff's verbal responses by solely comparing his responses to American populations utilizing American "***normative sample.***" Here, Michel confirmed that Plaintiff's responses compared to these "normative samples" was the foundation of her opinion that Plaintiff is malingering.

**Q. I understand that.**

**A. So his response are compared to the <u>normative sample</u>; and so the**

**symptoms, the results I received, placed him in a non-credible presentation.**

[25]

<u>STANDARDS GOVERNING THE ADMISSIBILITY OF EXPERT TESTIMONY</u>

The general rule governing the admissibility of expert witness testimony is set forth in Rule 702 of the Federal Rules of Evidence, which reads as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge

---

[24] *See*, Exhibit C, 60:6-61:1.
[25] *See*, Exhibit C, 94:2-6.

will help the trier of fact to understand the evidence or to
determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to
the facts of the case.[15]

In *Daubert v. Merrell Dow Pharmaceuticals, Inc*., the Supreme Court explained that Rule 702 imposes a "gatekeeping" obligation on district courts to ensure that expert testimony is "not only relevant, but [also] reliable" in order to be admitted into evidence.[16]   The overriding objective of this gatekeeping role is to ensure that an expert witness "employs in the courtroom the same  level of intellectual rigor that characterizes the practice of an expert in the relevant field."[17]   Such scrutiny is required because "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it."[18]

Fed. R. Evid. 403 states as follows:

"The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

Plaintiff respectfully suggests that Michel's opinions fall squarely within the scope of Rule 403 because, being based upon shockingly partial information, they will cause unfair prejudice, and they will also confuse and mislead the jury.  In articulating the applicability and scope of Rule 403, the United States Court of Appeals for the Fifth Circuit has acknowledged:

Relevant evidence is inherently prejudicial; but it is only [u]nfair prejudice, [s]ubstantially outweighing probative value, which permits exclusion of relevant matter under Rule 403. Unless trials are to be conducted on scenarios, on unreal facts tailored and sanitized for the occasion, the application of Rule 403 must be cautious and sparing. Its major function is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect. As to such, Rule 403 is meant to relax the iron rule of relevance, to permit

the trial judge to preserve the fairness of the proceedings by exclusion despite its relevance. It is not designed to permit the court to "even out" the weight of the evidence, to mitigate a crime, or to make a contest where there is little or none.[5]

Here, however, Michel's opinions should be excluded under Rule 403.

### A. <u>Daubert v. Merrell Dow Pharmaceuticals</u>

Michel's opinions should also be excluded under *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) because the paucity of their underlying information makes them unreliable.  In *Daubert*, the United States Supreme Court examined the admissibility of new techniques as a basis for expert *scientific* testimony. *Daubert* requires the trial court to act in a gatekeeping function to "ensure that any and all *scientific testimony or evidence* admitted is not only relevant, but reliable." *Id.,* 509 U.S. at 589, 113 S.Ct. at 2795. (Emphasis added)

This requirement stems from a belief that the rules on expert testimony serve to relax "the usual requirement of first-hand knowledge" to ensure reliability on the part of a witness. This relaxation is justified so long as "the expert's opinion (has) a reliable basis in the knowledge and experience of his discipline." *Daubert,* 509 U.S. at 590, 113 S.Ct. at 2796.

The reliability of expert testimony is to be ensured by a requirement that there be "a valid scientific connection to the pertinent inquiry as a precondition to admissibility." This connection is to be examined in light of "a preliminary assessment" by the trial court "of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether the reasoning or methodology properly can be applied to the facts in issue." *Id*.

Said differently, the Court must determine whether Michel's exclusive reliance on Plaintiff's purported pattern of responses and ignoring other reliable administered tests is

scientifically invalid methodology. Obviously, this is not a "hard science" case. Thus, many of *Daubert's* normal inquiries are inapplicable, *i.e*., whether or not a technique had been subjected to peer review and/or publication, whether there is a "known or potential rate of error," whether there exist "standards controlling the technique's operation," whether the technique is "refutable" or, whether the technique has general acceptance in the scientific community. *Id.*

Here, within the context of this *Daubert* motion, the Court should ask the Defendants how Michel's opinions pass *Daubert* muster despite the myriad of discrepancies referenced herein. Other rules of evidence govern expert testimony, namely, the balancing test of Fed. Evid. 403, which excludes probative evidence if outweighed by its potential for unfair prejudice. Because there is a possibility that the expert's testimony can be quite misleading and prejudicial if this gate-keeping role is not properly satisfied, a flexible approach and a careful evaluation of the methodology surrounding the testimony and its conclusions is required. *See, Daubert,* 509 U.S. at 590, 113 S.Ct. at 2797.

In *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the U.S. Supreme Court held that *Daubert's* general "gatekeeping" obligation "applies not only to testimony based on `scientific' knowledge, but also to testimony based on `technical' and `other specialized' knowledge." The Court further held that the trial court may consider one or more of the four *Daubert* factors, but that the list of factors "neither necessarily nor exclusively applies to all experts or in every case." *Kumho*, 119 S.Ct. at 1171.

In order for the testimony to be admissible, all three components of Fed. R. Evid. 702's reliability analysis must be met. *See, e.g., Amorgianos v. National R.R. Passenger Corp*., 303

11

F.3d 256, 267 (2d Cir.2002) ("The reliability analysis applies to all aspects of the expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion.") (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir.1994)).

An expert's testimony must be held inadmissible if "there is simply too great an analytical gap between the data and the opinion proffered," such that the opinion is "connected to the existing data only by the ipse dixit of the expert." *Amorgianos*, 303 F.3d at 266 (quoting *General Electric Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)); *see also Mancuso v. Consolidated Edison Co. of New York, Inc.*, 967 F.Supp. 1437, 1441 (S.D.N.Y.1997) That's exactly what we have here, an "analytical gap" in Michel's opinions caused by the factors referenced above, including: Michel's enumerated opinions (1-12) where are derived from unreliable psychometric instruments and/or unreliable psychometric instrument results which are not:

(a) normed for the Indian population, rather the American population and cultural normal.

(b) administered with the aid of an interpreter,

(c) administered in the presence of a third-party,

(d) reliance on IOP-29 (deemed unreliable to confirm malingering)[26]

(e) reliance on SIMS (the cutoff score has been called into question)[27]

---

[26] IOP-29: ("Inventory of Problems -29") Tested without 2,000 individuals – half bona fided patents and half experimental feigners. Calculates the probability of coming from one of these two groups. IOP-29 was not normed with the Indian populous or for Hindi culture. *See*, Dr. Charles Figley's Supplemental Review of Psychometric Instruments, Exhibit B. IOP-29 "cannot be relied upon to confirm malingering." *See, Id.*

[27] SIMS: ("Structured Inventory of Malingered Symptomology") is not a stand-alone or independent assessment tool to determine detection of feigned or exaggerated psychiatric disturbance. *See, Id.*

(f) intentionally disregarding the results of her administration of PTSD Checklist for DSM-5 ("PCL-5") which score confirms the diagnosis of PTSD.  PCL-5 is the industry gold standard for diagnosing PTSD[28].

(g) intentionally disregarding the results of her administration of the TSI-2[29] test, which score confirms the diagnosis of PTSD.

(h) methology in reaching opinions for disregarding the results of PCL-5 and TSI-2 testing confirming the diagnosis of PTSD is without merit.

"[E]xpert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison." *Boucher v. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996). Michel's opinions as set forth in her report and deposition should be excluded under Fed. R. Evid. 403 and because they are wholly unreliable under *Daubert.*  For the same reasons, Michel should also be barred from offering these opinions at trial.

Respectfully submitted this 30th day of September, 2022.

---

[28] PCL-5: ("PTSD Checklist for DSM-5") *See, Id.*
[29] TSI-2: ("Trauma Symptom Inventory") "findings are consistent with PTSD."

Respectfully Submitted,


*/s/ Richard M. Martin, Jr.*
**Richard M. Martin, Jr. LA Bar #08998**
LAMOTHE LAW FIRM, LLC
400 Poydras Street
Suite 1760
New Orleans, Louisiana 70130
Telephone: (504) 704-1414
E-Mail: rmartin@lamothefirm.com
*Local Counsel for Plaintiff*

*/s/ Alejandro J. Gonzalez*
Alejandro J. Gonzalez, FL Bar # 015293
GONZALEZ, P.A.
19 South Krome Ave.
Homestead, FL 33030
Telephone: (786) 429-1511
E-Mail: alex@agonzalezlaw.com
*Co-Counsel for Plaintiff, pro hac vice*

*/s/ Pedro P. Sotolongo*
Pedro P. Sotolongo, FL Bar #0584101
SOTOLONGO, P.A.
1000 5th Street
Suite 402
Miami Beach, FL 33139
Telephone: (305) 415-0073
E-Mail: psotolongo@sotolongolaw.colm
*Co-counsel for Plaintiff, pro hac vice*

14

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a copy of the above and foregoing pleading has this day been forwarded to counsel of record to this proceeding by electronic transmission, facsimile and/or by depositing same in the U.S. Postal Service, properly addressed and postage prepaid, this September 30, 2022.

> _/s/ Alejandro J. Gonzalez_
> Alejandro J. Gonzalez, FL Bar # 015293



## Little Rock Psychological Assessments
### Sandra Michel, PsyD, PLLC

P.O. Box 7751        **Phone: (949) 735-4421**
Little Rock, AR 72207        **smichel@lrpsych.com**

### <u>EXPERT REPORT</u>

### <u>IDENTIFYING INFORMATION:</u>
**Name of Claimant:** Vishveshwar Ganpat Kholkar
**Date of Birth:** 08/21/1987 (Age 34)
**Date of Examination:** 08/02/2022
**Duration of Testing**: 4 hours and 30 minutes
**Date Report Submitted**: 08/06/2022
**Evaluator**: Sandra Michel, PsyD

### <u>REFERRAL QUESTION:</u>
Mr. Kholkar is a 34-year-old, Indian male who was referred for the purpose of my preparing an expert report, pursuant to Mr. Kohlkar filing a civil lawsuit alleging psychological injuries. The evaluation for my report was conducted through HIPAA-compliant Zoom Video Communications and Mr. Kholkar identified his primary language as Konkani. Of importance, a professional interpreter was present throughout the entirety of the evaluation on Zoom Video Communications and assisted Mr. Kholkar with the completion of the present examination.

### <u>SOURCES OF INFORMATION:</u>
- Direct observation, including clinical interview, behavioral observations, and test administration, of Mr. Kholkar for 4 hours and 30 minutes on 08/02/2022
- Administration of the following psychometric instruments on 08/02/2022:
  - Inventory of Problems-29 (IOP-29)
  - Inventory of Problems – Memory Module (IOP-M)
  - Morel Emotional Numbing Test for PTSD – 5th Edition (MENT)
  - PTSD Checklist for DSM-5 (PCL-5)
  - Trauma Symptom Inventory – 2nd Edition (TSI-2)
  - Structured Inventory of Malingered Symptomology (SIMS)
- Records and information about the case:
  - Medical documentation from Eastern Pacific Shipping
  - Records International Medical Care 24 hours – Hospital Rio Mar
  - Records from Salgaocar Medical Research Centre's – V.M. Salgaocar Hospital
  - Records from Dr. Anand D. Kamat
  - Records from Dr. Anil Mehndiratta

Kholkar, Vishveshwar Ganpat      EXHIBIT A      Page **1** of **17**
08/21/1987

Exhibit
Michel 9/21/22
**7**

- o   Records from Dr. Edwin M. Araujo
- o   Records from Dr. Francis Almeida
- o   Records from Grace Ultrasound/ X-Ray Clinic/ O.P.G & Mammography Centre
- o   Letter authored by Arthur M. Fournier, M.D., dated 04/01/2022
- o   Expert Report by Arthur M. Fournier, M.D., dated 07/06/2022
- o   Letter authored by James M. Losito, DPM, dated 04/01/2022
- o   Podiatric Medical Report by James M. Losito, DPM, FACFAS, dated 06//27/2022
- o   Expert Witness Report by Mark F. Wiser, Ph.D., dated 06/29/2022
- o   Report of Expert Trauma Psychology Opinion by Charles R. Figley, Ph.D., dated 07/05/2022
- o   Letter to Sandra Michel, PsyD, authored by Thomas A. Rayer, Jr., from Wagner, Bagot & Rayer, LLP, dated 08/01/2022

**INFORMED CONSENT**

At the outset of the evaluation, I informed Mr. Kholkar that I was asked to evaluate and report on his current emotional state and functioning. He was also notified that I would be conducting tests (e.g., verbal, paper-and-pencil, virtual) of his psychiatric symptoms, as well as assessing for any distressing symptomatology. He was informed that telehealth evaluations may result in some loss of qualitative data usually obtained during an in-person examination, and this coupled with the interpretation of tests being written and normed in English, may reduce the richness of the clinical data and further limit diagnostic conclusions and recommendations. As such, it was explained that the involvement of a third-party in the evaluation (interpreter) may add additional concerns about the impact of observation on performance and that telehealth may pose additional risks to privacy. He was told that although I maintain confidentiality, the report of the examination would be released to the party who retained me, Wagner, Bagot & Rayer, LLP, who represent Eastern Pacific Shipping. As such, he was informed that my testimony may be required in any civil litigation or court proceedings in his case. I informed him of the testing procedures and that he could elect to discontinue the evaluation at any time. Furthermore, he was notified that I am a licensed psychologist in the United States of America. As such, he was informed that I was a mandated reporter for any suspected self-harm, dangerousness to others, or any child, dependent adult, or elder abuse and/or neglect. Mr. Kholkar was also notified that no treating relationship exists between us, and that no treatment or feedback surrounding the evaluation would be provided to him. Mr. Kholkar indicated that he understood the informed consent information, signed the informed consent document, and agreed to cooperate with the evaluation process.

**PRESENTING CONCERNS, ETIOLOGY, & DETAILED JOB DESCRIPTION:**

Mr. Kholkar is a 34-year-old, Indian male who was referred for the purpose of my preparing an expert report, pursuant to Mr. Kohlkar filing a civil lawsuit alleging psychological injuries against Eastern Pacific Shipping. He filed this suit due to experiencing a range of mental health symptoms after he contracted Malaria in 2017 and consequently endured a range of medical sequalae. Mr. Kholkar remarked that he worked on numerous vessels from 2007 until 2017, and throughout his employment, he received several job promotions, including a transition from "engine trainee" to "ordinary seaman," and lastly "able body seaman." During the present evaluation, Mr. Kholkar was asked to provide a detailed job description of his title and duties, to which he explained, "I started working for Zodiac Maritime Agencies LTD in 2007 as an engine trainee, cleaned and

mopped, then on the same contract I joined another company and I got promoted as an ordinary seaman in 2008 until 2011, and then Zodiac transferred me to Eastern Pacific Shipping in 2014 as an able body seaman, I did general maintenance, steering the vessel, painting, cleaning, and worked there until 2017." As such, he expressed that his main duties comprised of performing general maintenance, sanitation, repair, and upkeep of the vessel's equipment and structure, in addition to steering the vessel. Mr. Kholkar elaborated that the development of his mental health symptoms is subsequent to being surrounded by traumatic incidences on the ships, in addition to contracting Malaria in 2017 and consequently enduring a range of medical sequalae. Specifically, Mr. Kholkar identified the following exposures to traumatic events while working on various vessels from 2007 until 2017. However, he was not able to recall specific timelines (e.g., months and dates) or vessel names for the incidences identified below (except #4):

1) Mr. Kholkar reported that during the first event in "2008," he was working on his first contract in China. While performing his job duties, he witnessed a "Jordanian Chief Officer" fall into the cargo hold, which resulted in tremendous "bloodshed." Consequently, Mr. Kholkar remarked that he observed his "dead body" and watched him "die."

2) Regarding the second event in "2012 or 2013," Mr. Kholkar stated that a "Jordanian engineer" was exhibiting "problems" on the vessel. When prompted to elaborate, he explained, "Something happened and they weren't able to take him to the hospital, next day they took him to the hospital, and we heard he died the following day." As such, Mr. Kholkar reflected that his death was particularly distressful for everyone on board.

3) During the third event in "2014," Mr. Kholkar expressed that he witnessed an "Indian electrical engineer," who exhibited symptoms of "Jaundice" on board. Thus, he explained that after his condition progressed, he received appropriate medical attention after "10 days."

4) Lastly, as it pertains to the fourth event, Mr. Kholkar indicated that in 2017, he was supposed to receive "anti-malaria" medication two weeks prior to departing for "African countries." During this timeframe, Mr. Kholkar was notified by "the second medical officer" in the port of "Savannah" that they were not in possession of enough tablets to distribute to all the crew members. Of note, he also stated, "One week they gave it, and I took it, but the second week I didn't get it, so I didn't take it, they said they didn't have enough to give to all of us." Nevertheless, the vessel departed and in "May 2017," it was approaching Brazil. At this time, Mr. Kholkar reflected that he began experiencing a range of symptoms throughout the next several days, including fatigue, body aches, fever, vomiting, headache, dark urine, and blurred vision, which impacted his ability to perform his job duties. Consequently, he notified "medical officers on board" of his symptoms and was prescribed a range of medical interventions (e.g., "tablets, Turkish tablets"). Furthermore, on "May 23rd," Mr. Kholkar reflected that his symptoms worsened, and thus, he reported his

concerns to the "captain," which were ultimately dismissed. During the next several days, Mr. Kholkar remarked that he was decompensating and spent the majority of time in his cabin. On the "27th of May," an individual arrived at his headquarters and escorted him to a hospital in "Rio De Janeiro, Brazil." Upon arrival to the hospital, Mr. Kholkar expressed that he slipped into a coma for "16 days" and when awakened, he felt disoriented and tired. Moreover, he noticed that his toes were discolored; therefore, his treating physicians informed him that he developed gangrene, which required amputation of his lower extremities (e.g., toes). At this point in the evaluation, Mr. Kholkar recalled that subsequent to contracting Malaria, he experienced a range of medical sequalae, including a failing kidney, feeling tearful, and gaining weight. In August 2017, he was able to contact his family members, as he was deemed medically stable and was ultimately transported to Goa, India, to receive further medical treatment. Additionally, Mr. Kholkar reflected that in 2018, he underwent another surgery on his "right toe" in India.

Lastly, it is important to highlight that Mr. Kholkar never identified the aforementioned traumatic events, aside from contracting malaria (#4), during his previous evaluations with providers.

## RELEVANT HISTORY:

### Social History:
Mr. Kholkar was born and reared in South Goa, India, by his mother and father. Moreover, he reflected that he has two siblings, with whom he maintains close contact and relations. Additionally, he denied any verbal, physical, or sexual abuse, and reported that he always had access to adequate shelter, nutrition, and clothing during his childhood. He reported that he has been married to his wife since 2014 and has fathered one child. At the present time, he resides in a house in South Goa, India, with his parents, wife, and daughter.

### Functional Abilities:
With regard to his adaptive functioning, he reported that he possesses a driver's license, and he does not require any assistance in performing his activities of daily living (e.g., cooking, cleaning, dressing himself). Presently, Mr. Kholkar resides with his parents, wife, and their daughter in a house in South Goa, India. Of note, he reported that historically he financially contributed to the household; however, he now relies on his father's pension for financial support. Furthermore, he does not complete any of the chores around the household and upon being asked to offer an explanation for his lack of contribution, he remarked, "Women do all the cooking and cleaning." When asked how he alleviates potential stress, he remarked, "I spend time with my daughter and wife, or I watch television," and as it pertains to his hobbies, he reported that he "used to play football or cricket," but ever since he underwent surgery on his feet, he is unable to participate in these activities. Currently, Mr. Kholkar is unemployed and has not obtained employment upon his return from Brazil in August 2017. When prompted to report on any potential work-related restrictions subsequent to his mental health symptoms, he

continuously discussed his physical ailments, as he responded, "I have amputated toes, I cannot go back to ship because my toes got amputated, I have 30 percent disability given by doctors, no one will accept me." At this point, I redirected Mr. Kholkar to discuss any work-related restrictions solely related to his mental health symptoms, rather than medical concerns, to which he remarked, "I don't like that I am a jobless guy, very frustrated and tense I can't work, I can't work properly, I can't work physically, I can't walk properly, I am limping." Lastly, I questioned if Mr. Kholkar has submitted any job applications since his return from Brazil, to which he responded, "I applied to some jobs last year for office government work and because of my necrosis problem, I did not get a call back."

## Educational:
Mr. Kholkar indicated that he graduated high school and classified himself as a "B and C, average" student. Moreover, he denied a history of special education classes or behavioral issues that ever led to suspensions or expulsions. Regarding postsecondary education, he remarked that in 2006, he completed a six-month course required for employment on a ship. Specifically, he specialized in "deck/engine" curriculum and obtained a certificate upon completion. Lastly, Mr. Kholkar reported that in 2020, he enrolled in online college classes, where he studied "history" for approximately one year; however, due to COVID-19 restrictions, the classes have ceased operation.

## Occupational:
Mr. Kholkar reported that starting at the age of 20-years-old, he primarily pursued career ventures on "ships." As such, he stated that he was worked on numerous vessels from 2007 until 2017, where he maintained occupations as an engine trainee, ordinary seaman, and ultimately being promoted to an able body seaman. As previously mentioned, Mr. Kholkar is currently unemployed, as he believes his medical symptoms are impeding his ability to retain gainful employment. He did not specify a timeline of when he will return to the work force, and he could not identify any career pursuits for the future.

## Legal:
According to Mr. Kholkar, he indicated that he "filed a suit on this US company in 2018," which resulted in "a March 2021 counter case in Goa, India, to stop the procedures in the USA." When questioned to elaborate on the reasoning for these lawsuits, he responded, "Because they could have ordered the malaria pills in the USA, Savannah, and they didn't, they were having an argument on the ship, they were saying they ordered the pills, the pills never came on board, and they didn't have enough, the company had a chance to order them in the US and they didn't." Subsequently, Mr. Kholkar expressed that he was summoned to appear in court in India and was mandated by the judge to "post a bond." Of note, Mr. Kholkar indicated that because he refused to "apply for a bond," he was sentenced to spend 24 hours in jail by the judge. Upon being questioned if he was displaying inappropriate behavior during court proceedings, he reported, "I was very tense and confused, I said I will not sign the bond, she said if you are not listening to me I will send you to jail, I was quiet so she sent me to jail, then released the next day, I signed the bond the next day and she told me to hire a lawyer." Regarding his experience in jail, Mr. Kholkar detailed that it was "terrible," as he stayed with "the criminals" and endured deplorable conditions (e.g., a "dirty" and "small" jail cell, presence of mosquitos). Lastly, Mr. Kholkar

denied any other history of arrests or incarcerations, aside from the aforementioned present legal situation.

## Substance Use:
Mr. Kholkar endorsed drinking "one beer" per month on social occasions. Of note, Mr. Kholkar denied that his alcohol use had any impact on his functioning or that it negatively impacted any domains in his life. Additionally, he denied any drug use; likewise, he has never received substance abuse treatment.

## Relevant Medical and Developmental:
Mr. Kholkar endorsed a range of medical complications subsequent to contracting Malaria in 2017. Specifically, having his toes amputated and more recently being diagnosed with "avascular necrosis" in his "left hip." As such, he stated that since 2020, he has been monitored by a physician and is prescribed Max Bio D3 and Cartigen, which he takes on a daily basis to alleviate symptoms associated with avascular necrosis. As it pertains to the present time, he indicated that he does not utilize a wheelchair for ambulation purposes, and he does not require the assistance of prosthetics on his toes. When prompted to discuss any loss of functioning, he stated, "I can walk, but I can't run, I can still walk okay, but my walking stance changed and I can't bend my left toe, I have to wear soft slippers all the time, I take medicines and do physical exercises." In addition, he denied any history of head injuries, loss of consciousness, other pertinent surgeries, or seizures. Lastly, Mr. Kholkar reported that he achieved all his developmental milestones at age-expected times and denied any developmental deficits.

## Mental Health Treatment:
Mr. Kholkar endorsed a minimal history of mental health treatment. Specifically, he stated that during his hospital stay in Brazil, a psychiatrist sporadically visited him at his bedside and inquired about his overall psychological functioning (e.g., mood, asked about familial support). As it pertains to the present time, he is not receiving any mental health treatment; however, when prompted to elaborate on the quality of any mental health symptoms, he reported, "Right now I am jobless, I am suffering from avascular necrosis, I lost my toes, and I don't have any job to do, I am very frustrated, I have no financial stability right now, I depend on my parents." I redirected Mr. Kholkar to discuss his mental health symptoms, rather than physical ailments, to which he responded, "Sometimes I can't sleep, whenever I see my amputated toes I feel frustrated, sometimes I have dreams about the Brazil hospital and how doctors amputated my toes, I can't forget those moments, from 2017 until now, I am tense." Moreover, he elaborated, "Impossible to forget all that, sleeping issues three or four times a week, and the thought of toes are every day, when I start thinking about being jobless." As previously mentioned, when prompted to discuss the etiology of his psychological symptoms, Mr. Kholkar elaborated that the development of his mental health symptoms is subsequent to being surrounded by traumatic incidences on the ship (e.g., witnessing deceased and ill employees), in addition to contracting Malaria in 2017 and consequently enduring a range of medical sequalae. Furthermore, he denied any past or current suicidal ideation, as well as any current or past homicidal ideation. However, he expressed that he recently has grown "irritated," which causes him to occasionally engage in verbal altercations with his wife. Of importance, he simultaneously reported that his family members are his greatest source of support. In addition, he endorsed slight difficulties with concentration, but denied experiencing auditory or visual hallucinations. In summary, Mr.

Kholkar endorsed symptoms of sleep disturbance (e.g., nightmares, interrupted sleep), distressful thoughts surrounding his toes, agitation, and difficulties with concentration. I inquired about the reasoning as to why Mr. Kholkar has not sought out mental health treatment services upon his return to India, to which he responded, "I don't have enough money and I am trying to adjust myself." Lastly, he reported that he has never been prescribed any psychotropic medications or been diagnosed with a mental illness.

**REVIEW OF MEDICAL AND MENTAL HEALTH TREATMENT RECORDS:**
*Although I reviewed an extensive number of medical records and expert reports that are highlighted in my sources of information above, I only provided a summarization of records for pertinent documents that reference any mental health symptoms or treatment.*

Records International Medical Care 24 hours – Hospital Rio Mar:
According to records, Mr. Kholkar presented to the emergency room at Hospital Rio Mar on 05/27/2017 due to experiencing the following symptoms, "fever, sweating, headache, malaise, anorexia, asthenia, nausea, abdominal pain, hyperbilirubinemia, jaundice, elevated transaminases, elevated urea, low platelets count, anemia, dehydration, and malaria by plasmodium falciparum." Consequently, on 05/29/2017, a confirmation of his diagnosis was achieved, and Mr. Kholkar received "platelets reposition and started Hemodialysis, and Artesunate with Clindamycin treatment." On the same day, his condition worsened, as he developed "respiratory insufficiency requiring mechanical ventilation and sedation." On the following day, 05/30/2017, he went into septic shock and experienced numerous "febrile episodes." On 06/07/2017, "mechanical ventilation was removed," and Mr. Kholkar began to react to verbal and physical stimulus. Throughout the month of June, Mr. Kholkar's presentation evidenced steady improvement, as he was initially started on a "parenteral diet through central venous access on right jugular vein," which ultimately, he transitioned to an oral diet, and he regained mobility functioning (e.g., was able to walk around his room with assistance); however, renal insufficiency and "micro arterial lesions" were still an area of concern. As such on 06/17/2017, Mr. Kholkar displayed "a depressive mood," and a psychiatrist was consulted. As time progressed, the "specialist psychiatrist," noted "great improvement of the depressive mood and insomnia." On 07/01/2017, "surgical debridement for removal of necrotic tissues" was performed, as "myopathies" was severe and caused weakness. During mid-July Mr. Kholkar was described as "very positive regarding his evolution," which his medical team deemed "very important for the success of the treatment." In late July, Mr. Kholkar underwent additional surgical amputation on both feet and endorsed a depressed mood due to "amputation and its permanent sequela, the restrictions that will remain, and the perspectives and difficulties for the future." As such, Mr. Kholkar reflected that he hoped to return to India by August; however, when he did not receive a confirmation of his return by 08/03/2017, he grew highly agitated. Upon being informed that his departure was postponed, Mr. Kholkar once again evidenced depressive symptoms and insomnia, but records reflect that his feet were "much less painful and post operatory showed good evolution." On 08/09/2017, Mr. Kholkar was deemed clinically stable for discharge and fit for "AeroMedical" transportation to India, where it was recommended he receive additional treatment "for approximately the next two months." Of importance, although mental health treatment was noted in the aforementioned records, a comprehensive overview of the course and progress of his treatment (e.g., medication

management, psychotherapeutic modalities, assigned psychiatric diagnoses) was not reported in the records, and thus, was not readily available for further review.

**PREVIOUS PSYCHOLOGICAL EVALUATION:**

Mr. Kholkar underwent a psychological evaluation by Charles R. Figley, Ph.D., on 07/05/2022 for diagnostic clarification and treatment recommendations. During the evaluation, Mr. Kholkar was administered a variety of measures to assess his subjective complaints of depression, stress, trauma, empathy, and social support. Based on the Purdue Social Support Scale, Mr. Kholkar identified his primary source of support as his wife, parents, and two brothers-in-law, which according to Dr. Figley reflects a "good, solid, and dependable support system." Next, Mr. Kholkar was administered the Interpersonal Reactivity Index (IRI), which highlights "a person's general capacity for empathy." On this measure, Mr. Kholkar scored highest on "Perspective Taking," which highlights his "cognitive capacity to see other's point of view without necessarily experiencing affective involvement." Additionally, Mr. Kholkar was asked to complete the Figley Traumagram Inventory, which comprises of "a three-page inventory of all stressor dates, along with dates of recovery." On this measure, Mr. Kholkar identified contracting malaria, losing his grandmother to COVID-19 in July 2021, loss of his toes, financial strains, and being incarcerated in Goa as his primary stressors. Afterwards, Mr. Kholkar completed the Beck Depression Inventory, which is a self-report measure used to assess the severity of depression. Of importance, in Dr. Figley's testing and interpretation section of the report, no quantifiable total score was provided for the Beck Depression Inventory. Furthermore, Mr. Kholkar was administered the Holmes and Rahe Life Change Stress Scale, which ultimately provides an "assessment of risk" in developing an illness subsequent to stress. As such, Dr. Figley reflected that Mr. Kholkar obtained a score of 263, which placed his probability at a "51 percent chance" of developing "a major illness during the next two years." Next, the Purdue Post-Traumatic Stress Disorder Scale was administered, and Mr. Kholkar was asked to subjectively rate his distress since the traumatic event. Moreover, he endorsed being bothered by memories or thoughts of the event, nightmares, hypervigilance, and feeling easily startled. Lastly, he was administered the Impact of Events Scale – Revised (IES-R), which is another self-report measure that assesses the presence of Post-Traumatic Stress Disorder (PTSD). Consequently, results yielded that Mr. Kholkar rated "64% of items as being distressed or bothered at "Quite a bit" (14 or 22 items)." Dr. Figley's findings suggest that at the time of the examination, Mr. Kholkar met diagnostic criteria for "PTSD, acute and chronic anxiety, a sleep disorder, and Generalized Anxiety Disorder." Although he reflected that his PTSD symptomology may worsen due to "the impending trial," he recommended several forms of treatment, including "hypnosis, cognitive behavioral therapy, and eye-movement desensitization and processing." Lastly, Dr. Figley did not administer any formal standardized measures of performance validity or to detect the presence of malingering during his evaluation.

