UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| KHOLKAR VISHVESHWAR GANPAT, | Civil Action No. 18-13556 "E" (4) |
| Plaintiff, | IN ADMIRALTY |
| v. | JUDGE SUSIE MORGAN |
| EASTERN PACIFIC SHIPPING PTE, LTD., d/b/a "EPS" | CHIEF MAGISTRATE JUDGE KAREN WELLS ROBY |
| Defendant. | |

**EPS' SEPARATE STATEMENT OF CONTESTED MATERIAL FACTS**

Pursuant to this Court's order (R. Doc. 228), Defendant, Eastern Pacific submits the following separate statement of the material facts which EPS contends present genuine issues of material fact and states as follows:

1.      "[T]here were still enough medical supplies onboard the Vessel including anti malarials to reach Gabon."  R. Doc. 256-2 at 5 (EPS' Answers to Interrogatory No. 4).

2.      The timeline of this case is as follows.  The M/V STARGATE (or the "Vessel") stocked up with anti-malaria medicines during a refueling stop in Las Palmas, then sails for Abidjan, Côte d'Ivoire, Exh. 2 (Las Palmas Receipt); Exh. 3; R. Doc. 339-3 at 2 (Nelick Supp.).

3.      On January 21, 2017, beginning this date, and once each week until Feb. 25, 2017, some crew chose to take the Chloroquine pills received in Las Palmas.  Exh. 4.

4.      On January 27, 2017, the Vessel arrives in Abidjan.  Exh. 3.

5.      On January 31, 2017, the inventory of medicines shows various anti-malaria medication aboard; there are zero mefloquine pills inventoried.  Exh. 5.

6.      On February 22, 2017, the M/V STARGATE received 100 mefloquine pills in Abidjan.  Exh. 6.

7.     On March 3, 2017, some of 23-member crew chose to take a mefloquine pill.  Exh. 4.

8.     On March 10, 2017, the Vessel departed Abidjan.  Exh. 3

9.     March 11, 2017, some of 23-member crew choose to take a mefloquine pill.  Exh. 4.  The inventory shows 72 mefloquine pills remain of the 100 pills received in Abidjan, in addition to other anti-malarial medicines.  Exh. 7.

10.     On March 18, 2017, some of 23-member crew chose to take a mefloquine pill; this is the final dose after Abidjan.  Exh. 4.

11.     On March 20, 2017, the Vessel arrived New Amsterdam, Guyana.  Exh. 3.  Medical supplier (Princeton) gives quote for medications "required to replenish onboard vessel" for renewed medical chest certificate.  Exh. 8.

12.     On March 21, 2017, EPS staff order replenishment of medicines expiring over the next year and receive renewed medical chest certificate.  Exh. 9.  The only malaria-related item on this list was a box of artemether injections to replace what was coming up for expiry in Aug. 2017.  Perlstein Dep. (Exh. 21) 88:2-92:8.

13.     On March 26, 2017, the Vessel departed New Amsterdam.  Exh. 3.

14.     On April. 2, 2017:     the Vessel arrived Savannah, Georgia, United States.  Exh. 3.

15.     On April 4, 2017, Captain Ivanoschi joined M/V STARGATE as captain.  Exh. 1 at ¶ 2.

16.     On April 7, 2017, the Vessel departs Savannah for Barranquilla, Colombia.  Exh. 3.  The medicines to replace those expiring over the next year did not arrive.  Still, the STARGATE "had sufficient appropriate anti-malarial medicine remaining on board even without delivery of the requisition . . . ."  R. Doc. 341-1 at 5 (Nelick Rep.); Exh. 1 at ¶ 3; R. Doc. 256-2 at 5 (EPS

- 2 -

answer).

17.     On April 11, 2017, the Vessel arrived in Barranquilla to pick up new cargo.  Exh. 3.

18.     On April 14, 2017, the Vessel departed Barranquilla for Owendo, Gabon.  Exh. 3. During the voyage, the captain makes anti-malaria pills available to the crew, and advises them about the risks of malaria.  Exh. 1 at ¶ 4.

