UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| KHOLKAR VISHVESHWAR GANPAT,<br><br>    Plaintiff,<br><br>v.<br><br>EASTERN PACIFIC SHIPPING PTE, LTD.,<br>d/b/a "EASTERN PACIFIC"<br><br>    Defendant. | Civil Action No. 18-13556 "E" (4)<br><br>IN ADMIRALTY<br><br>JUDGE SUSIE MORGAN<br><br>CHIEF MAGISTRATE JUDGE<br>KAREN WELLS ROBY |

**EPS' LR 56.2 SEPARATE AND CONCISE STATEMENT OF
MATERIAL FACTS WHICH EPS CONTENDS PRESENT GENUINE
ISSUES OF MATERIAL FACT TO PLAINTIFF'S STATEMENT
[DKT 421-21]; PLAINTIFF'S "UNSEAWORTHINESS' MOTION [DKT. 421]**

NOW INTO COURT, through undersigned counsel, comes Eastern Pacific Shipping, Pte. Ltd ("EPS") and responds to Plaintiff's statement of uncontested material facts (Dkt. 421-21), as follows: (Exhibits refer to, those filed with or referred to in EPS' Memorandum Opposing Plaintiff's Motion and Cross Moving for Summary Judgment, and EPS Material Facts Statement of Contest Facts, unless otherwise noted).

1. EPS was a vessel manager which assumed responsibility for the operation of M/V STARGATE from her owner.

**EPS RESPONSE:** Denied.

Larchep Shipping is the owner of the M/V STARGATE and Ventnor Navigation is the employer that employs seafarers to work aboard the ship. **Ex. O** Emilianou Dep. (20:6-12; 21:2-22:13). EPS's Director Capt. Anil Singh also testified to these separate roles of the involved corporations. *See, e.g.*, **Ex. P** Singh Dep. (18:11-14) (Aug. 7, 2019) ("Is it true that, in connection with Mr. Kholkar's employment, Eastern Pacific was Ventnor Navigation's agent? A. EPS was Ventnor's agent."); (58:11-17 )("[W]hether Captain Bona was a corporate officer or not

with respect to his day-to-day duties as the captain who supervised the activities of vessel management for Eastern Pacific? What difference would it make? A. Bona is employed by Ventnor and acts for Ventnor, not EPS."). Capt. Nelick, EPS maritime expert, notes that "M/V STARGATE was operating under an arrangement between the owners of the vessel (Larchep Shipping) and a ship management company, (Eastern Pacific Shipping)." R. Doc. 341-1 (Nelick Rep.) at 3. "This arrangement is quite common . . . [Owners] engage a ship management company to perform shoreside functions for the ship and owners." *Id*. "[M]odern seagoing shipmasters, and the crews under them, perform, for the behalf of owners, operational functions aboard ship, while shoreside managers take care of technical requirements . . . that are best handled ashore." *Id*.

EPS did not assume ownership of M/V STARGATE. *Id.* Admitted only that EPS was the shoreside technical manager of M/V STARGATE.

Cited deposition testimony is taken out of context and does not include all of paragraph 4 of Mr. Singh's January 4, 2019 affidavit, which reads as follows:

> Eastern Pacific manages but does not own the M/V STARGATE (IMO No. 9493212) or the M/V BANDA SEA (IMO No. 9337406). Any designation of Eastern Pacific as a "shipowner" refers solely to the definition of that term in the ILO Maritime Labour Convention 2006 Article II, para. 1. (j) ("Definitions and Scope of Application"), including Eastern Pacific as "the manager ... who has assumed the responsibility for the operation of the ship from the owner."

Plaintiff Exhibit 18 at paragraph 4.

2. EPS knew the anti-malaria medication for the year 2017 had not been delivered to M/V STARGATE during an April 2017 port call Savannah, Georgia.

