UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| GANPAT VISHVESHWAR GANPAT, <br><br> Plaintiff, <br><br> v. <br><br> EASTERN PACIFIC SHIPPING PTE, LTD., d/b/a "EASTERN PACIFIC" <br><br> Defendant. | Civil Action No. 18-13556 "E" (4) <br><br> IN ADMIRALTY <br><br> JUDGE SUSIE MORGAN <br><br> CHIEF MAGISTRATE JUDGE KAREN WELLS ROBY |

**EPS' LR 56.1 SEPARATE AND CONCISE STATEMENT OF MATERIAL FACTS WHICH EPS CONTENDS PRESENT NO GENUINE ISSUE – SUPPORTING EPS' COUNTER-SUMMARY JUDGMENT MOTION AGAINST PLAINTIFF'S "GENERAL MARITIME NEGLIGENCE" CLAIMS**

　　　　Defendant Eastern Pacific submits the following separate statement of the material facts which EPS contends present genuine issues of material fact and states as follows:

1. M/V STARGATE had all the medical supplies and equipment required by Liberian law, including anti-malaria medication.  Dkt. 341-1 ; Dkt. 339-3 at 2;

2. M/V STARGATE had an adequate supply of anti-malaria medication onboard when it left Savannah for its trip to Gabon.  **Ex. J** (Easmon Rep.) at ¶ 14; **Ex. B** at 7 (Perlstein Rep.); Dkt. 415-4 (Wiser Rep.); Dkt. 341-1; Dkt. 339-3 at 2.

3. "[T]here were still enough medical supplies onboard the Vessel including anti-malarials to reach Gabon."  Dkt. 415-3 at 5 (emphasis added).

4. At all material times, malaria test kits were not required onboard M/V STARGATE. **Ex. B**; Dkt. 341-1 at 3.

5. The March 11, 2017 inventory indicated that the M/V STARGATE had 72 mefloquine pills, in addition to other anti-malarial medicines, onboard. **Ex. E**.

6.  On March 19, 2017, EPS emailed Princeton Pharmacy its March 11, 2017 inventory ("Medicine List,") and requested a quote to renew its Medical Chest. **Ex. C**.

7.  M/V STARGATE's "Medicine List" lists an inventory of medication onboard the vessel.  It does not specify quantities to maintain onboard and is not a list of required medication. **Ex. D**; **Ex. E**.

8.  Princton Pharmacy reviewed the list of medicines onboard and provided a quote for medicines and medical supplies. **Ex. E**.

9.   Princton Pharmacy transmitted the quote to EPS via email and stated that: "Items quoted are those required to replenish onboard the vessel." **Ex. E**.

10. Princeton Pharmacy's quote did not list: (1) anti-malaria medication; or (2) malaria test kit(s). **Ex. E**.

11. Princeton Pharmacy's review determined that the M/V STARGATE did not require more mefloquine for its Medical Chest. **Ex. E**.

12. The only malaria-related item on the March 20 order was a single box of artemether injections.  This was to replace in the Medicine Chest what was *coming up* for expiry in August 2017. **Ex. G**. (Perlstein Dep. 88:2-92:8).

13. On March 20, 2017, EPS approved Princeton Pharmacy's quote and authorized the purchase of those items necessary to replenish the Medical Chest on M/V STARGATE.  Ex. F.

14. Captain Ivanoschi expected the Princeton Pharmacy order to arrive in Savannah, Georgia. He had no other medical items on order for Savannah, Georgia. **Ex. H** at 3.

15. M/V STARGATE's Medical Chest Certificate was renewed and reissued on March 21, 2017. **Ex. L**.

16. M/V STARGATE's previous captain submitted a request for mefloquine on March 28, 2017 that remained pending upon his departure. Dkt 415-3.

17. The March 28, 2017 mefloquine request was unrelated to items needed for the Medical Chest. **Ex. E**.

18. On April 2, 2017, M/V STARGATE arrived in Savannah, Georgia. **Ex. W**.

19. Captain Ivanoschi assumed command in Savannah and chose how his logs were kept. **Ex B**. at 5.

20. On April 6, 2017, M/V STARGATE's classification society (ClassNK) conducted its annual inspection on the M/V STARGATE and renewed the vessel's certificate of classification and the ship safety construction certificate. **Ex. N**.