**BEHAVIORAL OBSERVATIONS AND MENTAL STATUS:**

Mr. Kholkar presented as a 34-year-old, Indian male who appeared his stated age. He was dressed in casual attire, and his grooming and hygiene appeared good. His affect was euthymic and appropriate to context. Throughout the present evaluation, he spoke English rather fluently but occasionally relied on an interpreter who was proficient in English and Konkani. He was polite and cooperative, and he maintained good eye contact throughout the evaluation. Moreover, he engaged in the testing process in an appropriate manner. His attention, concentration, and

memory appeared intact, as evidenced by his ability to recall information about his history. Mr. Kholkar was alert and oriented to person, time, and place. His speech was normal in volume, rate, prosody, and tone. Comprehension and language abilities appeared intact. He presented as an adequate historian and there were no obvious expressive or receptive language deficits. He denied having any hearing or vision issues that would impact the purposes of the present evaluation. Throughout the entire testing process, he was easy to engage, appeared receptive to me and the interpreter, and rapport was easily established. As testing progressed, Mr. Kholkar proceeded through testing at an appropriate pace and asked several clarifying questions about the assessment content. He required minimal redirection and prompting to continue and was easily able to engage with the testing procedures. His thought processes were linear and goal-directed, and he did not exhibit any evidence of a thought disorder such as loose associations, flight of ideas, or tangentiality. Likewise, he did not appear to be attending to any internal stimuli such as auditory or visual hallucinations, and he did not exhibit any bizarre or odd behaviors characteristic of a severe mental illness. Lastly, he evidenced an appropriate frustration tolerance and an ability to self-regulate when discussing distressful emotions and/or events.

## TESTING RESULTS AND INTERPRETATION:

### Morel Emotional Numbing Test for PTSD – 5th Edition (MENT):
The *Morel Emotional Numbing Test for PTSD – 5th Edition* (MENT) is a 60-item performance-based measure of validity for detecting malingered PTSD. Specifically, the MENT was designed to provide empirically grounded evidence on the veracity of symptom presentation by assessing an individual's facial emotional recognition skills. The MENT has shown to be cross-culturally effective in classifying valid and not-valid performance. Mr. Kholkar completed this measure virtually with the assistance of the interpreter and the examiner. Mr. Kholkar obtained a score that is equivalent to a z-score of 0.20, and a binomial probability of 0.48. As such, his response pattern suggests that Mr. Kholkar demonstrated appropriate effort on this measure.

### Inventory of Problems-29 (IOP-29):
The *Inventory of Problems-29* (IOP-29) is a 29-item measure that helps to assess the credibility of various psychiatric and cognitive complaints. This measure is designed to discriminate feigners from patients with genuine psychopathology, such as psychosis, PTSD, depression, and neuropsychological dysfunction. Moreover, the IOP-29 is deemed an international test, and has been culturally and linguistically adapted in formally detecting the overall credibility of a given symptom presentation, as outlined in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5). Mr. Kholkar completed this measure virtually with the assistance of the interpreter and examiner. Based on the chief scale of the IOP-29, the False Disorder Probability Score (FDS), the higher the value on this scale, the more likely the respondent is feigning (scale ranges from zero to one). Mr. Kholkar's responses reflected a FDS score of 0.54, suggesting that there is a 54% probability that he would fall within the non-credible presentation category of PTSD.

### Inventory of Problems – Memory Module (IOP-M):
The *Inventory of Problems – Memory Module* (IOP-M) is a 34-item performance validity test that serves as a memory module and is administered immediately after the IOP-29. This assessment uses a forced-choice recognition format, in which two words or brief statements are

provided. More specifically, it includes one item content that was part of the IOP-29, and one that was not. Mr. Kholkar completed this measure virtually with the assistance of the interpreter and the examiner. On this measure, Mr. Kholkar's score was above the recommended cut-off score suggested in the existing literature. Therefore, his response profile is suggestive of inadequate effort and invalid responding on this measure.

### Trauma Symptom Inventory – 2nd Edition (TSI-2):

*The Trauma Symptom Inventory – 2nd Edition (TSI-2)* is a 136-item, widely used test to evaluate post-traumatic stress and other psychological sequelae of traumatic events in adults. In this measure, individuals are asked to respond to items based on their experiences of the past six months, and their responses are compared to others of the examinee's age and sex. Of note, Mr. Kholkar completed this measure virtually with the assistance of the interpreter and examiner, and he completed every item on the assessment. The TSI-2 includes two validity scales that evaluate the respondent's general approach to testing, including if they are exaggerating or minimizing symptoms. Specifically, on the Response Level (RL) scale, which measures underreporting of experiences that would be commonly endorsed by most people, Mr. Kholkar yielded a score in the expected, non-elevated range (Raw Score = 2, T-Score = 54, %ile = 79). Similarly, on the Atypical Response (ATR) scale, which measures over-reporting of trauma-related symptoms, Mr. Kholkar also scored in the expected, non-elevated range (Raw Score = 6, T-Score = 70, %ile = 94). Thus, the scores on this protocol are deemed a valid representation of his current psychological functioning. As such, Mr. Kholkar's response pattern is indicative of anxious arousal (AA Scale; Raw Score = 23, T-Score = 69, %ile = 97), depression (D Scale; Raw Score = 23, T-Score = 69, %ile = 95), and intrusive experiences (IE Scale; Raw Score = 19, T-Score = 70, %ile = 96). Furthermore, his response profile did not reflect any further elevations in the domains of emotional, behavioral, or somatic dysfunction, including the Post-Traumatic Stress (TRAUMA) factor.

Given Mr. Kholkar's invalid test results on other measures, it is worth mentioning that a study conducted by Gray and colleagues (2010), found that a cutoff score of 7 on the Atypical Response scale (ATR) was optimal in correctly identifying PTSD simulators (feigners) versus honest responders, which is only one point above Mr. Kholkar's ATR raw score. Moreover, it is important to highlight that the various items he endorsed on the TSI-2 varied significantly from the symptoms he spontaneously reported during the current evaluation. For instance, on the TSI-2, he endorsed sexual dysfunction, experiencing flashbacks several times throughout the day, paralysis due to recalling a bad memory, an accelerated heart rate, and difficulty swallowing, which he did not report during the entirety of the clinical interview.

### Structured Inventory of Malingered Symptomatology (SIMS):

The *Structured Inventory of Malingered Symptomatology* (SIMS) is a 75-item true-false self-report questionnaire designed to assess the intentional exaggeration or feigning of psychiatric symptoms or neurological complaints. Of note, Mr. Kholkar completed this measure virtually with the assistance of the interpreter and examiner, and he completed every item on the assessment. In addition to a Total Score designed as an overall estimate of the likelihood that an individual is intentionally exaggerating or feigning symptoms of a psychiatric disorder or cognitive dysfunction, this measure produces additional scores estimating the validity of responding across five domains including: Psychosis (P), Neurologic Impairment (NI), Amnestic

Disorders (AM), Low Intelligence (LI), and Affective Disorders (AF). On this measure, Mr. Kholkar's Total Score was significantly elevated and above the cutoff score recommended by the test developers, which is suggestive of malingered psychopathology. His responses indicated that he endorsed extremely uncommon symptoms that even individuals with genuine psychopathology and cognitive impairment do not report. Additionally, he endorsed rare symptom combinations which are both unlikely and inconsistent with common psychiatric and cognitive disorders. Furthermore, Mr. Kholkar's scores on the Psychosis (P), Low Intelligence (LI), and Affective Disorders (AF) domains were significantly elevated above the recommended cut off score, which further suggests that he was likely responding on this measure in an invalid manner in an attempt to feign symptoms of psychiatric disorders.

**PTSD Checklist for DSM-5 (PCL-5):**
The *PTSD Checklist for DSM-5* (PCL-5) is a 20-item, self-report measure that assesses the 20 DSM-5 symptoms of PTSD diagnostic criteria. The PCL-5 has shown promising results in cross-cultural research with different populations and for the utilization of cross-national comparisons. Mr. Kholkar completed this measure virtually with the assistance of the interpreter and examiner. On the PCL-5, he obtained a score of 50 out of 80, which is above the suggested cutoff score for a probable diagnosis of PTSD, according to test developers. As such, on this measure he endorsed almost every item, which included symptoms of intrusive memories, nightmares, feeling upset, possessing negative beliefs, social isolation, feeling easily startled, difficulties with concentration, loss of interest in pleasurable activities, and sleep disturbance. Moreover, he denied having any memory difficulties or engaging in avoidance of memories, thoughts, or external reminders associated with his traumatic incidents. However, it is imperative to highlight, particularly in light of other test results, that this instrument does not contain any validity measures.

**OPINIONS:**
The following opinions are rendered to a reasonable degree of medical certainty based upon the information available during this evaluation in addition to my education, training, and clinical experience. Should additional information become available in the future, I reserve the right to amend this report accordingly. I have integrated available information and drawn conclusions based on the assumptions that the records received were reasonably complete, accurate, and representative of the overall facts. My opinions were formed utilizing methods and measures commonly employed by psychologists operating in forensic-related contexts. Furthermore, all potential diagnoses are based on the criteria and guidance outlined in the *Diagnostic and Statistical Manual of Mental Disorders – 5th Edition* (DSM-5). Lastly, it is outside the scope of this examination and my professional expertise to opine on the existence and/or treatment of physical health conditions, and all opinions rendered below refer to psychological conditions and functioning.

1. **What is your diagnosis of Mr. Kholkar's current psychological/emotional condition (if any)?**

   Mr. Kholkar is a 34-year-old, Indian male who was referred for fthe purpose of my preparing an expert report, pursuant to Mr. Kohlkar filing a civil lawsuit alleging psychological injuries against Eastern Pacific Shipping. He claims that he filed this suit due to experiencing a range of mental health symptoms after he contracted Malaria in 2017 and

consequently enduring a range of medical sequalae. Mr. Kholkar remarked that he worked on numerous vessels from 2007 until 2017, and that throughout his employment, he received several job promotions, including a transition from "engine trainee" to "ordinary seaman," and lastly an "able body seaman." Mr. Kholkar endorsed a minimal history of mental health treatment. Specifically, he stated that during his hospital stay in Brazil, a psychiatrist sporadically visited him at his bedside and inquired about his overall psychological functioning (e.g., mood, asked about familial support). As it pertains to the present time, he is not receiving any mental health treatment; however, when prompted to elaborate on the quality of any mental health symptoms, he reported, "Right now I am jobless, I am suffering from avascular necrosis, I lost my toes, and I don't have any job to do, I am very frustrated, I have no financial stability right now, I depend on my parents." I redirected Mr. Kholkar to discuss his mental health symptoms, rather than physical ailments, to which he responded, "Sometimes I can't sleep, whenever I see my amputated toes I feel frustrated, sometimes I have dreams about the Brazil hospital and how doctors amputated my toes, I can't forget those moments, from 2017 until now, I am tense." Moreover, he elaborated, "Impossible to forget all that, sleeping issues three or four times a week, and the thought of toes are every day, when I start thinking about being jobless." In summary, Mr. Kholkar endorsed symptoms of sleep disturbance (e.g., nightmares, interrupted sleep), distressful thoughts surrounding his toes, agitation, and difficulties with concentration. As previously mentioned, when prompted to discuss the etiology of his psychological symptoms, Mr. Kholkar elaborated that the development of his mental health symptoms is subsequent to being surrounded by traumatic incidences on the ship (e.g., witnessing deceased and ill employees), in addition to contracting Malaria in 2017 and consequently enduring a range of medical sequalae. I inquired about the reasoning as to why Mr. Kholkar has not sought out mental health treatment services upon his return to India, to which he responded, "I don't have enough money and I am trying to adjust myself." As such, he reported that he has never been prescribed any psychotropic medications or been diagnosed with a mental illness. Of importance, although mental health treatment was noted in the records from International Medical Care 24 hours – Hospital Rio Mar, a comprehensive overview of the course and progress of his treatment (e.g., medication management, psychotherapeutic modalities, assigned psychiatric diagnoses) was not reported in the records, and thus, was not readily available for further review.

During the present evaluation, he was administered a variety of performance validity assessments, in addition to assessments that measure his emotional functioning, post-traumatic stress symptomology, and other psychological sequelae of traumatic events in adults. As such, there was marked discrepancy between Mr. Kholkar's self-reported symptoms and objective findings on multiple validity measures. Specifically, his response pattern on the IOP-29 and IOP-M indicate invalid responding, inadequate effort, and over-reporting of psychopathology. Additionally, on the SIMS, he endorsed atypical responses at a frequency above the suggested cutoff score and what is common amongst

individuals who exhibit genuine psychopathology and cognitive impairment within the normative sample, as published by test developers. Thus, rendering the entirety of his response profile invalid and reflective of malingered psychopathology. Although his test performance on the TSI-2 was valid, it is worth mentioning that a study conducted by Gray and colleagues (2010), found that a cutoff score of 7 on the Atypical Response scale (ATR) was optimal in correctly identifying PTSD simulators (feigners) versus honest responders, which is only one point above Mr. Kholkar's ATR raw score. Moreover, it is important to highlight that the various items he endorsed on the TSI-2 varied significantly from the symptoms he spontaneously reported during the current evaluation. For instance, on the TSI-2, he endorsed sexual dysfunction, experiencing flashbacks several times throughout the day, paralysis due to recalling a bad memory, an accelerated heart rate, and difficulty swallowing, which he did not report during the entirety of the clinical interview. As such, he was often inconsistent in his report of symptoms and endorsed more severe symptoms when they were presented to him in an itemized format (e.g., PCL-5). Thus, the items he endorsed on these measures varied significantly from the symptoms he reported during the clinical interview, where he was expected to produce spontaneous experienced symptoms on his own.

Of note, it is important to mention that although Mr. Kholkar did not appear overly distressed during the examination, it is completely understandable and plausible that he is experiencing emotional sequalae following his medical ailment. As such, I did consider the potential of psychiatric comorbidity, as it is very common for a myriad of psychological symptoms to emerge following a serious physical illness. However, research currently suggests that partial malingering may also be exhibited by individuals who are experiencing genuine mental illness, where in essence, one embellishes the severity and/or number of existing symptoms. Therefore, while it is possible that Mr. Kholkar does have some legitimate psychological symptoms, his performance on the IOP-29, IOP-M, and SIMS, in addition to his inconsistent self-reporting of symptomology, makes it difficult to discern between any genuine symptoms and those that are exaggerated or feigned. In conclusion, a comprehensive examination should always include a systemic approach in evaluating historical information, an individual's claims, as well as the use of objective psychological assessments. Thus, it is always imperative to administer malingering and performance validity measures to rule out the possibility of feigned psychopathology and poor effort, in order to ensure that an individual's self-report, as well as the results of subsequent testing are valid. As such, the results on the aforementioned measures were suggestive of overreporting and not-valid performance, which raises concern about the veracity of Mr. Kholkar's claims throughout the clinical interview. Therefore, this makes it difficult, if not impossible, to validly interpret his other scores or to consider his self-report to be reliable.

In conclusion, based on Mr. Kholkar's history, clinical presentation, and given that his testing results were suggestive of feigned psychopathology and non-

credible performance, he does not satisfy criteria for PTSD or any other DSM-5 diagnosis.

2. **If a psychological/emotional condition is diagnosed, please describe the nature and extent of this condition.**

Not applicable, although he endorsed clinically significant mental health symptoms, his self-report was judged to be unreliable. As noted above, his testing results were suggestive of feigned psychopathology and non-credible performance; therefore, this makes it difficult, if not impossible, to validly interpret his other scores or to consider his self-report to be reliable. Thus, there is insufficient evidence to support a reliable diagnosis of any psychological/emotional condition.

3. **If you have diagnosed Mr. Kholkar with a psychological/emotional condition, please provide your opinion as to the cause of that condition, and specifically if Mr. Kholkar's condition was caused by his contraction of malaria and/or subsequent medical conditions and procedures that he attributes to the malarial infection and complications or some other cause.**

Not applicable, as there is insufficient evidence to support a reliable diagnosis of any psychological/emotional condition that is related to Mr. Kholkar's contraction of malaria and subsequent medical sequalae.

4. **Does Mr. Kholkar require further treatment for his psychological/emotional condition? If so, please describe the type of treatment you recommend, including frequency and duration.**

Based on available information and results of testing, it is my expert medical opinion, to a reasonable degree of medical certainty, that Mr. Kholkar does not meet criteria for a psychological condition, according to the DSM-5. Thus, based on available information, I would not recommend any form of mental health treatment for a specific psychological condition at this time.

5. **In your medical opinion, from a psychological/emotional standpoint, is Mr. Kholkar able to return to work full-duty in his pre-injury employment? If so, from a psychological/emotional standpoint, when could he have returned to work in his pre-injury employment?**

At the present time, I believe Mr. Kholkar is able to return to work full duty with his pre-injury employer. Specifically, there is insufficient, reliable evidence to indicate that Mr. Kholkar has suffered from a psychological/emotional condition during any period of time that would have impeded his ability to retain full-duty employment. As previously mentioned, Mr. Kholkar is presently unemployed, and he did not specify a timeline of when he will return to the work force. Of importance, he primarily contributed his inability of maintaining gainful employment to his physical disability; thus, there is no available evidence that he cannot be employed or perform his job duties for a position for which he is trained and skilled to do so from a psychological standpoint.

6. **If you do not believe Mr. Kholkar is currently able to return to work full duty in his pre-injury employment, please indicate any work restrictions you would place upon Mr. Kholkar's return to work at this time and whether these restrictions are permanent or temporary in nature. Please also indicate when Mr. Kholkar could have returned to some form of gainful employment with the restrictions you have assessed.**

   Not applicable, as there is insufficient, reliable evidence to indicate that Mr. Kholkar is suffering from a psychological/emotional condition that would impede his ability to retain full-duty employment. Thus, there are no specific restrictions or limitations to report surrounding his past or future place of employment during any period of time.

7. **Has Mr. Kholkar reached Maximum Medical Improvement (MMI) with respect to his psychological/emotional condition? Please provide a date of MMI, if found.**

   Not applicable, as there is insufficient evidence to support a reliable diagnosis of any psychological/emotional condition.

8. **If you do not believe Mr. Kholkar has reached MMI, please advise as to when you expect Mr. Kholkar to reach MMI for his psychological/emotional condition (if any).**

   Not applicable, as there is insufficient evidence to support a reliable diagnosis of any psychological/emotional condition.

9. **What is the prognosis for a full recovery of his psychological/emotional condition (if any)?**

   Not applicable, as there is insufficient evidence to support a reliable diagnosis of any psychological/emotional condition. Of importance, research currently suggests that the onset of a physical disability may result in a change of someone's life, not necessarily a reduction in the quality of life, with mediating protective prognostic factors playing a major role in recovery. Specifically, ongoing social support, intact adaptive functioning, and absence of psychiatric disorders.

10. **Does Mr. Kholkar exhibit any signs of malingering or symptom magnification? Please explain how you reached this conclusion.**

    As previously mentioned, it is always imperative to administer malingering and performance validity measures to aid in assessing the credibility of various psychiatric and cognitive complaints, as well as detecting valid and not-valid performance. Mr. Kholkar's response pattern on the various aforementioned measures was suggestive of feigned symptoms and intentional overreporting of difficulties, and thus, his results should be deemed an invalid representation of his emotional, behavioral, and cognitive functioning. Furthermore, there was marked discrepancy between Mr. Kholkar's self-reported symptoms and objective findings on multiple validity measures. Specifically, his current results on the IOP-29, IOP-M, and SIMS indicate invalid responding and over-reporting

psychopathology. Although his test performance on the TSI-2 was valid, it is worth mentioning that a study conducted by Gray and colleagues (2010), found that a cutoff score of 7 on the Atypical Response scale (ATR) was optimal in correctly identifying PTSD simulators (feigners) versus honest responders, which is only one point above Mr. Kholkar's ATR raw score. Moreover, it is important to highlight that the various items he endorsed on the TSI-2 varied significantly from the symptoms he spontaneously reported during the current evaluation. For instance, on the TSI-2, he endorsed sexual dysfunction, experiencing flashbacks several times throughout the day, paralysis due to recalling a bad memory, an accelerated heart rate, and difficulty swallowing, which he did not report during the entirety of the clinical interview. As such, he was often inconsistent in his report of symptoms and endorsed more severe symptoms when they were presented to him in an itemized format (e.g., PCL-5). Thus, the items he endorsed on these measures varied significantly from the symptoms he reported during the clinical interview, where he was expected to produce spontaneous experienced symptoms on his own.

*For more detailed information, please reference the testing results and interpretation section of this report.*

Research currently suggests that PTSD has become a common nexus for civil litigation, primarily because diagnostic criteria is heavily based on subjective and self-reported complaints, which makes the possibility of malingering much more likely. Therefore, various guidelines have been published to aid clinicians in utilizing a multimodal approach when evaluating PTSD, especially when financial incentive is involved. This includes the utilization of objective measures, collateral data (e.g., records), and a thorough clinical interview. As such, although I considered Dr. Figley's diagnoses of Mr. Kholkar, he primarily relied on self-report measures to corroborate his conclusions, and thus, he did not administer any formal standardized measures to detect malingering or invalid performance. Therefore, this makes it difficult, if not impossible, to judge Dr. Figley's conclusions as being valid.

**11. In your opinion, does Mr. Kholkar exhibit a genuine desire to obtain medical treatment for his psychological/emotional condition? Please explain how you reached this conclusion.**

Not applicable, as there is insufficient evidence to support a reliable diagnosis of any psychological/emotional condition that would require treatment.

**12. Do you believe that secondary gain is a factor here? Please explain how you reached this conclusion.**

Yes, I believe secondary gain is a factor in Mr. Kholkar's case. More specifically, Malingering, as defined in the DSM-5, is the intentional production of false or grossly exaggerated psychological symptoms, motivated by external incentives, such as avoiding military duty/work and obtaining financial compensation. His current test results indicate an exaggeration of symptoms, compromised effort,

and over-reporting psychopathology. Mr. Kholkar reported that he is presently not capable of maintaining gainful employment due to his physical ailments along with subsequent emotional sequalae, and he failed to disclose when he will return to the workforce. In summary, there is insufficient, reliable evidence that Mr. Kholkar suffers from any psychological condition. In contrast, given that he is filing a civil lawsuit due to an alleged psychological injury, it is my opinion that he has intentionally produced false or grossly exaggerated psychological symptoms in an effort to receive financial compensation.

_____                    _____
Sandra Michel, PsyD                                                       08/06/2022
Licensed Forensic/Clinical Psychologist (AR #202123)           Date
Little Rock Psychological Assessments

Review of Psychometric Instruments

| Test | Norms, Reliability, Validity | Test Results |
|---|---|---|
| **Inventory of Problems – 29**<br>https://iop-test.com//#/<br>retrieved 9/30/22 @ 1:51 pm<br><br>LANGUAGES<br><br>English, German, French, Dutch, Italian, Spanish, Brazilian & European Portuguese, Traditional & Simplified Chinese, and Lithuanian. | ACCURACY AND PRECISION<br><br>Tested with about 2,000 individuals – half bona fide patients and half experimental feigners. Calculates the probability of coming from one of these two groups.<br><br>Was not normed with the Indian population | Cannot be relied upon to confirm malingering |
| Morel Emotional Numbing Test for PTSD – 5th Edition (MENT)<br>https://www.mentptsd.com/psychometric-properties | Reliability = .87 to .94, p < 0.0001, SEM = 0.08<br>.<br>Sensitivity = .82<br>.<br>Specificity = 1.0<br>.<br>Positive predictive power = 1.0<br>Negative predictive power = .94<br>Overall efficiency or hit rate = .96<br>SEM = 0.08 for valid responders<br>Correlation to the most widely validated personality test validity scale, regression model = 50%, r = .71, p < 0.0001, d = 2.0<br>.<br>Correlation to the most effective measure of performance validity in neuropsychological testing, linear model = 68%, r = .83, p < 0.0001, d = 2.9<br>. | |

**Page 1**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

CIVIL ACTION NO. 18-13556 SM-KWR

IN ADMIRALTY

JUDGE SUSIE MORGAN

MAG. JUDGE KAREN WELLS ROBY

KHOLKAR VISHVESHWAR GANPAT,

        Plaintiff,

vs.

EASTERN PACIFIC SHIPPING PTE,
LTD, d/b/a "EPS",

_____/

LOCATION:  Remote Audio-Video Communication

DATE:   September 21, 2022

TIME:   10:08 a.m. - 12:05 p.m.

    VIDEOTAPED DEPOSITION OF SANDRA MICHEL, M.D.

      Taken before Elena Robaina, Florida
Professional Reporter, Notary Public in and for the
State of Florida at Large, pursuant to Notice of
Taking Deposition filed in the above case.

**Page 3**

| PLAINTIFF'S | | PAGE |
|---|---|---|
| No. 1** | Letter to Dr. Michel from defense counsel ** | 8 |
| No. 2 | CV for Dr. Michel | 11 |
| No. 3 | DSM-5, Diagnostic Statistical Manual for Mental Disorders | 26 |
| No. 4** | Independent notes apart from doctor's report | 69 |
| No. 5 | Newspaper article from Brazil, "Voyage of Near Death and Survival." | 70 |
| No. 7 | Dr. Michel's Report | 97 |

**Exhibits to be later produced by Counsel for EPS

**Page 2**

ALL APPEARANCES VIA ZOOM CONFERENCE:
ON BEHALF OF THE PLAINTIFF:
SOTOLONGO, P.A.
1000  5th Street
Suite 402
Miami Beach, Fl  33139
BY: Peter Sotolongo, Esq.
E-mail: PSotolongo@sotolongolaw.com

LAMOTHE LAW FIRM, LLC
400 Poydras Street
Suite 1760
New Orleans, Louisiana 70130
BY: Richard M. Martin, Jr., Esq.
E-mail: RMartin@lamothefirm.com

ON BEHALF OF DEFENDANT:
WAGNER, BAGOT & RAYER, LLP
601 Poydras St.
Suite 1660
New Orleans, LA 70130
BY: Thomas A. Rayer, Jr. Esq.
E-mail: Trayer@wb-lalaw.com

ALSO PRESENT:
Brandon Mendiola, Video Court Reporting

I N D E X

E X A M I N A T I O N S

SANDRA MICHEL, M.D.
        DIRECT  CROSS  REDIRECT RECROSS
   BY MR. SOTOLONGO5

**Page 4**

          VIDEOGRAPHER:  In the case styled
*Kholkar Vishveshwar Ganpat v. Eastern*
*Pacific Shipping Pte. Ltd.*, Civil Action
No. 18-13556 SM-KWR, this is the video
deposition of Sandra Michel, M.D., on
September 21st, 2022.  The time is now
10:08 a.m.
      Would counsel please state their
appearances for the record.
      MR. SOTOLONGO:  Peter Sotolongo and
Richard Martin on behalf of the plaintiff,
Mr. Kholkar.
      MR. RAYER:  Tom Rayer on behalf of
Eastern Pacific Shipping.
      THE REPORTER:  Doctor, would you
please raise your right hand for me?
      THE WITNESS:  Sorry, are you speaking
to me?
      THE REPORTER:  Yes, ma'am.
      THE WITNESS:  Okay.  I'm sorry.
      THE REPORTER:  That's okay.
      Do you swear to tell the truth, the
whole truth, and nothing but the truth, so
help you God?
      THE WITNESS:  Yes, I do.

5

1    THE REPORTER:  Thank you.
2    Thereupon:
3            SANDRA MICHEL, M.D.
4    was called as a witness and, having been first duly
5    sworn, was examined and testified as follows:
6            DIRECT EXAMINATION
7    BY MR. SOTOLONGO:
8        Q.    Hi, good morning.
9        A.    Hi, there.  Good morning.
10       Q.    Please tell us your name for the
11   record.
12       A.    My name is Sandra Michel.
13       Q.    And what is your profession?
14       A.    I am a forensic and clinical
15   psychologist.
16       Q.    Have you ever given a deposition
17   before like you are doing today?
18       A.    I've never given a deposition before.
19       Q.    Okay.  So this is your first time.
20   How many years have you been a clinical
21   psychologist?
22       A.    I graduated in 2019, and then in 2020,
23   I did my fellowship, and ever since then I've been
24   employed.
25       Q.    Okay.  How did you get involved in

6

1    this case?
2        A.    So I work at the Arkansas State
3    Hospital conducting forensic evaluations, and I'm
4    also part of a private practice.  And our
5    supervisor, Dr. Brittany Baldwin, was referred this
6    case from her colleague in Louisiana, and then it
7    got trickled down to me.  I've done many testimony
8    and court before, and they felt like this would be
9    a good case for me, so.
10       Q.    What type of testimony have you done
11   in court if you've never given a deposition before?
12       A.    I've done hearings and trials for
13   criminal proceedings, mostly fitness to proceed as
14   well as criminal responsibility evaluations.
15       Q.    So you've testified in court in those
16   type of cases?
17       A.    Correct.  All criminal cases, never
18   civil.
19       Q.    So this is your first civil case where
20   you're giving testimony in a civil case, civil
21   litigation?
22       A.    That's correct.
23       Q.    And who hired you?  Who hired you?
24       A.    Mr. Thomas Rayer contacted me, and I
25   believe he hired me, his law firm.

7

1        Q.    And had you ever met him before?
2        A.    No.
3        Q.    Did you know of him?
4        A.    No.
5        Q.    Had you done any work with him or his
6    law firm?
7        A.    No.
8        Q.    Did you inquire as to how it is that
9    they got to you or found you or got your name or
10   anything like that?
11       A.    They've acquired it from another
12   psychologist, and it was trickled down to me, the
13   referral.
14       Q.    Okay.  And what is your understanding
15   as to what you were asked to do here, what your
16   role is in this particular case?
17       A.    I was asked to produce an independent
18   medical examination of Mr. Kholkar.
19       Q.    And who asked you to do that?
20       A.    Mr. Thomas Rayer's law firm hired me,
21   so I suspect he was the one who asked me.
22       Q.    Okay.  And when were you initially
23   engaged or contacted to be -- to get involved in
24   this case?  Give me a timeframe.
25       A.    I don't know the exact date, but it

8

1    must have been maybe, approximately one or two
2    weeks prior to conducting the evaluation with
3    Mr. Kholkar.
4        Q.    So you conducted the evaluation
5    August 2nd -- August 2nd of 2022, and you're saying
6    maybe one or two weeks prior to that?
7        A.    Correct.
8        Q.    Okay.  And did you receive a letter,
9    an e-mail or anything in writing to kind of give
10   you an idea of what it is that was being requested
11   of you?
12       A.    Yes.  I received a letter with certain
13   questions that should be asked in addition to my
14   evaluation that were for the independent medical
15   examination.
16       Q.    Okay.  And do you still have that
17   letter?
18       A.    Yes, in my e-mail drafts, I do, if you
19   wanted me to produce it.
20       Q.    Yeah, I do.  So I'm going to have that
21   letter marked as Plaintiff's 1.
22            (Thereupon, Plaintiff's Exhibit
23   No. 1 was marked for identification.)
24   BY MR. SOTOLONGO:
25       Q.    Do you have a date on that letter, a

9

1 date for that letter?
2      A.   Yes.  The letter was authored
3 August 1st, 2022.
4      Q.   Okay.  All right.  So I assume that
5 you got that letter and you had a conference with
6 the lawyer or someone from his law firm?
7      A.   I had a phone conversation with
8 Mr. Thomas Rayer indicating that he sent over the
9 letter to me to review.
10      Q.   Okay.  And then in that phone -- how
11 long did that phone conversation take?
12      A.   I don't know the exact time, but maybe
13 15, 20 minutes.
14      Q.   Okay.  And that would have been August
15 1st or around that timeframe?
16      A.   Yes, sir.
17      Q.   And how many more conversations have
18 you had with the lawyer or anyone from his law firm
19 after that initial conversation?
20      A.   Maybe a handful of times.  Maybe five
21 times in total.
22      Q.   Okay.  And how many drafts of your
23 report did you prepare?
24      A.   There was only -- I sent my initial
25 first draft, and then there was only one draft of

10

1 revisions, and those included just minor typos,
2 grammatical errors, but that's pretty much it.
3      Q.   All right.  How long would you say it
4 took you to go over everything you received in
5 order to write your report?
6      A.   It took me 21 hours.
7      Q.   Okay.  And you've billed for those
8 21 hours?
9      A.   Yes.
10      Q.   How much have you billed to date?
11      A.   I want to get the exact numbers for
12 you, so I'm going to go back and take a look.  So I
13 billed, up to this date, five hours for deposition
14 prep.  So that was $2,750, two hours for the actual
15 deposition, which was $1,100; and then for the
16 actual report, which took 21 hours, I billed
17 $11,550.
18      Q.   So the report took you 21 hours?
19      A.   Correct.  So that includes review of
20 records, writing the report, the actual examination
21 with Mr. Kholkar.
22      Q.   What's the total number so far that
23 you've billed on the case?
24      A.   Including the two-hour deposition that
25 I billed for your law firm?