19.     On May 2, 2017, the Vessel arrived at anchor off Owendo.  Exh. 3.

20.     On May 7, 2017, the Vessel docked.  Gabon Port State Control inspection confirms Medical Chest Certificate.  Exhs. 1 at ¶ 5; 11.  Mr. Kholkar leaves the ship for the bar at 6:04 p.m. wearing a T-shirt.  Kholkar Dep. Exh. 24 73:17-76:2.

21.     On May 11, 2017, the Vessel departed Owendo.  Exh. 3.

22.     On May 12, 2017, referring to medicines expiring over the next year, Capt. Ivanoschi emailed EPS purchasing staff "about the medicines which have to be delivered on board for the year 2017 which were supposed to be received on board in Savannah/ USA."  Exh. 1 at ¶ 3.

23.     On May 22, 2017, expired medicines removed from "medicines list" spreadsheet. Exh. 11.

24.     When STARGATE left the United States, the ship "had sufficient appropriate anti-malarial medicine remaining on board even without delivery of the requisition" anticipated in Savannah.  R. Doc. 341-1 at 5 (Nelick Rep.).

25.     EPS's maritime expert and public health expert both disclosed opinions to this effect, about which they were both deposed.  *Id.*; R. Doc. 339-3 at 2 (Nelick Supp. Rep.) ("[T]he ship was in fact fully provisioned with an ample supply of such medicine . . . ."); Exh. 12 (Easmon Rep.) at ¶ 14 ("The ship in my professional opinion had the appropriate level of WHO advised

malaria treatments for its crew size of 23."). Even Plaintiff's maritime expert agrees that, based

on the March 11, 2017 inventory of medicines, Exh. 7, the ship had sufficient medicines for the

voyage from Colombia to Gabon:

> The medical inventory dated 11 March 2017 indicated several different anti-malarial medications and their quantities. ***Sufficient quantities were on board the M/V Stargate for each crewmember to receive for the voyage to Owendo, Gabon, West Africa***, for the period in port and the necessary period thereafter.

R. Doc. 355-5 at 7 (Perlstein Rep.) (emphasis added); *see also* Exh. 13 (Wiser Rep.) (Plaintiff's

public health expert) ("According to the Medical Inventories dated March 11, 2017 and May 22,

2018 (spreadsheets), there were antimalarial drugs for both prevention and treatment on board.").

      25.    What did not arrive in Savannah was a supplier's requisition to replace medicines

due to expire over the coming year. Exh. 9 (Princeton order). As *Plaintiff's* maritime expert put

it:

> Q Okay. Now, you had been discussing these [emails] with Mr. Sotolongo. I want to make sure I understand correctly your testimony. You've testified that the medicines coming to the ship were those that were [set] to expire in 2017. Is that correct?
> MR. SOTOLONGO: Form.
> A Yes.
> Q And those are the medicines you see on the Princeton quotation list; correct?
> MR. SOTOLONGO: Form.
> A Those I take it to be the medicines required to replenish the kit for the year.
> Q Okay. And that's – that's the list we looked at earlier from Princeton, the long quotation of 62 items; correct?
> A Correct.

Perlstein Dep. 149:15-150:7; *see also* Exh. 1 (Ivanoschi Decl.) ("I have reviewed the Princeton

requisition form [exhibit 8]. It shows medicines we thought would arrive in Savannah, U.S.").

      26.    The only malaria-related item on order when the ship left Savannah was a single

box of artemether injections. This was to replace what was coming up for expiry in August 2017,

months after Mr. Kholkar went to the hospital. Perlstein Dep. (Ex. 21) 88:2-92:8 ("Q . . . [T]he

only identified item related to malaria prevention or treatment is the artemether injections; correct?

A Correct. . . . Q Do you know why the artemether injections needed replacement?  A Coming up for expiry.  Q When was that expiry going to occur?  A August.").

27.    Plaintiff told his own expert the opposite during a private interviews reduced to writing.  *See* Exh. 14 (Perlstein notes).  Mr. Kholkar told Captain Perlstein that he took a dose of antimalarial medicine during the trip to Gabon:

> [Q] Let me go to your interview notes, [Exh. 14], and I'm showing your page 2
> here.  **According to your notes**, this [Exh. 14] says that **Mr. Kholkar told you**
> **after sailing Colombia, he had one dose of antimalarial**; correct?
> **A Yes.**
> Q That's what he told you; correct?
> A Correct.