**EPS RESPONSE:** Denied.

STARGATE had an adequate supply of anti-malaria medication onboard at all material times in 2017. Dkt. 339-3 at 2 (Nelick Supp. Rep.) ("[T]he ship was in fact fully provisioned with an

2

ample supply of such medicine . . . ."); **Ex. J** (Easmon Rep.) at ¶ 14 ("The ship in my professional opinion had the appropriate level of WHO advised malaria treatments for its crew size of 23."); **Ex. K** at 7 (Perlstein Rep.)( Sufficient quantities were on board the M/V Stargate for each crewmember to receive for the voyage to Owendo, Gabon, West Africa, for the period in port and the necessary period thereafter); Dkt. 415-4 (Wiser Rep.) (Plaintiff's public health expert) ("According to the Medical Inventories dated March 11, 2017 and May 22, 2018 (spreadsheets), there were antimalarial drugs for both prevention and treatment on board.").

The pending requisition in Savannah, Georgia was for medicines to replace medicines that would expire later in the year and did not prevent M/V STARGATE receiving certification of its medical chest. **Ex. H** (Ivanoschi Decl.); *see also* **Ex. C -F**.  The only malaria-related item on the requisition was a box of artemether injections to replace what was coming up for expiry in Aug. 2017. Perlstein Dep. (**Ex. G**) 88:2-92:8 ("Q . . . [T]he only identified item related to malaria prevention or treatment is the artemether injections; correct? A. Correct. . . . Q. Do you know why the artemether injections needed replacement? A. Coming up for expiry. Q. When was that expiry going to occur? A. August.").

The ship's Medical Chest Certificate was renewed and reissued on March 21, 2017. **Ex. M** (certifying the medical chest "in accordance with the guidelines established by the World Health Organization," and that the "medical chest is in compliance with the Maritime Labour Convention, 2006); *see also* **Ex. H** at ¶ 5 (Ivanoschi Decl.)

Admitted that Captain Ivanoschi's predecessor submitted a request on March 28, 2017 – unrelated to the medical chest – for unnecessary surplus mefloquine that was pending when Captain Ivanoschi's predecessor left the M/V STARGATE.

3. In May 2017, M/V STARGATE made a port call at Owendo, Gabon.

3

**EPS RESPONSE:** Admitted.

4. In answer to Plaintiff's April 22, 2022 Interrogatory No. 4, EPS stated:

   "Due to the unseasonably dry and cool weather in Gabon at the time, local agents advised that the risk of malaria was low. Anti-malaria pills were therefore not required to be distributed during the voyage to Gabon."

**EPS RESPONSE:** Admitted.

5. EPS's answer to Interrogatory No. 4 did not identify these "local agents," their public health or medical backgrounds, when they informed EPS that the malaria risk in Gabon was "low," or the starting and ending dates of this "low risk" time period.

**EPS RESPONSE:** Disputed as vague and misleading. Plaintiff's April 22, 2022 Interrogatory No. 4 did not request EPS to: "identify these 'local agents,' their public health or medical backgrounds, when they informed EPS that the malaria risk in Gabon was 'low,' or the starting and ending dates of this 'low risk' time period." Interrogatory 4 requested a, "brief description of the incident as known by the Defendant." Admitted that the Interrogatory answer- as evidenced in Dkt. 421-3- speaks for itself and does not contain the information-not requested in it by Plaintiff in Interrogatory 4.

6. The World Health Organization recognizes that equatorial west Africa, which includes Gabon, is a known perennial high risk malaria zone dominated by *Plasmodium falciparum,* the most virulent of all malaria parasite strains.

**EPS RESPONSE:** Objection. The cited reference is irrelevant and details a study with a study period from "June 2019 to April 2022" which is outside of the material time of this litigation and thus, not a material fact.

Objection, the cited authority focuses on Franceville, and not Owendo, Gabon the location where Mr. Gabon alleges he contracted malaria and thus is irrelevant and not a material fact.

Disputed. The cited authority does not support Plaintiff's assertion. Specifically, it does

4

not designate Gabon as "high risk," but rather indicates "[m]alaria transmission in Gabon is stable." It also notes a seasonal pattern and that most cases of malaria were "seen in the months of September to November (rainy season in Gabon)" - i.e. outside of the material time of Mr. Ganpat's shore leave in Gabon (May 2017).