21. On April 14, 2017, the Vessel departed Barranquilla for Owendo, Gabon. **Ex. W**.

22. Due to the unreasonably dry and cool weather at Gabon at the time, local agents advised that the risk of malaria was low. Anti-malarial pills were therefore not required to be distributed during the voyage to Gabon. Dkt 415-3 at 6.

23. Gabon was not a "designated risk zone" in accordance with paragraph 16.4 of Mr. Ganpat's CBA agreement. Dkt. 419-8 at 6.

24. The "CDC Yellow Book 2024" contains 2024 guidance that is irrelevant to that material time at issue in this litigation – 2017 - when Mr. Ganpat contracted malaria.  Dkt 415-1 at fn. 58; Dkt. 411.

25. During the voyage, the captain made anti-malaria pills available to the crew and advised them about the risks of malaria. **Ex. H** at ¶ 4.

26. Mr. Ganpat took a dose of anti-malarial medicine during the trip to Gabon. **Ex. Q**; **Ex. G** (Perlstein Dep. at 153:21-154:3).

3

27. On May 2, 2017, the Vessel arrived at anchor off Owendo. **Ex. W**.

28. A Gabon Port State Control inspection on May 7, 2017 verified a valid Medical Chest

    Certificate for the M/V STARGATE during its inspection. **Ex. M**.

29. On May 7, 2017, Mr. Ganpat left M/V STARGATE for the bar at 6:04 p.m. wearing a T-

    shirt. **Ex. U** (Kholkar Dep. 73:17-76).

30. On May 12, 2017, referring to medicines contained within the March 20, 2017 Princeton

    Pharmacy order and expiring over the course of the year, Capt. Ivanoschi emailed EPS

    purchasing staff "about the medicines which have to be delivered on board for the year 2017

    which were supposed to be received on board in Savannah/USA." **Ex. H** at ¶ 3.

31. At sea from Gabon to Brazil, Mr. Ganpat never shared any complaints about being ill prior to

    M/V STARGATE'S arrival in Brazil on May 25, 2017. **Ex. H**. at ¶7.

32. Plaintiff first reported his illness on May 25, 2017. **Ex. R**; **Ex. S**; **Ex. H** at 8.

33. "Malaria is difficult to diagnose." **Ex. T** (Easmon Dep. 44:11-19).

34. Mr. Ganpat took medication including Augmentin BID and Paracetamol Ecopharm while on

    the ship during the transit from Gabon to Brazil.  **Ex. X**.

35. Capt. Ivanoschi sent him to the hospital in Brazil less than 48 hours after learning of his

    condition. **Ex. R**.

36. Captain Ivanoschi had the ship's agent drive Plaintiff to the hospital. **Ex. H** at ¶10-11.

37. A team of 13 medical specialists at a world class, fully equipped hospital took from May 27

    to May 29 to diagnose malaria. **Ex. U** (Ganpat Dep. 118:24-119:4).

38. EPS never assumed the role of "shipowner."  **Ex. O** (Emilianou Dep. 20:6-12; 21:2-22:13);

    **Ex. V** (Singh Dep. 18:11-14).

4

39. EPS was designated "shipowner" only "For the purpose of this [Seafarer's Employment] Agreement and as required pursuant to the provisions of the ILO Maritime Labour Convention 2006 . . . ." Dkt 421-1 at 14. Dkt. 341-1 (Nelick Rep.) at 3

40. M/V STARGATE was operating under an arrangement between the owners of the vessel (Larchep Shipping) and a ship management company, (Eastern Pacific Shipping). This arrangement is quite common . . . [Owners] engage a ship management company to perform shoreside functions for the ship and owners. Dkt. 341-1 (Nelick Rep.) at 3

41. [M]odern seagoing shipmasters, and the crews under them, perform, for the behalf of owners, operational functions aboard ship, while shoreside managers take care of technical requirements . . . that are best handled ashore.) Dkt. 341-1 (Nelick Rep.) at 3.