11

1      Q.   No, without the deposition.  Without
2 the depo.
3      A.   So just the deposition prep and the
4 actual report?
5      Q.   What you've billed EPS?
6      A.   Okay.  So the total was 14,300.
7      Q.   Okay.  How did you get the records
8 that you reviewed for your report?  Were they sent
9 to you in an e-mail?  Were they sent to you via
10 mail?  How did you get them?
11      A.   A Dropbox link.
12      Q.   All right.  Let me go ahead and mark
13 your CV --
14      A.   Okay.
15      Q.   -- as Plaintiff's 2.
16           (Thereupon, Plaintiff's Exhibit
17      No. 2 was marked for identification.)
18 BY MR. SOTOLONGO:
19      Q.   Do you have it in front of you?  Do
20 you have your CV available to you?  If not, I can
21 bring it up.
22      A.   I don't have it in front of me, but I
23 can pull it up on my computer, if you'd like.
24      Q.   All right.  Let's do that.
25      A.   Okay.  I apologize for the delay.

12

1      Q.   No, it's okay.
2           MR. SOTOLONGO:  Off the record.
3           (Off the record.)
4 BY MR. SOTOLONGO:
5      Q.   So I want to mark your CV as
6 Plaintiff's 2.  I want to go all the way to the
7 end, and you have there a section called
8 "Conference Presentations," right?
9      A.   Uh-huh.
10      Q.   And I went through this.  There's one,
11 two, three -- there is approximately 14 items
12 listed there.  None of those items have to do with
13 malingering, right?
14      A.   Malingering of just --
15      Q.   The word "malingering," is the word
16 "malingering" found in any of those conference
17 presentations that you've listed there?
18      A.   No.
19      Q.   All right.  There's also, above that,
20 there's a manuscript -- "Manuscripts," and that
21 does not deal with malingering either, right?
22      A.   Not necessarily, no.
23      Q.   And then on top of that, you have
24 "Publications," and that does not include
25 malingering, right?

13

1    A.   No.
2    Q.   All right.  And then you have --
3  working up, backwards -- you have a "Testimony
4  list."  I guess this is some of the stuff you
5  talked to us about earlier, right?
6    A.   Yes.
7    Q.   And this is all basically doing
8  court-ordered forensic evaluations for people that,
9  I guess, you needed to determine whether they were
10 fit to proceed with trial or not, right?
11   A.   Yes.  And if they are malingering
12 symptomology to evade criminal prosecution as well
13 as criminal responsibility; so were they criminally
14 insane at the time they committed the alleged
15 offense.
16   Q.   All right.  Well, the word
17 "malingering" is nowhere found in this list either,
18 right?
19   A.   Well, the court proceedings are not
20 called malingering.
21   Q.   They are not.  That's my point.  They
22 are not called malingering, right?  In fact, the
23 Court does not refer to such a term, and you don't
24 refer to it either, right?
25   A.   I refer to it in court, yes.  In

14

1  criminal proceedings, I use the word "malingering"
2  quite often.
3    Q.   In your list here, you have 11 items.
4  The word "malingering" does not appear in there,
5  right?
6    A.   It's not a -- no, it doesn't appear.
7    Q.   That's my question.  Okay.  I
8  understand what you want to say, and I know where
9  you're going with that, but my question is whether
10 the word is in there.  So I appreciate you
11 answering that.
12   A.   Okay.  I understand.  Got it.
13   Q.   Then you have "Skills" on page 10.  It
14 says you're fluent in English and Polish, and
15 you're proficient on Windows and Macintosh
16 operating systems, Excel, Word, PowerPoint,
17 EndNote, PBworks and SPSS, right?
18   A.   Yes.
19   Q.   Nothing about the word "malingering"
20 or nothing related to malingering is listed under
21 your skills, right?
22   A.   No.
23   Q.   All right.  And then on top of that,
24 we have "Affiliations."  All right.  And then we
25 have, let me see, more "publications" on page 8.

15

1  Right.  You have a publication there.  That has
2  nothing to do with malingering, right?  The words
3  "malingering" are not there either, right?
4    A.   No.
5    Q.   "Conference Presentations," you start
6  on page 7, you have some conference presentations
7  there.  The word "malingering" is found in none of
8  those presentations, right?
9    A.   Correct.
10   Q.   All right.  Then we go to research --
11 "Research Experience," which is on page 6.  I
12 didn't find the word "malingering" in there
13 anywhere either, right?
14   A.   Uh- huh.
15   Q.   Correct?
16   A.   That's correct.  I don't see that.
17   Q.   You've never published anything on
18 malingering?
19   A.   No.
20   Q.   All right.
21        So I thought of a theme for this depo
22 today.  I thought it was important to come up with
23 a theme, and thinking about it this morning, the
24 theme is going to be malingering versus bias.
25   A.   Okay.

16

1    Q.   You understand?
2    A.   Yes.
3    Q.   So we're going to see whether we have
4  an issue of malingering here or an issue of bias.
5  That's fair, right?
6    A.   Okay.  Could I ask a clarifying
7  question?
8    Q.   Yes, of course.
9    A.   What do you mean by "bias"?
10   Q.   Well, I was going to ask you that.
11 You know, you can give me your definition, and then
12 I'll see if we're on the same page.  What is your
13 definition of "bias"?
14   A.   So response style bias is often seen
15 with individuals who are maybe not performing
16 adequately on certain measures, or who have poor
17 effort.  So some response style biases center
18 around underreporting, maybe, at some time, or
19 overreport ing of symptoms.  So that's considered a
20 response style bias.
21   Q.   How about the bias of the person
22 that's doing the reporting of the person that's
23 carrying out the tests or the person that's writing
24 the report?
25   A.   Yeah.  Well, as a psychologist, I have

**17**

1  ethical guidelines to abide by, so I make sure in
2  all my evaluations to not be biased. That's why I
3  approach my evaluations with objective testing and
4  evidence to support my opinions.
5    Q.  Okay. Well, we're going to go through
6  that, and that's why that's the theme.
7    A.  Okay. That sounds great.
8    Q.  So what I'm going to do, I'm going to
9  ask you some questions, and then we'll get into
10  your report. We'll set some foundations, and then
11  we'll go ahead and look at some things together,
12  and then that should take us through your depo
13  today.
14    A.  Okay. That sounds great.
15    Q.  If I ask you something and you do not
16  understand, then you let me know. Okay?
17    A.  Okay. Thank you.
18    Q.  So let me start with some -- let me
19  give you what my definition of bias is based on
20  what I am doing here today. My definition of bias
21  is prejudice in favor of or against a person,
22  right, thing or group.
23    So my position is that I want to see
24  if you're biased and prejudiced in favor of -- you
25  know, your bias is in favor of EPS Singapore, which

**18**

1  is who's paying you to do this, and against my
2  client, Mr. Kholkar. Okay? So just so we're
3  clear.
4    A.  Okay.
5    Q.  And then you are accusing Mr. Kholkar
6  of malingering. So my question to you is what is
7  your definition of malingering from a -- as a
8  psychologist?
9    A.  Sure. So malingering is defined as an
10  individual who produces false or grossly
11  exaggerated psychological or physical symptoms in
12  order to achieve a certain reward or to evade
13  something that's not favorable, so in this
14  situation and civil litigation situations, it's
15  mostly for a larger incentive, such as finances.
16  During my work in the state hospital, it's to evade
17  criminal prosecution. So there's different
18  motivations that determine someone's behavior to,
19  maybe, falsely exaggerate certain symptoms or
20  produce false symptoms altogether.
21    Q.  You would agree with me that having
22  earned $14,300 in this case so far is a financial
23  gain on your part, right?
24    A.  It is --
25    MR. RAYER:  Let me just enter an

**19**

1  objection here. I mean, I'm going to let
2  her go with this.
3    MR. SOTOLONGO:  Just don't do -- don't
4  do a speaking objection. Do a form
5  objection, and we can -- you can strike it
6  out, or the Court can strike it out. But I
7  don't want you doing a speaking objection.
8    MR. RAYER:  I just would -- I would
9  appreciate it if you would be mindful of
10  accusing the doctor of something
11  unprofessional.
12    MR. SOTOLONGO:  It's bias. I'm
13  entitled to get into bias. That's why we
14  get into the numbers. That's why we get
15  into the amounts.
16    She is accusing my client of
17  malingering. She's an expert. I'm
18  entitled to get into bias and all of those
19  things.
20  BY MR. SOTOLONGO:
21    Q.  So it's with all due respect, but it's
22  what we do, ma'am.
23    MR. RAYER:  I just ask that this
24  remain respectful and professional.
25    MR. SOTOLONGO:  And if we were in

**20**

1  front of a jury, I'm entitled to get into
2  bias and flush out the bias. So I am doing
3  it as most respectfully.
4  BY MR. SOTOLONGO:
5    Q.  I don't mean to disrespect you, ma'am.
6  I am just doing my job. This is part of what we do
7  as lawyers.
8    MR. RAYER:  And that's all I ask, is
9  that we keep this respectful and
10  professional.
11    MR. SOTOLONGO:  Yes. And I will do
12  that. I promise you that.
13  BY MR. SOTOLONGO:
14    Q.  All right. You would agree with me,
15  that having -- you know, 14,300 is a financial gain
16  that you have in this case so far, right?
17    A.  I am paid for the work I produce. So
18  it took me quite a bit of time to get my degree,
19  and so with that, I'm able to become an expert and
20  provide my opinion on certain matters. But I have
21  to be paid for my time. I don't do pro bono. So
22  that is just the fee schedule we have for my
23  private practice, and that is what we charge.
24    Q.  And you also understand that if
25  Mr. Kholkar was injured in this particular case and

21

1 he has damages, he's also entitled to get paid, you
2 understand that, right?
3          MR. RAYER:  Object to the form.  Are
4     you asking her for a legal opinion?
5          MR. SOTOLONGO:  I'm asking her just a
6     basic question about financial gain.
7 BY MR. SOTOLONGO:
8     Q.    You understand that if he's been
9 injured and if he does have a claim and he
10 prevails, he's entitled to financial compensation,
11 right?
12          MR. RAYER:  Object to the form.
13          THE WITNESS:  If someone is filing a
14     civil litigation lawsuit that is -- and
15     they are claiming psychological and
16     physical injuries, that is what they are
17     hoping to receive, yes.
18 BY MR. SOTOLONGO:
19     Q.    Okay.  Okay.  That's just the way it
20 is.  That's just the way the process works as far
21 as you know, right?  Right?
22     A.    Sure.
23     Q.    Let me ask you, is there someone in
24 the room with you, because I've seen you look to
25 your left twice already in front of you?  Is there

22

1 anyone in the room with you?
2     A.    No one in my room.  Would you like for
3 me to show you?
4     Q.    No, I trust you.  I believe you if you
5 tell me that.
6     A.    Let me clarify.  I live in an
7 apartment complex, and we have a conference room,
8 so I rented it out and sometimes there's people
9 walking.
10     Q.    I believe you, like I said.  I just
11 want to make sure.  You know?
12     A.    Okay.
13     Q.    So my definition of malingering -- and
14 I looked it up -- is inventing -- and just keeping
15 it simple for the jury to follow or judge --
16 inventing or exaggerating mental symptoms, because
17 this is what we're talking about here, mental
18 symptoms for financial gain, right?  We can agree
19 on that definition?
20     A.    In this case, yes.
21     Q.    Yeah.  Inventing or exaggerating
22 mental symptoms for financial gain, right?
23     A.    Within the civil litigation case, yes.
24     Q.    And the position that you take -- and
25 I read your report thoroughly.  The position that

23

1 you take is that you believe Mr. Kholkar is
2 malingering because what he reported to you during
3 your oral interview is different than what he
4 reported in one of the tests that you gave him.
5     A.    So to assess for malingering, there's
6 a multimodal approach in assessing for that, and
7 that is the gold standard we use as clinicians in
8 order to be objective and not have any biases on
9 our end.  So I tend to utilize, first, a thorough
10 clinical interview.  I utilize collateral, such as
11 examining any other expert reports or records, and
12 then I use objective measures.  And at the end of
13 everything, I tend to look at all my data, and I
14 say:  Are there discrepancies?  Are there
15 inconsistencies, and do they match up with what
16 Mr. Kholkar is experiencing?
17          And I found that given his performance
18 on these measures, he was not demonstrating a
19 credible presentation.
20     Q.    That's not what you say in your
21 report.  What you say in your report is that what
22 he told you in your interview and what he reported
23 in some of the tests, in particular in one test,
24 was different, and that that's why you believe he's
25 malingering.

24

1     A.    Right.
2     Q.    That's what you say in your report.
3     A.    Right.  So those are the
4 inconsistencies I mentioned.
5     Q.    All right.  And I just want to make
6 sure, because going forward, I just want to make
7 sure we're on the same page.  Those are the
8 inconsistencies we're talking about, what he told
9 you versus what he reported on your exams, on the
10 tests.
11     A.    Correct.
12     Q.    Or what he marked or what he checked
13 off or whatever he selected, correct?
14     A.    There was discrepancy, yes, between
15 his spontaneous self-reported symptoms and what he
16 exhibited and performed on the measures.
17     Q.    And so you called that an
18 inconsistency, and, therefore, that's why, in your
19 mind, he's a malinger.  He's exaggerating, or
20 he's inventing his mental symptoms, right?
21     A.    That's is what the assessments
22 demonstrate, yes.
23     Q.    Okay.  So we'll go through that.  How
24 about consistencies?  Do you also look at
25 consistencies in things he's telling you?

25

1    A.   Yes. So what he spontaneously told me
2  in the beginning where he had no prompts -- and I
3  do that purposefully with my interviews, as I allow
4  the opportunity for the individual to tell me their
5  experience. So whatever he's feeling, his
6  symptoms, what he's experiencing, I would like to
7  know that spontaneously without me prompting
8  anything. And then, so that opportunity, I put --
9  and I place that in my report, what he reported to
10  me. But down the line, I also put what the
11  inconsistency was with on the measures.
12    Q.   So you also mention -- you also
13  mention in your report, the DSM-5.
14    A.   Uh-huh.
15    Q.   Right? And what is the DSM-5?
16    A.   It's the Diagnostic Statistical Manual
17  for Mental Disorders that we utilize as
18  psychologists and as psychiatrists to assess for
19  mental disorders and to qualify mental disorders,
20  describe them.
21    Q.   So let's look -- let me mark, as
22  Plaintiff's 3 -- I think I'm up to 3 -- the DSM-5
23  Table of Contents. Okay? You're familiar with
24  that, right?
25          (Thereupon, Plaintiff's Exhibit No. 3

26

1          was marked for identification.)
2          THE WITNESS: Is there a particular
3          page you want me to look at?
4  BY MR. SOTOLONGO:
5    Q.   The Table of Contents.
6    A.   Okay. So just the beginning.
7    Q.   Yes. And the DSM, it says "DSM-5
8  Table of Contents, American Psychiatric
9  Association." Right?
10    A.   Uh-hmm.
11    Q.   It does not say "American
12  Psychological Association," right?
13    A.   That's correct.
14    Q.   Do you know why it says Psychiatric
15  Association and not Psychology or Psychological
16  Association; do you know?
17    A.   It's published by the American
18  Psychiatric Association. So the majority of
19  individuals that have published this book are MDs.
20  However, there are many psychologists who also
21  participate.
22    Q.   You talked about Dr. Figley in your
23  report. Dr. Figley, you understand, is our expert,
24  right?
25    A.   That's correct.

27

1    Q.   And you understand he's a
2  psychiatrist?
3    A.   I saw that he has a Ph.D., but --
4    Q.   That's okay.
5    A.   Yeah. I see here that he has --
6  Charles Figley, Ph.D. So that would make him a
7  psychologist.
8    Q.   Okay. I misspoke, then. All right.
9  So let's go through the DSM-5 Table of Contents.
10  So the DSM-5 -- does the Table of Contents, does it
11  include the word "malingering" in any of the
12  sections?
13    A.   No. That would be under the other
14  conditions that may be a focus of clinical
15  attention.
16    Q.   You cited this book. You cited it in
17  your report, so it has different sections, right,
18  and one -- the first section is DSM-5 Basics,
19  right, which is the introduction, the use of the
20  manual and "cautionary statement for forensic use
21  of DSM-5."
22          Is that what you're doing here today,
23  forensic evaluation, or forensic testimony, based
24  on forensic evaluation you did on Mr. Kholkar?
25    A.   Yes.

28

1    Q.   Okay. Do you know why it says
2  "cautionary statement for forensic use"?
3    A.   Could you enlighten me, please?
4    Q.   I'm asking you if you know. If you
5  don't, you can just say, I don't.
6    A.   I do not know the exact details in
7  that section, no.
8    Q.   So if we go to Section 2, it's
9  Diagnostic Criteria and Codes, right?
10    A.   Okay.
11    Q.   Diagnostic Criteria and Codes, the
12  word "malingering" would not be found anywhere in
13  there, right?
14    A.   I would like to be precise. So if you
15  can give me a moment to look through there because
16  malingering...
17          So malingering is on page 726 under
18  non-adherence to medical treatment.
19    Q.   We're looking at the Table of
20  Contents.
21    A.   Right. So that's for the other
22  conditions that may be a focus of clinical
23  attention, so once you go to the actual page, it
24  talks about malingering.
25    Q.   What page?

**29**

1    A.    Of the Table of Contents, the "Other
2    Conditions That May Be Focus For Clinical
3    Attention."  So if you go to the actual page of the
4    DSM --
5        Q.    The Table of Contents itself does not
6    even reference the word "malingering," right?  It
7    does not come up?
8        A.    It's a subsection of that.
9        Q.    All right.  So let me do it this way,
10   then.  We're looking at Section 2 together here,
11   right?  Diagnostic Criteria and Codes.  I'm going
12   to give you a chance to look at it.  It's on the
13   screen.  Do you see the word "malingering" anywhere
14   in there?
15       A.    No.
16       Q.    All right.  If we go to the next
17   section, you have "Schizophrenia Spectrum" right
18   under that.
19       A.    Okay.
20       Q.    And you have "Bipolar Related
21   Disorders, Depressive Disorders, Anxiety Disorders,
22   Obsessive Compulsive and Related Disorders, Trauma
23   and Stressor Related Disorders, Somatic Symptoms."
24           I mean, I don't see malingering
25   anywhere in here.  "Elimination disorders,

**30**

1    Sleep/Wake disorders."
2            Mr. Kholkar has a sleep/wake disorder,
3    doesn't he, insomnia?
4        A.    I wasn't -- I didn't provide that
5    diagnosis.  So I don't --
6        Q.    But he told you he was having issues
7    sleeping, right?
8        A.    He said -- he reported having sleep
9    disturbance, yes.
10       Q.    You didn't diagnose him with insomnia,
11   right?
12       A.    No.
13       Q.    Not even sleep -- not even sleep
14   disorders or sleep disturbance or anything, right?
15       A.    I didn't diagnose him with any
16   psychological.
17       Q.    None at all, zero?
18       A.    No.
19       Q.    Only malingering?
20       A.    I didn't diagnose him with anything.
21       Q.    Exactly, because malingering is not
22   even a diagnosis, right?
23       A.    Malingering is an other condition that
24   may be a focus of clinical attention.
25       Q.    Well, that's all that this DSM says

**31**

1    you can do, is just pay some clinical attention to
2    it because it's not considered a diagnosis; isn't
3    that correct?
4        A.    Malingering is not a diagnosis, no.
5        Q.    Okay.  Thank you.
6            You would agree with me, there are
7    issues with objective ways to diagnose malingering
8    disorders, right?
9        A.    Could you please repeat or rephrase
10   the question?
11       Q.    There are issues with objective ways
12   to diagnose malingering disorders.
13           MR. RAYER:  Object to the form.
14           THE WITNESS:  I'm sorry.  Do I respond
15   to that?
16           MR. RAYER:  Oh, yeah.  I apologize.
17   If I just object to the form, you can
18   respond, if you're able to.
19           THE WITNESS:  Yeah.
20   BY MR. SOTOLONGO:
21       Q.    Go ahead.
22       A.    There are limitations in diagnosing
23   anything.  That's why I primarily always use
24   objective evidence to corroborate my opinions.  So
25   that is why, as psychologists, we invented

**32**

1    assessments to help us guide the credibility of
2    individuals' reports and not to take everything as
3    face valid.
4            So it's very difficult to -- if
5    someone comes to you and just reports many
6    symptoms, anyone can do that.  Anyone can go online
7    and report anything.  But I tend to utilize
8    objective measures to corroborate my opinion.
9        Q.    Okay.  And one of the objective
10   measures that you use are the tests that you gave
11   him at the end during your interview, right?
12       A.    At the -- so initially, I do clinical
13   interview, and then it's their opportunity to tell
14   me how they feel, anything they are experiencing
15   spontaneously, and then afterwards, we get to
16   utilizing the assessments.  Yeah.
17       Q.    Tell me if this is a true or false
18   statement:  Malingerers often show poor compliance
19   with treatment.
20           Malingerers often show poor compliance
21   with treatment.
22           Is that a true or false statement?
23       A.    Well, if someone is malingering, then
24   they have no requirement, potentially, for
25   treatment, so I don't really know how that goes

**33**

1  hand-in-hand.

2  **Q.**   So you don't know the answer to that

3  question?

4       MR. RAYER:  Object to the form.

5       THE WITNESS:  I would assume -- I

6  mean, there's various outcomes of

7  performance on treatment and non-compliance

8  with treatment.

9  BY MR. SOTOLONGO:

10       **Q.**   In your review of the -- I'm sorry.  I

11  didn't mean to cut you off.  What did you say at

12  the end?

13       **A.**   That's okay.  There's various things

14  that could contribute to someone being

15  non-compliant with treatment.

16       If someone is potentially feigning

17  some symptoms, that could be a part of it, but,

18  again, it's not that linear.  There's many things

19  that can contribute to non-compliance and

20  non-adherence.

21       **Q.**   Did you see any issues that

22  Mr. Kholkar had with complying -- compliance with

23  treatment anywhere?

24       **A.**   Mr. Kholkar --

25       **Q.**   When he was here, when he was in

**34**

1  India, when he was on the ship, anywhere, any

2  issues that you saw poor compliance with treatment;

3  yes or no?

4       **A.**   That is outside of my scope.  He only

5  received medical treatment.  He never sought mental

6  health treatment for anything.

7       **Q.**   Poor compliance with treatment; did

8  you see any evidence of him refusing to comply with

9  any treatment protocol, whether it was mental or

10  physical?  Did you see that in any of the medical

11  records you looked at?

12       **A.**   Not in the records.  I mean, he

13  received medical treatment, yes.

14       **Q.**   I understand.  Okay.  I already asked

15  you the question.  I think you understood my

16  question, right?  You didn't see any issues with

17  poor compliance, right, where he was refusing to

18  take medications or refusing treatment that was

19  being provided to him, whether it was mental or

20  physical, correct?

21       **A.**   He never received mental treatment,

22  but it seems like he was adherent with his medical

23  treatment based on the medical records I looked at.

24       **Q.**   Why would you say he never received

25  mental treatment?  Why would you say that?

**35**

1       **A.**   He received bedside therapy.  It's

2  very common in hospital settings for psychiatrists

3  to be involved on the treatment team and just to

4  talk with them, what's going on; but other than

5  that, he never obtained any mental health treatment

6  after that period.

7       **Q.**   You said "never," and I just want to

8  make sure we're clear in what we're talking about.

9  You said "never," right?  And he was being seen by

10  a psychiatrist while he was hospitalized in Brazil

11  for months.

12       **A.**   Yes, he was.  He was.  But I'm talking

13  about when after he came back, he never sought

14  mental health treatment.

15       **Q.**   Okay.  Well, here's another true or

16  false question:  Malingering is associated with an

17  acute social personality disorder.

18       Is that a true statement or false?

19       **A.**   Malingering is associated with an

20  acute personality disorder?

21       **Q.**   Yes, an acute social personality

22  disorder.

23       **A.**   I've never heard of that phrasing, and

24  I don't know how malingering -- anyone can malinger

25  anything.  They can malinger personality disorders

**36**

1  or other disorders, so I'm not sure where --

2       **Q.**   Does Mr. Kholkar, in your opinion,

3  suffer from acute social personality disorder; yes

4  or no?

5       **A.**   I've never heard of that disorder.

6       **Q.**   Okay.

7       **A.**   But --

8       **Q.**   If you don't know, you can say you

9  don't know.

10       **A.**   I've never heard of that personality

11  disorder.

12       **Q.**   Did you have him perform the same

13  tasks, or did you have him perform different tasks?

14  In other words, did you have him perform the same

15  test two or three times, or did you have him

16  perform one test only one time?

17       **A.**   So we did the clinical interview, and

18  then we proceeded with testing.  So he would

19  perform one test, one at a time, with the

20  interpreter present.

21       **Q.**   Okay.  You don't have an inconsistent

22  score in the same task that was performed multiple

23  times in this particular case.  In other words, you

24  didn't give Mr. Kholkar the same test two or three

25  times and see if he scored differently on that

**37**

1  test, correct?
2      A.    That's not common procedure.  We don't
3  want practice effects associated with our tests,
4  so, no.
5      Q.    I'm asking you, you didn't do that?
6  You gave him one test, only one time, right?
7      A.    Yes, that's usually what we do with
8  tests; one time.
9      Q.    All right.
10             One of the things that Mr. Kholkar --
11  let me ask you -- let me go back.  Have you ever
12  been to India?
13      A.    No.
14      Q.    Have you ever treated an Indian
15  patient?
16      A.    Yes.  In California, I believe I
17  administered a neuropsychological battery on
18  someone from India one time.
19      Q.    One time.  Okay.
20             You obviously had never met
21  Mr. Kholkar before that one time that you talked to
22  him, right?
23      A.    No.  Just that one time through Zoom.
24      Q.    And when you -- when you talked to
25  him, and when you had him in your presence, and

**38**

1  when you were asking him to do the things that you
2  were asking him to do, he was, according to you,
3  polite, right?
4      A.    Yes.
5      Q.    Cooperative?  He cooperated, right?
6      A.    Yes.
7      Q.    He maintained good eye contact
8  throughout the evaluation?
9      A.    Yes.
10      Q.    You say also in your report that he
11  engaged in the testing process in an appropriate
12  manner, right?
13      A.    Yes, uh-huh.
14      Q.    And throughout the entire testing
15  process, he was engaged, receptive and a rapport
16  was easily established between you, him and the
17  translator, right?
18      A.    Yes, that's correct.
19      Q.    He didn't look like someone that was
20  evasive or non-cooperative or was trying to be
21  elusive or anything like that, right?
22      A.    Not in his physical presentation, no.
23      Q.    Okay.  And one of the things that you
24  kept asking him, because you obviously -- you don't
25  know Mr. Kholkar, so you don't really know how much

**39**

1  He understands the world of psychology, right?
2  Right?
3      A.    I don't know his knowledge base on
4  psychology, but...
5      Q.    Exactly.  And, in fact, you needed an
6  interpreter to be able to communicate with him at
7  times, right?
8      A.    I did that to make sure I was being
9  culturally sensitive in case any sort of wording or
10  terminology was off.  It's in best practice to
11  always have someone there that speaks the native
12  language of an individual.
13      Q.    And even with that, you can still have
14  miscommunication or misunderstanding of some terms,
15  right, and terminology, right?  Based on culture,
16  language, right?
17      A.    Of course.  Yes, definitely, and
18  that's why I try to be culturally adaptive and make
19  sure in all my cases that I do internationally,
20  that I have someone there from that culture so I
21  can kind of understand better.
22      Q.    Well, you don't understand their
23  language.  You don't, right?
24      A.    No, I don't.
25      Q.    That's why you have -- so when the

**40**

1  interpreter --
2      A.    No, I don't.
3      Q.    So when the interpreter was
4  interpreting whatever you said, you don't know
5  whether he's even interpreting correct, right?
6      A.    I guess not, no.  But that's, you
7  know, why we hire certain interpreters that are
8  approved to do such evaluations, that we make
9  sure -- and I tell them, actually, please, in the
10  beginning, to do everything verbatim, please, you
11  know, tell them everything I say, and tell me
12  verbatim what they say so nothing gets lost in
13  translation.
14      Q.    But it can, and you would have no
15  control over that because you don't understand the
16  language, right, ma'am?
17      A.    That's correct.
18      Q.    'Cause you asked -- one of the
19  questions that you kept asking Mr. Kholkar, I take
20  it through the interpreter, is about the
21  etiology -- etiology of his mental symptoms,
22  correct?
23      A.    Yes.  But I would like to preface that
24  Mr. Kholkar spoke English rather fluently, so we
25  mostly spoke English.  Except for little nuances,

41

1  things in there that he didn't understand, I wanted
2  to have a backup of an interpreter that would
3  assist us.  And --
4      Q.   Did -- go ahead.  I didn't mean to
5  interrupt you.
6      A.   Sorry.  I was going to answer the
7  etiology question.
8           Etiology is just a term I use that's
9  just the causation of something.  So when I asked
10  him, I worded it, "Can you please tell me what
11  caused your mental health symptoms?"  And then
12  that's when he told me.
13     Q.   Okay.  So you used the word "etiology"
14  in your report, 'cause you used it consistently.
15  But when you asked him, you asked him differently.
16          In other words, you asked him, What do
17  you believe caused your mental issues or your
18  mental problems or your mental injuries, or however
19  you want to look at it, right?
20     A.   Yes, of course.  Many of the words
21  that I utilized in my report, I didn't say to him.
22  It's just, that's my wording.  That's my
23  terminology I tend to utilize in writing my report.
24     Q.   And that's why I want to clarify that
25  because, in your report, you consistently indicate

43

1  EPS ship, right?
2      A.   Amongst others, yes.
3      Q.   All right.  And he told you that he
4  has amputated toes, correct?
5      A.   Correct.
6      Q.   You asked him, what do you believe is
7  the cause of the mental issues you're having, and
8  he gave you several reasons consistently, right?
9      A.   Yes.
10     Q.   And one of them is, "I have amputated
11  toes," right?
12     A.   Correct.
13     Q.   Do you know how many amputated toes he
14  has?
15     A.   I believe there was eight partial
16  amputations of the toes.
17     Q.   Okay.  Were you provided with a photo
18  of the amputated toes?
19     A.   I was.
20     Q.   Photos of the amputated toes?
21     A.   Yes.
22     Q.   You were?
23     A.   Yes.
24     Q.   When were you provided with those
25  photos?