Perlstein Dep. (Ex. 21) at 153:21-154:3 (emphasis added); *contra* R. Doc. 356-1 at 21 ("There is no . . .  testimony that Mr. Kholkar received anti-malaria medication after M/V STARGATE departed Savannah, Georgia.").

28.    Captain Ivanoschi "remembers clearly that each time he went to the Mess Room he repeatedly told the crewmembers to use insect repellent while also reminding the crew of basic prevention steps and to spread the message among other crew. . . . Typically, anti-malarial pills would be laid out on a table before lunch or dinner."  Exh. 356-2 at 5.  Captain Ivanoschi further states:

> During the Gabon voyage, I saw the Second Officer put anti-malaria pills on the
> tables in the crew's mess room for anyone who wanted to take them.  We made
> mosquito sprays available also.  I repeatedly advised the crew about the risks of
> malaria when sailing in West African countries.

Exh. 1 at ¶ 4.

29.    Captain Hurcuneyt (the departing captain of STARGATE) chose how his logs were kept; and Captain Ivanoschi chose his own.  *See* R. Doc. 355-5 (Perlstein Rep.) at 5 ("As Master I

was ultimately responsible for all that went on onboard.").[1]

30.     M/V STARGATE had all the medical supplies and equipment required by Liberian law.  R. Doc. 341-1 at 3 (Nelick Rep.) ("[The] vessel had continuously maintained, . . . as required by various guidelines and regulations, a 'medicine chest' which contains medical supplies, equipment, and references . . . ."); *see also Stiward v. United States*, No. 05-cv-1926, 2008 WL 927948, at *7 (E.D. La. Apr. 3, 2008) (denying plaintiff's summary judgment motion as "the [U.S.] statute only requires a 'medicine chest,' and it does not provide what must specifically be inside that chest.").

31.     Plaintiff's maritime expert, relies on Liberian regulations – a concession that Liberian law controls the admiralty tort claims. Exh. 16 (Perlstein Rep.) at 4, 7, 9-10, 12; Perlstein Dep. (Ex. 21) 54:23-55:4 ("Q. Why did you look to Liberian regulations and Liberian law when assessing this case?  A. Because that is the flag of the country, and the country will have their own requirements or they will defer to international regulations . . . ."); 55:17-19 ("Q. What country's laws govern the conduct of the captain aboard Stargate?  A. Liberia.").[2]

32.     EPS Liberian law expert, opines that "[o]nce granted the right to fly the Liberian flag, the vessel obtained Liberian 'nationality,' and became subject to the exclusive jurisdiction and control of Liberia."  Exh. 17 at ¶ 15 (citing Liberia Code of Laws (Rev.), Title 21, Maritime Law, Sec. 84).  He further opines that, "under Liberian law, this would be a case controlled by contract and in particular the limitations of contract that Plaintiff agreed to."  *Id.* at ¶ 19.[3]

---

[1] Similarly, exercising his authority regarding shipboard medical recordkeeping, Captain Ivanoschi directed the Second Officer to prepare the Medical Statement of Fact. Exh. 15 (Ivanoschi Decl.) at ¶ 8.

[2] In deposition, as well, Mr. Kholkar agreed that his Seafarer's Employment Agreement chose Liberian law.  Kholkar Dep. 20:22-25 ("Q. So according to this agreement, your promise with your employer, this agreement would be controlled by the laws of Liberia, correct?  A. Yes.").

[3] The expert goes on to opine that the compensation scheme of Mr. Kholkar's contract controls,

33.     EPS was not the "shipowner."  EPS was designated "shipowner" only "*For the purpose of* this [Seafarer's Employment] Agreement and as required pursuant to the provisions of the ILO Maritime Labour Convention 2006 . . . ."  Exh. 18 (emphasis added).