> Admitted only that the reference is accurately cited in footnote 4. Dkt 421-21.

7. Captain Ivanoschi "repeatedly advised the crew about the risks of malaria when sailing in West African countries."

**EPS RESPONSE:** Admitted.

8. No pre-Gabon port call anti-malaria medication was administered to the Plaintiff.

**EPS RESPONSE:** Denied. Plaintiff told his own maritime expert Captain Perlstein that he took a dose of anti-malaria medication after departing Barranquilla, Colombia for Owendo, Gabon. **Ex. Q**; **Ex. I** (Perlstein Dep: 153:21-154:3). Captain Ivanoschi also made sure anti-malarial medicines were available to the crew in this period. **Ex. H** (Ivanoschi Decl.) at ¶ 4.

9. No post-Gabon port call anti-malaria medication was administered to the Plaintiff.

**EPS RESPONSE:** Denied as vague. Mr. Ganpat received emergency medical care on May 27, 2017, when Capt. Ivanoschi sent him to the hospital in Brazil, less than 48 hours after learning of his condition where he received anti-malaria medication and treatment. **Ex. R** (Medical SOF); **Ex. H**. Further, Mr. Ganpat took other medication including Augmentin BID and Paracetamol Ecopharm while on the ship. **Ex. V**.

10. No post-Gabon port call blood tests were performed on the Plaintiff.

**EPS RESPONSE:** Denied as vague. Mr. Ganpat was hospitalized on May 27, 2017, after Capt. Ivanoschi sent him to the hospital in Brazil and he had blood testing. **Ex. H** (Medical SOF).

> Admitted no blood testing occurred on M/V STARGATE.

11. No malaria blood test kits were aboard M/V STARGATE

**EPS RESPONSE:** Admitted, but malaria blood test kits were not required and there was no duty to have a malaria test kit onboard. Dkt. 341-1 at 3 (Nelick Rep – EPS maritime expert.) ("[The] vessel had continuously maintained, . . . as required by various guidelines and regulations, a 'medicine chest' which contains medical supplies, equipment, and references . . . ."); **Ex. M**. (Medical Chest Certificate) (certifying the medical chest "in accordance with the guidelines established by the World Health Organization," and that the "medical chest is in compliance with the Maritime Labour Convention, 2006); **Ex. B** (Vessel classification renewal certificate dated April 6, 2017 confirming vessel compliance with class standards/Liberian law).

12. M/V STARGATE's "Medicines Lists" used the bold and underlined words **"ANTI-MALARIA (only required in designated malaria risk zones"** with reference to various anti-malaria medicines and "Malarial Test Kits."

**EPS RESPONSE:** Admitted only that Medicines Lists" used the bold and underlined words **"ANTI- MALARIA (only required in designated malaria risk zones,"** as it did with all of the other section headers.

13. The acronym "NIL" (i.e., none) appeared in the **"ANTI-MALARIA (only required in designated malaria risk zones"** sections of both the March 11, 2017 "at sea" Medicines List and the May 22, 2017 "Rio de Janeiro" Medicines List regarding code item 14al (Chloroquine Phosphate Tablets 250mg), code item 14a3 (Proguanil Hydrochloride Tablets 100mg), code item Mo349 (Atovaquone + Proguanil (Malarone)), and code item M0032 (Malarial Test Kit - optimal).

**EPS RESPONSE:** Admitted.

14. Upon hearing of the Plaintiff's symptoms, the Master did not immediately think that it was malaria because the Plaintiff's only known symptoms were dizziness and vomiting.

**EPS RESPONSE:** Admitted.

15. Drugs to treat malaria were available on board M/V STARGATE and could have been administered if the cause of Plaintiffs symptoms was known.

**EPS RESPONSE:** Admitted with clarification. "Malaria is difficult to diagnose," and it is

6

known as the "great mimicker" because it "can mimic many other conditions." **Ex. S** - Easmon Dep. 44:11-19; 55:23-56:18.