42. Owner's crew, not EPS, were charged with executing shipboard operational tasks – including distribution of medications and other medical care. Dkt. 341-1 (Nelick Rep.) at 3.

### *Additional Undisputed Material Facts*

43. Liberian law does not recognize a seaman's action predicated upon negligence.

    *Konstantopoulos v. Diamante CIA De Vapores, S A*, 170 F. Supp. 662, 666 (S.D.N.Y. 1959).

44. U.S. general maritime law does not provide a seaman with general maritime negligence cause of action. *See Stewart v. Dutra Const. Co., 543 U.S. 481* (2005).

45. Liberian Maritime Law, Title 21 of the Liberian Code of Laws (1956), provides that:

    **§ 351A. Contracts for Seafaring Labor.**

    (1) The following clause shall appear, or be by force of law included, in all contracts for seafaring labor on board Liberian vessels:

    "The parties to this contract hereby stipulate that the terms and conditions laid down herein shall be subject to the applicable provisions of the Liberian Maritime Law, Regulations, Rules and Notices. Any dispute as to the terms and conditions of this contract shall be resolved in accordance with the Liberian Maritime Law Regulations, Rules and Notices."

(2) ***All contracts relating to service aboard a vessel registered under this Title shall be governed in interpretation and application by the Laws of the Republic of Liberia, including this Title and any Regulations, Rules and Notices thereunder.***

**§354. Bargaining and Execution of Labor Contract.**

(1) It shall be lawful for any employer or employer organization and any labor organization representing seamen to bargain and enter into a labor contract concerning wages and other terms and conditions of employment, provided that no labor contract provisions may be contrary to the laws of Liberia or deprive the Republic of Liberia of any jurisdiction over labor relations.

**§355. Provisions Authorized in Labor Contracts.**

***It shall be lawful for any employer or employer organization and any labor organization to agree to be bound by any provisions in entering into a labor contract, provided that such provisions are not prohibited by Liberian laws or Regulations or Rules.***

Dkt. 419-2 (emphasis added)

46. The Legislature of Liberia enacted the "Liberian Construction Statute" to facilitate the interpretation of – in part – the Liberian Maritime Law. **Ex. A**.

47. The Liberian Construction Statute provides that, "[e]xcept as modified by laws now in force and those which may hereafter be enacted and by the Liberian common law, the following shall be, when applicable, considered Liberian law: (a) the rules adopted for chancery proceedings in England, and (b) the common law and usages of the courts of England and of the United States of America, as set forth in case law and in Blackstone's and Kent's Commentaries and in other authoritative treatises and digests." Dkt. 419-5, Liberian Construction Statute, Liberia Code of Law, (1956 Code), Title 15, General Construction Law § 40.

48. Liberian law only allows for the application of U.S. case law in the absence of statutory or decisional law on an issue. **Ex. A**.

49. Plaintiff's labor contract provides -with one hundred precent disability – that he is entitled to only One Hundred and Two Thousand, Three Hundred and Eight Dollars (US $102,308.00). Dkt. 419-7; **Ex. A**.

Dated:  August 6, 2024.

Respectfully Submitted,

| | |
|---|---|
| Michael H. Bagot, Jr., T.A. (#2665) | /s/ J. Stephen Simms |
| Thomas A. Rayer, Jr. (#20581) | J. Stephen Simms (*pro hac vice*) |
| WAGNER, BAGOT & RAYER LLP | Catherine M. Benson (*pro hac vice*) |
| Pan American Life Center – Suite 1660 | Gary C. Murphy (*pro hac vice*) |
| 601 Poydras St. | Simms Showers LLP |
| New Orleans, Louisiana 70130 | 201 International Circle, Suite 230 |
| Telephone: 504-525-2141 | Baltimore, Maryland 21030 |
| Facsimile: 504-523-1587 | Tel: 410-783-5795 |
| E-mail: mbagot@wb-lalaw.com | Fax: 410-510-1789 |
|        trayer@wb-lalaw.com | Email: jssimms@simmsshowers.com |
| |         cmbenson@simmsshowers.com |
| |         gcmurphy@simmsshowers.com |

Counsel for Eastern Pacific Shipping Pte, Ltd.