42

1  that when you prompt him to tell you the etiology
2  of his -- of his mental issues, he would always
3  tell you the same thing, right?
4      A.   Yes.  He reported the events I talked
5  about in my report.
6      Q.   All right.  And throughout the
7  different times that you asked him the same
8  question, because it appears from your report that
9  you asked him on several occasions, more than once
10  and up to three times, according to what you
11  reported here; each time you asked him that
12  question, he always gave you the same answer,
13  right?
14     A.   So even though I might discuss the
15  etiology numerous times in my report, I only asked
16  in the beginning for him to kind of explain to me
17  the etiology of his symptoms.  And so those events,
18  in the beginning, even though I reference them
19  throughout, this was the only platform where he
20  spontaneously told me all his --
21     Q.   Okay.
22     A.   -- reasons why he's experiencing them.
23     Q.   And what he told you consistently was
24  the issues -- all the issues that he was having
25  associated to having contracted malaria aboard an

44

1      A.   They were in the DropBox.
2      Q.   Okay.  They are not listed in your --
3  they are not listed in your records and information
4  about the case.  You didn't consider them
5  pertinent?
6      A.   I just kind of clumped them with the
7  medical records.  I didn't think I needed to cite
8  pictures as a source of information, no.
9      Q.   Well, it confirms that he did develop
10  gangrene.  The pictures that you have of his toes,
11  are they with gangrene and bloody, or were they the
12  pictures after his toes had been amputated, and
13  they were dried and clean and healed?  Which of the
14  two?
15     A.   I believe it was at the onset of when
16  they were bloody.
17     Q.   You understand that Mr. Kholkar was in
18  a hospital for 76 days in Brazil, right?
19     A.   Yes.  I received those records, and I
20  cited them in there.
21     Q.   You didn't mention the fact that he
22  was in a hospital for 76 days in Brazil, right?
23     A.   So these -- I mentioned the
24  International Medical Care 24-Hours Hospital, Rio
25  Mar.  Those are the records I reviewed.

45

1    Q.   All right.  Did you make any notice or
2  mention of 76 days and 14 days in ICU fighting for
3  his life?
4    A.   I don't know if I mentioned those
5  exact terms.  Again, with my reports, I don't --
6  you know, I have to kind of make everything
7  concise, and I don't put everything in the details.
8  There was quite a lot of records, so I try to kind
9  of just summarize everything.
10   Q.   Is being near death and hospitalized
11  in a hospital for 76 days something that can cause
12  post-traumatic stress disorder?
13   A.   It could.  However, currently in the
14  DSM, it does state that a life-threatening illness
15  or debilitating medical condition is not
16  necessarily something that could cause
17  Post-Traumatic Stress Disorder.
18       So, oftentimes, it actually notes --
19  in the DSM-5, it only noted two instances,
20  something that could involve that.  So it's
21  something that's really eminent, like waking up
22  from surgery or going into anaphylactic shock.
23   Q.   Well, he was in a coma for two weeks,
24  right?  Did you know that?
25   A.   Yes.  I read that he was in a coma.

46

1    Q.   And he saw his toes being amputated
2  while he was hospitalized for 76 days throughout
3  those months.  Did you see that as well?
4    A.   I believe I saw that, yes.
5    Q.   And he had to have a psychiatrist come
6  and treat him and be with him and talk to him and
7  do whatever psychiatrists do throughout the time
8  that he was having his toes amputated.  Did you see
9  that?
10   A.   I saw that a psychiatrist did come.
11  However, there was no mention of any kind of
12  medications that were administered, any kind of
13  psychotherapeutic interventions.  There was no
14  assigned diagnoses in the records that I noticed.
15  But, again, it's common practice for individuals to
16  have bedside assistance from a psychiatrist.
17   Q.   Did you look at those records
18  yourself?
19   A.   Uh-huh.
20   Q.   And you're sure there was no mention
21  of medication being administered to him for his
22  mental issues?
23   A.   Not that -- I didn't see any
24  medication.  Maybe I missed something.  I did see
25  that there was mention about him being agitated and

47

1  exhibiting a depressed mood, which would often wax
2  and wane.  There were instances where he was
3  feeling pretty good about himself.
4    Q.   If you're, obviously, looking at the
5  record subjectively, you were looking for that kind
6  of stuff, right?  I mean, you're a clinical
7  psychologist.  That's what you're looking for,
8  right?
9    A.   I was looking for mention of any
10  mental health treatment, yes.
11   Q.   Okay.  So consistently he told you, "I
12  have amputated toes.  I cannot work on the ship,"
13  right?
14   A.   I'm sorry.  I think it cut off.
15   Q.   I want to go over the things that he
16  consistently told you.  "I have amputated toes,"
17  number one, correct?
18   A.   So if we go to page 3 --
19   Q.   I have the pages.  It's on page 5,
20  page 6 and page 12, where he consistently tells you
21  the same thing.
22       If you go to your page 5, page 6 and
23  page 12 of your report, you consistently report the
24  same thing that he kept telling you.
25   A.   Oh, yes.  Yes, of course.  He said, "I

48

1  have amputated toes.  I cannot go back to the ship
2  because my toes got amputated."  Yes.
3    Q.   That was in response to your question
4  about the etiology of his mental health issues.
5  His mental issues?
6    A.   That was when prompted to report on
7  any potential work-related restriction subsequent
8  to his mental health symptoms.
9    Q.   I disagree with you.
10       You asked him -- you report in your
11  report that you asked him to explain to you the
12  etiology of his mental issues, and he would always
13  refer to having amputated toes; not being able to
14  work on the ship; being jobless --
15   A.   Yes.
16   Q.   -- very frustrated and tense, can't
17  sleep; has dreams about his toes being amputated.
18   A.   Yes.
19   Q.   Has avascular necrosis.
20   A.   Yes, yes.  I agree with you on that.
21   Q.   No financial stability, and can't
22  forget 2017.  That's what he reported to you,
23  right?
24   A.   Yes.  Those were some of the symptoms
25  he stated, uh-hmm.

49

1    **Q.**   Those were the symptoms he stated to
2  you that in his mind is what were causing his
3  mental issues, right?  Having the amputated toes;
4  not being able to work; being jobless; not being
5  able to walk properly; not being able to sleep and
6  dreaming about his toes being amputated; that's
7  what he was reporting to you, right?
8         MR. RAYER:  Object to the form.
9  BY MR. SOTOLONGO:
10    **Q.**   That's what he reported to you, and
11  that's what you reported in your report, right?
12    **A.**   I stated what he reported to me in the
13  report.
14    **Q.**   And that's what he reported to you.
15  That's what I'm trying to confirm.  That's what he
16  reported to you, right?
17    **A.**   That is what he reported to me.
18    **Q.**   Let me -- so we can -- you know, I
19  don't want to -- I'm not trying to put words in
20  your mouth.  Let's go to page 6 of your report.
21    **A.**   Okay.
22    **Q.**   "Mental Health Treatment."  Right?
23    **A.**   Uh-huh.
24    **Q.**   You say halfway down -- not halfway,
25  but the beginning to the right of the first

50

1  paragraph, the big paragraph:  "When prompted to
2  elaborate on the quality of any mental health
3  symptoms, he reported, 'Right now I am jobless, I
4  am suffering from avascular necrosis, I lost my
5  toes, and I don't have any job to do, I'm jobless,
6  and I don't have any job to do.  I'm very
7  frustrated.  I have no financial stability right
8  now.  I depend on my parents.'"
9         Did I read that correct?
10    **A.**   Yes.
11    **Q.**   And then you indicated (as read):  "I
12  redirected -- I redirected Mr. Kholkar to discuss
13  his mental health symptoms, rather than physical
14  ailments, to which he responded, 'Sometimes I can't
15  sleep, whenever I see my amputated toes I feel
16  frustrated, sometimes I have dreams about the
17  Brazil hospital and how the doctors amputated my
18  toes.  I can't forget those moments, from 2017,
19  until now, I am tense.'"  Right?
20    **A.**   Yes, yes.
21    **Q.**   All right.  "Moreover, he elaborated,
22  'Impossible to forget all that, sleeping issues,
23  they are three or four times a week, and the
24  thought of toes are every day, when I start
25  thinking about being jobless.'"  Right?  Did I read

51

1  that correct?
2    **A.**   Yes.
3    **Q.**   And then you say, "As previously
4  mentioned, when prompted to discuss the etiology of
5  his psychological symptoms, Mr. Kholkar elaborated
6  that the development of his mental health symptoms
7  is subsequent to being surrounded by traumatic
8  incidents on the ship in addition to contracting
9  malaria in 2017 and the enduring range of medical
10  sequelae," right?
11    **A.**   Uh-huh.
12         THE REPORTER:  Excuse me, Doctor, if
13  you can please say "yes" instead of
14  "uh-huh," or "no" if it's a "no."
15         THE WITNESS:  I'm so sorry.  Yes.
16  That's correct, yes.
17  BY MR. SOTOLONGO:
18    **Q.**   Then if we go to 12, page 12, of your
19  report --
20    **A.**   Okay.
21    **Q.**   -- towards the top of page 12 on the
22  right, "When prompted to elaborate on the quality
23  of any mental health symptoms, he reported, 'Right
24  now I am jobless, suffering from avascular
25  necrosis, I lost my toes, and I don't have any job

52

1  to do, I'm very frustrated.  I have no financial
2  stability right now.  I depend on my parents.
3  Can't sleep.  I have amputated toes.  I feel
4  frustrated.  I have dreams.  Being jobless."  All
5  of those things, right?
6    **A.**   Yes.  I --
7    **Q.**   And then you -- correct?
8    **A.**   Yes.  I just took the same statement
9  from before and just put it into this section.
10    **Q.**   Yes, but then you repeat again, "As
11  previously mentioned, when prompted to discuss the
12  etiology of his psychological symptoms," he
13  elaborates on those same things.
14         In his mind, he's telling you that's
15  what he believes is causing all his mental issues,
16  right?
17    **A.**   Yes.
18    **Q.**   And he was very consistent with that,
19  correct?
20    **A.**   Well, it's the same statement.  I just
21  put it in two different sections.  He didn't report
22  it twice.  It was just the one time.
23    **Q.**   But it is -- then, let's go through
24  it.  He did have amputated toes, right?
25    **A.**   According to him, yes, he had

53

1  amputated toes.
2       Q.   Not only according to him, you saw the
3  pictures.  I mean, this is not something he's
4  making up.
5       A.   Right.  Yes.  I read that he had eight
6  partial amputations of his toes.
7       Q.   And he's a young man, right?  I mean,
8  how young is he?
9       A.   He's 34, I believe.
10      Q.   Okay.  And he's got a wife and a small
11  child, right, that he's responsible for, right?
12      A.   Yes.
13      Q.   Okay.  He also told you that he can't
14  work on the ship because he's got a 30 percent
15  disability rating, right?
16           (Noise interruption.  Discussion off
17      the record.)
18  BY MR. SOTOLONGO:
19      Q.   So just so we're clear, that's what he
20  told you that's what he believed in his mind was
21  causing all his mental problems, right?  Having the
22  amputations, not being able to work, financial
23  instability, avascular necrosis, not being able to
24  sleep, not being able to forget what happened to
25  him in 2017, right?

54

1       A.   So those -- that was only .4.  He also
2  mentioned many different other incidents that
3  contributed to his symptoms.  Something about a
4  Jordanian chief officer falling into a cargo hold.
5  And there were other incidents; an engineer being
6  ill.  So there are other instances he also
7  mentioned.
8       Q.   But you don't mention that -- you
9  don't mention that on the two pages that we just
10  went through.
11      A.   Right.
12      Q.   You specifically talk about him
13  mentioning these things as what was causing him the
14  mental issues, not whatever was happening on the
15  ship before he got malaria.
16      A.   Oh, I'm sorry.  I thought you meant
17  what were the traumatic events.
18           So there were the traumatic events,
19  and he was saying that there's all these other
20  instances that made him -- for example, contracting
21  malaria and having the sequelae afterwards.
22      Q.   All right.  And that's what I'm
23  focusing on.
24      A.   Okay.
25      Q.   And I'm focusing on the fact that you

55

1  were asking him what was causing him the mental
2  issues, and this is what he was describing to you:
3  Losing his toes, being jobless, and not being able
4  to sleep, and the avascular necrosis, and all of
5  those things, right?
6       A.   Yes.
7       Q.   You mentioned -- going back to what
8  you're saying -- the development, according to you
9  in your report, the development of his mental
10  health symptoms, all right, is subsequent to the
11  traumatic incidents on the ship that you just
12  referred to, number one.  Number two, contracting
13  malaria in 2017; and number three, enduring --
14  enduring a range of medical sequelae, right?  In
15  other words, ongoing medical issues related to his
16  having contracted malaria, right?
17      A.   That is what he reported are causing
18  his symptoms, yes.
19      Q.   Okay.  Before 2017, before Mr. Kholkar
20  contracted malaria, do you have any records or any
21  evidence that he had any mental issues?
22      A.   He denied having any mental health
23  issues.
24      Q.   Okay.  And also in your review of any
25  medical record, did you see any indication of any

56

1  prior mental health issues?
2       A.   There wasn't really any records prior
3  to this, so, no, I didn't see anything in the
4  records.
5       Q.   And you also did not receive any
6  records from EPS Singapore indicating that
7  Mr. Kholkar had any mental issues, or any issues on
8  the ship with getting along with people or not
9  cooperating or anything related to his mental
10  status, right, or his attitude?  Absolutely
11  nothing, right?
12      A.   I did not see any ship logs or
13  anything like that about Mr. Kholkar.
14      Q.   In fact, what you did report -- what
15  you did report in your report is that he was
16  consistently promoted throughout his career to the
17  position of able body seaman, right?
18      A.   That's what he told me, so I put that
19  in the report.
20      Q.   Okay.  All right.  And obviously, you
21  put that in the report because you believed him,
22  right?
23      A.   I just took his words, and I placed it
24  in the report as his self-report.  Again, during
25  the clinical interview, it's up to him to tell me

**57**

1  things, and it's not my job to determine if it's
2  fact or not fact.  I just place it in the report.
3      **Q.**  Well, he worked for EPS Singapore.  If
4  you needed to verify that, you could have always
5  verified it with them, as far as his employment and
6  his position and all of that.  You didn't have any
7  issues with that, right?  You believed that he was
8  someone that was promoted throughout his career,
9  right?
10     **A.**  I just reported what he said.
11     **Q.**  Okay.
12         Are you familiar with those jobs
13  aboard ship, the ones he described to you?
14     **A.**  Just what he told me.  I'm not -- I'm
15  not familiar with that, no.
16     **Q.**  Okay.  Let's go to page 3 of your
17  report.  This is, you indicate there that "The
18  development of his mental health symptoms is
19  subsequent to the three things we discussed:  The
20  traumatic incidents on the ship, contracting
21  malaria in 2017, and then enduring a range of
22  medical sequelae."
23         You know he was imprisoned in India
24  over this case, right?
25         MR. RAYER:  Object to the form.

**58**

1         THE WITNESS:  During the clinical
2             interview, once I asked about any legal
3             history, that is when he told me that he
4             spent, according to him, 24 hours in jail.
5  BY MR. SOTOLONGO:
6      **Q.**  And did you ask him if that was a
7  traumatic event that should also be included here
8  in this section in page 3, as far as, you know, one
9  of the reasons why he also has mental health
10  issues?
11     **A.**  He didn't mention that event, that
12  that was traumatic for him as one of the events
13  that caused him the symptoms.
14     **Q.**  All right.  Let's go to page 5 of your
15  report, where you talk about that.
16     **A.**  Yes.
17     **Q.**  So it says under "Legal," you put a
18  note:  "Mr. Kholkar indicated" -- this is halfway
19  down that paragraph:  "Of note, Mr. Kholkar
20  indicated that because he refused to 'apply for a
21  bond,' he was sentenced to spend 24 hours in jail
22  by the judge."  Right?
23     **A.**  Uh-huh.  Yes.
24     **Q.**  "And upon being questioned if he was
25  displaying appropriate behavior during the court

**59**

1  proceedings" -- I guess you asked him that -- "he
2  reported, 'I was very tense and confused,'" right?
3      **A.**  Yes.
4      **Q.**  That's what he said to you, right?
5      **A.**  Yes.
6      **Q.**  "I was quiet so she sent me to jail,
7  then released the next day.  I signed a bond the
8  next day, and she told me to hire a lawyer."
9  Right?
10     **A.**  Yes.  It reads, "I was very tense,
11  confused.  I said, 'I will not sign the bond.'
12         "She said, 'If you're not listening to
13  me, I will send you to jail.'
14         "I was quiet, so she sent me to jail
15  then released me the next day."
16     **Q.**  Okay.
17     **A.**  "Then I signed the bond the next day."
18     **Q.**  And then you said, "regarding his
19  experience," that's what you wrote on there,
20  "Regarding his experience in jail, Mr. Kholkar
21  detailed that it was 'terrible.'"  That's what you
22  wrote, and you put it in quotes, right?
23     **A.**  Yes.
24     **Q.**  "It was terrible.  And he stayed with
25  the criminals," "and endured deplorable

**60**

1  conditions," and then you put in parentheses,
2  "example, a dirty and small jail cell, presence of
3  mosquitos."
4         Did I read that correct?
5      **A.**  That's correct.
6      **Q.**  So he told you that was a terrible
7  experience for him.  Why?  Because he was put with
8  criminals, because he had fear of mosquitos, and he
9  was put in a dirty cell with other prisoners.  And
10  you didn't think that was important to include in
11  page 3 under the "other events"?
12     **A.**  He didn't identify that as a traumatic
13  event.
14     **Q.**  Did you?
15     **A.**  It is up to his experience to tell me
16  what is causing him his mental health symptoms, and
17  he did not identify that as one.
18     **Q.**  Did you flush that out to see if he
19  believed that that was one of the -- one of the
20  things that contributed to his symptoms also?  Did
21  you flush that out?
22     **A.**  He didn't report it was one, so it was
23  not included.
24     **Q.**  He reported it as being "terrible,"
25  right?

**61**

1    A.    Correct.

2    Q.    Okay.  You're the clinical

3  psychologist; not him, right?  All he can tell you

4  is, report what he believes are terrible things or

5  bad things that are happening to him in

6  contributing to his mental state of mind, correct?

7        MR. RAYER:  Object to the form.

8        THE WITNESS:  Correct.

9  BY MR. SOTOLONGO:

10    Q.    Is that a "yes"?

11    A.    It is up to him to tell me his lived

12  experience.  And if he didn't identify that as a

13  traumatic event, it's not my place to say it was.

14    Q.    Well, you're the one that put in your

15  report "terrible" in quotes.  So he told you it was

16  a terrible experience.  He told you -- he detailed

17  -- you say "Mr. Kholkar detailed that it was

18  terrible as he stayed with criminals and endured

19  deplorable conditions, including a dirty and small

20  jail cell and presence of mosquitos", right?

21    A.    Correct.  But, again, he didn't

22  identify that as a traumatic event.

23        MR. RAYER:  Peter, do you think you're

24        going to go till 11?  If so, can we take a

25        five-minute break?

**62**

1        MR. SOTOLONGO:  Let me just finish

2        this area, and then we can do that.  Okay?

3        MR. RAYER:  Sure.

4  BY MR. SOTOLONGO:

5    Q.    You also --

6    A.    I'm so sorry.  I do want to say

7  something.  I have a criminal trial I have to get

8  to today.  So I know that we were for two hours; is

9  that correct, till 11?

10    Q.    We started at 1.  Oh, it's 11 for you.

11  So we have another 45 minutes.  I'll try to get

12  through in the 45 minutes.  I don't want to keep

13  you from that.  Okay?

14    A.    Sorry.  I just -- I have an

15  outstanding subpoena for that court.

16    Q.    No.  I'll try to get you out of here.

17  We just have to try to move along as fast as

18  possible.

19    A.    Okay.  Still, Mr. Rayer, did you want

20  to take like a minute or two break?  Is that what

21  you mentioned?

22        MR. RAYER:  We'll let him finish his

23        thought, and we'll take no more than a

24        five-minute break.

25        THE WITNESS:  Okay.  Of course.

**63**

1  BY MR. SOTOLONGO:

2    Q.    Your report also does not mention

3  anywhere in the report including the section that

4  we've been discussing, traumatic incidences.  You

5  have no mention in your report whatsoever that

6  Mr. Kholkar feared for his life when he was on the

7  ship, sick, because he thought he was going to die

8  without getting to a hospital.  I'm sure he told

9  you that, right?

10        MR. RAYER:  Object to the form.

11        THE WITNESS:  I reported everything he

12        told me in the report.

13  BY MR. SOTOLONGO:

14    Q.    So your testimony today under oath is

15  that Mr. Kholkar did not tell you that while he was

16  on the ship, he thought he was going to die because

17  they were not sending him to the hospital?

18    A.    I don't know if I have that exact

19  phrase in my report.  I would have to go through to

20  see if that particular statement is in there.

21    Q.    Well, you looked at your report before

22  your deposition today, right?

23    A.    Yes, I did, very extensively, but I

24  can't remember every single statement that he

25  mentioned.

**64**

1    Q.    And you wrote the report, right?

2    A.    Yes, I wrote this report.

3    Q.    I went through your report yesterday,

4  and I went through it today.  I did not find

5  anywhere in your report where you indicate that

6  Mr. Kholkar thought he was dying because they were

7  not getting him off the ship to a doctor.  It's not

8  in there anywhere, right?

9    A.    Again, I would have to look a hundred

10  percent through everything.  I don't want to, you

11  know, say something under oath and maybe it is.  So

12  I don't know if that particular statement is in

13  there.

14    Q.    Okay.  I'm telling you it's not, but

15  you can take a minute or two to look real quick and

16  see if you have anything about that in there.

17  Okay?

18        MR. RAYER:  Doctor, you can take as

19        long as you need.

20  BY MR. SOTOLONGO:

21    Q.    You can take as long as you need.

22  Whatever.  It's just a matter of...

23        MR. RAYER:  I mean, if you want her to

24        assume that, we can save some time.

25        MR. SOTOLONGO:  I know it's not on

**65**

1  there, but she wants to verify it. I'm
2  telling her it's not mentioned in there,
3  and it's not.
4       MR. MARTIN:  Why don't we take a one
5  or two-minute break, and, during that time,
6  the witness can examine her notes, if it
7  includes the statement or not include it,
8  and that way, we can take a break, and she
9  can look through her notes, and we can
10  reconvene in a minute or two.
11  BY MR. SOTOLONGO:
12       Q.  Let me ask something before we go on
13  the break.
14       The thought of impending death, can
15  that be a traumatic event?
16       A.  Impending death?  Yes, if someone's
17  life is threatened, threatened death or serious
18  injury or sexual violence, yes.
19       Q.  Let's go ahead and take a break so you
20  can look through your report real quick.  Whatever.
21  Take your time.
22       Five minutes you said, Tom?
23       MR. RAYER:  That's all I need.
24       THE WITNESS:  That's okay.
25       MR. SOTOLONGO:  Five minutes, it is.

**66**

1       VIDEOGRAPHER:  We're going off the
2  record at 11:19 a.m.
3       (At this time, a recess was taken.)
4       VIDEOGRAPHER:  We're going back on the
5  record at 11:26 a.m.
6  BY MR. SOTOLONGO:
7       Q.  All right.  We were talking about the
8  section where you had indicated that the
9  development of his mental health symptoms is
10  subsequent to the three things we discussed:  The
11  traumatic incidents, contracting malaria and
12  enduring a range of medical sequelae from the
13  malaria.
14       And I was asking you, you had not
15  mentioned in that section the incarceration.  We
16  discussed that, right?
17       A.  Yes.
18       Q.  And you also didn't discuss in that
19  section that he thought he was going to die while
20  he was on the ship because he had malaria and they
21  were not giving him any medical care or medication.
22  Right?
23       A.  So, yeah, I looked in my report, the
24  word, "impending death," like you mentioned, and I
25  was not able to find that word in my report.

**67**

1       Q.  Okay.  And your report doesn't also
2  indicate anything about -- about Mr. Kholkar having
3  fear of dying aboard that ship without seeing his
4  daughter, who was about to be born during that same
5  time.  Nothing in your report about that either,
6  right?
7       A.  About his daughter being born?
8       Q.  Yes.  About his fear of dying and also
9  his fear of dying without seeing his daughter, his
10  newborn daughter that was in the process of being
11  delivered by his wife around that same time period.
12  You didn't mention that in your report either,
13  right?
14       A.  I see here, he stated that in
15  August 2017, he was able to contact his family
16  members as he was deemed medically stable, and was
17  ultimately transported to Goa, India.
18       Q.  But you know he has a daughter, right?
19       A.  Yes.  He did report he had a daughter.
20       Q.  And you didn't indicate -- obviously,
21  you don't know when his daughter was born, but do
22  you know that his daughter was born while he was in
23  a coma?
24       MR. RAYER:  Object to the form.
25  BY MR. SOTOLONGO:

**68**

1       Q.  Did you know that?
2       A.  Again, I would have to read through my
3  notes exactly to know when his daughter was born.
4       Q.  You don't have to know that.  You
5  don't have to know when she was born.  I'm asking
6  you, did you know, did you have any understanding
7  that while he was in the hospital in a coma, his
8  daughter was born?
9       A.  I don't believe I had that
10  understanding.
11       Q.  Okay.  And that's nowhere in your
12  report, obviously, right?
13       A.  Again, I'd have to look exactly what
14  statements he made about the daughter.
15       Q.  Do you have independent notes apart
16  from your report, independent notes that you took
17  while you were speaking with Mr. Kholkar?
18       A.  The clinical interview, uh-huh.
19       Q.  Yes, you do have those notes?
20       A.  (Nods head.)
21       Q.  How many pages do you have?
22       A.  I have no idea.  They are all in,
23  unfortunately, my house.
24       Q.  That's okay.
25       MR. SOTOLONGO:  I'm going to go ahead

69

1    -- what exhibit are we up to?  Number 4?
2    Let me go ahead and mark that as
3    Exhibit No. 4.
4        (Thereupon, Plaintiff's Exhibit No. 4.
5        was marked for identification.)
6  BY MR. SOTOLONGO:
7        Q.    I would like you to produce that to us
8  as well.
9        A.    Yes.
10       Q.    In addition to that letter that we
11  asked for, of you, okay?
12       A.    Sure.
13       Q.    All right.  So let me move on here.
14  Let's bring this up.  I'm going to show you an
15  article, a newspaper article from Brazil.
16           Were you provided with a copy of this
17  article with additional stuff that was provided to
18  you by the EPS lawyers?
19       A.    I was not provided this article, no.
20       Q.    Okay.  And you see what the article is
21  titled?
22       A.    "Voyage of Near Death and Survival."
23       Q.    And do you know who that person is in
24  that?  Do you know that is Mr. Kholkar?
25       A.    Is the article about him or --

70

1        Q.    It's about him.
2        A.    Okay.
3        Q.    Do you recognize him?  Does he look
4  like the Mr. Kholkar that you interviewed?
5        A.    Yeah.  You know, it's a little -- it's
6  a little black and white, so it's kind of hard to
7  see exactly, and with the things he has over his
8  face, but that looks like it is him, yes.
9        MR. SOTOLONGO:  All right.  So I'll
10  mark this as Plaintiff's 5.
11       MR. RAYER:  I'm assuming we're
12  reserving objections on exhibits as well.
13       MR. SOTOLONGO:  That's fine.
14       (Thereupon, Plaintiff's Exhibit
15       No. 5 was marked for identification.)
16  BY MR. SOTOLONGO:
17       Q.    You didn't review Mr. Kholkar's
18  deposition, right?
19       A.    No.  I don't believe I did.
20       Q.    In fact, you haven't reviewed any of
21  the depositions taken in this case, right?
22       A.    No.
23       Q.    And did you receive a copy of the
24  Complaint?
25       A.    The Complaint?  Could you please

71

1  elaborate?
2        Q.    Yes.  The Complaint, the lawsuit.  The
3  Complaint, what brings this case into life.
4        A.    No, I did not.
5        Q.    So when you say in your report that he
6  filed this lawsuit due to experiencing a range of
7  mental health symptoms, where did you get that
8  from?
9        A.    He told me he was filing a civil
10  lawsuit.
11       Q.    Okay.  But you -- so you took his word
12  for it.  You have not seen the Complaint yourself,
13  right?
14       A.    Well, I was also notified by the law
15  firm that he's filing a lawsuit.
16       Q.    You have not personally seen the
17  Complaint with your own eyes, right?
18       A.    No, I have not.
19       Q.    So you have no idea whatsoever what
20  allegations Mr. Kholkar is making in his Complaint
21  about his mental illness, or causation, or anything
22  like that, right?
23       A.    I put in the report what he reported
24  to me.
25       Q.    Okay.  Did he report to you that he

72

1  was suing over his mental issues, or did he tell
2  you that he was suing over all the bad things that
3  happened to him, the malaria, not getting timely
4  medical care, losing his toes, and now dealing with
5  all the aftermath of all of that?
6        A.    He told me he's filing a civil
7  litigation lawsuit, but I don't know exactly the
8  specifics.  I just know it was for medical as well
9  as mental health concerns.
10       Q.    Okay.  Because you say he filed his
11  lawsuit due to experiencing a range of mental
12  health symptoms, and I don't think Mr. Kholkar
13  would have told you that.
14           So I'm asking -- that's why I want to
15  know where you got that from.
16       A.    Well, he mentioned that he is
17  experiencing mental health symptoms subsequent to
18  what occurred to him, and so he's -- this is the
19  civil lawsuit that he told me he's pursuing is for
20  medical and mental health.
21       Q.    Okay.  You also indicated in your
22  report, "I only provided a summarization of records
23  for pertinent documents that referenced any mental
24  health symptoms or treatment."  Right?
25       A.    Right.