34.     EPS testified as to the respective roles of Ventnor and EPS:

> Q. What was the purpose of these two companies?
> A. As I said, Larchep Shipping is the owner of the ship. . . . [a]nd Ventnor is the employer of the  seafarer.
> Q. And the ship is used by EPS Singapore?
> A. No, it's not used by EPS Singapore.
> Q. It's managed.
> A. EPS Singapore is, yes, the ship manager.
> Q. So we have EPS Singapore, the ship manager.  We have Ventnor Navigation, Inc. which is the employer who employs seafarers to work aboard ships that are managed by EPS Singapore, and Larchep is the company that supposedly owns the ship where EPS manages employees for Ventnor.
> A. It manages the ship.  It doesn't manage employees of Ventnor.

Emilianou Dep. (Ex. 22) 20:6-12; 21:2-22:13.  EPS's Director Capt. Anil Singh also testified to these separate roles of the involved corporations.  *See, e.g.*, Singh Dep. (Ex. 23) 18:11-14 (Aug. 7, 2019) ("Is it true that, in connection with Mr. Kholkar's employment, Eastern Pacific was Ventnor Navigation's agent?  A. EPS was Ventnor's agent."); 58:11-17 ("[W]hether Captain Bona was a corporate officer or not with respect to his day-to-day duties as the captain who supervised the activities of vessel management for Eastern Pacific?  What difference would it make?  A. Bona is employed by Ventnor and acts for Ventnor, not EPS.").  Capt. Nelick notes that "STARGATE was operating under an arrangement between the owners of the vessel (Larchep Shipping) and a ship management company, (Eastern Pacific Shipping)."  R. Doc. 341-1 (Nelick Rep.) at 3.  "This arrangement is quite common . . . [Owners] engage a ship management company to perform shoreside functions for the ship and owners."  *Id.*  He continues:

> [M]odern seagoing shipmasters, and the crews under them, perform, *for the behalf*

meaning that his employer would pay as appropriate according to the compensation table, and Mr. Kholkar is in breach for seeking relief beyond that exclusive amount.  Exh. 17 at ¶¶ 24-32.

*of owners, operational functions aboard ship*, while shoreside managers take care of technical requirements . . . that are best handled ashore.

*Id.* (emphasis added).

35.     Plaintiff chose not to take the course of anti-malaria medicines offered.  Exh. 1 (Ivanoschi Decl.).  He did this despite being told of the risks or malaria.  *Id.*  It is clear he knew of the risks because he said he took one dose while en route Owendo, Perlstein Dep. (Ex. 21) at 153:21-154:3, because he knew to cover his head, neck, arms, hands, and legs while on deck, Kholkar Dep., Exh. 24, at 64:1-66:2, and because he had previously completed a voyage to West Africa, during which the crew were offered anti-malaria medications, Exh. 4.

36.     Without having taken prophylaxis on the way to Gabon, Mr. Kholkar chose to go ashore, and sit poolside at an Owendo bar while wearing a short-sleeved shirt.  Kholkar Dep., Exh. 24, at 68:2–69:2; 75:15-76:13; Plaintiff at poolside in short sleeve shirt, Owendo, Exh. 20.  As the Court has already been briefed, EPS had to uncover this through social media research, after Plaintiff failed to produce it in discovery.  *See* R. Doc. 328-1.

37.     A team of 13 medical specialists at a world class hospital in Brazil took from May 27 to May 29 to diagnose malaria, an effort no one in this case has criticized.  *See, e.g.*, Kholkar Dep. (Exh. 24) 118:24-119:4 (after noting diagnosis took from May 27 to May 29, 2017, testified to have "no complaints" about the care received).

Dated: October 6, 2022

Respectfully Submitted,

| | |
|---|---|
| /s/ J. Stephen Simms | MICHAEL H. BAGOT, JR., T.A. (#2665) |
| J. Stephen Simms | THOMAS A. RAYER, Jr. (#20581) |
| Thomas M. Brown | WAGNER, BAGOT & RAYER, LLP |
| Catherine M. Benson | Pan American Life Center – Suite 1660 |
| Simms Showers LLP | 601 Poydras Street |
| 201 International Circle, Suite 230 | New Orleans, Louisiana 70130 |
| Baltimore, Maryland 21030 | Telephone: 504-525-2141 |
| Tel:  410-783-5795 | Facsimile: 504-523-1587 |

Fax: 410-510-1789                         E-mail: mbagot@wb-lalaw.com
Email: jssimms@simmsshowers.com

Eastern Pacific Shipping Pte. Ltd. Counsel