16. Captain Ivanoschi had tonic water brought aboard and discussed its health benefits with the crew.

**EPS RESPONSE:** Admitted.

17. On April 4, 2017, Teodor Ivanoschi joined M/V STARGATE as her Master.

**EPS RESPONSE:** Admitted.

18. The departing Master told Ivanoschi the vessel's Medical Chest Certificate was up for renewal and that he had made a request *with EPS* to be sent a new one while the vessel was in Savannah

**EPS RESPONSE:** Disputed. The ship's Medical Chest Certificate was renewed and issued on March 21, 2017. **Ex. M**. 9; **Ex H** at ¶ 5 (Ivanoschi Decl.). Admitted only that departing Master made the incorrect statement to Captain Ivanosch as detailed.

19. An Excel file of the inventory was sent directly *to EPS' medical suppliers* who would review the inventory, compare it with the flag state's list of mandatory drugs, and replace any missing/expired items.

**EPS RESPONSE:** Disputed as vague. Admitted that M/V STARGATE's inventory was sent to Princeton Pharmacy on March 11, 2017 to review the inventory, compare it with the flag state's list of mandatory drugs, and replace any missing/expired items.

20. Captain Ivanoschi's predecessor made the requisition for the anti-malaria drugs on March 28, 2017. The requisition was still pending when the predecessor left the M/V STARGATE.

**EPS RESPONSE:** Disputed as misleading and to the to the extent that "the requisition" refers to the Medical Chest Certificate. There were two requisitions.

The ship's Medical Chest Certificate was issued on March 21, 2017. **Ex. M**; **Ex. H** at ¶ 5 (Ivanoschi Decl.).

The pending requisition expected in Savannah, Georgia was for medicines to replace

7

medicines that would expire later in the year. **Ex. H**; **Ex. D-G**. The only malaria-related item on this list was a box of artemether injections to replace what was coming up for expiry in Aug. 2017. **Ex. I** Perlstein Dep. (88:2-92:8) ("Q . . . [T]he only identified item related to malaria prevention or treatment is the artemether injections; correct? A. Correct. . . . Q. Do you know why the artemether injections needed replacement? A. Coming up for expiry. Q. When was that expiry going to occur? A. August.").

Admitted that Captain Ivanoschi's predecessor submitted a request on March 28, 2017 – unrelated to the medical chest – for unnecessary surplus mefloquine that was pending when Captain Ivanoschi's predecessor left the M/V STARGATE.

21. Before the vessel departed Savannah, Captain Ivanoschi realized that neither the medical chest nor the additional anti-malarial drugs had been delivered.

**EPS RESPONSE:** Denied. Further discovery revealed that the ship's Medical Chest Certificate was renewed and reissued on March 21, 2017. **Ex. M** (certifying the medical chest "in accordance with the guidelines established by the World Health Organization," and that the "medical chest is in compliance with the Maritime Labour Convention, 2006); *see also* **Ex. H** at ¶ 5 (Ivanoschi Decl.).  No additional anti-malarial drugs were required onboard. *Id.*

Admitted that Captain Ivanoschi's predecessor submitted a request on March 28, 2017 – unrelated to the Medical Chest – for unnecessary surplus mefloquine that was pending when Captain Ivanoschi's predecessor left the M/V STARGATE.

22. "Due to the risk of severe disease and death, it is strongly recommended that visitors to areas endemic for *falciparum* malaria take chemoprophylaxis. Chemoprophylaxis is the use of drugs to prevent an infectious disease, or to minimize its severity if a person becomes infected. Depending on the specific drug(s) used, anti-malarial chemoprophylaxis possibly starts at least two weeks before traveling to a malaria endemic area, continues while in the endemic area, and continues for an additional 1-4 weeks after departing from the endemic area."

**EPS RESPONSE:**  Denied as vague. Admitted only that Plaintiff Expert Dr. Wisner opines in

his report that malarial chemoprophylaxis is recommended for visitors to areas in which malaria is endemic. *See also* **Ex H** (Ivanoschi Decl.) at ¶ 4 (stating that he made chemoprophylaxis available and warned the crew).