73

1    Q.   That's on page 7 of your report. What
2    was he -- what was he diagnosed with in the
3    hospital in Brazil? Was he diagnosed with any
4    mental issues?
5        A.   It mentioned that he displayed a
6    depressive mood, and so a psychiatrist was
7    consulted.
8        Q.   Okay.
9        A.   And then they noted great improvement
10   of the depressive and insomnia, and I think I kind
11   of mentioned that his presentation waxed and waned
12   throughout times. So there would be certain times
13   when he would display a depressed mood, and then he
14   wouldn't. However, at the end I noted that a
15   comprehensive overview of the course of progress of
16   his treatment such as medication, management, and
17   any kind of therapy modalities they used or
18   diagnoses were not reported.
19       Q.   All right. We'll look at that real
20   quick. But you indicate on page 7 of your report
21   that, "In late July --" he's in the hospital in
22   Brazil, "-- Mr. Kholkar underwent additional
23   surgical amputation on both feet and endorsed a
24   depressed mood due to amputation and its permanent
25   sequelae, the restrictions that will remain, and

74

1    the perspectives and difficulties for the future."
2    Right?
3        A.   This was in the records, yes.
4        Q.   Yes. And this is what the doctors are
5    reporting in the record in July of 2017, correct?
6        A.   Yes.
7        Q.   And Mr. Kholkar, consistent with that
8    statement there, okay, that "He has a depressed
9    mood due to amputation and its permanent sequelae,
10   the restrictions that will remain, and the
11   perspectives and difficulties for the future," that
12   was in July of 2017, and you just took
13   Mr. Kholkar's statement -- or you interviewed him
14   in August of 2022; and that's what he's reporting
15   to you basically, right? That he's got amputated
16   toes. He cannot work. He's jobless, very
17   frustrated and tense, can't walk properly, can't
18   sleep. Right? He's still dealing with some of the
19   sequelae that they were talking about in July
20   of 2017, right?
21       A.   Yes, that's what he reported.
22       Q.   All right. Let's look at the records
23   from Brazil.
24       A.   Okay. Sorry. I just wanted to say I
25   don't -- oh, okay. You have the records. I wanted

75

1    to say that I don't have all the records in front
2    of me.
3            (Sharing screen.)
4            MR. SOTOLONGO: Let's move down to
5        June 5th, Carol. Page 5, thank you.
6    BY MR. SOTOLONGO:
7        Q.   All right. This is -- let's go to the
8    very beginning so we can mark -- let's go ahead.
9    These are International Medical Care 24 Hours
10   records from Rio de Janeiro dated August 10, 2017,
11   pertaining to the M/V STARGATE, which is where
12   Mr. Kholkar worked. And this is the hospital where
13   he was hospitalized for 76 days. On page 5 of this
14   report, you see where it says there in Paragraph 2
15   at the end, that last sentence, "had agitation
16   episodes during the night," right?
17       A.   I see that sentence, yes.
18       Q.   And Precedex, 5 milligrams/H was
19   started. Right?
20       A.   I see that statement, yes.
21       Q.   That's a medication for what?
22       A.   I'm not a psychiatrist, so that is
23   outside of my scope of expertise. I'm not sure
24   what that treats.
25       Q.   Do you think that treatment was to

76

1    deal with his agitation, or you think it was to
2    deal with something else?
3            MR. RAYER: Object to the form.
4            THE WITNESS: That is outside of my
5        scope of expertise. I'm not sure what it
6        was treating.
7    BY MR. SOTOLONGO:
8        Q.   All right. Let's look it up really
9    quick.
10           According to what I looked up, it's a
11   medication used to treat acute agitation. You're
12   not familiar with it, right?
13       A.   No.
14       Q.   When you indicated earlier that there
15   was no evidence of any medication being
16   administered to him or anything like that, you had
17   not seen this?
18       A.   I don't believe I saw that statement,
19   no.
20       Q.   And that was June 5th, right?
21   June 5th. So he was admitted to the hospital
22   July 27th. This is June 5th, according to what
23   we're looking at here, right?
24       A.   Personally, I would want to know more
25   information about what "agitation" means. I don't

77

1  know if that's physical agitation, emotional, so
2  there was really no further description.
3       Q.   All right.  So let's go on to page 10.
4  All right.  And you see Paragraph 2, the last
5  sentence there, "Depressive mood is being treated
6  by a specialist psychiatrist," right?
7       A.   Yes.  And I believe I put that also in
8  my report, a specialist psychiatrist, uh-huh.
9       Q.   So I guess he's been diagnosed with
10  depressive mood, right?
11          MR. RAYER:  Object to the form.
12          THE WITNESS:  It just mentions that
13       he's being treated for that.  Depressive
14       mood is also not a diagnosis, so...
15  BY MR. SOTOLONGO:
16       Q.   All right.  So the June 20th,
17  June 21st, the last sentence, the same thing.
18  "Depressive mood is being treated by a specialist
19  psychiatrist, and his mood and insomnia has
20  improved."  Right?
21       A.   That's what it says, yes.
22       Q.   So again, here they are treating him
23  for depressive mood and for insomnia, right?
24       A.   That's what the records say.
25       Q.   Okay.  And he told you during your

78

1  interview that he's still having issues with
2  insomnia, right?
3       A.   He mentioned he has sleep disturbance,
4  fragmented sleeping patterns, as well as
5  nightmares, yes.
6       Q.   Okay.  Let's go to page 18,
7  Paragraph 2, July 19th, last sentence there, "The
8  patient is under psychotherapy and understood the
9  necessity of the surgical procedures and the
10  sequelae as what was left from a life-threatening
11  disease he went through."  Right?
12       A.   Okay.
13       Q.   Did you ask EPS -- did you ask EPS,
14  the lawyers for EPS, to try to get you some of the
15  records for his psychiatric treatment or
16  psychiatric therapy that he was undergoing in
17  Brazil?
18       A.   I received these records, so I didn't
19  know there was further specific records from a
20  psychiatrist.  I believed everything was outlined
21  in the records I obtained from Medical Care
22  24-Hours Hospital Rio Mar.
23       Q.   Because you say -- in your report,
24  "All the mental health treatment was noted in
25  Brazil records -- the Brazil records.  The records

79

1  don't provide a comprehensive overview of the
2  course and the progress of his treatment, including
3  medication, psychotherapies or psychiatrist
4  diagnosis."  But that's not correct.  This record
5  does have an indication of him receiving
6  medications, psychotherapies and a diagnosis.
7          MR. RAYER:  Object to the form.
8  BY MR. SOTOLONGO:
9       Q.   Correct?
10       A.   So it mentioned that he has a
11  depressed mood and that he is receiving
12  psychotherapy.  It did not mention anything about
13  what type of modalities, how often, what are they
14  discussing.  Besides that, agitation medication, I
15  didn't see anything else.  And then there was
16  nothing about a diagnosis besides just, "He has a
17  depressed mood."
18       Q.   Okay.  And again, my question is, did
19  you try to get your hands on any additional
20  records?  Did you ask EPS Singapore for any of the
21  records of the psychotherapy or anything like that,
22  medications; anything to that effect?
23       A.   I was told that the records I received
24  were all the records that -- from this particular
25  hospital.  They were quite extensive, so I reviewed

80

1  the records from this hospital.
2          MR. RAYER:  Let me interject, Peter.
3       If you have records that you have not
4       produced, please produce them, and we'll
5       take a look at them.  But all we got is
6       what you've given us.
7          MR. SOTOLONGO:  EPS Singapore is
8       responsible for his medical care, paid for
9       his medical care, should have obtained all
10       his medical records.  So that's why I'm
11       asking that question.  I didn't pay for
12       that.  I wasn't in touch with them at the
13       time; you guys were -- or your P&I club
14       was.
15          So try to keep your objections to a
16       form objection.  If I had those records,
17       obviously, I would have showed them to you
18       during discovery.
19          MR. RAYER:  I'm just trying to make
20       sure we've got everything that you've got.
21          MR. SOTOLONGO:  You guys were in
22       control of these records, and you guys paid
23       for the treatment, so you should've got
24       your hands on whatever you thought was
25       necessary.

**81**

1  My question to her, anyway, I think
2  whether she asked for it, and I think the
3  answer was no, and that she was told this
4  was all there was.
5  BY MR. SOTOLONGO:
6     Q.   Right, ma'am?
7     A.   I was just provided the records I was
8  provided. I didn't think that there would be more.
9  These explain kind of his entire progression of his
10  treatment, and they were quite comprehensive. So I
11  felt this was all there was.
12     Q.   All right.
13     As of July 22nd, right, at least
14  according to this, according to page 19 -- let's go
15  to page 19 -- July 22nd, "He's in a depressed mood
16  due to the amputation and its permanent sequelae,"
17  'cause that is a permanent condition; his toes will
18  not grow back, correct?
19     A.   Yes.
20     Q.   "And the restrictions that will remain
21  and the perspective and difficulties for the
22  future." Those are some of the things you guys
23  talked about in your interview, right? I think I
24  asked you this question earlier. Right?
25     A.   Yes.

**82**

1     Q.   Okay. Then July 23rd, the next
2  paragraph, "He's maintaining a depressed mood due
3  to the amputation and his permanent sequelae, the
4  restrictions that will remain and the perspectives
5  and difficulties for the future." I read that
6  correct?
7     A.   Correct.
8     Q.   Page 20, paragraph 3, July 26th: "As
9  of July 26th, the patient is sad, upset, feeling
10  razed and with the feeling that being mutilated, it
11  will be difficult for getting a position in the
12  future." I read that correct?
13     A.   Yes.
14     Q.   Okay. Page 22, from August 1st: "The
15  patient shows good clinical evolution. He is
16  emotionally unstable. He is experiencing his anger
17  for his present condition and for not receiving the
18  information of his return to India on August 3rd.
19  And his anxiety has increased also by the near
20  return to home." Right?
21     A.   Uh-hmm, yes.
22     Q.   All right. Page 23, August 4th -- now
23  he's been in the hospital since May 27th, right?
24     A.   Yes.
25     Q.   "As from August 4th, the patient is in

**83**

1  a depressive mood, quiet and with insomnia," right?
2     A.   Yes.
3     Q.   "August 5th, the patient is still
4  showing sadness, quiet and complaining of insomnia,
5  besides treatment," right?
6     A.   Yes.
7     Q.   All right. And then page 24. This
8  is, he is getting discharged from the hospital.
9  This is the last report, the last page. And it
10  indicates that he is under therapy -- let's see,
11  where are we -- paragraph -- that big paragraph
12  there towards the end, the last sentence, "He is
13  under psychotherapy in order to help him overcome
14  this permanent loss at an early stage of his life."
15  Right?
16     A.   That's what it says, yes.
17     Q.   Okay. You didn't include any of this
18  information in your report, right? All this stuff
19  that we just went over, you didn't include all
20  these dates, and you didn't include any of this
21  language in your report, right?
22     A.   I don't have to include everything in
23  the records. Again, I try to be as concise with
24  summarization, so I try to include pertinent
25  information.

**84**

1     Q.   Well, your record -- your record has a
2  section -- your record has a section that deals
3  with mental health treatment, right? Right?
4     A.   Yes.
5     Q.   That's page 6. And then on page 7,
6  you have another section, "Review of medical and
7  mental health treatment records," right?
8     A.   Correct.
9     Q.   Okay. Dr. Figley -- he diagnosed
10  Mr. Kholkar with PTSD, acute chronic anxiety, sleep
11  disorder and generalized anxiety disorder. Do you
12  understand that? That's on page 8 of your report.
13     A.   Correct. Yes, I understand that.
14     Q.   And you disagree with all of those
15  diagnoses, right?
16     A.   I do not find Mr. Figley's conclusions
17  credible and reliable, given that he did not
18  perform any performance or symptom validity
19  objective measures.
20     Q.   All right. So let's do this.
21  Obviously, you disagree with him that he's got
22  PTSD. You think he's malingering as to PTSD,
23  right?
24     A.   I do not believe he meets diagnostic
25  criteria for any mental health diagnosis.

85

1    Q.   You do not believe that he has acute
2  or chronic anxiety?
3    A.   So that's not a diagnosis in the
4  DSM-5.  The only diagnosis that he put is PTSD that
5  is in the DSM-5 and generalized anxiety disorder.
6  He did mention sleep disorder, but there are many
7  different sleep disorders, so I am not sure which
8  one he's also talking about.
9         But given his performance on the
10  measures I administered, I do not believe he meets
11  the diagnostic threshold for a diagnosis of any
12  mental illness.
13    Q.   Do you agree that Mr. Kholkar suffers
14  from acute and chronic anxiety; yes or no?
15    A.   No.
16    Q.   Do you believe that he suffers from
17  sleep disorder, insomnia, or whatever you want to
18  call it?
19    A.   No.
20    Q.   Do you believe that he suffers from
21  generalized anxiety disorder?
22    A.   No.
23    Q.   Okay.  All right.  Let's go now to
24  your -- the test that you did.
25    A.   Okay.

86

1    Q.   And you did approximately six
2  different tests on him, right?
3    A.   Yes.
4    Q.   Right?
5    A.   Correct.
6    Q.   And all of these tests had a lot of
7  items.  The first test had 60 items; the second
8  test had 29 items; the third test had 34 items; the
9  other one had 136 items; the other one had 75
10  items; and then the last one had 20 items; right?
11    A.   Correct.
12    Q.   And he did all of these in one sitting
13  during your interview, right?
14    A.   Correct.  The entirety of the
15  evaluation took four hours and 30 minutes.
16    Q.   Okay.  And then you have one of the
17  tests that you administered, which is on page 11 of
18  your report, is a test called "PTSD Checklist for
19  DSM-5."
20    A.   Correct.
21    Q.   And what is the PTSD Checklist for
22  DSM-5?
23    A.   So it measures -- it's a self-report
24  measure that assesses the 20 DSM-5 symptoms of PTSD
25  diagnostic criteria.  So it's often used as a

87

1  self-report measure to see about what PTSD symptoms
2  an individual might endorse.
3    Q.   Okay.  How did he do on this test?
4    A.   He received a score of 50 out of 80.
5  Currently, in the test manual, it suggests that an
6  individual should receive about a score of 31 to 33
7  for a probable diagnosis of PTSD.
8    Q.   All right.  So how did he do?  Did he
9  have a problem?
10    A.   He went above the criteria, which is
11  suggestive that he's over-endorsing symptoms.  But
12  I think it is imperative to highlight this measure
13  is a self-report measure, so it contains no
14  validity kind of scales within it.  So again, it's
15  all based on self-report and based on someone's
16  experience.
17    Q.   All right.  And then you, in your
18  opinions -- in all of the opinions that you were
19  asked to address, I guess, by the lawyers for EPS,
20  you were given, I guess, what, how many questions?
21  You were given --
22    A.   I was given.
23    Q.   -- 12 questions to answer?
24    A.   Yes, 12 questions, hmm-hmm.
25    Q.   And in answering your 12 questions,

88

1  basically the conclusion that you came to is that
2  he's malingering because of the inconsistency
3  between what he told you in the oral interview and
4  what he reported in all of these tests that you
5  gave him in that one sitting, right?
6    A.   Correct.
7    Q.   Okay.  And you actually indicate on
8  your report that his test performance on the TS1
9  was valid, right?
10    A.   Yes, it was, uh-huh.
11    Q.   And the TSI-2 is the one that you're
12  saying he reported some things on that test
13  that he didn't report during the oral interview,
14  right?
15    A.   Correct.
16    Q.   And that is your basis.  Even though
17  you're saying that his test performance on the
18  TS1-2 is valid, you are still thinking he's a
19  malingerer because he reported something on there
20  that he didn't tell you verbally during your
21  interview with him, correct?
22         MR. RAYER:  Object to the form.
23  BY MR. SOTOLONGO:
24    Q.   Correct?
25    A.   Throughout my entire evaluation, my

**89**

1  job is to find inconsistencies and discrepancies,
2  and so here it does indicate that there were things
3  on here that he did not report spontaneously to me.
4      Q.  But you're not reporting
5  inconsistencies in this test, and you're not
6  reporting inconsistencies in the way he is
7  answering these tests that we can all look at;
8  you're reporting inconsistencies between what he
9  told you verbally and what he reported on some of
10 these tests; and in particular, in that one test,
11 the PTS (sic) test, right?
12     A.  The trauma symptom inventory?
13     Q.  Yes, the one we just talked about.
14     A.  Yes.  So I'm just highlighting --
15     Q.  Your inconsistencies -- just so we are
16 clear, his inconsistencies are not amongst the
17 tests that you gave him.  The inconsistency --
18     A.  They are --
19     Q.  -- the inconsistency that you're
20 highlighting is the inconsistency between what you
21 said he told you and what he reported to you in the
22 test, right?
23     A.  There are inconsistencies in his self
24 report, what he spontaneously reported, and among
25 measures, yes.

**90**

1      Q.  But you don't talk about that in your
2  report.  You don't talk about inconsistencies
3  amongst the measures; you talk about
4  inconsistencies in what he told you.
5      A.  It's not uncommon for individuals to
6  have inconsistencies among measures.  That's why we
7  administer so many to make sure that we have a good
8  comprehensive opinion.
9      Q.  Yeah.  And it's not uncommon for
10 someone to forget to tell you something, but then
11 see it in writing and check it off, right?  That's
12 not inconsistent either, right?
13     A.  I would describe that as an
14 inconsistent, yes.
15     Q.  Okay.  Well, isn't that why we have
16 records?  Isn't that why a lot of -- we keep
17 medical records and stuff, because a lot of us are
18 poor historians?
19     MR. RAYER:  Object to the form.
20 BY MR. SOTOLONGO:
21     Q.  Isn't that your understanding as to
22 why we do that?
23     MR. RAYER:  Object to the form.
24 BY MR. SOTOLONGO:
25     Q.  Yes or no?  Do you have an

**91**

1  understanding, yes or no?
2      A.  Sometimes some individuals are poor
3  historians, sure.
4      Q.  Okay.  And did you have a checklist of
5  all the same questions that you asked him that were
6  going to be on these tests before you gave him the
7  test?  Did you ask him the same questions from a
8  checklist that you had or something like that?
9      A.  No.  It is up to him to provide me
10 with his own experience, so I do not prompt or lead
11 or do anything in the beginning.  It's up to the
12 individual to tell me how they are feeling.
13     Q.  Okay.  So you're saying that the
14 different things that he reported to you that he
15 didn't report in his test is, one, sexual
16 dysfunction, right?
17     A.  Uh-huh.
18     Q.  Flashbacks?
19     A.  Uh-huh.
20     Q.  Recalling bad memories --
21     A.  Paralysis.
22     Q.  Excuse me?
23     A.  Paralysis due to recalling a bad
24 memory.
25     Q.  Okay.  Accelerated heart rate and

**92**

1  difficulty swallowing, right?
2      A.  Correct.
3      Q.  All right.  Did you ask him any of
4  those questions?  Did you ask him was he having
5  sexual dysfunction as a result of his mental issue?
6  Did you ask him that before you gave him the test?
7      A.  I don't provide prompting in the
8  beginning.  I allow the individual to tell me how
9  they feel.
10     Q.  Okay.  All right.  And you didn't ask
11 him also if he was having any issues with
12 flashbacks or accelerated heart rate or difficulty
13 swallowing, you didn't ask him any of that in your
14 oral interview?
15     A.  No.  It's an open-ended interview, so
16 I allow the individual to tell me how they feel
17 without putting any words in their mouth.
18     Q.  All right.  And then you gave him a
19 bunch of tests and a bunch of different tests where
20 he gets to now mark all the different things he
21 could be feeling and experiencing or going through,
22 huh?
23     A.  Correct.
24     Q.  And he marked as much as he could for
25 you, right?

93

1    A.    He -- he didn't miss any questions.
2  Like, he marked all of them.
3    Q.    Okay.  And because he didn't tell you
4  in your oral interview about sexual dysfunction or
5  difficulty swallowing or accelerated heart rate,
6  even though you didn't ask him about those
7  questions, you think that's why he's a malingerer?
8    A.    Again, it's a multimodal approach.  So
9  he failed numerous measures of objective validity.
10 And, thus, that is why I do not find his
11 presentation to be credible.  Because if he's
12 feigning on these measures and showing poor
13 performance, then I can't take his self report to
14 be credible.
15   Q.    What are you basing that on, the
16 testings, the different results in his testing
17 where he's self-reporting everything that he's
18 feeling?
19   A.    We have certain measures we use in
20 psychology.  They are called performance validity
21 measures and symptom validity measures, to assess
22 as an individual presenting more or producing more
23 answers that maybe match with someone who has
24 genuine psychopathology --
25   Q.    Yes?

94

1    A.    -- and one who is feigning.
2    Q.    I understand that.
3    A.    So his responses are compared to the
4  normative sample; and so the symptoms, the results
5  I received, placed him in a non-credible
6  presentation.
7    Q.    But in your report, what you report is
8  his inconsistency with what he told you verbally
9  and what he reported on this particular test.
10 That's what you're basing your opinion on.
11       MR. RAYER:  Object to the form.
12 BY MR. SOTOLONGO:
13   Q.    The sexual dysfunction, the
14 flashbacks, recalling bad memories that paralyzes
15 him, accelerated heart rate and difficulty
16 swallowing.  What you say in your report -- what
17 you say in your report is that he's malingering
18 because he didn't tell you that during the oral
19 interview, but marked it on the tests; isn't that
20 correct?
21   A.    That is --
22       MR. RAYER:  Object to the form.
23       THE WITNESS:  That is a component of
24 the evaluation.
25 BY MR. SOTOLONGO:

95

1    Q.    Okay.  Is there something that we can
2  look at that gives us an objective reading of all
3  these tests when you put them together like in a
4  computer or something, and it gives you a final
5  number after it calculates all the information and
6  all the data?
7        How is that calculated, or is that
8  done by you based on your own subjective findings?
9    A.    It's all -- so every single assessment
10 has their own manual, and in the manual it shows
11 you normative groups that their responses are
12 compared to.  And then it basically produces the
13 score.
14       So according to the test developers
15 that created these assessments, that is what I go
16 off of.  So everything I have said is not
17 subjective; it is purely based on objective
18 evidence, and that is why, I think I mentioned in
19 my report, in cases where there's a large
20 incentive, response style biases are quite
21 prevalent.  Thus, that's why psychologists -- we
22 should utilize objective evidence to corroborate
23 our findings.
24   Q.    Yes.  And the objective evidence that
25 we have here is that Mr. Kholkar was subjected to a

96

1  traumatic event.  He almost lost his life, lost his
2  toes, was in a hospital for 76 days, right?  Those
3  are all objective factors as well, right?
4        MR. RAYER:  Objection.
5  BY MR. SOTOLONGO:
6    Q.    Was incarcerated as a result of
7  bringing a lawsuit, right?
8        MR. RAYER:  Object to the form.
9  BY MR. SOTOLONGO:
10   Q.    And you don't believe, as a clinical
11 psychologist, that any of that stuff had any
12 bearing on his mental status presently; correct,
13 ma'am?
14       MR. RAYER:  Object to the form.
15 BY MR. SOTOLONGO:
16   Q.    Correct?
17   A.    I think I mentioned -- I think I
18 mentioned this in my report in that -- of course,
19 if someone endured such experiences in their
20 lifetime, yes, I could understand how that can be
21 particularly distressful for that person, and I'm
22 not disagreeing with that.  However, given his
23 performance on this evaluation, his results were
24 suggestive of grossly exaggerated symptomology and
25 poor effort.  And, thus, he does not meet the

## 97

1  diagnostic threshold for the symptoms he was
2  reporting.
3       Q.   For nothing; not even anxiety?  You
4  didn't even diagnose him with anxieties, nothing,
5  not even insomnia, right?  You don't even believe
6  he suffers from insomnia, right?  Right?
7       MR. RAYER:  Form.
8       THE WITNESS:  If objective evidence
9  demonstrates that his results were not
10  credible, I cannot take his report as
11  valid.
12 BY MR. SOTOLONGO:
13      Q.   Well, you saw -- you saw the insomnia
14 being reported all the way going back to Brazil,
15 right?
16      A.   Yes.
17      Q.   Okay.
18      MR. SOTOLONGO:  All right.  Thank you.
19 Those are all the questions I have.
20      MR. RAYER:  Thank you, everybody.
21      MR. SOTOLONGO:  Let me mark her report
22 as 7.
23      (Thereupon, Plaintiff's Exhibit No. 7
24 was marked for identification.)
25      MR. RAYER:  Sure.

## 98

1       VIDEOGRAPHER:  Ready to go off the
2  record?
3       MR. RAYER:  I think so.
4       VIDEOGRAPHER:  Going off the record at
5  12:05 p.m.
6       (Thereupon, the deposition was
7  concluded at 12:05 p.m.)

## 99

2
3  STATE OF FLORIDA    )
                       )
4  COUNTY OF MIAMI-DADE)
5
6
7       I, the undersigned authority, certify
8  that SANDRA MICHEL, M.D. personally appeared before
9  me and was duly sworn.
10      WITNESS my hand and official seal this
11 September 26, 2022.
12
13
14

16      _____
        ELENA ROBAINA, FPR
17      Notary Public-State of Florida
18

19
20
21 My Commission Expires:  4/17/2024
   My Commission #: GG971350
22
23
24
25

## 100

1       CERTIFICATE OF SHORTHAND REPORTER
2  STATE OF FLORIDA    )
                       ) SS.
3  COUNTY OF MIAMI-DADE)
4
5       I, Elena Robaina, Florida Professional
6  Shorthand Reporter, do hereby certify that I was
7  authorized to and did stenographically report the
8  deposition of SANDRA MICHEL, M.D.; and that the
9  foregoing transcript, pages 1 through 103, is a
10 true record of my stenographic notes.
11      I further certify that the said witness was
12 duly sworn according to law.
13      I further certify that I am not of counsel
14 to either of the parties to set cause or otherwise
15 interested in the action.
16      In witness whereof, I here unto set my hand
17 and affix my official seal this
18 September 26, 2022.
19
20
21      _____
        Elena Robaina
22      Florida Professional Reporter
23
24
25

101

VERIFICATION

STATE OF FLORIDA  )
                  )SS.
COUNTY OF DADE    )


        I, hereby certify that I have read the foregoing transcript pages 1 to 99 and find the same to be true and accurate.

        Any corrections made by me are set forth on the errata page attached hereto.


        _____
        SANDRA MICHEL, M.D.



Sworn to and subscribed before me on this,

the_____ day of_____, 2022.


        _____
        Notary Public
My Commission expires:
My Commission #:

---

102

ERRATA SHEET

        I, SANDRA MICHEL, M.D., do hereby acknowledge that I have read this transcript and find it to be accurate except for the corrections noted below.

PAGE __ LINE __ /
PAGE __ LINE __ / _____
PAGE __ LINE __ /
PAGE __ LINE __ /
PAGE __ LINE __ /
PAGE __ LINE __ / _____
PAGE __ LINE __ / _____
PAGE __ LINE __ / _____
PAGE __ LINE __ /
PAGE __ LINE __ /



        SANDRA MICHEL, M.D.


        Signed and dated this __ day of 2022.

---

103

TO: SANDRA MICHEL, M.D.
c/o Thomas A. Rayer, Jr. Esq.
601 Poydras St.
New Orleans, LA 70130

September 26, 2022

IN RE:  Kholkar V Ganpat v. EPS

Dear SANDRA MICHEL, M.D.,
With reference to the examination of YOURSELF, deponent in the above-styled cause, taken on 09/21/2022 under oath, please be advised that the transcript of the Deposition has been transcribed and is awaiting your signature.

Please arrange to conclude this matter at your earliest convenience. We would suggest that you or your attorney's office telephone this office and arrange an appointment suitable for all concerned.

However, if this has not been taken care of by October 27, 2022, we shall conclude the reading and signing of said deposition has been waived, and shall then proceed to file the original of the said transcript with the party who took the deposition, without further notice to any parties.

        Sincerely,

        _____
        ELENA ROBAINA, FPR



cc: All Counsel of Record.