23. EPS produced the M/V STARGATE's medical logbook for the January 21, 2017 through March 25, 2017 time period.

**EPS RESPONSE:** Admitted only that EPS produced Plaintiff's Exhibit 6 during discovery.

24. This medical logbook shows that anti-malaria medicine was dispensed to the entire crew during a recent prior voyage to Abidjan, Ivory Coast, another high risk malaria zone on the Atlantic coast of equatorial Africa.

**EPS RESPONSE:** Denied. Cited authority does not support Plaintiff's contention. It does not discuss the medical logbook nor establish Abidjan – or any other area- as "high risk."

To the extent that this material fact refers to the logbook contained in Plaintiff Exhibit 6- as reference in material fact 23: Admitted only that Plaintiff's Exhibit 6, generated when Captain Hurcuneyt was in command of the M/V STARGATE, and for which Plaintiff does not have an authenticating witness, has the words "given for all crew" on dates corresponding to the signature sheet.

25. No medical logbook was ever produced which showed administration of anti-malarial medicine before M/V STARGATE's port call at Owendo, Gabon.

**EPS RESPONSE:** Denied. Cited authority does not support Plaintiff's contention. It does not discuss a "medical logbook." Further, Plaintiff Exhibit 6, generated when Captain Hurcuneyt was in command of the M/V STARGATE, and for which Plaintiff does not have an authenticating witness, has the words "given for all crew" on dates corresponding to the signature sheet.

26. When Plaintiff requested the production of documents pertaining to administration of anti-malaria medicine during the voyage to Gabon, EPS' May 23, 2022, responses to Production Request Nos. 3, 4, and 5 were "none."

**EPS RESPONSE:** Admitted with clarification.  EPS's responses to Production Request Nos. 3, 4, and 5 was, "Subject to EPS' General Objections, *supra*, none."

27. E-mails produced by EPS show that the lack of anti-malaria medicine for the year 2017 persisted until *after* the vessel's arrival in Brazil.

**EPS RESPONSE:** Denied.

M/V STARGATE had an adequate supply of anti-malaria medication onboard at all material times in 2017, including when it left the United States for Gabon.  Dkt. 339-3 at 2 (Nelick Supp. Rep.) ("[T]he ship was in fact fully provisioned with an ample supply of such medicine . . . ."); **Ex. J** (Easmon Rep.) at ¶ 14 ("The ship in my professional opinion had the appropriate level of WHO advised malaria treatments for its crew size of 23."); **Ex. K** at 7 (Perlstein Rep.)(Sufficient quantities were on board the M/V Stargate for each crewmember to receive for the voyage to Owendo, Gabon, West Africa, for the period in port and the necessary period thereafter); Dkt. 415-4 (Wiser Rep.) (Plaintiff's public health expert) ("According to the Medical Inventories dated March 11, 2017 and May 22, 2018 (spreadsheets), there were antimalarial drugs for both prevention and treatment on board.").

28. Dr. Charlie Easman [sp], EPS' Rule 26 medical expert witnes , testified:

> Q. So did you see evidence of that, Doctor, between April of
> 2017 and May of 2017 that he was given malaria prophylaxis
> aboard ship? Yes or no?
>
> A. I don't recall seeing any evidence.

**EPS RESPONSE:** Admitted only that Dr. Easmon testified as cited. In discovery, EPS obtained Captain Perlstein's handwritten interview notes (Plaintiff's maritime expert), in which he documented Mr. Ganpat's statement to him that Mr. Ganpat took a dose of anti-malaria medication after departing Barranquilla, Colombia for Owendo, Gabon – the reference timeframe. **Ex. Q**; *see also* **Ex. G** (Perlstein Dep: 153:21-154:3)(Mr. Ganpat admitted to taking

10

one dose of anti-malaria medication on trip to Gabon).

29. Dr. Charlie Easman [sp], EPS' Rule 26 medical expert witness, testified:

> Q. Okay. But my question to you is -- I wanted to make sure, because I know once he got to the hospital in Brazil he got the proper treatment for malaria -- but my question to you. There is no evidence from any shipboard record that you are able -- that you reviewed that Mr. Kholkar received any prevention malaria medication or treatment malaria medication at any time between April of 2017 and May of 2017, correct, sir?
>
> A. That is correct.