## $

**$1,100** [1] - 10:15
**$11,550** [1] - 10:17
**$14,300** [1] - 18:22
**$2,750** [1] - 10:14

## '

**'apply** [1] - 58:20
**'If** [1] - 59:12
**'Impossible** [1] - 50:22
**'Right** [2] - 50:3, 51:23
**'Sometimes** [1] - 50:14
**'terrible** [1] - 59:21

## 0

**09/21/2022** [1] - 103:11

## 1

**1** [6] - 3:3, 8:21, 8:23, 62:10, 100:9, 101:7
**10** [3] - 14:13, 75:10, 77:3
**1000** [1] - 2:3
**103** [1] - 100:9
**10:08** [2] - 1:16, 4:7
**11** [6] - 3:4, 14:3, 61:24, 62:9, 62:10, 86:17
**11:19** [1] - 66:2
**11:26** [1] - 66:5
**12** [8] - 47:20, 47:23, 51:18, 51:21, 87:23, 87:24, 87:25
**12:05** [3] - 1:16, 98:5, 98:7
**136** [1] - 86:9
**14** [2] - 12:11, 45:2
**14,300** [2] - 11:6, 20:15
**15** [1] - 9:13
**1660** [1] - 2:11
**1760** [1] - 2:7
**18** [1] - 78:6
**18-13556** [2] - 1:2, 4:4
**19** [2] - 81:14, 81:15
**19th** [1] - 78:7
**1st** [3] - 9:3, 9:15, 82:14

## 2

**2** [9] - 3:4, 11:15, 11:17, 12:6, 28:8, 29:10, 75:14, 77:4, 78:7
**20** [4] - 9:13, 82:8, 86:10, 86:24
**2017** [12] - 48:22, 50:18, 51:9, 53:25, 55:13, 55:19, 57:21, 67:15, 74:5, 74:12, 74:20, 75:10
**2019** [1] - 5:22
**2020** [1] - 5:22
**2022** [11] - 1:15, 4:6, 8:5, 9:3, 74:14, 99:11, 100:18, 101:19, 102:22, 103:7, 103:16
**20th** [1] - 77:16
**21** [5] - 1:15, 10:6, 10:8, 10:16, 10:18
**21st** [2] - 4:6, 77:17
**22** [1] - 82:14
**22nd** [2] - 81:13, 81:15
**23** [1] - 82:22
**23rd** [1] - 82:1
**24** [4] - 58:4, 58:21, 75:9, 83:7
**24-Hours** [1] - 44:24, 78:22
**26** [4] - 3:4, 99:11, 100:18, 103:7
**26th** [2] - 82:8, 82:9
**27** [1] - 103:16
**27th** [2] - 76:22, 82:23
**29** [1] - 86:8
**2nd** [2] - 8:5

## 3

**3** [9] - 3:4, 25:22, 25:25, 47:18, 57:16, 58:8, 60:11, 82:8
**30** [2] - 53:14, 86:15
**31** [1] - 87:6
**33** [1] - 87:6
**33139** [1] - 2:4
**34** [2] - 53:9, 86:8
**3rd** [1] - 82:18

## 4

**4** [5] - 3:5, 54:1, 69:1, 69:3, 69:4
**4/17/2024** [1] - 99:21
**400** [1] - 2:6

**402** [1] - 2:3
**45** [2] - 62:11, 62:12
**4th** [2] - 82:22, 82:25

## 5

**5** [10] - 2:21, 3:6, 47:19, 47:22, 58:14, 70:10, 70:15, 75:5, 75:13, 75:18
**50** [1] - 87:4
**5th** [6] - 2:3, 75:5, 76:20, 76:21, 76:22, 83:3

## 6

**6** [5] - 15:11, 47:20, 47:22, 49:20, 84:5
**60** [1] - 86:7
**601** [2] - 2:11, 103:5
**69** [1] - 3:5

## 7

**7** [7] - 3:8, 15:6, 73:1, 73:20, 84:5, 97:22, 97:23
**70** [1] - 3:6
**70130** [2] - 2:7, 2:12, 103:6
**726** [1] - 28:17
**75** [1] - 86:9
**76** [7] - 44:18, 44:22, 45:2, 45:11, 46:2, 75:13, 96:2

## 8

**8** [3] - 3:3, 14:25, 84:12
**80** [1] - 87:4

## 9

**97** [1] - 3:8
**99** [1] - 101:7

## A

**a.m** [4] - 1:16, 4:7, 66:2, 66:5
**abide** [1] - 17:1
**able** [14] - 20:19, 31:18, 39:6, 48:13, 49:4, 49:5, 53:22,

**53:23, 53:24, 55:3, 56:17, 66:25, 67:15
aboard** [3] - 42:25, 57:13, 67:3
**above -styled** [1] - 103:10
**absolutely** [1] - 56:10
**accelerated** [4] - 91:25, 92:12, 93:5, 94:15
**according** [12] - 38:2, 42:10, 52:25, 53:2, 55:8, 58:4, 76:10, 76:22, 81:14, 95:14, 100:12
**accurate** [2] - 101:8, 102:5
**accusing** [3] - 18:5, 19:10, 19:16
**achieve** [1] - 18:12
**acknowledge** [1] - 102:4
**acquired** [1] - 7:11
**Action** [1] - 4:3
**action** [1] - 100:15
**ACTION** [1] - 1:2
**actual** [6] - 10:14, 10:16, 10:20, 11:4, 28:23, 29:3
**acute** [8] - 35:17, 35:20, 35:21, 36:3, 76:11, 84:10, 85:1, 85:14
**adaptive** [1] - 39:18
**addition** [3] - 8:13, 51:8, 69:10
**additional** [3] - 69:17, 73:22, 79:19
**address** [1] - 87:19
**adequately** [1] - 16:16
**adherence** [2] - 28:18, 33:20
**adherent** [1] - 34:22
**administer** [1] - 90:7
**administered** [6] - 37:17, 46:12, 46:21, 76:16, 85:10, 86:17
**ADMIRALTY** [1] - 1:3
**admitted** [1] - 76:21
**advised** [1] - 103:11
**Affiliations** [1] - 14:24
**affix** [1] - 100:17
**aftermath** [1] - 72:5
**afterwards** [2] - 32:15, 54:21
**agitated** [1] - 46:25
**agitation** [6] - 75:15, 76:1, 76:11, 76:25, 77:1, 79:14
**agree** [6] - 18:21,

**20:14, 22:18, 31:6, 48:20, 85:13
ahead** [8] - 11:12, 17:11, 31:21, 41:4, 65:19, 68:25, 69:2, 75:8
**ailments** [1] - 50:14
**ALL** [1] - 2:1
**allegations** [1] - 71:20
**alleged** [1] - 13:14
**allow** [3] - 25:3, 92:8, 92:16
**almost** [1] - 96:1
**ALSO** [1] - 2:14
**altogether** [1] - 18:20
**American** [3] - 26:8, 26:11, 26:17
**amounts** [1] - 19:15
**amputated** [22] - 43:4, 43:10, 43:13, 43:18, 43:20, 44:12, 46:1, 46:8, 47:12, 47:16, 48:1, 48:2, 48:13, 48:17, 49:3, 49:6, 50:15, 50:17, 52:3, 52:24, 53:1, 74:15
**amputation** [5] - 73:23, 73:24, 74:9, 81:16, 82:3
**amputations** [3] - 43:16, 53:6, 53:22
**anaphylactic** [1] - 45:22
**anger** [1] - 82:16
**answer** [5] - 33:2, 41:6, 42:12, 81:3, 87:23
**answering** [3] - 14:11, 87:25, 89:7
**answers** [1] - 93:23
**anxieties** [1] - 97:4
**Anxiety** [1] - 29:21
**anxiety** [8] - 82:19, 84:10, 84:11, 85:2, 85:5, 85:14, 85:21, 97:3
**anyway** [1] - 81:1
**apart** [2] - 3:5, 68:15
**apartment** [1] - 22:7
**apologize** [2] - 11:25, 31:16
**appear** [2] - 14:4, 14:6
**appearances** [1] - 4:9
**APPEARANCES** [1] - 2:1
**appeared** [1] - 99:8
**appointment** [1] - 103:14
**appreciate** [2] - 14:10, 19:9

approach [3] - 17:3, 23:6, 93:8
appropriate [2] - 38:11, 58:25
approved [1] - 40:8
area [1] - 62:2
Arkansas [1] - 6:2
arrange [2] - 103:13, 103:14
article [7] - 3:6, 69:15, 69:17, 69:19, 69:20, 69:25
assess [3] - 23:5, 25:18, 93:21
assesses [1] - 86:24
assessing [1] - 23:6
assessment [1] - 95:9
assessments [4] - 24:21, 32:1, 32:16, 95:15
assigned [1] - 46:14
assist [1] - 41:3
assistance [1] - 46:16
associated [4] - 35:16, 35:19, 37:3, 42:25
Association [5] - 26:9, 26:12, 26:15, 26:16, 26:18
assume [3] - 9:4, 33:5, 64:24
assuming [1] - 70:11
attached [1] - 101:10
attention [2] - 27:15, 28:23, 30:24, 31:1
Attention [1] - 29:3
attitude [1] - 56:10
attorney 's [1] - 103:14
Audio [1] - 1:14
Audio -Video [1] - 1:14
August [12] - 8:5, 9:3, 9:14, 67:15, 74:14, 75:10, 82:14, 82:18, 82:22, 82:25, 83:3
authored [1] - 9:2
authority [1] - 99:7
authorized [1] - 100:7
available [1] - 11:20
avas cular [5] - 48:19, 50:4, 51:24, 53:23, 55:4
awaiting [1] - 103:12

## B

backup [1] - 41:2
backwards [1] - 13:3
bad [5] - 61:5, 72:2, 91:20, 91:23, 94:14

BAGOT [1] - 2:10
Baldwin [1] - 6:5
base [1] - 39:3
based [8] - 17:19, 27:23, 34:23, 39:15, 87:15, 95:8, 95:17
basic [1] - 21:6
Basics [1] - 27:18
basing [2] - 93:15, 94:10
basis [1] - 88:16
battery [1] - 37:17
Beach [1] - 2:4
bearing [1] - 96:12
become [1] - 20:19
bedside [1] - 35:1, 46:16
beginning [9] - 25:2, 26:6, 40:10, 42:16, 42:18, 49:25, 75:8, 91:11, 92:8
BEHALF [1] - 2:2, 2:10
behalf [2] - 4:11, 4:13
behavior [2] - 18:18, 58:25
believes [2] - 52:15, 61:4
below [1] - 102:6
best [1] - 39:10
better [1] - 39:21
between [5] - 24:14, 38:16, 88:3, 89:8, 89:20
bias [15] - 15:24, 16:4, 16:9, 16:13, 16:14, 16:20, 16:21, 17:19, 17:20, 17:25, 19:12, 19:13, 19:18, 20:2
biased [2] - 17:2, 17:24
biases [3] - 16:17, 23:8, 95:20
big [2] - 50:1, 83:11
billed [1] - 10:7, 10:10, 10:13, 10:16, 10:23, 10:25, 11:5
Bipolar [1] - 29:20
bit [1] - 20:18
black [1] - 70:6
bloody [2] - 44:11, 44:16
body [1] - 56:17
bond [4] - 58:21, 59:7, 59:11, 59:17
bono [1] - 20:21
book [2] - 26:19, 27:16
born [7] - 67:4, 67:7, 67:21, 67:22, 68:3, 68:5, 68:8

Brandon [1] - 2:14
Brazil [13] - 3:6, 35:10, 44:18, 44:22, 50:17, 69:15, 73:3, 73:22, 74:23, 78:17, 78:25, 97:14
break [7] - 61:25, 62:20, 62:24, 65:5, 65:8, 65:13, 65:19
bring [2] - 11:21, 69:14
bringing [1] - 96:7
brings [1] - 71:3
Brittany [1] - 6:5
bunch [2] - 92:19
but .. [1] - 39:4
BY [43] - 2:4, 2:8, 2:21, 5:7, 8:24, 11:18, 12:4, 19:20, 20:4, 20:13, 21:7, 21:18, 26:4, 31:20, 33:9, 49:9, 51:17, 53:18, 58:5, 61:9, 62:4, 63:1, 63:13, 64:20, 65:11, 66:6, 67:25, 69:6, 70:16, 75:6, 76:7, 77:15, 79:8, 81:5, 88:23, 90:20, 90:24, 94:12, 94:25, 96:5, 96:9, 96:15, 97:12

## C

c/o [1] - 103:5
calculated [1] - 95:7
calculates [1] - 95:5
California [1] - 37:16
cannot [4] - 47:12, 48:1, 74:16, 97:10
care [5] - 66:21, 72:4, 80:8, 80:9, 103:15
Care [3] - 44:24, 75:9, 78:21
career [2] - 56:16, 57:8
cargo [1] - 54:4
Carol [1] - 75:5
carrying [1] - 16:23
case [21] - 1:24, 4:1, 6:1, 6:6, 6:9, 6:19, 6:20, 7:16, 7:24, 10:23, 18:22, 20:16, 20:25, 22:20, 22:23, 36:23, 39:9, 44:4, 57:24, 70:21, 71:3
cases [4] - 6:16, 6:17, 39:19, 95:19
causation [2] - 41:9,

71:21
caused [3] - 41:11, 41:17, 58:13
causing [7] - 49:2, 52:15, 53:21, 54:13, 55:1, 55:17, 60:16
cautionary [1] - 27:20, 28:2
cc [1] - 103:23
cell [3] - 60:2, 60:9, 61:20
center [1] - 16:17
certain [8] - 8:12, 16:16, 18:12, 18:19, 20:20, 40:7, 73:12, 93:19
CERTIFICATE [2] - 99:1, 100:1
certify [5] - 99:7, 100:6, 100:11, 100:13, 101:6
chance [1] - 29:12
charge [1] - 20:23
Charles [1] - 27:6
check [1] - 90:11
checked [1] - 24:12
Checklist [2] - 86:18, 86:21
checklist [1] - 91:4, 91:8
chief [1] - 54:4
child [1] - 53:11
chronic [3] - 84:10, 85:2, 85:14
cite [1] - 44:7
cited [3] - 27:16, 44:20
CIVIL [1] - 1:2
Civil [1] - 4:3
civil [10] - 6:18, 6:19, 6:20, 18:14, 21:14, 22:23, 71:9, 72:6, 72:19
claim [1] - 21:9
claiming [1] - 21:15
clarify [1] - 22:6, 41:24
clarifying [1] - 16:6
clean [1] - 44:13
clear [4] - 18:3, 35:8, 53:19, 89:16
client [2] - 18:2, 19:16
Clinical [1] - 29:2
clinical [16] - 5:14, 5:20, 23:10, 27:14, 28:22, 30:24, 31:1, 32:12, 36:17, 47:6, 56:25, 58:1, 61:2, 68:18, 82:15, 96:10
clinicians [1] - 23:7
club [1] - 80:13
clumped [1] - 44:6

Codes [3] - 28:9, 28:11, 29:11
collateral [1] - 23:10
colleague [1] - 6:6
coma [4] - 45:23, 45:25, 67:23, 68:7
Commission [4] - 99:21, 99:21, 101:23, 101:24
committed [1] - 13:14
common [3] - 35:2, 37:2, 46:15
communicate [1] - 39:6
Communication [1] - 1:14
compared [2] - 94:3, 95:12
compensation [1] - 21:10
complaining [1] - 83:4
Complaint [7] - 70:24, 70:25, 71:2, 71:3, 71:12, 71:17, 71:20
complex [1] - 22:7
compliance [8] - 32:18, 32:20, 33:7, 33:19, 33:22, 34:2, 34:7, 34:17
compliant [1] - 33:15
comply [1] - 34:8
complying [1] - 33:22
component [1] - 94:23
comprehensive [4] - 73:15, 79:1, 81:10, 90:8
Compulsive [1] - 29:22
computer [2] - 11:23, 95:4
concerned [1] - 103:14
concerns [1] - 72:9
concise [2] - 45:7, 83:23
conclude [2] - 103:13, 103:16
concluded [1] - 98:7
conclusion [1] - 88:1
conclusions [1] - 84:16
condition [4] - 30:23, 45:15, 81:17, 82:17
conditions [4] - 27:14, 28:22, 60:1, 61:19
Conditions [1] - 29:2
conducted [1] - 8:4
conducting [2] - 6:3, 8:2
Conference [1] - 12:8

conference [5] - 9:5, 12:16, 15:5, 15:6, 22:7
CONFERENCE [1] - 2:1
confirm [1] - 49:15
confirms [1] - 44:9
confused [2] - 59:2, 59:11
consider [1] - 44:4
considered [2] - 16:19, 31:2
consistencies [2] - 24:24, 24:25
consistent [2] - 52:18, 74:7
consistently [9] - 41:14, 41:25, 42:23, 43:8, 47:11, 47:16, 47:20, 47:23, 56:16
consulted [1] - 73:7
contact [2] - 38:7, 67:15
contacted [2] - 6:24, 7:23
contains [1] - 87:13
Contents [8] - 25:23, 26:5, 26:8, 27:9, 27:10, 28:20, 29:1, 29:5
contracted [2] - 42:25, 55:16, 55:20
contracting [5] - 51:8, 54:20, 55:12, 57:20, 66:11
contribute [2] - 33:14, 33:19
contributed [2] - 54:3, 60:20
contributing [1] - 61:6
control [2] - 40:15, 80:22
convenience [1] - 103:13
conversation [3] - 9:7, 9:11, 9:19
conversations [1] - 9:17
cooperated [1] - 38:5
cooperating [1] - 56:9
cooperative [2] - 38:5, 38:20
copy [2] - 69:16, 70:23
correct [56] - 6:17, 6:22, 8:7, 10:19, 15:9, 15:15, 15:16, 24:11, 24:13, 26:13, 26:25, 31:3, 34:20, 37:1, 38:18, 40:5, 40:17, 40:22, 43:4,

43:5, 43:12, 47:17, 50:9, 51:1, 51:16, 52:7, 52:19, 60:4, 60:5, 61:1, 61:6, 61:8, 61:21, 62:9, 74:5, 79:4, 79:9, 81:18, 82:6, 82:7, 82:12, 84:8, 84:13, 86:5, 86:11, 86:14, 86:20, 88:6, 88:15, 88:21, 88:24, 92:2, 92:23, 94:20, 96:12, 96:16
corrections [2] - 101:9, 102:5
corroborate [1] - 31:24, 32:8, 95:22
counsel [3] - 3:3, 4:8, 100:13
Counsel [3] - 3:10, 103:23
COUNTY [3] - 99:4, 100:3, 101:3
course [8] - 16:8, 39:17, 41:20, 47:25, 62:25, 73:15, 79:2, 96:18
COURT [1] - 1:1
court [8] - 6:8, 6:11, 6:15, 13:8, 13:19, 13:25, 58:25, 62:15
Court [3] - 2:14, 13:23, 19:6
court-ordered [1] - 13:8
created [1] - 95:15
credibility [1] - 32:1
credible [6] - 23:19, 84:17, 93:11, 93:14, 94:5, 97:10
criminal [6] - 6:13, 6:14, 6:17, 13:12, 13:13, 14:1, 18:17, 62:7
criminally [1] - 13:13
criminals [2] - 59:25, 60:8, 61:18
Criteria [3] - 28:9, 28:11, 29:11
criteria [3] - 84:25, 86:25, 87:10
CROSS [1] - 2:21
culturally [2] - 39:9, 39:18
culture [2] - 39:15, 39:20
cut [2] - 33:11, 47:14
CV [4] - 3:4, 11:13, 11:20, 12:5

D

d/b/a [1] - 1:10
DADE [3] - 99:4, 100:3, 101:3
damages [1] - 21:1
data [2] - 23:13, 95:6
date [5] - 7:25, 8:25, 9:1, 10:10, 10:13
DATE [1] - 1:15
dated [2] - 75:10, 102:22
dates [1] - 83:20
daughter [11] - 67:4, 67:7, 67:9, 67:10, 67:18, 67:19, 67:21, 67:22, 68:3, 68:8, 68:14
days [8] - 44:18, 44:22, 45:2, 45:11, 46:2, 75:13, 96:2
de [1] - 75:10
deal [3] - 12:21, 76:1, 76:2
dealing [2] - 72:4, 74:18
deals [1] - 84:2
Dear [1] - 103:9
death [5] - 45:10, 65:14, 65:16, 65:17, 66:24
Death [2] - 3:7, 69:22
debilitating [1] - 45:15
deemed [1] - 67:16
DEFENDANT [1] - 2:10
defense [1] - 3:3
defined [1] - 18:9
definitely [1] - 39:17
definition [7] - 16:11, 16:13, 17:19, 17:20, 18:7, 22:13, 22:19
degree [1] - 20:18
delay [1] - 11:25
delivered [1] - 67:11
demonstrate [1] - 24:22
demonstrates [1] - 97:9
demonstrating [1] - 23:18
denied [1] - 55:22
deplorable [2] - 59:25, 61:19
depo [2] - 11:2, 15:21, 17:12
deponent [1] - 103:10
deposition [15] - 4:5, 5:16, 5:18, 6:11,

10:13, 10:15, 10:24, 11:1, 11:3, 63:22, 70:18, 98:6, 100:8, 103:16, 103:17
DEPOSITION [1] - 1:19
Deposition [2] - 1:24, 103:11
depositions [1] - 70:21
depressed [8] - 47:1, 73:13, 73:24, 74:8, 79:11, 79:17, 81:15, 82:2
depressive [7] - 73:6, 73:10, 77:10, 77:13, 77:18, 77:23, 83:1
Depressive [2] - 29:21, 77:5
describe [2] - 25:20, 90:13
described [1] - 57:13
describing [1] - 55:2
description [1] - 77:2
detailed [3] - 59:21, 61:16, 61:17
details [2] - 28:6, 45:7
determine [2] - 13:9, 18:18, 57:1
develop [1] - 44:9
developers [1] - 95:14
development [5] - 51:6, 55:8, 55:9, 57:18, 66:9
diagnose [6] - 30:10, 30:15, 30:20, 31:7, 31:12, 97:4
diagnosed [4] - 73:2, 73:3, 77:9, 84:9
diagnoses [3] - 46:14, 73:18, 84:15
diagnosing [1] - 31:22
diagnosis [13] - 30:5, 30:22, 31:2, 31:4, 77:14, 79:4, 79:6, 79:16, 84:25, 85:3, 85:4, 85:11, 87:7
Diagnostic [3] - 3:4, 25:16, 28:9
diagnostic [6] - 28:11, 29:11, 84:24, 85:11, 86:25, 97:1
die [3] - 63:7, 63:16, 66:19
different [14] - 18:17, 23:3, 23:24, 27:17, 36:13, 42:7, 52:21, 54:2, 85:7, 86:2, 91:14, 92:19, 92:20, 93:16

10:13, 10:15, 10:24...

differently [2] - 36:25, 41:15
difficult [2] - 32:4, 82:11
difficulties [4] - 74:1, 74:11, 81:21, 82:5
difficulty [4] - 92:1, 92:12, 93:5, 94:15
DIRECT [2] - 2:21, 5:6
dirty [3] - 60:2, 60:9, 61:19
disability [1] - 53:15
disagree [3] - 48:9, 84:14, 84:21
disagreeing [1] - 96:22
discharged [1] - 83:8
discovery [1] - 80:18
discrepancies [2] - 23:14, 89:1
discrepancy [1] - 24:14
discuss [5] - 42:14, 50:12, 51:4, 52:11, 66:18
discussed [3] - 57:19, 66:10, 66:16
discussing [2] - 63:4, 79:14
Discussion [1] - 53:16
disease [1] - 78:11
Disorder [1] - 45:17
disorder [14] - 30:2, 35:17, 35:20, 35:22, 36:3, 36:5, 36:11, 45:12, 84:11, 85:5, 85:6, 85:17, 85:21
disorders [10] - 25:19, 29:25, 30:1, 30:14, 31:8, 31:12, 35:25, 36:1, 85:7
Disorders [7] - 3:5, 25:17, 29:21, 29:22, 29:23
display [1] - 73:13
displayed [1] - 73:5
displaying [1] - 58:25
disrespect [1] - 20:5
distressful [1] - 96:21
DISTRICT [2] - 1:1, 1:1
disturbance [3] - 30:9, 30:14, 78:3
doctor [3] - 19:10, 64:7, 64:18
Doctor [2] - 4:15, 51:12
doctor's [1] - 3:6
doctors [2] - 50:17, 74:4
documents [1] - 72:23

**done** [5] - 6:7, 6:10, 6:12, 7:5, 95:8
**down** [6] - 6:7, 7:12, 25:10, 49:24, 58:19, 75:4
**Dr** [7] - 3:3, 3:4, 3:8, 6:5, 26:22, 26:23, 84:9
**draft** [2] - 9:25
**drafts** [2] - 8:18, 9:22
**dreaming** [1] - 49:6
**dreams** [3] - 48:17, 50:16, 52:4
**dried** [1] - 44:13
**Dropbox** [2] - 11:11, 44:1
**DSM** [4] - 26:7, 29:4, 30:25, 45:14
**DSM-5** [15] - 3:4, 25:13, 25:15, 25:22, 26:7, 27:9, 27:10, 27:18, 27:21, 45:19, 85:4, 85:5, 86:19, 86:22, 86:24
**due** [8] - 19:21, 71:6, 72:11, 73:24, 74:9, 81:16, 82:2, 91:23
**duly** [3] - 5:4, 99:9, 100:12
**during** [15] - 18:16, 23:2, 32:11, 56:24, 58:1, 58:25, 65:5, 67:4, 75:16, 77:25, 80:18, 86:13, 88:13, 88:20, 94:18
**dying** [4] - 64:6, 67:3, 67:8, 67:9
**dysfunction** [4] - 91:16, 92:5, 93:4, 94:13

## E

**e-mail** [6] - 2:5, 2:8, 2:13, 8:9, 8:18, 11:9
**earliest** [1] - 103:13
**early** [1] - 83:14
**earned** [1] - 18:22
**easily** [1] - 38:16
**EASTERN** [2] - 1:1, 1:9
**Eastern** [2] - 4:2, 4:14
**effect** [1] - 79:22
**effects** [1] - 37:3
**effort** [2] - 16:17, 96:25
**eight** [2] - 43:15, 53:5
**either** [9] - 12:21, 13:17, 13:24, 15:3,

15:13, 67:5, 67:12, 90:12, 100:14
**elaborate** [3] - 50:2, 51:22, 71:1
**elaborated** [2] - 50:21, 51:5
**elaborates** [1] - 52:13
**ELENA** [2] - 99:16, 103:21
**Elena** [3] - 1:21, 100:5, 100:21
**elimination** [1] - 29:25
**elusive** [1] - 38:21
**eminent** [1] - 45:21
**emotional** [1] - 77:1
**emotionally** [1] - 82:16
**employed** [1] - 5:24
**employment** [1] - 57:5
**end** [8] - 12:7, 23:9, 23:12, 32:11, 33:12, 73:14, 75:15, 83:12
**ended** [1] - 92:15
**EndNote** [1] - 14:17
**endorse** [1] - 87:2
**endorsed** [1] - 73:23
**endorsing** [1] - 87:11
**endured** [3] - 59:25, 61:18, 96:19
**enduring** [5] - 51:9, 55:13, 55:14, 57:21, 66:12
**engaged** [3] - 7:23, 38:11, 38:15
**engineer** [1] - 54:5
**English** [3] - 14:14, 40:24, 40:25
**enlighten** [1] - 28:3
**enter** [1] - 18:25
**entire** [3] - 38:14, 81:9, 88:25
**entirety** [1] - 86:14
**entitled** [5] - 19:13, 19:18, 20:1, 21:1, 21:10
**episodes** [1] - 75:16
**EPS** [15] - 1:10, 3:10, 11:5, 17:25, 43:1, 56:6, 57:3, 69:18, 78:13, 78:14, 79:20, 80:7, 87:19, 103:8
**errata** [1] - 101:10
**ERRATA** [1] - 102:1
**errors** [1] - 10:2
**Esq** [4] - 2:4, 2:8, 2:12, 103:5
**established** [1] - 38:16
**ethical** [1] - 17:1
**etiology** [12] - 40:21,

41:7, 41:8, 41:13, 42:1, 42:15, 42:17, 48:4, 48:12, 51:4, 52:12
**evade** [3] - 13:12, 18:12, 18:16
**evaluation** [10] - 8:2, 8:4, 8:14, 27:23, 27:24, 38:8, 86:15, 88:25, 94:24, 96:23
**evaluations** [6] - 6:3, 6:14, 13:8, 17:2, 17:3, 40:8
**evasive** [1] - 38:20
**event** [7] - 58:7, 58:11, 60:13, 61:13, 61:22, 65:15, 96:1
**events** [6] - 42:4, 42:17, 54:17, 54:18, 58:12, 60:11
**evidence** [9] - 17:4, 31:24, 34:8, 55:21, 76:15, 95:18, 95:22, 95:24, 97:8
**evolution** [1] - 82:15
**exact** [6] - 7:25, 9:12, 10:11, 28:6, 45:5, 63:18
**exactly** [6] - 30:21, 39:5, 68:3, 68:13, 70:7, 72:7
**exaggerate** [1] - 18:19
**exaggerated** [2] - 18:11, 96:24
**exaggerating** [3] - 22:16, 22:21, 24:19
**EXAMINATION** [1] - 5:6
**examination** [4] - 7:18, 8:15, 10:20, 103:10
**examine** [1] - 65:6
**examined** [1] - 5:5
**examining** [1] - 23:11
**example** [2] - 54:20, 60:2
**exams** [1] - 24:9
**Excel** [1] - 14:16
**except** [2] - 40:25, 102:5
**Excuse** [1] - 51:12
**excuse** [1] - 91:22
**Exhibit** [7] - 8:22, 11:16, 25:25, 69:3, 69:4, 70:14, 97:23
**exhibit** [1] - 69:1
**exhibited** [1] - 24:16
**exhibiting** [1] - 47:1
**EXHIBITS** [1] - 3:1
**exhibits** [1] - 70:12

**Exhibits** [1] - 3:10
**Experience** [1] - 15:11
**experience** [9] - 25:5, 59:19, 59:20, 60:7, 60:15, 61:12, 61:16, 87:16, 91:10
**experiences** [1] - 96:19
**experiencing** [9] - 23:16, 25:6, 32:14, 42:22, 71:6, 72:11, 72:17, 82:16, 92:21
**expert** [4] - 19:17, 20:19, 23:11, 26:23
**expertise** [2] - 75:23, 76:5
**Expires** [1] - 99:21
**expires** [1] - 101:23
**explain** [3] - 42:16, 48:11, 81:9
**extensive** [1] - 79:25
**extensively** [1] - 63:23
**eye** [1] - 38:7
**eyes** [1] - 71:17

## F

**face** [2] - 32:3, 70:8
**fact** [8] - 13:22, 39:5, 44:21, 54:25, 56:14, 57:2, 70:20
**factors** [1] - 96:3
**failed** [1] - 93:9
**fair** [1] - 16:5
**false** [6] - 18:10, 18:20, 32:17, 32:22, 35:16, 35:18
**falsely** [1] - 18:19
**familiar** [4] - 25:23, 57:12, 57:15, 76:12
**family** [1] - 67:15
**far** [6] - 10:22, 18:22, 20:16, 21:20, 57:5, 58:8
**fast** [1] - 62:17
**favor** [3] - 17:21, 17:24, 17:25
**favorable** [1] - 18:13
**fear** [4] - 60:8, 67:3, 67:8, 67:9
**feared** [1] - 63:6
**fee** [1] - 20:22
**feet** [1] - 73:23
**feigning** [3] - 33:16, 93:12, 94:1
**fellowship** [1] - 5:23
**felt** [2] - 6:8, 81:11
**fighting** [1] - 45:2

**Figley** [4] - 26:22, 26:23, 27:6, 84:9
**figley 's** [1] - 84:16
**file** [1] - 103:17
**filed** [3] - 1:24, 71:6, 72:10
**filing** [4] - 21:13, 71:9, 71:15, 72:6
**final** [1] - 95:4
**finances** [1] - 18:15
**financial** [10] - 18:22, 20:15, 21:6, 21:10, 22:18, 22:22, 48:21, 50:7, 52:1, 53:22
**findings** [2] - 95:8, 95:23
**fine** [1] - 70:13
**finish** [2] - 62:1, 62:22
**firm** [7] - 6:25, 7:6, 7:20, 9:6, 9:18, 10:25, 71:15
**FIRM** [1] - 2:6
**first** [8] - 5:4, 5:19, 6:19, 9:25, 23:9, 27:18, 49:25, 86:7
**fit** [1] - 13:10
**fitness** [1] - 6:13
**five** [6] - 9:20, 10:13, 61:25, 62:24, 65:22, 65:25
**five-minute** [2] - 61:25, 62:24
**FI** [1] - 2:4
**flashbacks** [3] - 91:18, 92:12, 94:14
**florida** [1] - 100:22
**FLORIDA** [3] - 99:3, 100:2, 101:2
**Florida** [4] - 1:21, 1:23, 99:16, 100:5
**fluent** [1] - 14:14
**fluently** [1] - 40:24
**flush** [3] - 20:2, 60:18, 60:21
**focus** [3] - 27:14, 28:22, 30:24
**Focus** [1] - 29:2
**focusing** [2] - 54:23, 54:25
**follow** [1] - 22:15
**follows** [1] - 5:5
**FOR** [1] - 3:1
**foregoing** [2] - 100:9, 101:7
**forensic** [8] - 5:14, 6:3, 13:8, 27:20, 27:23, 27:24, 28:2
**forget** [5] - 48:22, 50:18, 50:22, 53:24, 90:10

**form** [23] - 19:4, 21:3, 21:12, 31:13, 31:17, 33:4, 49:8, 57:25, 61:7, 63:10, 67:24, 76:3, 77:11, 79:7, 80:16, 88:22, 90:19, 90:23, 94:11, 94:22, 96:8, 96:14, 97:7
**forth** [1] - 101:10
**forward** [1] - 24:6
**foundations** [1] - 17:10
**four** [2] - 50:23, 86:15
**FPR** [2] - 99:16, 103:21
**fragmented** [1] - 78:4
**front** [5] - 11:19, 11:22, 20:1, 21:25, 75:1
**frustrated** [6] - 48:16, 50:7, 50:16, 52:1, 52:4, 74:17
**future** [5] - 74:1, 74:11, 81:22, 82:5, 82:12

**G**

**gain** [5] - 18:23, 20:15, 21:6, 22:18, 22:22
**gangrene** [2] - 44:10, 44:11
**Ganpat** [2] - 4:2, 103:8
**GANPAT** [1] - 1:6
**generalized** [3] - 84:11, 85:5, 85:21
**genuine** [1] - 93:24
**GG 971350** [1] - 99:21
**given** [11] - 5:16, 5:18, 6:11, 23:17, 80:6, 84:17, 85:9, 87:20, 87:21, 87:22, 96:22
**Goa** [1] - 67:17
**God** [1] - 4:24
**gold** [1] - 23:7
**graduated** [1] - 5:22
**grammatical** [1] - 10:2
**great** [3] - 17:7, 17:14, 73:9
**grossly** [2] - 18:10, 96:24
**group** [1] - 17:22
**groups** [1] - 95:11
**grow** [1] - 81:18
**guess** [7] - 13:4, 13:9, 40:6, 59:1, 77:9, 87:19, 87:20
**guide** [1] - 32:1
**guidelines** [1] - 17:1