**EPS RESPONSE:** Admitted only that Dr. Easmon testified as cited. In discovery, EPS obtained Captain Perlstein's handwritten interview notes (Plaintiff's maritime expert), in which he documented Mr. Ganpat's statement to him that Mr. Ganpat took a dose of anti-malaria medication after departing Barranquilla, Colombia for Owendo, Gabon – the reference timeframe. **Ex. Q**; *see also* **Ex. G** (Perlstein Dep: 153:21-154:3)(Mr. Ganpat admitted to taking one dose of anti-malaria medication on trip to Gabon).

30. The Seafarer Employment Agreement between Plaintiff and Ventnor Navigation, in the "Employer's Standard Terms" section 1, states:
    1. "For purpose of this Agreement and as required pursuant to the provisions of the ILO Maritime Labour Convention 2006, the Shipowner is **Eastern Pacific Shipping Pte Ltd of 1 Temasek Avenue, #38-01, Millenia Tower, Singapore 039192** (the "Shipowner")."

(Bold emphasis in original)

**EPS RESPONSE:** Admitted only that the Seafarer Employment Agreement reads as cited. Larchep Shipping is the owner of the M/V STARGATE and Ventnor Navigation is the employer that employs seafarers to work aboard the ship. **Ex. O** Emilianou Dep. (20:6-12; 21:2-22:13). EPS's Director Capt. Anil Singh also testified to these separate roles of the involved corporations. *See, e.g.*, **Ex. P** Singh Dep. (18:11-14) (Aug. 7, 2019) ("Is it true that, in connection with Mr. Kholkar's employment, Eastern Pacific was Ventnor Navigation's agent? A. EPS was Ventnor's

11

agent."); (58:11-17 )("[W]hether Captain Bona was a corporate officer or not with respect to his day-to-day duties as the captain who supervised the activities of vessel management for Eastern Pacific? What difference would it make? A. Bona is employed by Ventnor and acts for Ventnor, not EPS."). Capt. Nelick, EPS maritime expert, notes that "M/V STARGATE was operating under an arrangement between the owners of the vessel (Larchep Shipping) and a ship management company, (Eastern Pacific Shipping)." R. Doc. 341-1 (Nelick Rep.) at 3. "This arrangement is quite common . . . [Owners] engage a ship management company to perform shoreside functions for the ship and owners." *Id.* "[M]odern seagoing shipmasters, and the crews under them, perform, *for the behalf of owners, operational functions aboard ship, while shoreside managers take care of technical requirements . . . that are best handled ashore." Id. (emphasis added).* EPS did not assume ownership of the M/V STARGATE and was only deemed the owner for the limited purpose of the agreement. *Id.*

   31. EPS managed M/V STARGATE.

**EPS RESPONSE:** Admitted with clarification. EPS provided "technical and commercial management of the vessel." Plaintiff Ex. 1 at 53.

   32. EPS finds commercial employment for M/V STARGATE and ensures that it has sufficient provisions, stores, spare parts, and a competent crew.

**EPS RESPONSE:** Admitted with clarification. EPS did not find "commercial employment" for the M/V STARGATE; employment was done by the then-charterer of the vessel Oldendorff Carriers.  **Ex. W**. As manager, EPS' responsibilities include the provisioning of the vessel, including for stores and spare parts.  EPS contracted with a crewing company, Ventor Navigation, to provide a competent crew

   33. This responsibility includes ensuring an on-hand supply of medications appropriate and necessary for the nature of the voyage and its intended destination.

**EPS RESPONSE:** Objection. The statement contains no citation to authority as required. *See* Fed R. Civ. P. 56. To extent a response is required, Denied. The ship owner is responsible for the seaworthiness of the vessel. *Beech v. Hercules Drilling Co., L.L.C.,* 691 F.3d 566, 570 (5th Cir. 2012)(Unseaworthiness is a claim under general maritime law based on the vessel owner's duty to ensure that the vessel is reasonably fit to be at sea." ).