**guys** [4] - 80:13, 80:21, 80:22, 81:22

**H**

**halfway** [3] - 49:24, 58:18
**hand** [5] - 4:16, 33:1, 99:10, 100:16
**hand-in-hand** [1] - 33:1
**handful** [1] - 9:20
**hands** [2] - 79:19, 80:24
**hard** [1] - 70:6
**head** [1] - 68:20
**healed** [1] - 44:13
**health** [28] - 34:6, 35:5, 35:14, 41:11, 47:10, 48:4, 48:8, 50:2, 50:13, 51:6, 51:23, 55:10, 55:22, 56:1, 57:18, 58:9, 60:16, 66:9, 71:7, 72:9, 72:12, 72:17, 72:20, 72:24, 78:24, 84:3, 84:7, 84:25
**Health** [1] - 49:22
**heard** [3] - 35:23, 36:5, 36:10
**hearings** [1] - 6:12
**heart** [4] - 91:25, 92:12, 93:5, 94:15
**help** [3] - 4:24, 32:1, 83:13
**hereby** [3] - 100:6, 101:6, 102:3
**hereto** [1] - 101:10
**hi** [2] - 5:8, 5:9
**highlight** [1] - 87:12
**highlighting** [2] - 89:14, 89:20
**himself** [1] - 47:3
**hire** [2] - 40:7, 59:8
**hired** [4] - 6:23, 6:25, 7:20
**historians** [2] - 90:18, 91:3
**history** [1] - 58:3
**hmm** [5] - 26:10, 48:25, 82:21, 87:24
**hmm-hmm** [1] - 87:24
**hold** [1] - 54:4
**home** [1] - 82:20
**hoping** [1] - 21:17
**hospital** [18] - 18:16, 35:2, 44:18, 44:22, 45:11, 50:17, 63:8, 63:17, 68:7, 73:3,

73:21, 75:12, 76:21, 79:25, 80:1, 82:23, 83:8, 96:2
**Hospital** [3] - 6:3, 44:24, 78:22
**hospitalized** [4] - 35:10, 45:10, 46:2, 75:13
**hour** [1] - 10:24
**Hours** [1] - 75:9
**hours** [10] - 10:6, 10:8, 10:13, 10:14, 10:16, 10:18, 58:4, 58:21, 62:8, 86:15
**house** [1] - 68:23
**hundred** [1] - 64:9

**I**

**ICU** [1] - 45:2
**idea** [3] - 8:10, 68:22, 71:19
**IDENTIFICATION** [1] - 3:1
**identification** [6] - 8:23, 11:17, 26:1, 69:5, 70:15, 97:24
**identify** [4] - 60:12, 60:17, 61:12, 61:22
**ill** [1] - 54:6
**illness** [3] - 45:14, 71:21, 85:12
**impending** [3] - 65:14, 65:16, 66:24
**imperative** [1] - 87:12
**important** [2] - 15:22, 60:10
**imprisoned** [1] - 57:23
**improved** [1] - 77:20
**improvement** [1] - 73:9
**IN** [2] - 1:3, 103:8
**incarcerated** [1] - 96:6
**incarceration** [1] - 66:15
**incentive** [2] - 18:15, 95:20
**incidences** [1] - 63:4
**incidents** [6] - 51:8, 54:2, 54:5, 55:11, 57:20, 66:11
**include** [9] - 12:24, 27:11, 60:10, 65:7, 83:17, 83:19, 83:20, 83:22, 83:24
**included** [3] - 10:1, 58:7, 60:23
**includes** [2] - 10:19, 65:7

**including** [4] - 10:24, 61:19, 63:3, 79:2
**inconsistencies** [13] - 23:15, 24:4, 24:8, 89:1, 89:5, 89:6, 89:8, 89:15, 89:16, 89:23, 90:2, 90:4, 90:6
**inconsistency** [7] - 24:18, 25:11, 88:2, 89:17, 89:19, 89:20, 94:8
**inconsistent** [3] - 36:21, 90:12, 90:14
**increased** [1] - 82:19
**independent** [4] - 7:17, 8:14, 68:15, 68:16
**Independent** [1] - 3:5
**India** [6] - 34:1, 37:12, 37:18, 57:23, 67:17, 82:18
**Indian** [1] - 37:14
**indicate** [8] - 41:25, 57:17, 64:5, 67:2, 67:20, 73:20, 88:7, 89:2
**indicated** [6] - 50:11, 58:18, 58:20, 66:8, 72:21, 76:14
**indicates** [1] - 83:10
**indicating** [2] - 9:8, 56:6
**indication** [2] - 55:25, 79:5
**individual** [9] - 18:10, 25:4, 39:12, 87:2, 87:6, 91:12, 92:8, 92:16, 93:22
**individuals** [5] - 16:15, 26:19, 46:15, 90:5, 91:2
**individuals '** [1] - 32:2
**information** [7] - 44:3, 44:8, 76:25, 82:18, 83:18, 83:25, 95:5
**ing** [1] - 16:19
**initial** [2] - 9:19, 9:24
**injured** [2] - 20:25, 21:9
**injuries** [2] - 21:16, 41:18
**injury** [1] - 65:18
**inquire** [1] - 7:8
**insane** [1] - 13:14
**insomnia** [12] - 30:3, 30:10, 73:10, 77:19, 77:23, 78:2, 83:1, 83:4, 85:17, 97:5, 97:6, 97:13

**instability** [1] - 53:23
**instances** [4] - 45:19, 47:2, 54:6, 54:20
**instead** [1] - 51:13
**interested** [1] - 100:15
**interject** [1] - 80:2
**International** [2] - 44:24, 75:9
**internationally** [1] - 39:19
**interpreter** [1] - 36:20, 39:6, 40:1, 40:3, 40:20, 41:2
**interpreters** [1] - 40:7
**interpreting** [2] - 40:4, 40:5
**interrupt** [1] - 41:5
**interruption** [1] - 53:16
**interventions** [1] - 46:13
**interview** [19] - 23:3, 23:10, 23:22, 32:11, 32:13, 36:17, 56:25, 58:2, 68:18, 78:1, 81:23, 86:13, 88:3, 88:13, 88:21, 92:14, 92:15, 93:4, 94:19
**interviewed** [2] - 70:4, 74:13
**interviews** [1] - 25:3
**introduction** [1] - 27:19
**invented** [1] - 31:25
**inventing** [4] - 22:14, 22:16, 22:21, 24:20
**inventory** [1] - 89:12
**involve** [1] - 45:20
**involved** [3] - 5:25, 7:23, 35:3
**issue** [3] - 16:4, 92:5
**issues** [32] - 30:6, 31:7, 31:11, 33:21, 34:2, 34:16, 41:17, 42:2, 42:24, 43:7, 46:22, 48:4, 48:5, 48:12, 49:3, 50:22, 52:15, 54:14, 55:2, 55:15, 55:21, 55:23, 56:1, 56:7, 57:7, 58:10, 72:1, 73:4, 78:1, 92:11
**items** [10] - 12:11, 12:12, 14:3, 86:7, 86:8, 86:9, 86:10
**itself** [1] - 29:5

## J

jail [8] - 58:4, 58:21, 59:6, 59:13, 59:14, 59:20, 60:2, 61:20
Janeiro [1] - 75:10
job [6] - 20:6, 50:5, 50:6, 51:25, 57:1, 89:1
jobless [9] - 48:14, 49:4, 50:3, 50:5, 50:25, 51:24, 52:4, 55:3, 74:16
jobs [1] - 57:12
Jordanian [1] - 54:4
Jr [3] - 2:8, 2:12, 103:5
judge [2] - 22:15, 58:22
JUDGE [2] - 1:4, 1:5
July [11] - 73:21, 74:5, 74:12, 74:19, 76:22, 78:7, 81:13, 81:15, 82:1, 82:8, 82:9
June [6] - 75:5, 76:20, 76:21, 76:22, 77:16, 77:17
JURAT [1] - 101:1
jury [2] - 20:1, 22:15

## K

KAREN [1] - 1:5
keep [4] - 20:9, 62:12, 80:15, 90:16
keeping [1] - 22:14
kept [3] - 38:24, 40:19, 47:24
KHOLKAR [1] - 1:6
Kholkar [47] - 4:2, 4:12, 7:18, 8:3, 10:21, 18:2, 18:5, 20:25, 23:1, 23:16, 27:24, 30:2, 33:22, 33:24, 36:2, 36:24, 37:10, 37:21, 38:25, 40:19, 40:24, 44:17, 50:12, 51:5, 55:19, 56:7, 56:13, 58:18, 58:19, 59:20, 61:17, 63:6, 63:15, 64:6, 67:2, 68:17, 69:24, 70:4, 71:20, 72:12, 73:22, 74:7, 75:12, 84:10, 85:13, 95:25, 103:8
Kholkar 's [2] - 70:17, 74:13
kind [14] - 8:9, 39:21, 42:16, 44:6, 45:6,
45:8, 46:11, 46:12, 47:5, 70:6, 73:10, 73:17, 81:9, 87:14
knowledge [1] - 39:3
KWR [2] - 1:2, 4:4

## L

LA [2] - 2:12, 103:6
lalaw .com [1] - 2:13
LAMOTHE [1] - 2:6
language [5] - 39:12, 39:16, 39:23, 40:16, 83:21
Large [1] - 1:23
large [1] - 95:19
larger [1] - 18:15
last [8] - 75:15, 77:4, 77:17, 78:7, 83:9, 83:12, 86:10
late [1] - 73:21
law [8] - 6:25, 7:6, 7:20, 9:6, 9:18, 10:25, 71:14, 100:12
LAW [1] - 2:6
lawsuit [9] - 21:14, 71:2, 71:6, 71:10, 71:15, 72:7, 72:11, 72:19, 96:7
lawyer [3] - 9:6, 9:18, 59:8
lawyers [4] - 20:7, 69:18, 78:14, 87:19
lead [1] - 91:10
least [1] - 81:13
left [2] - 21:25, 78:10
Legal [1] - 58:17
legal [2] - 21:4, 58:2
Letter [1] - 3:3
letter [10] - 8:8, 8:12, 8:17, 8:21, 8:25, 9:1, 9:2, 9:5, 9:9, 69:10
life [8] - 45:3, 45:14, 63:6, 65:17, 71:3, 78:10, 83:14, 96:1
life-threatening [2] - 45:14, 78:10
lifetime [1] - 96:20
limitations [1] - 31:22
line [1] - 25:10
LINE [10] - 102:8, 102:9, 102:10, 102:11, 102:12, 102:13, 102:14, 102:15, 102:16, 102:17
linear [1] - 33:18
link [1] - 11:11
list [3] - 13:4, 13:17,
14:3
listed [5] - 12:12, 12:17, 14:20, 44:2, 44:3
listening [1] - 59:12
litigation [5] - 6:21, 18:14, 21:14, 22:23, 72:7
live [1] - 22:6
lived [1] - 61:11
LLC [1] - 2:6
LLP [1] - 2:10
LOCATION [1] - 1:14
logs [1] - 56:12
look [24] - 10:12, 17:11, 21:24, 23:13, 24:24, 25:21, 26:3, 28:15, 29:12, 38:19, 41:19, 46:17, 64:9, 64:15, 65:9, 65:20, 68:13, 70:3, 73:19, 74:22, 76:8, 80:5, 89:7, 95:2
looked [6] - 22:14, 34:11, 34:23, 63:21, 66:23, 76:10
looking [7] - 28:19, 29:10, 47:4, 47:5, 47:7, 47:9, 76:23
looks [1] - 70:8
losing [2] - 55:3, 72:4
loss [1] - 83:14
lost [5] - 40:12, 50:4, 51:25, 96:1
LOUISIANA [1] - 1:1
Louisiana [2] - 2:7, 6:6
Ltd [1] - 4:3
LTD [1] - 1:10

## M

M.D [11] - 1:19, 2:20, 4:5, 5:3, 99:8, 100:8, 101:14, 102:3, 102:20, 103:4, 103:9
M/V [1] - 75:11
ma'am [6] - 4:19, 19:22, 20:5, 40:16, 81:6, 96:13
Macintosh [1] - 14:15
MAG [1] - 1:5
mail [7] - 2:5, 2:8, 2:13, 8:9, 8:18, 11:9, 11:10
maintained [1] - 38:7
maintaining [1] - 82:2
majority [1] - 26:18
malaria [12] - 42:25,
51:9, 54:15, 54:21, 55:13, 55:16, 55:20, 57:21, 66:11, 66:13, 66:20, 72:3
malinger [2] - 35:24, 35:25
malingerer [3] - 24:19, 88:19, 93:7
malingerers [2] - 32:18, 32:20
malingering [49] - 12:13, 12:14, 12:15, 12:16, 12:21, 12:25, 13:11, 13:17, 13:20, 13:22, 14:1, 14:4, 14:19, 14:20, 15:2, 15:3, 15:7, 15:12, 15:18, 15:24, 16:4, 18:6, 18:7, 18:9, 19:17, 22:13, 23:2, 23:5, 23:25, 27:11, 28:12, 28:17, 28:24, 29:6, 29:13, 29:24, 30:19, 30:21, 30:23, 31:4, 31:7, 31:12, 32:23, 35:16, 35:19, 35:24, 84:22, 88:2, 94:17
malingering .. [1] - 28:16
man [1] - 53:7
management [1] - 73:16
manner [1] - 38:12
manual [4] - 27:20, 87:5, 95:10
Manual [2] - 3:5, 25:16
manuscript [1] - 12:20
Manuscripts [1] - 12:20
Mar [2] - 44:25, 78:22
mark [8] - 11:12, 12:5, 25:21, 69:2, 70:10, 75:8, 92:20, 97:21
marked [8] - 8:21, 8:23, 11:17, 24:12, 26:1, 69:5, 70:15, 92:24, 93:2, 94:19, 97:24
MARTIN [1] - 65:4
Martin [2] - 2:8, 4:11
match [2] - 23:15, 93:23
matter [2] - 64:22, 103:13
matters [1] - 20:20
MDs [1] - 26:19
mean [12] - 16:9, 19:1, 20:5, 29:24, 33:6, 33:11, 34:12, 41:4,
47:6, 53:3, 53:7, 64:23
means [1] - 76:25
meant [1] - 54:16
measure [4] - 86:24, 87:1, 87:12, 87:13
measures [18] - 16:16, 23:12, 23:18, 24:16, 25:11, 32:8, 32:10, 84:19, 85:10, 86:23, 89:25, 90:3, 90:6, 93:9, 93:12, 93:19, 93:21
medical [25] - 7:18, 8:14, 28:18, 34:5, 34:10, 34:13, 34:22, 34:23, 44:7, 45:15, 51:9, 55:14, 55:15, 55:25, 57:22, 66:12, 66:21, 72:4, 72:8, 72:20, 80:8, 80:9, 80:10, 84:6, 90:17
Medical [3] - 44:24, 75:9, 78:21
medically [1] - 67:16
medication [9] - 46:21, 46:24, 66:21, 73:16, 75:21, 76:11, 76:15, 79:3, 79:14
medications [4] - 34:18, 46:12, 79:6, 79:22
meet [1] - 96:25
meets [2] - 84:24, 85:10
members [1] - 67:16
memories [2] - 91:20, 94:14
memory [1] - 91:24
Mendiola [1] - 2:14
mental [62] - 22:16, 22:17, 22:22, 24:20, 25:19, 34:5, 34:9, 34:19, 34:21, 34:25, 35:5, 35:14, 40:21, 41:11, 41:17, 41:18, 42:2, 43:7, 46:22, 47:10, 48:4, 48:5, 48:8, 48:12, 49:3, 50:2, 50:13, 51:6, 51:23, 52:15, 53:21, 54:14, 55:1, 55:9, 55:21, 55:22, 56:1, 56:7, 56:9, 57:18, 58:9, 60:16, 61:6, 66:9, 71:7, 71:21, 72:1, 72:9, 72:11, 72:17, 72:20, 72:23, 73:4, 78:24, 84:3, 84:7, 84:25, 85:12,

92:5, 96:12

**Mental** [3] - 3:5, 25:17, 49:22

**mention** [16] - 25:12, 25:13, 44:21, 45:2, 46:11, 46:20, 46:25, 47:9, 54:8, 54:9, 58:11, 63:2, 63:5, 67:12, 79:12, 85:6

**mentioned** [21] - 24:4, 44:23, 45:4, 51:4, 52:11, 54:2, 54:7, 55:7, 62:21, 63:25, 65:2, 66:15, 66:24, 72:16, 73:5, 73:11, 78:3, 79:10, 95:18, 96:17, 96:18

**mentioning** [1] - 54:13

**mentions** [1] - 77:12

**met** [2] - 7:1, 37:20

**MIAMI** [2] - 99:4, 100:3

**Miami** [1] - 2:4

**MIAMI -DADE** [2] - 99:4, 100:3

**Michel** [4] - 3:3, 3:4, 4:5, 5:12

**MICHEL** [10] - 1:19, 2:20, 5:3, 99:8, 100:8, 101:14, 102:3, 102:20, 103:4, 103:9

**Michel 's** [1] - 3:8

**might** [2] - 42:14, 87:2

**milligrams /H** [1] - 75:18

**mind** [5] - 24:19, 49:2, 52:14, 53:20, 61:6

**mindful** [1] - 19:9

**minor** [1] - 10:1

**minute** [6] - 61:25, 62:20, 62:24, 64:15, 65:5, 65:10

**minutes** [6] - 9:13, 62:11, 62:12, 65:22, 65:25, 86:15

**miscommunication** [1] - 39:14

**miss** [1] - 93:1

**missed** [1] - 46:24

**misspoke** [1] - 27:8

**misunderstanding** [1] - 39:14

**modalities** [2] - 73:17, 79:13

**moment** [1] - 28:15

**moments** [1] - 50:18

**months** [2] - 35:11, 46:3

**mood** [16] - 47:1, 73:6, 73:13, 73:24, 74:9,

77:5, 77:10, 77:14, 77:18, 77:19, 77:23, 79:11, 79:17, 81:15, 82:2, 83:1

**Moreover** [1] - 50:21

**MORGAN** [1] - 1:4

**morning** [3] - 5:8, 5:9, 15:23

**mosquitos** [3] - 60:3, 60:8, 61:20

**most** [1] - 20:3

**mostly** [3] - 6:13, 18:15, 40:25

**motivations** [1] - 18:18

**mouth** [2] - 49:20, 92:17

**move** [2] - 62:17, 69:13, 75:4

**MR** [99] - 2:21, 4:10, 4:13, 5:7, 8:24, 11:18, 12:2, 12:4, 18:25, 19:3, 19:8, 19:12, 19:20, 19:23, 19:25, 20:4, 20:8, 20:11, 20:13, 21:3, 21:5, 21:7, 21:12, 21:18, 26:4, 31:13, 31:16, 31:20, 33:4, 33:9, 49:8, 49:9, 51:17, 53:18, 57:25, 58:5, 61:7, 61:9, 61:23, 62:1, 62:3, 62:4, 62:22, 63:1, 63:10, 63:13, 64:18, 64:20, 64:23, 64:25, 65:4, 65:11, 65:23, 65:25, 66:6, 67:24, 67:25, 68:25, 69:6, 70:9, 70:11, 70:13, 70:16, 75:4, 75:6, 76:3, 76:7, 77:11, 77:15, 79:7, 79:8, 80:2, 80:7, 80:19, 80:21, 81:5, 88:22, 88:23, 90:19, 90:20, 90:23, 90:24, 94:11, 94:12, 94:22, 94:25, 96:4, 96:5, 96:8, 96:9, 96:14, 96:15, 97:7, 97:12, 97:18, 97:20, 97:21, 97:25, 98:3

**multimodal** [2] - 23:6, 93:8

**multiple** [1] - 36:22

**must** [1] - 8:1

**mutilated** [1] - 82:10

N

**name** [3] - 5:10, 5:12, 7:9

**native** [1] - 39:11

**Near** [2] - 3:7, 69:22

**near** [2] - 45:10, 82:19

**necessarily** [2] - 12:22, 45:16

**necessary** [1] - 80:25

**necessity** [1] - 78:9

**necrosis** [5] - 48:19, 50:4, 51:25, 53:23, 55:4

**need** [3] - 64:19, 64:21, 65:23

**needed** [4] - 13:9, 39:5, 44:7, 57:4

**neuropsychological** [1] - 37:17

**never** [15] - 5:18, 6:11, 6:17, 15:17, 34:5, 34:21, 34:24, 35:5, 35:7, 35:9, 35:13, 35:23, 36:5, 36:10, 37:20

**New** [3] - 2:7, 2:12, 103:6

**newborn** [1] - 67:10

**Newspaper** [1] - 3:6

**newspaper** [1] - 69:15

**next** [6] - 29:16, 59:7, 59:8, 59:15, 59:17, 82:1

**night** [1] - 75:16

**nightmares** [1] - 78:5

**NO** [1] - 1:2

**Noise** [1] - 53:16

**non** [7] - 28:18, 33:7, 33:15, 33:19, 33:20, 38:20, 94:5

**non -adherence** [1] - 28:18, 33:20

**non -compliance** [2] - 33:7, 33:19

**non -compliant** [1] - 33:15

**non -cooperative** [1] - 38:20

**non -credible** [1] - 94:5

**none** [3] - 12:12, 15:7, 30:17

**normative** [2] - 94:4, 95:11

**Notary** [3] - 1:22, 99:16, 101:23

**note** [2] - 58:18, 58:19

**noted** [5] - 45:19,

73:9, 73:14, 78:24, 102:6

**notes** [9] - 3:5, 45:18, 65:6, 65:9, 68:3, 68:15, 68:16, 68:19, 100:10

**nothing** [10] - 4:23, 14:19, 14:20, 15:2, 40:12, 56:11, 67:5, 79:16, 97:3, 97:4

**Notice** [1] - 1:23

**notice** [2] - 45:1, 103:18

**noticed** [1] - 46:14

**notified** [1] - 71:14

**nowhere** [2] - 13:17, 68:11

**nuances** [1] - 40:25

**number** [6] - 10:22, 47:17, 55:12, 55:13, 95:5

**Number** [1] - 69:1

**numbers** [2] - 10:11, 19:14

**numerous** [2] - 42:15, 93:9

O

**OATH** [1] - 99:1

**oath** [3] - 63:14, 64:11, 103:11

**object** [20] - 21:3, 21:12, 31:13, 31:17, 33:4, 49:8, 57:25, 61:7, 63:10, 67:24, 76:3, 77:11, 79:7, 88:22, 90:19, 90:23, 94:11, 94:22, 96:8, 96:14

**objection** [6] - 19:1, 19:4, 19:5, 19:7, 80:16, 96:4

**objections** [2] - 70:12, 80:15

**objective** [16] - 17:3, 23:8, 23:12, 31:7, 31:11, 31:24, 32:8, 32:9, 84:19, 93:9, 95:2, 95:17, 95:22, 95:24, 96:3, 97:8

**Obsessive** [1] - 29:22

**obtained** [3] - 35:5, 78:21, 80:9

**obviously** [8] - 37:20, 38:24, 47:4, 56:20, 67:20, 68:12, 80:17, 84:21

**occasions** [1] - 42:9

**occurred** [1] - 72:18

**October** [1] - 103:16

**OF** [12] - 1:1, 1:19, 2:2, 2:10, 99:1, 99:3, 99:4, 100:1, 100:2, 100:3, 101:2, 101:3

**of ..** [1] - 64:22

**offense** [1] - 13:15

**office** [2] - 103:14

**officer** [1] - 54:4

**official** [2] - 99:10, 100:17

**often** [7] - 14:2, 16:14, 32:18, 32:20, 47:1, 79:13, 86:25

**oftentimes** [1] - 45:18

**ON** [2] - 2:2, 2:10

**once** [3] - 28:23, 42:9, 58:2

**one** [48] - 7:21, 8:1, 8:6, 9:25, 12:10, 22:2, 23:4, 23:23, 27:18, 32:9, 36:16, 36:19, 37:6, 37:8, 37:10, 37:18, 37:19, 37:21, 37:23, 38:23, 40:18, 43:10, 47:17, 52:22, 55:12, 58:8, 58:12, 60:17, 60:19, 60:22, 61:14, 65:4, 85:8, 86:9, 86:10, 86:12, 86:16, 88:5, 88:11, 89:10, 89:13, 91:15, 94:1

**ones** [1] - 57:13

**ongoing** [1] - 55:15

**online** [1] - 32:6

**onset** [1] - 44:15

**open** [1] - 92:15

**open -ended** [1] - 92:15

**operating** [1] - 14:16

**opinion** [6] - 20:20, 21:4, 32:8, 36:2, 90:8, 94:10

**opinions** [4] - 17:4, 31:24, 87:18

**opportunity** [3] - 25:4, 25:8, 32:13

**oral** [6] - 23:3, 88:3, 88:13, 92:14, 93:4, 94:18

**order** [4] - 10:5, 18:12, 23:8, 83:13

**ordered** [1] - 13:8

**original** [1] - 103:17

**Orleans** [3] - 2:7, 2:12, 103:6

**otherwise** [1] - 100:14

**outcomes** [1] - 33:6

outlined [1] - 78:20
outside [1] - 34:4, 75:23, 76:4
outstanding [1] - 62:15
over-endorsing [1] - 87:11
overcome [1] - 83:13
overreport [1] - 16:19
overview [2] - 73:15, 79:1
own [4] - 71:17, 91:10, 95:8, 95:10

**P**

P&I [1] - 80:13
P.A [1] - 2:2
p.m [3] - 1:16, 98:5, 98:7
Pacific [2] - 4:3, 4:14
PACIFIC [1] - 1:9
PAGE [12] - 3:2, 101:1, 102:8, 102:9, 102:10, 102:11, 102:12, 102:13, 102:14, 102:15, 102:16, 102:17
page [43] - 14:13, 14:25, 15:6, 15:11, 16:12, 24:7, 26:3, 28:17, 28:23, 28:25, 29:3, 47:18, 47:19, 47:20, 47:22, 47:23, 49:20, 51:18, 51:21, 57:16, 58:8, 58:14, 60:11, 73:1, 73:20, 75:5, 75:13, 77:3, 78:6, 81:14, 81:15, 82:8, 82:14, 82:22, 83:7, 83:9, 84:5, 84:12, 86:17, 101:10
pages [5] - 47:19, 54:9, 68:21, 100:9, 101:7
paid [5] - 20:17, 20:21, 21:1, 80:8, 80:22
Paragraph [3] - 75:14, 77:4, 78:7
paragraph [7] - 50:1, 58:19, 82:2, 82:8, 83:11
paralysis [2] - 91:21, 91:23
paralyzes [1] - 94:14
parentheses [1] - 60:1
parents [2] - 50:8, 52:2
part [4] - 6:4, 18:23,

20:6, 33:17
partial [2] - 43:15, 53:6
participate [1] - 26:21
particular [10] - 7:16, 20:25, 23:23, 26:2, 36:23, 63:20, 64:12, 79:24, 89:10, 94:9
particularly [1] - 96:21
parties [2] - 100:14, 103:18
party [1] - 103:17
patient [6] - 37:15, 78:8, 82:9, 82:15, 82:25, 83:3
patterns [1] - 78:4
pay [2] - 31:1, 80:11
paying [1] - 18:1
PBworks [1] - 14:17
people [3] - 13:8, 22:8, 56:8
percent [2] - 53:14, 64:10
perform [6] - 36:12, 36:13, 36:14, 36:16, 36:19, 84:18
performance [9] - 23:17, 33:7, 84:18, 85:9, 88:8, 88:17, 93:13, 93:20, 96:23
perfor med [2] - 24:16, 36:22
performing [1] - 16:15
period [2] - 35:6, 67:11
permanent [6] - 73:24, 74:9, 81:16, 81:17, 82:3, 83:14
person [6] - 16:21, 16:22, 16:23, 17:21, 69:23, 96:21
personality [6] - 35:17, 35:20, 35:21, 35:25, 36:3, 36:10
personally [3] - 71:16, 76:24, 99:8
perspective [1] - 81:21
perspectives [3] - 74:1, 74:11, 82:4
pertaining [1] - 75:11
pertinent [1] - 44:5, 72:23, 83:24
Peter [4] - 2:4, 4:10, 61:23, 80:2
Ph.D [2] - 27:3, 27:6
phone [3] - 9:7, 9:10, 9:11
photo [1] - 43:17
photos [2] - 43:20,

43:25
phrase [1] - 63:19
phrasing [1] - 35:23
physical [7] - 18:11, 21:16, 34:10, 34:20, 38:22, 50:13, 77:1
pictures [4] - 44:8, 44:10, 44:12, 53:3
place [2] - 25:9, 57:2, 61:13
placed [2] - 56:23, 94:5
Plaintiff [1] - 1:7
plaintiff [1] - 4:11
PLAINTIFF [1] - 2:2
Plaintiff 's [11] - 8:21, 8:22, 11:15, 11:16, 12:6, 25:22, 25:25, 69:4, 70:10, 70:14, 97:23
PLAINTIFF 'S [1] - 3:2
platform [1] - 42:19
point [1] - 13:21
Polish [1] - 14:14
polite [1] - 38:3
poor [10] - 16:16, 32:18, 32:20, 34:2, 34:7, 34:17, 90:18, 91:2, 93:12, 96:25
position [6] - 17:23, 22:24, 22:25, 56:17, 57:6, 82:11
possible [1] - 62:18
post [1] - 45:12
Post [1] - 45:17
post-traumatic [1] - 45:12
Post -Traumatic [1] - 45:17
potential [1] - 48:7
potentially [2] - 32:24, 33:16
PowerPoint [1] - 14:16
Poydras [3] - 2:6, 2:11, 103:5
practice [5] - 6:4, 20:23, 37:3, 39:10, 46:15
Precedex [1] - 75:18
precise [1] - 28:14
preface [1] - 40:23
prejudice [1] - 17:21
prejud iced [1] - 17:24
prep [2] - 10:14, 11:3
prepare [1] - 9:23
presence [3] - 37:25, 60:2, 61:20
PRESENT [1] - 2:14
present [2] - 36:20,

82:17
presentation [5] - 23:19, 38:22, 73:11, 93:11, 94:6
Presentations [2] - 12:8, 15:5
presentations [3] - 12:17, 15:6, 15:8
presenting [1] - 93:22
presently [1] - 96:12
pretty [2] - 10:2, 47:3
prevails [1] - 21:10
prevalent [1] - 95:21
previously [2] - 51:3, 52:11
primarily [1] - 31:23
prisoners [1] - 60:9
private [2] - 6:4, 20:23
pro [1] - 20:21
probable [1] - 87:7
problem [1] - 87:9
problems [2] - 41:18, 53:21
procedure [1] - 37:2
procedures [1] - 78:9
proceed [3] - 6:13, 13:10, 103:17
proceeded [1] - 36:18
proceedings [4] - 6:13, 13:19, 14:1, 59:1
process [4] - 21:20, 38:11, 38:15, 67:10
produce [6] - 7:17, 8:19, 18:20, 20:17, 69:7, 80:4
produced [2] - 3:10, 80:4
produces [2] - 18:10, 95:12
producing [1] - 93:22
profession [1] - 5:13
Professional [3] - 1:22, 100:5, 100:22
professional [2] - 19:24, 20:10
proficient [1] - 14:15
progress [2] - 73:15, 79:2
progression [1] - 81:9
promise [1] - 20:12
promoted [2] - 56:16, 57:8
prompt [2] - 42:1, 91:10
prompted [5] - 48:6, 50:1, 51:4, 51:22, 52:11
prompting [1] - 25:7, 92:7

prompts [1] - 25:2
properly [2] - 49:5, 74:17
prosecution [2] - 13:12, 18:17
protocol [1] - 34:9
provide [5] - 20:20, 30:4, 79:1, 91:9, 92:7
provided [9] - 34:19, 43:17, 43:24, 69:16, 69:17, 69:19, 72:22, 81:7, 81:8
PSotolongo @ sotolongolaw .com [1] - 2:5
Psychiatric [3] - 26:8, 26:14, 26:18
psychiatric [2] - 78:15, 78:16
psychiatrist [12] - 27:2, 35:10, 46:5, 46:10, 46:16, 73:6, 75:22, 77:6, 77:8, 77:19, 78:20, 79:3
psychiatrists [3] - 25:18, 35:2, 46:7
psychological [5] - 18:11, 21:15, 30:16, 51:5, 52:12
Psychological [2] - 26:12, 26:15
psychologist [9] - 5:15, 5:21, 7:12, 16:25, 18:8, 27:7, 47:7, 61:3, 96:11
psychologists [4] - 25:18, 26:20, 31:25, 95:21
psychology [3] - 39:1, 39:4, 93:20
Psychology [1] - 26:15
psychopathology [1] - 93:24
psychotherapeutic [1] - 46:13
psychotherapies [2] - 79:3, 79:6
psychotherapy [4] - 78:8, 79:12, 79:21, 83:13
Pte [1] - 4:3
PTE [1] - 1:9
PTS [1] - 89:11
PTSD [9] - 84:10, 84:22, 85:4, 86:18, 86:21, 86:24, 87:1, 87:7
Public [3] - 1:22,