EPS is not the vessel owner - Larchep Shipping is the owner of the M/V STARGATE and Ventnor Navigation is the employer that employs seafarers to work aboard the ship. **Ex. O** Emilianou Dep. (20:6-12; 21:2-22:13). EPS' Director Capt. Anil Singh also testified to these separate roles of the involved corporations. *See, e.g.*, **Ex. P** Singh Dep. (18:11-14) (Aug. 7, 2019) ("Is it true that, in connection with Mr. Kholkar's employment, Eastern Pacific was Ventnor Navigation's agent? A. EPS was Ventnor's agent."); (58:11-17 )("[W]hether Captain Bona was a corporate officer or not with respect to his day-to-day duties as the captain who supervised the activities of vessel management for Eastern Pacific? What difference would it make? A. Bona is employed by Ventnor and acts for Ventnor, not EPS."). Capt. Nelick, EPS maritime expert, notes that "M/V STARGATE was operating under an arrangement between the owners of the vessel (Larchep Shipping) and a ship management company, (Eastern Pacific Shipping)." R. Doc. 341-1 (Nelick Rep.) at 3. "This arrangement is quite common . . . [Owners] engage a ship management company to perform shoreside functions for the ship and owners." *Id.* "[M]odern seagoing shipmasters, and the crews under them, perform, for the behalf of owners, operational functions aboard ship, while shoreside managers take care of technical requirements . . . that are best handled ashore." *Id.* EPS did not assume ownership of the M/V STARGATE. *Id*.

34. Maritime Labor Convention, 2006, at Title 4, Regulation 4.4 "Medical Care On Board Ship and Ashore" states:

    (a) all ships shall carry a medicine chest, medical equipment and a medical guide,

13

>the specifics of which shall be prescribed and subject to regular inspection by the competent authority; the national requirements shall take into account the type of ship, the number of persons on board and the nature, destination and duration of voyages and relevant national and international recommended medical standards.

**EPS RESPONSE:** Admitted.

35. Captain Ivanoschi first learned of Plaintiff's health issues on May 25, 2017.

**EPS RESPONSE:** Admitted.

36. The manifestation of Plaintiff's symptoms of severe illness was consistent with the World Health Organization's 10 to 15 day incubation period of *P. falciparum* and the expert opinion of Mark F. Wiser, Ph.D.

**EPS RESPONSE:** Denied. Cited authority does not stand for the proposition stated. Dr. Wisner opines that it is "widely known that the typical incubation period for falciparum malaria is 7-14 days." Attachment A to Plaintiff Exhibit 5 at p. 3.

37. The May 29, 2017 8:49 am e-mail described Plaintiff's condition when he was medically evacuated from the vessel:

>"He was in really poor physical condition. He was very weak and [UNREADABLE IN ECF FILING ] then to the car arranged by local agent

**EPS RESPONSE:** Denied that Plaintiff was medically evacuated. On May 27, 2017, Captain Ivanoschi had the ship's agent drive Plaintiff to the hospital. **Ex. H** (Ivanoschi Decl.) at ¶10-11.

>Admit only Plaintiff Exhibit 14 speaks for itself.

38. EPS produced two "Medicines Lists" for M/V STARGATE. One is "March 11, 2017 AT SEA" and the other is "May 22, 2017 RIO DE JANEIRO." These lists are 72 days apart in time, yet every item on both lists is identical as to quantity, or "NIL," or expiration date.

**EPS RESPONSE:** Denied.  Plaintiff cites to Plaintiff Ex. 15 [Dkt. 421-16] and Plaintiff Ex. 15 [421-17], but these exhibits are not complete and do not show the full Medicine Lists.  A review of the full Medicine Lists show that information is not the same for every item as Plaintiff

14

contends (see *e.g.* Ibuprofen 400 mg tablets at **Ex. E** (noting 120) and **Ex. X** (noting 100)).