99:16, 101:23
**Public -State** [1] -
99:16
**publication** [1] - 15:1
**Publications** [1] -
12:24
**publications** [1] -
14:25
**published** [3] - 15:17,
26:17, 26:19
**pull** [1] - 11:23
**purely** [1] - 95:17
**purposefully** [1] -
25:3
**pursuant** [1] - 1:23
**pursuing** [1] - 72:19
**put** [18] - 25:8, 25:10,
45:7, 49:19, 52:9,
52:21, 56:18, 56:21,
58:17, 59:22, 60:1,
60:7, 60:9, 61:14,
71:23, 77:7, 85:4,
95:3
**putting** [1] - 92:17

## Q

**qualify** [1] - 25:19
**quality** [2] - 50:2,
51:22
**questioned** [1] - 58:24
**questions** [13] - 8:13,
17:9, 40:19, 87:20,
87:23, 87:24, 87:25,
91:5, 91:7, 92:4,
93:1, 93:7, 97:19
**quick** [4] - 64:15,
65:20, 73:20, 76:9
**quiet** [4] - 59:6, 59:14,
83:1, 83:4
**quite** [6] - 14:2, 20:18,
45:8, 79:25, 81:10,
95:20
**quotes** [2] - 59:22,
61:15

## R

**raise** [1] - 4:16
**range** [6] - 51:9,
55:14, 57:21, 66:12,
71:6, 72:11
**rapport** [1] - 38:15
**rate** [4] - 91:25, 92:12,
93:5, 94:15
**rather** [2] - 40:24,
50:13
**rating** [1] - 53:15
**RAYER** [40] - 2:10,

4:13, 18:25, 19:8,
19:23, 20:8, 21:3,
21:12, 31:13, 31:16,
33:4, 49:8, 57:25,
61:7, 61:23, 62:3,
62:22, 63:10, 64:18,
64:23, 65:23, 67:24,
70:11, 76:3, 77:11,
79:7, 80:2, 80:19,
88:22, 90:19, 90:23,
94:11, 94:22, 96:4,
96:8, 96:14, 97:7,
97:20, 97:25, 98:3
**Rayer** [6] - 2:12, 4:13,
6:24, 9:8, 62:19,
103:5
**Rayer 's** [1] - 7:20
**razed** [1] - 82:10
**RE** [1] - 103:8
**read** [12] - 22:25,
45:25, 50:9, 50:11,
50:25, 53:5, 60:4,
68:2, 82:5, 82:12,
101:6, 102:4
**reading** [2] - 95:2,
103:16
**reads** [1] - 59:10
**ready** [1] - 98:1
**real** [3] - 64:15, 65:20,
73:19
**really** [6] - 32:25,
38:25, 45:21, 56:2,
76:8, 77:2
**reasons** [3] - 42:22,
43:8, 58:9
**recalling** [3] - 91:20,
91:23, 94:14
**receive** [5] - 8:8,
21:17, 56:5, 70:23,
87:6
**received** [12] - 8:12,
10:4, 34:5, 34:13,
34:21, 34:24, 35:1,
44:19, 78:18, 79:23,
87:4, 94:5
**receiving** [3] - 79:5,
79:11, 82:17
**receptive** [1] - 38:15
**recess** [1] - 66:3
**recognize** [1] - 70:3
**reconvene** [1] - 65:10
**Record** [1] - 103:23
**record** [17] - 4:9, 5:11,
12:2, 12:3, 47:5,
53:17, 55:25, 66:2,
66:5, 74:5, 79:4,
84:1, 84:2, 98:2,
98:4, 100:10
**records** [45] - 10:20,
11:7, 23:11, 34:11,

34:12, 34:23, 44:3,
44:7, 44:19, 44:25,
45:8, 46:14, 46:17,
55:20, 56:2, 56:4,
56:6, 72:22, 74:3,
74:22, 74:25, 75:1,
75:10, 77:24, 78:15,
78:18, 78:19, 78:21,
78:25, 79:20, 79:21,
79:23, 79:24, 80:1,
80:3, 80:10, 80:16,
80:22, 81:7, 83:23,
84:7, 90:16, 90:17
**RECROSS** [1] - 2:21
**REDIRECT** [1] - 2:21
**redirected** [1] - 50:12
**refer** [4] - 13:23,
13:24, 13:25, 48:13
**reference** [3] - 29:6,
42:18, 103:10
**referenced** [1] - 72:23
**referral** [1] - 7:13
**referred** [2] - 6:5,
55:12
**refused** [1] - 58:20
**refusing** [3] - 34:8,
34:17, 34:18
**regarding** [1] - 59:18
**Regarding** [1] - 59:20
**Related** [3] - 29:20,
29:22, 29:23
**related** [4] - 14:20,
48:7, 55:15, 56:9
**released** [2] - 59:7,
59:15
**reliable** [1] - 84:17
**remain** [5] - 19:24,
73:25, 74:10, 81:20,
82:4
**remember** [1] - 63:24
**Remote** [1] - 1:14
**rented** [1] - 22:8
**repeat** [2] - 31:9,
52:10
**rephrase** [1] - 31:9
**report** [104] - 3:6, 9:23,
10:5, 10:16, 10:18,
10:20, 11:4, 11:8,
16:24, 17:10, 22:25,
23:21, 24:2, 25:9,
25:13, 26:23, 27:17,
32:7, 38:10, 41:14,
41:21, 41:23, 41:25,
42:5, 42:8, 42:15,
47:23, 48:6, 48:10,
48:11, 49:11, 49:13,
49:20, 51:19, 52:21,
55:9, 56:14, 56:15,
56:19, 56:21, 56:24,
57:2, 57:17, 58:15,

60:22, 61:4, 61:15,
63:2, 63:3, 63:5,
63:12, 63:19, 63:21,
64:1, 64:2, 64:3,
64:5, 65:20, 66:23,
66:25, 67:1, 67:5,
67:12, 67:19, 68:12,
68:16, 71:5, 71:23,
71:25, 72:22, 73:1,
73:20, 75:14, 77:8,
78:23, 83:9, 83:18,
83:21, 84:12, 86:18,
86:23, 87:1, 87:13,
87:15, 88:8, 88:13,
89:3, 89:24, 90:2,
91:15, 93:13, 94:7,
94:16, 94:17, 95:19,
96:18, 97:10, 97:21,
100:7
**Report** [1] - 3:8
**reported** [35] - 23:2,
23:4, 23:22, 24:9,
24:15, 25:9, 30:8,
42:4, 42:11, 48:22,
49:10, 49:11, 49:12,
49:14, 49:16, 49:17,
50:3, 51:23, 55:17,
57:10, 59:2, 60:24,
63:11, 71:23, 73:18,
74:21, 88:4, 88:12,
88:19, 89:9, 89:21,
89:24, 91:14, 94:9,
97:14
**Reporter** [3] - 1:22,
100:6, 100:22
**REPORTER** [6] - 4:15,
4:19, 4:21, 5:1,
51:12, 100:1
**reporting** [9] - 16:22,
49:7, 74:5, 74:14,
89:4, 89:6, 89:8,
93:17, 97:2
**Reporting** [1] - 2:14
**reports** [4] - 23:11,
32:2, 32:5, 45:5
**requested** [1] - 8:10
**requirement** [1] -
32:24
**research** [1] - 15:10
**Research** [1] - 15:11
**reserving** [1] - 70:12
**respect** [1] - 19:21
**respectful** [2] - 19:24,
20:9
**respectfully** [1] - 20:3
**respond** [2] - 31:14,
31:18
**responded** [1] - 50:14
**response** [5] - 16:14,
16:17, 16:20, 48:3,

95:20
**responses** [2] - 94:3,
95:11
**responsibility** [2] -
6:14, 13:13
**responsible** [2] -
53:11, 80:8
**restriction** [1] - 48:7
**restrictions** [4] -
73:25, 74:10, 81:20,
82:4
**result** [2] - 92:5, 96:6
**results** [4] - 93:16,
94:4, 96:23, 97:9
**return** [2] - 82:18,
82:20
**review** [5] - 9:9, 10:19,
33:10, 55:24, 70:17
**Review** [1] - 84:6
**reviewed** [4] - 11:8,
44:25, 70:20, 79:25
**revisions** [1] - 10:1
**reward** [1] - 18:12
**Richard** [2] - 2:8, 4:11
**Rio** [3] - 44:24, 75:10,
78:22
**RMartin @
lamothefirm .com** [1]
- 2:8
**ROBAINA** [2] - 99:16,
103:21
**Robaina** [3] - 1:21,
100:5, 100:21
**ROBY** [1] - 1:5
**role** [1] - 7:16
**room** [4] - 21:24, 22:1,
22:2, 22:7

## S

**sad** [1] - 82:9
**sadness** [1] - 83:4
**sample** [1] - 94:4
**Sandra** [2] - 4:5, 5:12
**SANDRA** [10] - 1:19,
2:20, 5:3, 99:8,
100:8, 101:14,
102:3, 102:20,
103:4, 103:9
**save** [1] - 64:24
**saw** [9] - 27:3, 34:2,
46:1, 46:4, 46:10,
53:2, 76:18, 97:13
**scales** [1] - 87:14
**schedule** [1] - 20:22
**Schizophrenia** [1] -
29:17
**scope** [3] - 34:4,
75:23, 76:5

**score** [4] - 36:22, 87:4, 87:6, 95:13
**scored** [1] - 36:25
**screen** [2] - 29:13, 75:3
**seal** [2] - 99:10, 100:17
**seaman** [1] - 56:17
**second** [1] - 86:7
**section** [13] - 12:7, 27:18, 28:7, 29:17, 52:9, 58:8, 63:3, 66:8, 66:15, 66:19, 84:2, 84:6
**Section** [2] - 28:8, 29:10
**sections** [3] - 27:12, 27:17, 52:21
**see** [35] - 14:25, 15:16, 16:3, 16:12, 17:23, 27:5, 29:13, 29:24, 33:21, 34:8, 34:10, 34:16, 36:25, 46:3, 46:8, 46:23, 46:24, 50:15, 55:25, 56:3, 56:12, 60:18, 63:20, 64:16, 67:14, 69:20, 70:7, 75:14, 75:17, 75:20, 77:4, 79:15, 83:10, 87:1, 90:11
**seeing** [2] - 67:3, 67:9
**selected** [1] - 24:13
**self** [9] - 24:15, 56:24, 86:23, 87:1, 87:13, 87:15, 89:23, 93:13, 93:17
**self-report** [5] - 56:24, 86:23, 87:1, 87:13, 87:15
**self-reported** [1] - 24:15
**self-reporting** [1] - 93:17
**send** [1] - 59:13
**sending** [1] - 63:17
**sensitive** [1] - 39:9
**sent** [6] - 9:8, 9:24, 11:8, 11:9, 59:6, 59:14
**sentence** [6] - 75:15, 75:17, 77:5, 77:17, 78:7, 83:12
**sentenced** [1] - 58:21
**September** [5] - 1:15, 4:6, 99:11, 100:18, 103:7
**sequelae** [11] - 51:10, 54:21, 55:14, 57:22, 66:12, 73:25, 74:9, 74:19, 78:10, 81:16,

82:3
**serious** [1] - 65:17
**set** [4] - 17:10, 100:14, 100:16, 101:9
**settings** [1] - 35:2
**several** [2] - 42:9, 43:8
**sexual** [5] - 65:18, 91:15, 92:5, 93:4, 94:13
**shall** [2] - 103:16, 103:17
**Sharing** [1] - 75:3
**SHEET** [1] - 102:1
**ship** [18] - 34:1, 43:1, 47:12, 48:1, 48:14, 51:8, 53:14, 54:15, 55:11, 56:8, 56:12, 57:13, 57:20, 63:7, 63:16, 64:7, 66:20, 67:3
**SHIPPING** [1] - 1:9
**Shipping** [2] - 4:3, 4:14
**shock** [1] - 45:22
**SHORTHAND** [1] - 100:1
**Shorthand** [1] - 100:6
**should 've** [1] - 80:23
**show** [4] - 22:3, 32:18, 32:20, 69:14
**showed** [1] - 80:17
**showing** [2] - 83:4, 93:12
**shows** [2] - 82:15, 95:10
**sic** [1] - 89:11
**sick** [1] - 63:7
**sign** [1] - 59:11
**signature** [1] - 103:12
**signed** [2] - 59:7, 59:17
**Signed** [1] - 102:22
**signing** [1] - 103:16
**simple** [1] - 22:15
**Sincerely** [1] - 103:19
**Singapore** [5] - 17:25, 56:6, 57:3, 79:20, 80:7
**single** [2] - 63:24, 95:9
**sitting** [2] - 86:12, 88:5
**situation** [1] - 18:14
**situations** [1] - 18:14
**six** [1] - 86:1
**Skills** [1] - 14:13
**skills** [1] - 14:21
**sleep** [16] - 30:8, 30:13, 30:14, 48:17, 49:5, 50:15, 52:3, 53:24, 55:4, 74:18,

78:3, 84:10, 85:6, 85:7, 85:17
**Sleep /Wake** [1] - 30:1
**sleep /wake** [1] - 30:2
**sleeping** [3] - 30:7, 50:22, 78:4
**SM** [2] - 1:2, 4:4
**SM-KWR** [2] - 1:2, 4:4
**small** [3] - 53:10, 60:2, 61:19
**so..** [1] - 77:14
**social** [3] - 35:17, 35:21, 36:3
**Somatic** [1] - 29:23
**someone** [15] - 9:6, 21:13, 21:23, 32:5, 32:23, 33:14, 33:16, 37:18, 38:19, 39:11, 39:20, 57:8, 90:10, 93:23, 96:19
**sometimes** [3] - 22:8, 50:16, 91:2
**sorry** [11] - 4:17, 4:20, 31:14, 33:10, 41:6, 47:14, 51:15, 54:16, 62:6, 62:14, 74:24
**sort** [1] - 39:9
**SOTOLONGO** [60] - 2:2, 2:21, 4:10, 5:7, 8:24, 11:18, 12:2, 12:4, 19:3, 19:12, 19:20, 19:25, 20:4, 20:11, 20:13, 21:5, 21:7, 21:18, 26:4, 31:20, 33:9, 49:9, 51:17, 53:18, 58:5, 61:9, 62:1, 62:4, 63:1, 63:13, 64:20, 64:25, 65:11, 65:25, 66:6, 67:25, 68:25, 69:6, 70:9, 70:13, 70:16, 75:4, 75:6, 76:7, 77:15, 79:8, 80:7, 80:21, 81:5, 88:23, 90:20, 90:24, 94:12, 94:25, 96:5, 96:9, 96:15, 97:12, 97:18, 97:21
**Sotolongo** [2] - 2:4, 4:10
**sought** [2] - 34:5, 35:13
**sounds** [2] - 17:7, 17:14
**source** [1] - 44:8
**speaking** [4] - 4:17, 19:4, 19:7, 68:17
**speaks** [1] - 39:11
**specialist** [1] - 77:6, 77:8, 77:18

**specific** [1] - 78:19
**specifically** [1] - 54:12
**specifics** [1] - 72:8
**Spectrum** [1] - 29:17
**spend** [1] - 58:21
**spent** [1] - 58:4
**spontaneous** [1] - 24:15
**spontaneously** [6] - 25:1, 25:7, 32:15, 42:20, 89:3, 89:24
**SPSS** [1] - 14:17
**SS** [2] - 100:2, 101:2
**St** [2] - 2:11, 103:5
**stability** [3] - 48:21, 50:7, 52:2
**stable** [1] - 67:16
**stage** [1] - 83:14
**standard** [1] - 23:7
**STARGATE** [1] - 75:11
**start** [3] - 15:5, 17:18, 50:24
**started** [2] - 62:10, 75:19
**state** [4] - 4:8, 18:16, 45:14, 61:6
**State** [3] - 1:23, 6:2, 99:16
**STATE** [3] - 99:3, 100:2, 101:2
**statement** [15] - 27:20, 28:2, 32:18, 32:22, 35:18, 52:8, 52:20, 63:20, 63:24, 64:12, 65:7, 74:8, 74:13, 75:20, 76:18
**statements** [1] - 68:14
**STATES** [1] - 1:1
**Statistical** [2] - 3:4, 25:16
**status** [2] - 56:10, 96:12
**stayed** [2] - 59:24, 61:18
**stenographic** [1] - 100:10
**stenographically** [1] - 100:7
**still** [7] - 8:16, 39:13, 62:19, 74:18, 78:1, 83:3, 88:18
**Street** [2] - 2:3, 2:6
**stress** [1] - 45:12
**Stress** [1] - 45:17
**Stressor** [1] - 29:23
**strike** [2] - 19:5, 19:6
**stuff** [6] - 13:4, 47:6, 69:17, 83:18, 90:17, 96:11
**style** [4] - 16:14,

16:17, 16:20, 95:20
**styled** [2] - 4:1, 103:10
**subjected** [1] - 95:25
**subjective** [2] - 95:8, 95:17
**subjectively** [1] - 47:5
**subpoena** [1] - 62:15
**subscribed** [1] - 101:17
**subsection** [1] - 29:8
**subsequent** [4] - 48:7, 51:7, 55:10, 57:19, 66:10, 72:17
**suffer** [1] - 36:3
**suffering** [2] - 50:4, 51:24
**suffers** [4] - 85:13, 85:16, 85:20, 97:6
**suggest** [1] - 103:13
**suggestive** [2] - 87:11, 96:24
**suggests** [1] - 87:5
**suing** [2] - 72:1, 72:2
**suitable** [1] - 103:14
**Suite** [3] - 2:3, 2:7, 2:11
**summarization** [2] - 72:22, 83:24
**summarize** [1] - 45:9
**supervisor** [1] - 6:5
**support** [1] - 17:4
**surgery** [1] - 45:22
**surgical** [2] - 73:23, 78:9
**surrounded** [1] - 51:7
**Survival** [3] - 3:7, 69:22
**SUSIE** [1] - 1:4
**suspect** [1] - 7:21
**swallowing** [4] - 92:1, 92:13, 93:5, 94:16
**swear** [1] - 4:22
**Sworn** [1] - 101:17
**sworn** [3] - 5:5, 99:9, 100:12
**symptom** [3] - 84:18, 89:12, 93:21
**symptomology** [2] - 13:12, 96:24
**Symptoms** [1] - 29:23
**symptoms** [41] - 16:19, 18:11, 18:19, 18:20, 22:16, 22:18, 22:22, 24:15, 24:20, 25:6, 32:6, 33:17, 40:21, 41:11, 42:17, 48:8, 48:24, 49:1, 50:3, 50:13, 51:5, 51:6, 51:23, 52:12, 54:3, 55:10, 55:18,

57:18, 58:13, 60:16, 60:20, 66:9, 71:7, 72:12, 72:17, 72:24, 86:24, 87:1, 87:11, 94:4, 97:1
**systems** [1] - 14:16

## T

**Table** [8] - 25:23, 26:5, 26:8, 27:9, 27:10, 28:19, 29:1, 29:5
**talks** [1] - 28:24
**task** [1] - 36:22
**tasks** [2] - 36:13
**team** [1] - 35:3
**telephone** [1] - 103:14
**tend** [4] - 23:9, 23:13, 32:7, 41:23
**tense** [5] - 48:16, 50:19, 59:2, 59:10, 74:17
**term** [2] - 13:23, 41:8
**terminology** [3] - 39:10, 39:15, 41:23
**terms** [2] - 39:14, 45:5
**terrible** [7] - 59:24, 60:6, 60:24, 61:4, 61:15, 61:16, 61:18
**test** [26] - 23:23, 36:15, 36:16, 36:19, 36:24, 37:1, 37:6, 85:24, 86:7, 86:8, 86:18, 87:3, 87:5, 88:8, 88:12, 88:17, 89:5, 89:10, 89:11, 89:22, 91:7, 91:15, 92:6, 94:9, 95:14
**testified** [2] - 5:5, 6:15
**Testimony** [1] - 13:3
**testimony** [5] - 6:7, 6:10, 6:20, 27:23, 63:14
**testing** [5] - 17:3, 36:18, 38:11, 38:14, 93:16
**testings** [1] - 93:16
**tests** [19] - 16:23, 23:4, 23:23, 24:10, 32:10, 37:3, 37:8, 86:2, 86:6, 86:17, 88:4, 89:7, 89:10, 89:17, 91:6, 92:19, 94:19, 95:3
**THE** [24] - 2:2, 4:15, 4:17, 4:19, 4:20, 4:21, 4:25, 5:1, 21:13, 26:2, 31:14, 31:19, 33:5, 51:12,

51:15, 58:1, 61:8, 62:25, 63:11, 65:24, 76:4, 77:12, 94:23, 97:8
**theme** [4] - 15:21, 15:23, 15:24, 17:6
**therapy** [4] - 35:1, 73:17, 78:16, 83:10
**therefore** [1] - 24:18
**Thereupon** [8] - 5:2, 8:22, 11:16, 25:25, 69:4, 70:14, 97:23, 98:6
**they've** [1] - 7:11
**thinking** [3] - 15:23, 50:25, 88:18
**third** [1] - 86:8
**Thomas** [5] - 2:12, 6:24, 7:20, 9:8, 103:5
**thorough** [1] - 23:9
**thoroughly** [1] - 22:25
**threatened** [2] - 65:17
**threatening** [2] - 45:14, 78:10
**three** [8] - 12:11, 36:15, 36:24, 42:10, 50:23, 55:13, 57:19, 66:10
**threshold** [2] - 85:11, 97:1
**throughout** [10] - 38:8, 38:14, 42:6, 42:19, 46:2, 46:7, 56:16, 57:8, 73:12, 88:25
**TIME** [1] - 1:16
**timeframe** [2] - 7:24, 9:15
**timely** [1] - 72:3
**titled** [1] - 69:21
**TO** [1] - 103:4
**today** [9] - 5:17, 15:22, 17:13, 17:20, 27:22, 62:8, 63:14, 63:22, 64:4
**toes** [32] - 43:4, 43:11, 43:13, 43:16, 43:18, 43:20, 44:10, 44:12, 46:1, 46:8, 47:12, 47:16, 48:1, 48:2, 48:13, 48:17, 49:3, 49:6, 50:5, 50:15, 50:18, 50:24, 51:25, 52:3, 52:24, 53:1, 53:6, 55:3, 72:4, 74:16, 81:17, 96:2
**together** [3] - 17:11, 29:10, 95:3
**Tom** [2] - 4:13, 65:22

**took** [12] - 10:4, 10:6, 10:16, 10:18, 20:18, 52:8, 56:23, 68:16, 71:11, 74:12, 86:15, 103:17
**top** [3] - 12:23, 14:23, 51:21
**total** [3] - 9:21, 10:22, 11:6
**touch** [1] - 80:12
**towards** [2] - 51:21, 83:12
**transcribed** [1] - 103:11
**transcript** [5] - 100:9, 101:7, 102:4, 103:11, 103:17
**translation** [1] - 40:13
**translator** [1] - 38:17
**transported** [1] - 67:17
**Trauma** [1] - 29:22
**trauma** [1] - 89:12
**traumatic** [15] - 45:12, 51:7, 54:17, 54:18, 55:11, 57:20, 58:7, 58:12, 60:12, 61:13, 61:22, 63:4, 65:15, 66:11, 96:1
**Traumatic** [1] - 45:17
**trayer @wb** [1] - 2:13
**trayer @wb-lalaw.com** [1] - 2:13
**treat** [2] - 46:6, 76:11
**treated** [4] - 37:14, 77:5, 77:13, 77:18
**treating** [2] - 76:6, 77:22
**Treatment** [1] - 49:22
**treatment** [33] - 28:18, 32:19, 32:21, 32:25, 33:7, 33:8, 33:15, 33:23, 34:2, 34:5, 34:6, 34:7, 34:9, 34:13, 34:18, 34:21, 34:23, 34:25, 35:3, 35:5, 35:14, 47:10, 72:24, 73:16, 75:25, 78:15, 78:24, 79:2, 80:23, 81:10, 83:5, 84:3, 84:7
**treats** [1] - 75:24
**trial** [2] - 13:10, 62:7
**trials** [1] - 6:12
**trickled** [2] - 6:7, 7:12
**true** [6] - 32:17, 32:22, 35:15, 35:18, 100:10, 101:8
**trust** [1] - 22:4
**truth** [3] - 4:22, 4:23

**try** [10] - 39:18, 45:8, 62:11, 62:16, 62:17, 78:14, 79:19, 80:15, 83:23, 83:24
**trying** [4] - 38:20, 49:15, 49:19, 80:19
**TS1** [1] - 88:8
**TS1-2** [1] - 88:18
**TSl-2** [1] - 88:11
**twice** [2] - 21:25, 52:22
**two** [18] - 8:1, 8:6, 10:14, 10:24, 12:11, 36:15, 36:24, 44:14, 45:19, 45:23, 52:21, 54:9, 55:12, 62:8, 62:20, 64:15, 65:5, 65:10
**two-hour** [1] - 10:24
**two-minute** [1] - 65:5
**type** [3] - 6:10, 6:16, 79:13
**typos** [1] - 10:1

## U

**uh-hmm** [3] - 26:10, 48:25, 82:21
**ultimately** [1] - 67:17
**uncommon** [2] - 90:5, 90:9
**under** [12] - 14:20, 27:13, 28:17, 29:18, 58:17, 60:11, 63:14, 64:11, 78:8, 83:10, 83:13, 103:11
**undergoing** [1] - 78:16
**underreporting** [1] - 16:18
**undersigned** [1] - 99:7
**understood** [2] - 34:15, 78:8
**underwent** [1] - 73:22
**unfortunately** [1] - 68:23
**UNITED** [1] - 1:1
**unprofessional** [1] - 19:11
**unstable** [1] - 82:16
**unto** [1] - 100:16
**up** [21] - 10:13, 11:21, 11:23, 13:3, 15:22, 22:14, 23:15, 25:22, 29:7, 42:10, 45:21, 53:4, 56:25, 60:15, 61:11, 69:1, 69:14, 76:8, 76:10, 91:9,

91:11
**upset** [1] - 82:9
**utilize** [6] - 23:9, 23:10, 25:17, 32:7, 41:23, 95:22
**utilized** [1] - 41:21
**utilizing** [1] - 32:16

## V

**valid** [4] - 32:3, 88:9, 88:18, 97:11
**validity** [5] - 84:18, 87:14, 93:9, 93:20, 93:21
**various** [2] - 33:6, 33:13
**verbally** [3] - 88:20, 89:9, 94:8
**verbatim** [2] - 40:10, 40:12
**verified** [1] - 57:5
**verify** [2] - 57:4, 65:1
**versus** [2] - 15:24, 24:9
**VIA** [1] - 2:1
**via** [1] - 11:9
**video** [1] - 4:4
**Video** [2] - 1:14, 2:14
**VIDEOGRAPHER** [5] - 4:1, 66:1, 66:4, 98:1, 98:4
**VIDEOTAPED** [1] - 1:19
**violence** [1] - 65:18
**VISHVESHWAR** [1] - 1:6
**Vishveshwar** [1] - 4:2
**Voyage** [2] - 3:7, 69:22
**vs** [1] - 1:8

## W

**WAGNER** [1] - 2:10
**waived** [1] - 103:16
**waking** [1] - 45:21
**walk** [2] - 49:5, 74:17
**walking** [1] - 22:9
**wane** [1] - 47:2
**waned** [1] - 73:11
**wants** [1] - 65:1
**wax** [1] - 47:1
**waxed** [1] - 73:11
**ways** [2] - 31:7, 31:11
**week** [1] - 50:23
**weeks** [3] - 8:2, 8:6, 45:23

**WELLS** [1] - 1:5
**whatsoever** [2] - 63:5, 71:19
**whereof** [1] - 100:16
**white** [1] - 70:6
**whole** [1] - 4:23
**wife** [2] - 53:10, 67:11
**Windows** [1] - 14:15
**WITNESS** [19] - 4:17, 4:20, 4:25, 21:13, 26:2, 31:14, 31:19, 33:5, 51:15, 58:1, 61:8, 62:25, 63:11, 65:24, 76:4, 77:12, 94:23, 97:8, 99:10
**witness** [4] - 5:4, 65:6, 100:11, 100:16
**word** [17] - 12:15, 13:16, 14:1, 14:4, 14:10, 14:19, 15:7, 15:12, 27:11, 28:12, 29:6, 29:13, 41:13, 66:24, 66:25, 71:11
**Word** [1] - 14:16
**worded** [1] - 41:10
**wording** [2] - 39:9, 41:22
**words** [9] - 15:2, 36:14, 36:23, 41:16, 41:20, 49:19, 55:15, 56:23, 92:17
**work -related** [1] - 48:7
**works** [1] - 21:20
**world** [1] - 39:1
**write** [1] - 10:5
**writing** [5] - 8:9, 10:20, 16:23, 41:23, 90:11
**wrote** [4] - 59:19, 59:22, 64:1, 64:2

## Y

**years** [1] - 5:20
**yesterday** [1] - 64:3
**young** [2] - 53:7, 53:8
**YOURSELF** [1] - 103:10
**yourself** [2] - 46:18, 71:12

## Z

**zero** [1] - 30:17
**Zoom** [1] - 37:23
**ZOOM** [1] - 2:1

|  | Structural neuroimaging differences between valid PTSD and invalid PTSD groups on the MENT, whole brain analysis = $p < 0.0001$ |  |
|---|---|---|
| TSI-2 |  | Findings are consistent with PTSD |
| PCL-5 | Description<br><br>The PCL-5 is a 20-item self-report measure that assesses the 20 DSM-5 symptoms of PTSD. The PCL-5 has a variety of purposes, including:<br><br>• Monitoring symptom change during and after treatment<br>• Screening individuals for PTSD<br>• Making a provisional PTSD diagnosis<br><br>The gold standard for diagnosing PTSD is a structured clinical interview such as the Clinician-Administered PTSD Scale (CAPS-5). When necessary, the PCL-5 can be scored to provide a provisional PTSD diagnosis. | PCL-5 score confirms PTSD |
| SIMS | Serves as a Screening Tool for the detection of feigned or exaggerated psychiatric disturbance and cognitive function, age 18+, or in combination with other assessment tools. | The cutoff score has been called into question; those who have PTSD may be viewed as over-reporting when they are not; in addition, cultural differences may account for misinterpretation and misunderstanding. |