39. Liberian General Maritime Regulation 10.296 (3)(b) requires that:

"Every Liberian Vessel shall carry and maintain an adequate medicine chest bearing in mind the number of persons aboard and the nature and duration of the voyage."

**EPS RESPONSE:** Admitted.

40. EPS managed M/V STARGATE as "the manager ... who has assumed the responsibility for the operation of the ship from the owner.

**EPS RESPONSE:** Denied as misleading. Plaintiff Exhibit 18 at pp. 1-2 reads in full as:

"Eastern Pacific manages but does not own the M/V STARGATE (IMO No. 9493212) or the M/V BANDA SEA (IMO No. 9337406). **Any designation of Eastern Pacific as a "shipowner" refers solely to the definition of that term in the ILO Maritime Labour Convention 2006 Article II, para. 1. (j) ("Definitions and Scope of Application"), including Eastern Pacific as "the manager ...** who has assumed the responsibility for the operation of the ship from the owner." (emphasis added).

41. When EPS assumed the duties of "shipowner" it assumed the duties incumbent upon shipowners under the General Maritime Law, including the non-delegable duty to provide a seaworthy vessel.

**EPS RESPONSE:** Objection. The statement contains an improper conclusion of law rather than a statement of fact, to which no response is required.

Objection. The statement contains no citation to authority as required. *See* Fed R. Civ. P. 56.

To the extent, a response is required, denied. EPS did not assume the duties and liabilities of the shipowner.

42. When EPS assumed the duties of "shipowner" it assumed the duties incumbent upon shipowners under the General Maritime Law, including the non-delegable duty to provide prompt and adequate medical care to the crew.

15

**EPS RESPONSE:** Objection. The statement contains an improper conclusion of law rather than a statement of fact, to which no response is required.

Objection. The statement contains no citation to authority as required. *See* Fed R. Civ. P. 56.

To the extent, a response is required, denied. EPS did not assume the duties and liabilities of the shipowner to provide medical care to the crew.

43. When EPS assumed the duties of "shipowner" it assumed the duties incumbent upon shipowners under the General Maritime Law, including the non-delegable duty to provide maintenance and cure to the crew.

**EPS RESPONSE:** Objection. The statement contains an improper conclusion of law rather than a statement of fact, to which no response is required.

Objection. The statement contains no citation to authority as required. *See* Fed R. Civ. P. 56.

To the extent, a response is required, denied. EPS did not assume the duties and liabilities of the shipowner – if any- to provide maintenance and cure.

44. The May 12, 2017, e-mails between Captain Ivnoschi and EPS shows that EPS was the entity responsible for delivery of medicine chest items to M/V STARGATE.

**EPS RESPONSE:** Denied. Cited authority does not stand for the stated proposition. The ship's Medical Chest Certificate was renewed and reissued on March 21, 2017 by Princeton Pharmacy, before the May 12, 2017 emails. **Ex. M**. Princeton Pharmacy was responsible for delivering the items ordered by EPS. **Ex. G**.

Dated: August 6, 2024.

Respectfully Submitted,

Michael H. Bagot, Jr., T.A. (#2665)                    /s/ J. Stephen Simms

16

| | |
|---|---|
| Thomas A. Rayer, Jr. (#20581) | J. Stephen Simms (*pro hac vice*) |
| WAGNER, BAGOT & RAYER LLP | Catherine M. Benson (*pro hac vice*) |
| Pan American Life Center – Suite 1660 | Gary C. Murphy (*pro hac vice*) |
| 601 Poydras St. | Simms Showers LLP |
| New Orleans, Louisiana 70130 | 201 International Circle, Suite 230 |
| Telephone: 504-525-2141 | Baltimore, Maryland 21030 |
| Facsimile: 504-523-1587 | Tel: 410-783-5795 |
| E-mail: mbagot@wb-lalaw.com | Fax: 410-510-1789 |
| trayer@wb-lalaw.com | Email: jssimms@simmsshowers.com |
| | cmbenson@simmsshowers.com |
| | gcmurphy@simmsshowers.com |

Counsel for Eastern Pacific Shipping Pte, Ltd.