DISTRICT OF COLUMBIA COURT OF APPEALS
BOARD ON PROFESSIONAL RESPONSIBILITY

In the Matter of:                              :
                                               :
        JOHN W. STEWART, JR.,                  :
                                               :
Respondent.                                    :        Bar Docket No. 167-05, *et al.*
                                               :
A Member of the Bar of the                     :
District of Columbia Court of Appeals          :
(Bar Registration No. 464842)                  :

REPORT AND RECOMMENDATION OF THE
BOARD ON PROFESSIONAL RESPONSIBILITY

## I.        BACKGROUND

On October 12, 2007, an Ad Hoc Hearing Committee filed a thorough and well-reasoned 107-page Report in this 17-count disciplinary proceeding.  It found many serious violations of the disciplinary rules and recommended disbarment.  Respondent has been temporarily suspended from the practice of law since August 16, 2006, based on the serious allegations pending against him.  Order, *In re Stewart*, No. 06-BG-859 (D.C. Aug. 16, 2006).  The Board is in agreement with the Hearing Committee and recommends that the Court disbar Respondent and, as a condition of reinstatement, require restitution to his former clients and the Clients' Security Trust Fund.

The Committee's evidentiary hearings extended over four days in 2007 with testimony heard from 20 witnesses, 15 of whom were client-victims of Respondent. Although Respondent participated in the hearings, he did not testify or introduce

documentary evidence.  Tr. IV (March 20, 2007) at 886.[1]  Bar Counsel filed a 176-page set of Proposed Findings and Conclusions.  No post-trial briefs were filed by Respondent.

Following the issuance of the Hearing Committee Report, Bar Counsel filed a letter with the Board on October 15, 2007, stating that it took no exception.[2]  On November 2, 2007, Respondent submitted a letter indicating that he would take an exception.  Because Respondent's notice of exception was untimely under Board Rule 13.3, it was rejected for filing with instructions that Respondent should seek leave of the Board to file his exception.  Respondent filed nothing further with the Board.

The Board has examined the record carefully and concurs in the findings and recommendations set forth in the Hearing Committee Report, which is attached to this Report and incorporated herein by reference.[3]

## II.    THE MISCONDUCT

The following is a summary of the Hearing Committee's findings of fact, which we conclude are supported by substantial evidence in the record and establish the violations of the disciplinary rules found by the Committee.

Respondent opened a law office in the District of Columbia in late 2002 or early 2003, and began advertising his legal services to people who had been successful bidders

---

[1] Due to his failure to respond to the Specification of Charges, Respondent was precluded from introducing exhibits.  Board Rule 7.7.  *See* Hearing Committee ("H.C.") Report at 6; Tr. I (Jan. 23, 2007) at 3-4.  Other transcripts referred to herein are Tr. II (Jan. 24, 2007), Tr. III (March 19, 2007), and Tr. IV (April 6, 2007).

[2] Bar Counsel however, notes his disagreement with the Hearing Committee's failure to find that Respondent's taking of flat fees paid in advance of services to be rendered constituted misappropriation under Rule 1.15(a) and criminal conduct that bears on fitness under Rule 8.4(b), but has waived the right to brief the question because it would not change the sanction.  October 15, 2007 Letter of Bar Counsel to the Board.

[3] Bar Counsel's October 15, 2007 letter also notes an apparent oversight in the Hearing Committee Report – it found dishonesty in violation of Rule 8.4(c) in connection with Count 16 of the Specification of Charges (Mr. Raoul Johnson) but on pages 81 and 89 of its Report neglected to list Count 16 as a count where dishonesty was found.  Based on our review of the Hearing Committee Report in its entirety, it is clear that this omission was an oversight.

and, thereby, purchased real property at the District of Columbia's annual tax foreclosure sale held in July. Bidders must, at a minimum, have covered the amount of delinquent taxes plus advertising expenses, in the amounts bid. A successful purchaser of such tax property must then file a complaint in the D.C. Superior Court within one year to obtain the tax deed and foreclose the right of redemption, or forfeit all monies paid for the property. The purchaser must also comply with other rules to obtain free and clear title to the property, including a title search, service of the complaint on interested parties and publication of the action. The 16 clients who filed disciplinary complaints against Respondent had each purchased real property at the 2002, 2003, or 2004 District of Columbia tax foreclosure sales, and retained Respondent to file the required civil complaints to foreclose the right of redemption on those properties. Some had purchased more than one property and retained Respondent to litigate two or more actions. District of Columbia law provides the original property owner the opportunity to redeem the property before the court enters an order foreclosing such right. However, the owner must then not only pay delinquent taxes, but also reimburse the tax sale purchaser (Respondent's clients) for his or her incurred costs, including attorney's fees and litigation expenses. Hence, Respondent's obligation to follow through on his commitment to file timely actions on behalf of each of his clients was critical.

As the Hearing Committee found, the record evidence (including testimony from 15 of Respondent's former clients, and voluminous documentary evidence on Respondent's dealings with them – retainer agreements, cancelled checks on fees paid, bank records showing clear commingling and misappropriation, and court filings and rulings on actions filed) overwhelmingly establish Respondent's lack of competence,

failure to communicate with his clients, criminal fraud and theft, dishonesty, and misappropriation of advances paid to cover fees for filings, publications and title searches. Respondent's checks to the court for filings were even returned for insufficient funds, although his clients had prepaid the costs (in a total amount of over $14,000). *See* H.C. Report at 91. The evidence established that Respondent required his clients to pay a flat fee in advance and promised that he would handle their individual transactions by preparing and filing the appropriate court papers on time (within the one-year window), but invariably failed and later refused to communicate with the clients. As they became concerned that the cut-off date approached for the filing of their civil complaints, they were unable to reach Respondent. H.C. Report at 83, 100-101.

With few exceptions, Respondent filed the complaints outside the one-year filing period, resulting in the dismissals of the actions and forfeitures of his clients' rights to recover the purchase prices paid for the tax properties. H.C. Report at 84, 100. Copies of several of these late-filed complaints, which were sent to the clients, had been back-dated by Respondent so that they would appear to have been filed on time. H.C. Report at 84-85. Respondent's clients lost more than $47,500 in deposits paid for the purchases of tax sale properties – amounts that should have been returned as a result of original owners redeeming the properties. H.C. Report at 82. They also lost the fees and cost advances paid to Respondent for work he never performed. The magnitude of this misconduct and its widespread impact on so many innocent former clients is evidenced by the 15 men and women who willingly gave their time to testify against Respondent in this matter. These included a school principal (Tr. II at 202), a nurse at Walter Reed Army Medical Center (Tr. II at 224), a chef (Tr. III at 317), a security guard (Tr. III at 400), a postal worker and

self-employed handyman (Tr. III at 451), and a pastor (Tr. III at 626), among many others.

The Hearing Committee found that Respondent committed numerous violations of the disciplinary rules, including multiple violations of Rule 1.15(a) (intentional misappropriation) and Rule 8.4(b) (criminal theft) based on his unauthorized use of funds entrusted to him by his clients to pay the costs for court filings, publication, and title searches.  We adopt the Hearing Committee's findings in full as well as the analysis set forth in its Report.

III.    MISAPPROPRIATION, THEFT AND "FLAT FEES"

Although the Office of Bar Counsel did not except to the Hearing Committee Report, it has noted its disagreement with the Committee's failure to find misappropriation and criminal theft based on Respondent's alleged unauthorized use of flat fees paid in advance of services to be rendered.  October 15, 2007 Letter of Bar Counsel to the Board; s*ee p*.2, n.2 *supra*.  Inasmuch as (1) this legal issue is currently before the Court in *In re Mance*, Bar Docket No. 241-04 (BPR July 28, 2006), and (2) disbarment has already been recommended for Respondent's other misappropriations and thefts, Bar Counsel waives the briefing of this issue.  Although the resolution of this "flat fee" issue will not affect the severity of the sanction we recommend, the Board believes it should state its position for the Court.

Respondent was charged in multiple counts with obtaining advance fees from his clients to cover his legal fees, as well as advances on required costs (filing fees, publication fees, and fees for title search).  An example is Respondent's February 23, 2005 invoice to Mr. Melvin Sims of $1,500 (legal fees), $130 (filing fee), $240

5

(publication fee), and $300 (title search), or a total up-front charge of $2,170 per property. BX 42 at 5-7; H.C. Report, FF ¶ 24. The "Flat Fee Agreement and Authority to Represent" document signed by both parties made clear that Respondent charged a "flat fee" ($1,800) for the "preparation and representation of an uncontested tax sale redemption foreclosure suit." BX 42 at 5. The client was responsible for paying this flat fee, plus court costs, "to secure representation in court." *Id*. Should the matter be contested, "an additional hourly rate of $200.00" or such additional flat fee as the parties agreed to would be charged. *Id*.

Respondent's practice was to place in his trust account all payments from his clients, both flat fee payments and advances on costs. H.C. Report at 94; s*ee also* H.C. Report, FF ¶¶ 29, 71, and 104. Rather than using the cost advances for their intended purposes, he removed them for his personal use before he sought to file any complaints on behalf of his clients. *Id*. As an example, Respondent withdrew the cost advances provided by Mr. Sims before he had incurred any expenses for filing, publishing, or title searching. When he filed the two form complaints (beyond the statutory period), his account was overdrawn and his check was returned for insufficient funds. H.C. Report, FF ¶ 30. These funds had been clearly earmarked, when paid by Mr. Sims, to cover future court costs and remained the property of the client. *See* Rule 1.15(d). H.C. Report FF ¶ 24. The Hearing Committee correctly concluded that Respondent committed theft by using these earmarked funds for his own purposes, thereby violating Rule 8.4(b) (criminal theft), and misappropriation, in violation of Rule 1.15(a). Bar Counsel supports these findings.

As to the "flat fee" charged by Respondent for "preparation and representation of an uncontested tax sale redemption foreclosure suit," the Hearing Committee's conclusion is different. The Committee noted that in each case, the "fixed fee" or retainer was "for the purpose of Respondent representing the client through the conclusion of the case." H.C. Report at 92. Aside from this "flat fee agreement" signed by each of Respondent's clients, they typically received a form solicitation letter from Respondent describing his legal services, and specifically stating that "[w]e do all this for one flat fee of $1,800.00 for each property." *See*, *e.g.*, BX 38 at 3 (Tr. II at 259-260); BX 50 at 2 (Tr. II at 163); BX 67 at 3 (Tr. III at 439); BX 87 at 6 (Tr. III at 402-404); and BX 99 at 12 (Tr. II at 134-35).

Citing the Board's opinion in *In re Mance*, Bar Docket No. 241-04 (BPR July 28, 2006), the Hearing Committee concluded that Respondent's flat fees were Respondent's property upon receipt and were not advances of unearned fees within the meaning of Rule 1.15(d). H.C. Report at 93. From this conclusion, it follows that such flat fees, being Respondent's property, could not form the basis of a charge of theft or misappropriation. H.C. Report at 92 and 96. Having reviewed the factual record herein, including the "Flat Fee" agreements with each client and the "Flat Fee" solicitation letters, the Board agrees with the Hearing Committee's analysis, which we incorporate by reference. It correctly concluded that Bar Counsel failed to establish misappropriation in violation of Rule 1.15(a) or criminal theft in violation of Rule 8.4(b) when Respondent used for his own purposes the flat fees paid him for legal services in handling tax sale redemption foreclosure suits.

Nowhere in the factual record is there evidence to support a factual finding that these flat fees were paid with the expectation that Respondent would charge off his actual fees against this advance on an "hourly or specific sub-task basis." *See Mance*, at 20. Rather, it was an agreed fee to retain Respondent to handle the foreclosure on each tax property. "[I]t was a flat fee agreement.   Instead of being charged an hourly rate to take care of all the paperwork associated with, I guess, the motion to foreclose and file any notices that need to be done." Tr. III at 521 (Mr. Keith Dean). *See also*, *e.g.*, Tr. II at 167 (Mr. Melvin Sims)  "[The check was] for fees that would be necessary for him to complete the foreclosure on the stated property."); Tr. II at 259 (Ms. Darlene Horton) ("[H]e told us what his fee would be per property and he charged $1,800 per property."); Tr. III at 326 (Mr. James Ware) ("[H]e just said basically what's the standard fee, and that's what it would, you know, take."); Tr. III at 572 (Mr. Robert Wiley) ("He just said that was for the – to do the proceeding, that's what it would be."); and Tr. III at 632 (Mr. Abraham Mitchum) ("I think his base price was, like, $1,800 per property, but he said he would do all three of them if I would pay the $1,800.").

These were not "advances of unearned fees" within the meaning of Rule 1.15(d) as Bar Counsel argued before the Hearing Committee, but flat fees falling outside that rule.  However, Respondent's failure to "earn any portion" of these fees does constitute a separate violation of Rule 1.16(d) for not returning such unearned fees to his clients, and is also a basis for a recommendation of restitution.  H.C. Report at 103.

## IV.    RECOMMENDED SANCTION

Based on Respondent's acts of intentional misappropriation and theft, we concur with the Hearing Committee and Bar Counsel that disbarment should be imposed.  *See In*

*re Addams*, 579 A.2d 190, 191 (D.C. 1990) (en banc).  As succinctly stated by the

Hearing Committee:

> Respondent took client's funds to which he was not entitled, altered
> documents and filed them with the court, lied to his clients about the status
> of their cases, failed to communicate and respond to his client's inquiries,
> and refused to comply with valid subpoenas and/or orders issued by Bar
> Counsel, the Board, and the Court.  He further submitted checks to the
> [C]ourt knowing that he had insufficient funds in his trust account to cover
> them.

H.C. Report at 106-07.

Respondent's misconduct went far beyond the 15 clients who were the subject of

Bar Counsel's specification of charges and who testified before the Committee.[4]  More

than 100 of his forfeiture complaints were dismissed for being filed outside the time

limit, or for failure to prosecute, or both.  Tr. IV at 870-72.  His misconduct began almost

from the inception of his entering law practice in the District of Columbia, in late 2002 or

early 2003.  *See* H.C. Report at 1.  His willingness to hold himself out to an unsuspecting

public as an attorney experienced in tax lien lawsuits, who had "helped more than one

hundred clients successfully navigate the legal process" was fanciful.  *See*, *e.g.*, BX 38 at

3.  Nearly all of these clients' cases were dismissed due to Respondent's failures.  The

damage he caused to his clients was far-reaching, including not only the purchase price

each of them lost when the property was redeemed and no action had been filed to protect

them, but also fees paid to Respondent.  As one client explained at the hearing:

> This has been a nightmare, actually.  I mean, I'm losing my trust in hiring
> another lawyer.   I was going to hire another lawyer to pursue him
> [Stewart].  That's what I was going to do.  I just didn't have the money.
> And then Mr. Stewart, he disappeared altogether.  I mean, he wouldn't talk

---

[4] Facts surrounding Respondent's dealings with a sixteenth client, Ms. Penny Johnson, formed the basis for
Count Fifteen but she failed to appear at the hearing and such charges were withdrawn.  Tr. IV at 793; H.C.
Report at 6.

to me on the phone.  He wouldn't return my calls.  I left several messages for him, and he wouldn't show up.  When I did, I don't know if he forgot who I was when I called and made an appointment.  And when he realized it, he didn't show.

\* \* \*

[Mr. Stewart]:  I'm saying to you that I'm sorry.

Well, sorry doesn't take care of this whole situation.  There was a lot of money lost here.  You want to be sorry?  Pay for this.  Okay?  That would make me happy.  Pay for this problem here.

Tr. III at 473-74, 481 (Mr. Tony S. Dates).  *See also* Tr. II at 219 (Mr. Andre Walker) ("I've lost the $9,000 that I put down on the property.  I lost the $1,500 that I paid the other attorney and the $1,800 that I paid Mr. Stewart.")

In addition to disbarment, the Hearing Committee adopted Bar Counsel's recommendation that as a condition of reinstatement, Respondent be required to make restitution to his former clients or to the Clients' Security Trust Fund to the extent it has reimbursed these clients.  The object of restitution is "preventing unjust enrichment," *In re Hager*, 812 A.2d 904, 923 (D.C. 2002), and is permitted as a condition when imposing sanctions under D.C. Bar R. XI, § 3(b).  Restitution is often imposed in cases where the attorney either fails to perform the agreed work or does so in a wholly deficient manner, such that retaining the fees would amount to unjust enrichment.  *In re Roundtree*, 467 A.2d 143, 148 (D.C. 1983) (per curiam) (Some initial work done but total neglect by respondent after a certain point, resulting in dismissal of client's case.  "[Respondent's client] received no benefit from the money she paid to respondent . . . It is therefore equitable for . . . [Respondent] to make restitution, and not to require [the client] to bear any part of the loss."); *In re Ryan*, 670 A.2d 375, 381 (D.C. 1996) (restitution of fees for negligent handing of client's matter); and *In re Wright*, 702 A.2d

1251, 1257 (D.C. 1997) (per curiam) (Respondent's client "received no benefit from the money he paid to Respondent to pursue his case. In fact, Respondent's neglect led to the dismissal of the case."). The Board agrees with the Hearing Committee that restitution in the amount of $36,930, the funds paid to Respondent by his clients in flat fees and cost-advances, is a proper condition of Respondent's reinstatement. As referenced hereinbefore, the Committee specifically found that Respondent failed to earn any portion of his fees. H.C. Report at 103.

## V.    CONCLUSION

Based on the foregoing, the Board recommends that Respondent be disbarred for his violations of the disciplinary rules, including intentional misappropriation and criminal theft. As a condition of reinstatement, we recommend that he be required to pay restitution to his former clients or the Clients' Security Trust Fund, to the extent it has reimbursed his clients, in the amount of $36,930 with interest at the legal rate.

BOARD ON PROFESSIONAL RESPONSIBILITY

By: _____
               Ray S. Bolze

Dated: MAR 1 1 2008

All members of the Board concur in this Report and Recommendation.

11

# DISTRICT OF COLUMBIA COURT OF APPEALS
## BOARD ON PROFESSIONAL RESPONSIBILITY
## AD HOC HEARING COMMITTEE

| | |
|---|---|
| In re | : |
| | : |
| JOHN W. STEWART, JR. | : |
| | :    **Bar Docket No. 167-05 et al.** |
| Respondent | : |
| | : |

## REPORT AND RECOMMENDATION

### A. Background

Respondent, John W. Stewart, Jr., became a member of the Bar of the District of Columbia Court of Appeals on October 1, 1999, based on his motion and his membership in the Bar of New York. BX A. In late 2002 or early 2003, Respondent opened a law office in the District of Columbia and advertised his legal services to people who had purchased real property at the District of Columbia's annual tax foreclosure sale held in July. Respondent worked closely with Kenneth Cummins, an individual who had two companies – CII Title, LLC (a title research and real estate settlement firm) and Capitol Inquiry, Inc. (a private investigation business) – that assisted tax sale purchasers by performing title searches and helping them take steps to foreclose property owners' rights to redeem properties. Initially, in connection with the July 2001 Tax Sale, Mr. Cummins, and his companies had worked with attorney Charles Brumskine, who prepared and filed complaints to foreclose the property owners' rights of redemption. 1/23/07 Tr. at 52, 54-55, 59-60 (Cummins). In approximately late summer of 2002, Mr. Brumskine told Mr. Cummins that he did not wish to continue the work, and he referred Mr. Cummins to the

1

Respondent.  1/23/07 Tr. at 60 (Cummins).  Respondent took over the cases that Mr.

Brumskine had filed in 2002, and filed his first set of cases in July 2003.  1/23/07 Tr. at

74 (Cummins); BX 18 at 15-21.

 This matter arises as a result of 16 clients filing complaints against Respondent

with the Office of Bar Counsel.  These clients had retained Respondent to file actions to

foreclose the right of redemption for the property or properties they had purchased at the

2002, 2003, or 2004 tax sales.

 In March of each year, the District of Columbia sends tax bills to District of

Columbia real property owners.  If a property owner fails to pay his or her property taxes,

the property may be offered for sale at the Tax Sale that occurs each July.  BX 30;

1/23/07 Tr. at 22-23 (Ferguson).  At the Tax Sale, properties are sold at auction, with the

minimum price for the properties being the amount of delinquent taxes owed plus

advertising expenses.  BX 30 at 3; 1/23/07 Tr. at 23 (Ferguson); *see also* D.C. Code § 47-

1301, *et seq.*

 The successful purchaser of property at the Tax Sale must pay the total purchase

price within five business days of the last day of the Tax Sale.  BX 30 at 2-3.  The funds

are deposited with the District of Columbia government.  After the purchaser pays the

entire amount bid, the District of Columbia Office of Tax and Revenue ("OTR") issues

the purchaser a Certificate of Sale for Taxes.  BX 30 at 4; 1/23/07 Tr. at 24 (Ferguson).

 The Certificate of Sale for Taxes provides the purchaser with the opportunity to

acquire the property if she/he takes specific steps by certain deadlines set forth in the

statute.  BX 30 at 4.  The property owner or mortgagee or lien holder may redeem the

property at any time before the court enters an order foreclosing the right of redemption

entitling the tax sale purchaser to be issued a tax deed.  BX 30 at 5.  1/23/07 Tr. at 26 (Ferguson).  In order to redeem, the property owner or other party in interest must pay not only the delinquent taxes, but other costs including those necessary to reimburse the tax sale purchaser.  BX 30 at 6; 1/23/07 TR. at 26-27 (Ferguson).

A tax sale purchaser must file a complaint in D.C. Superior Court to foreclose the right of redemption within one year of the date of the tax sale certificate, but not before six months after the date of the certificate.  If the purchaser files after the one-year period, the court, on its own motion or on the motion of the District of Columbia, will dismiss the action with prejudice and the tax sale purchaser will forfeit all monies previously paid.  *See* D.C. Code § 47-1348(a) (12); 1/23/07 Tr. at 24-25 (Ferguson).

The tax sale purchaser must also comply with certain other rules to obtain free and clear title to the property.  Prior to filing a complaint to foreclose the right of redemption, the tax sale purchaser must conduct a title search no earlier than four months after the date of the Certificate of Sale for Taxes.  BX 30 at 5.  In addition, after filing the complaint, the tax sale purchaser has 180 days in which to serve interested parties with the complaint, publish the action, and file affidavits of service.  BX 30 at 6; 1/23/07 Tr. at 29, 31.

If the property owner redeems after a title search, but before the tax sale purchaser files an action, the tax sale purchaser is entitled to receive reimbursement for the amount paid for the property, plus 18% interest on the purchase price representing the amount of the delinquent property tax, and certain expenses such as the fee for a title search.  BX 30 at 5-6; 1/23/07 Tr. at 27-28 (Ferguson).  If the property owner redeems the property after an action is filed, the tax sale purchaser is also entitled to reimbursement for his/her

attorney's fees and litigation expenses.  BX 30 at 6; 1/23/07 Tr. at 27, 45-46 (Ferguson).

The property cannot be redeemed after an action has been filed until the property owner

receives payment of his/her reasonable attorneys' fees and costs.  D.C. Code §§ 47-

1361(a) (6) &47-1377(a) (2) (Supp. 2004); 1/23/07 Tr. at 27 (Ferguson); BX at 45-47.

On the other hand, if the court enters an order foreclosing the right of redemption,

then the D.C. government issues the purchaser a tax deed upon payment of all amounts

that may be due, including any additional assessments and utility bills.  D.C. Code § 47-

1382.

In this case, on June 30, 2006, Bar Counsel filed a 17-count Specification of

Charges against Respondent based upon complaints filed by 16 of his former clients and

the Budget and Finance Division of the D.C. Superior Court.  The charges include eight

counts of violations of Rules 1.1(a) and 1.1(b), lack of competence; 16 counts of

violations of Rules 1.3(a), 1.3(b)(1), 1.3(b)(2), and 1.3(c), lack of zeal, intentionally

failing to seek objectives, prejudicing or damaging a client, and failing to act with

reasonable promptness; 16 counts of violations of Rules 1.4(a) and 1.4(b), lack of

communication; three counts of violations of Rule 1.5(b), failure to provide a writing

setting forth the rate or basis of fee; 15 counts of violations of Rules 1.15(a) and 1.15(d),

misappropriation of advances of unearned fees and unincurred costs and commingling;

14 counts of violations of Rule 1.16(d), failure upon termination of a representation to

surrender papers and property and to refund unearned fees; two counts of violations of

Rule 8.1(a), making knowingly false statements to Bar Counsel; 17 counts of violations

of Rule 8.1(b), failure to respond to lawful demands for information from a disciplinary

authority; 15 counts of violations of Rule 8.4(b), committing criminal acts (theft and

fraud) that reflect adversely on honesty, trustworthiness, or fitness as a lawyer in other

respects; 17 counts of violations of Rule 8.4(c), dishonesty and fraud; 17 counts of

violations of Rule 8.4(d), serious interference with administration of justice; and 14

counts of violations of D.C. Bar Rule XI, § 2(b)(3), failure to comply with Court or

Board order.

Respondent did not file an answer to the specification of charges in July 2006 or

anytime thereafter.  On January 3, 2007, a pre-hearing conference was held for which the

Respondent received notice, but failed to appear.  On January 23 and 24, 2007 and March

19 and 20, 2007, an evidentiary hearing was held before this Ad Hoc Hearing Committee.

Respondent, who represented himself, was overseas in Liberia during the first two days

of the hearing, but participated by telephone.  On January 24, 2007, following the second

day of the hearing, the Committee set the next hearing date for February 27, 2007.

1/24/07 Tr. at 284-285.  On that date, the court buildings were closed at the last minute

due to a power outage at the main court building, but Bar Counsel, witnesses, and the

Hearing Committee were present and ready to proceed.  2/27/07 Tr. at 4-6.  Respondent

did not appear or contact the Office of Bar Counsel, however, and rather than proceed

with the hearing, the Hearing Committee continued the hearing to March 19.

During the Hearing, 15 of Respondent's former clients who had complained to the

Office of Bar Counsel testified.  Other witnesses who testified included Mr. Cummins,

Damon Privott, an Accountant Technician for the D.C. Superior Court Budget and

Finance Division; Christina Spears, the Office Manager for the Office of Bar Counsel;

and Charles Anderson, the Senior Forensic Investigator with the Office of Bar Counsel.

Bar Counsel's Exhibits BX A-C, BX 1-132, and BX 134-149 were admitted into

evidence. 3/20/07 Tr. at 813, 859-60, 873 (Anderson). Bar Counsel withdrew BX 133, and decided not to pursue charges that Respondent had violated Rules 1.3, 1.4, 8.1(a), and 8.4(c) of Count 15, all of which concerned Respondent's representation of Penny Johnson. 3/19/07 Tr. at 656,793 (Mitchum). Ms. Johnson's failed to appear to testify. Bar Counsel maintained its charges relating to Respondent's failure to cooperate with Bar Counsel's investigation and comply with Court orders concerning Ms. Johnson. Throughout the hearings, Respondent did not call witnesses or introduce documents (he was precluded from doing so under Board Rule 7.7 because he had failed to respond to the Specification of Charges) or testify himself. An Ad Hoc Hearing Committee comprised of Eric L. Yaffe, Chair, Ronald Dixon, Esq., and Suzanne Kramer, heard the evidence and render this Report and Recommendation.

## B. FINDINGS OF FACT

### COUNT ONE – DARLENE HORTON

1.      Darlene R. Horton is a District of Columbia resident who works as a data Systems Manager for the D.C. Board of Elections and Ethics, where she has been employed for 27 years. 1/24/07 Tr. at 255 (Horton).

2.      Ms. Horton and her associate, Elbert Mack, bid on two properties at the 2004 Tax Sale, one at 1949 S Street, S.E., Washington, D.C., and another at 1909 R Street, S.E., Washington, D.C. 1/24/07 Tr. at 255-257, 259-60 (Horton). Ms. Horton and Mr. Mack were the highest bidders on both properties and paid a total of $6,113.70 – $2,462.92 for the S Street property, and $3,650.78 for the R Street property. BX 39 at 4, 8; BX 40 at 5, 10; 1/24/07 Tr. at 257-58 (Horton).

3.      The D.C. Office of Tax and Revenue ("OTR") issued Ms. Horton and Mr.

Mack Certificates of Sale for Taxes for each of the properties, dated August 11, 2004.

The Certificates showed the amounts they paid for the properties, and provided that an

action could be brought after January 16, 2005 to foreclose the right of redemption.  The

certificate further provided:

> This certificate will be void unless such an action is brought and diligently
> pursued within one year from the date of this certificate.  If this certificate
> becomes void as provided in D.C. Code, 2001 Ed. § 47-1355, all monies paid
> for the real property will be forfeited to the District.

BX 39 at 8; BX 40 at 10; 1/24/07 Tr. at 258 (Horton).

4.      In late December 2004, Respondent sent Ms. Horton a form

solicitation letter.  1/24/07 Tr. at 259 (Horton); BX 38 at 3.  The letter, addressed to

"Tax Lien Certificate Purchaser," congratulated Ms. Horton on her purchase of

District of Columbia Tax Lien property and advised her that she would need an

attorney.  BX 38 at 3.  Respondent represented that he had been working with tax

lien holders since the existence of the Tax Clarity Act (D.C. Code §§ 47-1330, *et*

*seq.,* revised effective June 9, 2001, by the Tax Clarity Act of 2000), and claimed

that he had helped more than 100 clients successfully navigate the legal process

from start to completion.  *Id.*  Respondent further represented in the letter that his

firm prepares and files all papers necessary for the court action; represents the

client in court; provides the client with case updates and works towards ensuring

that the client succeeds.  He further stated that he would complete the work for a

"flat fee" of $1800 for each property, and that he could obtain the title report for

$300 plus photocopying charges, all of which he would only bill if he obtained the

report for the client.  Underscoring the advantages to being a tax lien holder,

Respondent stated that "100% of your legal fees and title report fees are reimbursable if the property owner redeems the property." *Id.*

5.      Finally, Respondent stated in the letter that his firm was not a "cookie factory," that he believed in "building relationships," and giving "personal attention to each client", and that his firm would not bill clients for calls or visits but instead would "take the time to answer your calls" and "help you understand the process." *Id.*

6.      Having reviewed Respondent's letter, Ms. Horton and Mr. Mack made an appointment to meet with Respondent, and did so at Respondent's office on 15th Street, N.W. on or about January 31, 2005.  1/24/07 Tr. at 259-61 (Horton). At the meeting, Respondent emphasized his experience in tax sale cases and provided them with a document entitled "Flat Fee Agreement and Authority to Represent" in which he represented that his agreed rate of compensation for the representation was $1,800 per property "as a flat fee for the preparation and representation of an uncontested tax sale redemption foreclosure suit."  BX 31 at 7. The agreement further provided that "[a]ll of Counsel's services in this matter will end, unless otherwise agreed upon in a writing signed by us, when there is a final agreement, settlement, decision or judgment by the court."  BX 31 at 8; 1/24/07 Tr. at 262 (Horton).

7.      Ms.  Horton and Mr. Mack signed the agreement at the meeting and Ms. Horton gave Respondent a check for $3,600.  1/24/07 Tr. at 261-262, 264-265 (Horton); BX 38 at 4-5.  Respondent deposited the funds into his attorney trust account on or about February 7, 2005.  BX 2 at 22; BX 3 at 1.  After receiving and

depositing these funds, Respondent did not communicate with Ms. Horton and Mr.

Mack.  1/24/07 Tr. at 262-63 (Horton).  Towards the end of February, Ms. Horton

began to call Respondent at his office.  She was never able to reach Respondent,

and he failed to return her calls.  1/24/07 Tr. at 263-64 (Horton).  Mr. Mack also

began to call Respondent, but Respondent failed to return his calls as well.  1/24/07

Tr. at 264 (Horton).

8.      Ms. Horton began to send Respondent e-mails by no later than April

2005 concerning the status of the two properties.  1/24/07 Tr. at 263 (Horton); BX

31 at 6.  On April 6, 2005, Respondent e-mailed back, stating that it had taken him

"longer than expected to get the title search done on the two properties.  The title

company finally got the reports to me on 3/15/05 and I filed on 3/31/05."  He

further stated that "[t]he process-server is trying to serve all necessary parties now.

I will provide an update by the end of April when hopefully all the service will be

done."  BX 31 at 6.

9.      Respondent's representations in this e-mail were false.  CII Title,

which shared an office suite and worked closely with Respondent, had completed

the title search for the properties on January 25, 2005, before Ms. Horton and Mr.

Mack had retained Respondent.  BX 39 at 9-12.  Further, Respondent had not filed

any actions on behalf of Ms. Horton and Mr. Mack in March of 2005.  Respondent

later filed an action with respect to one of the properties in July of 2005, at which

time he included a copy of the title search done in January.  BX 39.  There was

nothing for a process server to serve in April of 2005, contrary to what the

Respondent represented in his e-mail.

10.     Ms. Horton continued to try to reach Respondent after she received the April 6, 2005 e-mail.  On June 8, 2005, Ms. Horton wrote to Respondent and described her attempts to reach him.  She expressed the urgency in obtaining information from Respondent in light of the upcoming deadline for filing actions, and provided contact information for herself and Mr. Mack.  Ms. Horton did not hear from Respondent between April 6 and June 8.  BX 31 at 4-5.

11.     Respondent sent Ms. Horton an e-mail on June 9, 2005 stating that he would "get copies made and forwarded to you either tonight or tomorrow."  BX 31 at 4.  When Respondent failed to return Ms. Horton's subsequent calls, Ms. Horton sent Respondent another e-mail, on June 21, 2005, requesting information on her two properties.  BX 31 at 3.  Ultimately, when she did not hear back from Respondent, Ms. Horton again provided contact information for herself and Mr. Mack, requested the information she sought or a complete refund of her fees, and told Respondent that if she did not hear back from him, she would have no choice but to contact the Bar.  BX 31 at 2-3; 1/24/07 Tr. at 265-66 (Horton).

12.     Ms. Horton wrote to Bar Counsel on June 27, 2005, recounting the numerous communications she and/or Mr. Mack had sent to Respondent without receiving a response.  1/24/07 Tr. at 266, 273, 275-76 (Horton); BX 31 at 1-6.  At the time she filed the ethical complaint, Ms. Horton was unaware of the status of the two properties that she had purchased at the Tax Sale.  1/24/07 Tr. at 265-267 (Horton); BX 31 at 1.

13.     In early July 2005, Ms. Horton retained another attorney, Vanessa Carpenter Lourie, Esquire, to assist her in connection with the two properties.

1/24/07 Tr. at 267-68 (Horton).  In a letter to Respondent dated July 7, 2005, Ms. Lourie advised Respondent that Ms. Horton had retained her to prosecute Ms. Horton's complaints to foreclose the rights of redemption, and she requested information concerning any complaints Respondent had filed, which Ms. Lourie stated were not reflected in the court's filing system.  BX 38 at 6-7.  She also requested that Respondent not take any further action on behalf of Ms. Horton and Mr. Mack, and that he provide an accounting of his fees and costs and a refund of all monies already paid.  Respondent did not reply to Ms. Lourie's letter.  1/24/07 Tr. at 268 (Horton).

14.    Respondent did not provide any information to these clients or successor counsel.  He also failed to turn over any documents or files, failed to account for his fees and expenses, and failed to withdraw as counsel or notify Ms. Lourie or his former clients of the one action he had filed on July 1, 2005.  1/24/07 Tr. at 268, 271, 276 (Horton); BX 39.

15.    On July 1, 2005, Respondent filed with the D.C. Superior Court a complaint to foreclose the rights of redemption on the S Street property, entitled *Horton-Lesesne, et al. v. Frizzel, et al.,* No. 05CA005144.  BX 39.  The court file and docket sheet show that although Respondent filed the complaint on July 1, 2005, he handwrote the date of March 30, 2005, above his signature.  BX 39 at 6. Other than filing the complaint, Respondent took no further action to prosecute this matter, including serving any of the defendants.  BX 39 at 1.  At the first status hearing on February 8, 2006, of which Respondent had received notice when he filed the complaint, BX 39 at 16, the court dismissed the action pursuant to

Superior Court Civil Rule 4(o), which sets forth the time limits for service of the summons and complaint.

16.    Ms. Horton had received notice in late September 2005 that the owner of the S Street property was redeeming.  She did not seek reimbursement of her attorney's fees, however, because she did not know that Respondent had filed an action with respect to the property.  Thus, while Ms. Horton received reimbursement for her deposit of money for the S Street property, she did not receive reimbursement of her attorney's fees.  1/24/07 Tr. at 268-270 (Horton); BX 38 at 8-10.

17.    Respondent did virtually no work with respect to the R Street property although he had received $1,800 in legal fees for the work.  The case list shows that Respondent filed only one action on behalf of Ms. Horton and Mr. Mack.  BX 18 at 15-21.  On July 14, 2005, Ms. Lourie did prepare and file a complaint relating to the R Street property.  BX 40; 1/24/07 Tr. at 270-71 (Horton).  That action was still pending at the time of the hearing.

18.    Ms. Horton never received a reimbursement or refund of the $3,600 that she had paid to Respondent.  As of the end of July 29, 2005, Respondent had expended most, if not all of the $3,600, Ms. Horton had paid to him, as his account had only $500 remaining in it.  A review of the account also shows that Respondent had transferred monies into it during the time he represented Ms. Horton and Mr. Mack that were unrelated to client funds.  BX 2 at 30.

## COUNT TWO – MELVIN H. SIMS

19.    Mr. Sims is a resident of the District of Columbia who has been retired since 2004.  Prior to retiring, he worked for the State Department as a Facility Manager for 36 years.  1/24/07 Tr. at 157-58 (Sims).

20.    In July 2004, Mr. Sims was the highest bidder on two properties at the annual Tax Sale, one in the 3300 block of 10th Place, S.E., and the other in the 1200 block of Alabama Avenue.  He had never participated in a Tax Sale before, but thought it would be a good opportunity to build a nest egg for his grandchildren.  1/24/07 Tr. at 159 (Sims).  Mr. Sims paid a total of $4,287.93 for the properties ($2,824.33 for the 10th Place property and $1,463.60 for the Alabama Avenue property).  BX 42 at 8-9.

21.    On August 11, 2004, OTR issued Mr. Sims a Certificate of Sale for Taxes on each of the two properties.  Each certificate stated that an action could be brought after January 16, 2005 to foreclose the right of redemption, would become void if an action was not brought and diligently pursued within a year from the date of the certificate, and that if the certificate became void, all monies paid for the real property would be forfeited to the District.  BX 42 at 8-9; 1/24/07 Tr. at 161-62 (Sims).

22.    In late December, Mr. Sims received Respondent's form solicitation letter, 1/24/07 Tr. at 162-63 (Sims); BX 50 at 2, which was the same one Respondent sent to Ms. Horton.  Thereafter, Mr. Sims called Respondent and scheduled an appointment to discuss possible representation.  1/24/07 Tr. 162-64 (Sims).

23.     On or about February 23, 2005, Mr. Sims met with Respondent in his office.  At the meeting, Respondent provided Mr. Sims his standard retainer agreement, which was the same one provided to Ms. Horton, stating that his flat fee would be $1,800 per property.  BX 42 at 5-6.

24.     Mr. Sims signed the retainer agreement on February 23, 2005. Respondent provided Mr. Sims with an invoice, also dated February 23, 2005, which broke down the fees and expenses as follows:  legal fees of $1,500 per property; filing fees of $130 per property; publication fees of $240 per property; and title search fee of $300 per property.  After a deduction of $140, Respondent's total bill was $4,200.  BX 42 at 7; 1/24/07 Tr. at 191-92 (Sims).

25.     Mr. Sims paid Respondent $1,000 at their initial meeting in March and, on or about May 9, 2005, delivered a second check to Respondent for the balance of $3,200, with a cover letter requesting that Respondent contact him.  BX 50A; BX 50 at 4; BX 50B; 1/24/07 Tr. at 166-67, 185-86, 190-91 (Sims).

26.     In his cover letter, Mr. Sims stated that he had called Respondent "on many occasions but . . . ha[d] not received any answers."  BX 50B. Respondent never responded to Mr. Sims' letter.  1/24/07 Tr. at 169, 185-86 (Sims).

27.     Mr. Sims continued to call Respondent, but Respondent did not take or return Mr. Sims' calls.  The only time that Mr. Sims was able to speak with Respondent was when Mr. Sims called and gave a fictitious name. 1/24/07 Tr. 168-69, 192 (Sims).  Mr. Sims also sent Respondent e-mails and letters, including a

letter by certified mail, but Respondent failed to reply to Mr. Sims' e-mails and letters. 1/24/07 Tr. at 168-69, 185-86 (Sims); BX 50B.

28.     Eventually, Mr. Sims went to Respondent's office and sat in the lobby to "cor[r]al him . . . because he wasn't answering" Mr. Sims' calls. 1/24/07 Tr. at 169-70 (Sims). Mr. Sims advised Respondent that the property was to be placed on the delinquent tax list again. Respondent told Mr. Sims not to worry, that it was in the system, that the court process would take a long time, and that Mr. Sims should pay the subsequent taxes. Mr. Sims paid the taxes, $1,338.26, based on Respondent's advice. 1/24/07 Tr. at 170-71, 193-94 (Sims); BX 47 at 36. This was the last time that Mr. Sims spoke with Respondent.

29.     Respondent had deposited the $4,200 provided to him by Mr. Sims into his attorney trust account on March 11, 2005 ($1,000) and on May 31, 2005 ($3,200). BX 3 at 2; BX 2 at 23, 27. Respondent appropriated for himself all of the funds that Mr. Sims had paid him for the representation before he filed the form complaints that he eventually prepared. The trust account shows that as of August 9, 2005 only $66.84 remained. BX 2 at 30. Mr. Sims had not given Respondent permission or consent to withdraw any portion of the funds Mr. Sims had paid him. 1/24/07 Tr. at 170-71 (Sims).

30.     On September 1, 2005, the day before Respondent filed the complaints in Mr. Sims' matters, Respondent's trust account was overdrawn by more than $3,000. BX 2 at 32. Further, the check that Respondent wrote to the court to cover the $130 filing fee in Mr. Sims' two matters and 81 other matters were returned for insufficient funds. BX 6 at 6.

31.     On September 14, 2005, Mr. Sims filed an ethical complaint against Respondent.  BX 42.  When he filed the complaint, Mr. Sims did not know whether Respondent had filed an action or actions on his behalf as Respondent had not communicated with him or provided him any documentation.  BX 42; 1/24/07 Tr. at 172-73 (Sims).

32.     On September 2, 2005, Respondent filed two complaints with the D.C. Superior Court on behalf of Mr. Sims, *Sims v. Major, et al.,* No. 05CA007165, BX 51, and *Sims v. Kaplan, et al.,* No. 05CA007183, BX 52. Although Respondent filed the complaints with the court on September 2, he dated them August 21 and 24, 2005, respectively.  BX 51 at 7; BX 52 at 6.  Since the date of August 11, 2004 was on the Certificates, even if Respondent had filed the complaints on August 21 or 24, they still would have been time-barred because they were not filed before the expiration of the one-year deadline.  BX 42 at 8-9.

33.     In addition to back-dating the complaints, Respondent attached false certificates to them.  These certificates had different title and issuance dates than the actual certificates issued to Mr. Sims.  They also set forth interest rates of 114% per month, and stated that an action could be brought after July 19, 2004, before the date of issuance of the certificates rather than six months after as provided by the statute.  *Compare* BX 51 at 9 *with* BX 42 at 9 and BX 52 at 7 *with* BX 42 at 8. Respondent also certified in both complaints that a "title search has been caused to be performed . . . ."  BX 51 at 6; BX 52 at 4.  No title search was attached to either complaint, however, and there is no evidence that a title search was performed for

either property.  Mr. Cummins and his company did not perform any title searches for Mr. Sims.  BX 47; 1/24/07 Tr. at 177-78 (Sims).

34.    On September 22, 2005, after Mr. Sims filed an ethical complaint with Bar Counsel, Bar Counsel sent the complaint and a cover letter to Respondent, and then on October 13, 2005 sent another letter to Respondent at his home and office addresses.  BX 43; BX 44.  When Respondent failed to reply, Bar Counsel filed a motion to compel with the Board, serving Respondent at his home and office addresses.  BX 45.

35.    Respondent replied to Bar Counsel's motion to compel by stating that he had spoken with Mr. Sims and provided him with updates on his two cases.  BX 46.  However, the evidence shows that Respondent never provided Mr. Sims with an update or any information about his cases.  In response to Mr. Sims' request for information, Respondent told him that he would leave documents for Mr. Sims to pick up from the receptionist desk at his office, which Mr. Sims did on November 4, 2005.  1/24/07 Tr. at 175-76 (Sims).

36.    The documents Respondent left for Mr. Sims to pick up, which purported to include copies of the complaints, had been altered.  They did not include the copies of the complaints actually filed with the court on September 2, 2005, but instead included copies of complaints that had been stamped with the date of March 28, 2005.  BX 47 at 3-9; BX 47 at 10-16.  The case numbers, however, were the same as the actual case numbers assigned when they were filed on September 2.  BX 18 at 15-21.  These case numbers (05CA7165 and 05CA7183) are assigned sequentially by the court as the cases are filed, and could

not have been assigned in March 2005 as the stamped copies provided by

Respondent to Mr. Sims suggested.  BX 47 at 3, 10; BX 18 at 19; BX 51; BX 52.

The signature pages of the copies of complaints Respondent provided to Mr. Sims

also had a false date of March 28, 2005, suggesting that was the filing date when in

actuality it was not.  BX 47 at 7, 14.

37.     The complaints Respondent provided to Mr. Sims also contained the

correct certificates, rather than the false certificates that had been filed with the

court on September 2.  BX 47 at 8, 17.

38.     Respondent also provided Mr. Sims copies of motions that he

allegedly had filed with the court on September 2, 2005 to extend the time for

service of process.  BX 47 at 18-24, 25-31.  Respondent never filed these motions

with the court on September 2, or any time thereafter.  BX 51; BX 52.  The

falsified motions that Respondent provided to Mr. Sims also bore a false or forged

court stamp, falsely stating that a scheduling conference had been set for September

21, 2005 in each of the cases, BX 47 at 21, 28, and falsely representing that Mr.

Cummins had been retained to serve the defendants.  In fact, none of the

defendants, including the District of Columbia, were ever served in Mr. Sims'

matters.  BX 51; BX 52.  Mr. Cummins testified that he ceased to do work for

Respondent on any new matters by the beginning of 2005, prior to the time that

Respondent had been retained to work for Mr. Sims.  1/23/07 Tr. at 78-79, 81, 85-

86 (Cummins).

39.     After November 4, 2005, Mr. Sims continued to try to contact

Respondent, but Respondent never took his calls, and Mr. Sims was unable to find

Respondent at his office, learning on his own only later that it had been vacated and that Respondent had a new address at 1717 K Street. 1/24/07 Tr. at 164, 180 (Sims). As late as March of 2006, Mr. Sims reached out to Respondent by letter to seek closure on his matters, but Respondent never replied. 1/24/07 Tr. at 186-87 (Sims).

40. On April 12, 2006, Respondent attended the initial scheduling conference at which the court dismissed both of Mr. Sims' actions because they had been filed after the one-year statute of limitations. BX 51 at 1; BX 52 at 1. In fact, all 50 cases that day for which Respondent was counsel were dismissed. 1/24/07 Tr. at 174, 183 (Sims); BX 9; 3/20/07 Tr. at 869-72 (Anderson).

41. Respondent never advised Mr. Sims of this result. 1/24/07 Tr. at 183 (Sims). Mr. Sims lost all the money he paid on the properties as well as the right to obtain title. 1/24/07 Tr. at 184-85 (Sims). He also lost the $4,200 that he paid to Respondent in legal fees and expenses. 1/24/07 Tr. at 184 (Sims). Mr. Sims testified that he has been tremendously affected by his dealings with Respondent, that he could not afford to lose the money he paid in connection with the properties, and that his physical health has deteriorated as a result of this situation. 1/24/07 Tr. at 170, 173, 187-89 (Sims).

## COUNT THREE – JAMES WARE

42. James Ware has worked as a Chef for the Hyatt Regency Hotel for the past 31 years. 3/19/07 Tr. at 316-17 (Ware). For the last 10 to 12 years, Mr. Ware has invested in and rehabilitated properties. *Id.*

43.    At the 2002 Tax Sale, Mr. Ware was the highest bidder on two properties that are relevant to this action, one on Halley Terrace, S.E., and one on Pennsylvania Avenue, S.E., for which he paid $4,015.28 and $2,970.96, respectively.  3/19/07 Tr. at 318-22 (Ware); BX 57 at 3-5; BX 58 at 11.  The certificates provided to Mr. Ware explained that an action could be brought after January 19, 2003 to foreclose the right of redemption and that the certificate would become void if an action was not brought within one year from the date of the certificate, in which case all monies paid for the property would be forfeited to the District.  *Id.*

44.    Around April 2003, Mr. Ware retained Mr. Cummins' title search company to perform title searches on the two properties.  A title company employee advised Mr. Ware that he would need a lawyer, and recommended Respondent.  3/19/07 Tr. at 320, 322-23 (Ware); BX 57 at 6-12; BX 54 at 2.  Mr. Ware then called Respondent, who asked him to come to his office and to bring a check for $3,815, which would be Respondent's fee.  3/19/07 Tr. at 321, 324-25 (Ware); BX 57 at 1-2.

45.    On or about May 27, 2003, Mr. Ware met with Respondent at his law office and gave Respondent a check in the amount of $3,815.  3/19/07 Tr. at 325 (Ware).  Respondent told Mr. Ware that he would get Mr. Ware paperwork later on and would keep Mr. Ware informed of the status of the two properties.  *Id.* Respondent did not explain to Mr. Ware how he had calculated the $3,815 and never provided him with anything in writing concerning the fee.  3/19/07 Tr. at 326 (Ware).

46.     Respondent deposited the fee into his trust account on July 3, 2003. BX 2 at 5; BX 3 at 2.  Respondent withdrew these monies by no later than August 2004, although he never had received permission from Mr. Ware to do so.  3/19/07 Tr. at 326-27 (Ware); BX 2 at 16-17.

47.     On July 17, 2003 Respondent filed a complaint to foreclose the rights of redemption on the Pennsylvania Avenue property, *Ware v. McKnight, et al.,* No. 03A006067, and on the Halley Terrace property, *Ware v. McNeil, et al.,* No. 03CA006068.  BX 58; BX 59.  Both complaints constituted form complaints that Respondent had filed in other actions.  He did not provide Mr. Ware with copies of these complaints.  3/19/07 Tr. at 330-333; 340-41 (Ware).

48.     Following their initial meeting in late May 2003, Mr. Ware attempted to contact Respondent, and on the rare occasion when Respondent replied, he told Mr. Ware that everything was fine and that he had filed the papers. 3/19/07 Tr. at 327 (Ware).  Later, Respondent failed to take or return any of Mr. Ware's calls.  3/19/07 Tr. at 327-29 (Ware).  Finally, Mr. Ware began to give a fictitious name to the receptionist in order to be put through to Respondent. 3/19/07 Tr. at 328 (Ware).  When Mr. Ware was able to get through by giving a false name, Respondent told him that everything was going well.  Respondent mentioned that he could not find one party, but assured Mr. Ware that he would get the property.  3/19/07 Tr. at 327-330 (Ware).

49.     In 2004, Mr. Ware learned from another lawyer that the owner of the Pennsylvania Avenue property was seeking to redeem.  3/19/07 Tr. at 329-31 (Ware).  On May 14, 2004, OTR advised Mr. Ware that the property owner for the

Pennsylvania Avenue property was in the process of paying the delinquent taxes in order to redeem. BX 57 at 13. OTR requested that Mr. Ware provide a pay-off statement reflecting the legal fees that he had incurred so that the owner could pay Mr. Ware, which the owner would have to do to redeem the property. *Id.*

50.     Mr. Ware contacted Respondent and provided him with the document he had received from OTR. Respondent advised Mr. Ware that OTR would likely send the attorney's fees to Respondent who would then send the monies to Mr. Ware. 3/19/07 Tr. at 329-32 (Ware).

51.     Mr. Ware never received reimbursement of his legal fees for the Pennsylvania Avenue property. He was unsure whether Respondent received the fees, but knew that the property owner should not have been able to redeem the property until the legal fees were paid. 3/19/07 Tr. at 329-32 (Ware).

52.     In the meantime, on May 21, 2004, Respondent had filed a Praecipe with the Court in the Pennsylvania Avenue matter in which he instructed the clerk to "dismiss this cause in its entirety." BX 58 at 22. Mr. Ware was not aware of and never consented to Respondent dismissing his action regarding the Pennsylvania Avenue property. 3/19/07 Tr. at 334 (Ware). Later, Respondent informed Mr. Cummins that he had collected funds in the Pennsylvania Avenue matter when it was redeemed. 1/23/07 Tr. at 87 (Cummins). Respondent told Mr. Cummins that he would pay Mr. Cummins' company for the money owed for work done in Mr. Ware's matter, but never did. 1/23/07 Tr. at 87 (Cummins); BX 12. Respondent also never paid Mr. Ware the attorney's fees he was entitled to receive under the statute. 3/19/07 Tr. at 332-33, 340 (Ware).

53.     Mr. Ware did not know the status of the Halley Terrace property. When Mr. Ware was able to reach Respondent, Respondent assured him that he was working on the case, but claimed that he was having problems serving one of the parties.  3/19/07 Tr. at 334-35 (Ware).

54.     On August 27, 2004, Respondent filed a Praecipe dismissing Mr. Ware's claims against three of the defendants in the Halley Terrace matter.  BX 59 at 26.  Respondent did not advise Mr. Ware of the Praecipe or the dismissal of certain of number claims, and did not advise him why he had dismissed the claims against these defendants.  3/19/07 Tr. at 341 (Ware).

55.     On May 4, 2005, the court *sua sponte* dismissed the Halley Terrace matter for failure to prosecute.  BX 59 at 1.  On June 24, 2005, the court granted Respondent's motion to vacate the entry of judgment of dismissal, reinstated the case, and directed Mr. Ware to file a motion to amend the complaint by July 13, 2005.  BX 59 at 27-36.  Respondent neglected to inform Mr. Ware of these developments.  3/19/07 Tr. at 341 (Ware).  Mr. Ware, however, received a notice from the court of a status hearing to be held on August 31, 2005.  BX 57 at 14; 3/19/07 Tr. at 324 (Ware).  When Mr. Ware contacted Respondent about the notice, Respondent advised Mr. Ware that he did not have to attend the hearing and that he would "take care of it."  3/19/07 Tr. at 338 (Ware).

56.     Respondent failed to file a motion to amend the complaint once the case was reinstated.  BX 59 at 1.  At the status hearing on August 31, 2005, Respondent filed a Praecipe dismissing Mr. Ware's action "in its entirety."  BX 59

at 37.  Respondent did not consult with or receive the consent of Mr. Ware before filing the Praecipe.  3/19/07 Tr. at 342 (Ware).

57.     In the Praecipe, Respondent represented that "all taxes, penalties, interest and such other amounts due" had been paid on the property, BX 59 at 37, although Mr. Ware had never received any reimbursement of such monies at the time, and only later, after retaining new counsel, did he receive a return of his initial deposit.  3/19/07 Tr. at 342-43 (Ware).

58.     Following the status hearing, Mr. Ware continued to try to contact Respondent, to no avail.  3/19/07 Tr. at 335 (Ware); BX 54 at 3.  Mr. Ware then tried to learn about the status of the Halley Terrace property on his own.  Around October 2005, OTR advised Mr. Ware that the Halley Terrace property had been redeemed for $1 and that his deposit of $4,015.28 made to the D.C. Treasurer had been forfeited because his lawyer had not filed the necessary papers in a timely manner.  3/19/07 Tr. at 335-36 (Ware); BX 54 at 3.

59.     In mid-November 2005, Mr. Ware filed an ethical complaint against Respondent.  BX 54.  Mr. Ware never received from the property owners reimbursement of any of the $3,815 in fees he had paid to Respondent in connection with the two properties, although the owners should not have been able to redeem the properties without reimbursing Mr. Ware for such fees.  Mr. Ware did not "know for sure" whether Respondent had received reimbursement from the property owners.  3/19/07 Tr. at 343-44 (Ware).

60.     On December 5, 2006, the D.C. Bar's Clients' Security Fund notified Mr. Ware of its determination to reimburse him $3,815, based on its

24

finding that he had suffered a reimbursable loss due to Respondent's dishonesty in the course of not completing legal work of value for Mr. Ware.  BX 60; 3/19/07 Tr. at 344 (Ware).

### COUNT FOUR – RONALD AND VERA JACKSON

61.     Vera Jackson is a resident of the District of Columbia and is employed with the D.C. Department of Public Works.  3/19/07 Tr. at 524 (Jackson).  At the 2004 Tax Sale, Ms. Jackson and her husband, Ronald, were the highest bidders on three properties in the vicinity of H Street, N.E.  3/19/07 Tr. at 525-26, 553 (Jackson).  OTR issued the Jacksons certificates for each of the properties.  3/19/07 Tr. at 526 (Jackson).

62.     In late December 2004, the Jacksons received Respondent's solicitation letter.  3/19/07 Tr. at 527 (Jackson); BX 65 at 14.  On March 25, 2005, Ms. Jackson and her husband met with Respondent to discuss representation. During the meeting, Respondent reassured the Jacksons that if the property owners redeemed, they would receive all their money back, including the fees for legal work and expenses paid to Respondent.  3/19/07 Tr. at 528-29, 538, 558 (Jackson); BX 62 at 1-2.  At the meeting, Respondent requested that the Jacksons pay him $6,300.  BX 65 at 10; 3/19/07 Tr. at 529-30 (Jackson).  Ms. Jackson did not feel comfortable giving Respondent the full amount of the fee up front.  She advised him that she would send him a check and, on or about April 13, 2005, mailed him a check for $3,000.  3/19/07 Tr. at 529-30 (Jackson); BX 62 at 2; BX 65 at 2.

63.     On April 29, 2005, Respondent deposited Ms. Jackson's check into his trust account.  BX 2 at 25; BX 3 at 1.  Respondent did no work on the Jacksons'

matters, 3/19/07 Tr. at 545, 557 (Jackson), and never received permission from the Jacksons to withdraw any portion of the fees from his trust account.  3/19/07 Tr. at 531-32, 545 (Jackson).  Nevertheless, Respondent took and used for himself the $3,000 that he had received from the Jacksons.  By August 9, 2005, Respondent's trust account had a balance of less than $100.  BX 2 at 30.

64.     Ms. Jackson learned through her own research that all three properties had been redeemed and one, in fact, had been redeemed on March 25, 2005, the day she and her husband met with Respondent.  3/19/07 Tr. at 532-33 (Jackson).  She confirmed this with OTR, and then tried to reach Respondent, who initially did not return her calls.  3/19/07 Tr. at 533-34 (Jackson).  Ms. Jackson sent a letter to Respondent explaining the situation and seeking a reimbursement of the $3,000 in fees, but Respondent did not reply.  3/19/07 Tr. at 535-36 (Jackson). When Ms. Jackson was able to reach Respondent by telephone, he stated that he would return her funds, but he failed to do so and did not return Ms. Jackson's calls when she continued to try to reach him.  3/19/07 Tr. at 534-36 (Jackson).

65.     On or about July 11, 2005, the Jacksons went to Respondent's office seeking a return of their funds.  Respondent represented that they could not get their deposit back from OTR unless he provided the government with a release, and that he could not refund the Jacksons their legal fees until after the releases were submitted to the D.C. government.  3/19/07 Tr. at 540-41, 544-45 (Jackson).  At the time, Ms. Jackson did not question what Respondent told her and her husband, 3/19/07 Tr. at 538-40, 551, 556 (Jackson), but she now knows that the releases were not required for them to obtain a return of their deposit or for them to get a

26

refund on the $3,000 they had given to Respondent.  3/19/07 Tr. at 558-59 (Jackson).

66.     In and after July 2005, the Jacksons continued to call Respondent requesting that he refund their $3,000.  Respondent failed to take or return the calls, and Ms. Jackson spoke primarily with Respondent's assistant.  3/19/07 Tr. at 535-36 (Jackson).  Around November 2005, Ms. Jackson finally reached Respondent, who requested that she work with him by accepting payments over time.  Ms. Jackson agreed, and on November 4, 2005, Respondent sent her the first of what were to be three $1,000 payments.  3/19/07 Tr. at 536-37 (Jackson); BX 62 at 2.  In his cover letter, Respondent stated that he would make two additional installments of $1,000 each on November 10 and 17, 2005.  BX 62 at 4; 3/19/07 Tr. at 537 (Jackson).  Respondent did not make the additional installments at any time.  On November 10, 2005, a day after Respondent paid the first $1,000 installment to the Jacksons with funds in his trust account, he withdrew $7,150 in cash from that account.  3/19/07 Tr. at 545, 552 (Jackson); BX 62 at 2; BX 2 at 34.  By November 16, 2005, the balance in the trust account was $126.62.  BX 2 at 34.

67.     After trying in vain to reach Respondent in late November 2005, the Jacksons filed an ethical complaint against him dated November 29, 2005.  3/19/07 Tr. at 537-38 (Jackson); BX 62 at 2-5.  On January 27, 2007, the Clients' Security Fund notified the Jacksons of its determination to reimburse them $2,000 based on its finding that they had suffered a reimbursable loss due to Respondent's dishonest conduct in the course of not completing legal work of value for them.  3/19/07 Tr. at 545-47 (Jackson).

## COUNT FIVE – MICHAEL BULLOCK

68.     Michael Bullock is a resident of the District and employed at the General Services Administration as a Financial Manager.  3/19/07 Tr. at 431-32 (Bullock).  Mr. Bullock also is a member of the Micland Company, LLC ("Micland"), which invests in and develops real estate.  3/19/07 Tr. at 432 (Bullock).

69.     Mr. Bullock was the highest bidder on a number of properties at the "Absolute Sale" in 2004, which differs from the regular tax sale in that once the purchase was complete, the D.C. Government would forgive all prior tax liens that had not been redeemed.  3/19/07 Tr. at 433 (Bullock).  The relevant purchase Mr. Bullock made in this matter was a vacant lot on Montello Avenue.  3/19/07 Tr. at 433-35 (Bullock).  On August 24, 2004, OTR issued a certificate to Mr. Bullock's company, Micland, for the Montello Avenue property captioned "Certificate of Bid Off Sale For."  The certificate showed the price paid for the property – $17,000 – and provided that it would become void unless an action was brought and diligently pursued within a year from the date of the certificate, and that if the certificate became void, all monies paid for the real property would be forfeited to the District.  BX 67 at 7; 3/19/07 Tr. at 435 (Bullock).

70.     Respondent sent Mr. Bullock his form solicitation letter, and he and Mr. Bullock met on July 15, 2005 at Respondent's law office.  Respondent represented to Mr. Bullock that he had been involved in the tax sale process for several years, and Mr. Bullock believed that Respondent was knowledgeable about the process.  3/19/07 Tr. at 435-39 (Bullock); BX 67 at 3.  Respondent provided

Mr. Bullock with his standard retainer agreement, setting forth a flat fee of $1,800, together with an invoice breaking down the fee.  3/19/07 Tr. at 439 (Bullock); BX 67 at 4-6.  Mr. Bullock gave Respondent a check in the amount of $1,800 for his legal fee and expenses, and a second check for $300 payable to CII Title for a title search on the property.  3/19/07 Tr. at 439-40 (Bullock).

71.     Respondent deposited the $1,800 check into his attorney trust account on July 18, 2005.  BX 2 at 29; BX 3 at 1.  He then used the funds for his own purposes.  By August 9, the balance in Respondent's trust account was less than $100.  BX 2 at 30.  During the time he represented Mr. Bullock, Respondent never sought permission to withdraw any portion of the fee from his trust account. 3/19/07 Tr. at 440 (Bullock).

72.     Mr. Bullock began to call Respondent on August 25, 2005, the day after the filing deadline for his action, and called more than ten additional times, each time leaving a message for Respondent to call back.  Respondent failed to take or return any of Mr. Bullock's calls, and failed to provide Mr. Bullock with documentation he had requested.  3/19/07 Tr. at 440-41 (Bullock).  Mr. Bullock also went to Respondent's office three times, but was told that he was not in. 3/19/07 Tr. at 440-43 (Bullock); BX 67 at 1-2; BX 67 at 8-9.  By October 2005, still not having heard anything from Respondent, Mr. Bullock sought the assistance of another attorney to learn the status of the matter.  The attorney wrote a letter in October 2005 to Respondent, but Respondent never replied.  3/19/07 Tr. at 444 (Bullock); BX 67 at 2, 8-9.  Mr. Bullock filed an ethical complaint against

Respondent in December 2005, still not knowing anything about the status of his matter.  3/19/07 Tr. at 443 (Bullock); BX 67.

73.     On August 25, 2005, one day after the one-year period required by statute had expired; Respondent filed an action to foreclose the property owner's right of redemption.  Respondent had dated the complaint August 24, 2005.  BX 70 at 3-8.  The complaint was based on the same form complaint that Respondent had used in other actions.  *Id.*  The check that Respondent gave the court to pay the filing fee for Mr. Bullock's action (as well as eight other actions Respondent filed on August 25, 2005, BX 9 at 1) was returned for insufficient funds.  BX 6.

74.     The $300 that Respondent had received from Mr. Bullock payable to CII Title was cashed.  3/19/07 Tr. at 439, 448 (Bullock).  In the complaint Respondent filed with the court, he certified that a title search had been performed.  BX 70 at 6.  However, Mr. Bullock never saw evidence that a title search had been done, and Mr. Cummins stated that his company did not perform a title search for Mr. Bullock's property.  1/23/07 Tr. at 94 (Cummins).

75.     After filing the complaint with the court, Respondent did nothing further in the case, including serving the defendants.  BX 70 at 1.  In December 2005, Mr. Bullock requested that an attorney with Jackson and Campbell, a firm assisting him with another property, represent him on the Montello Avenue property.  3/19/07 Tr. at 445 (Bullock).  Mr. Bullock later learned from either Jackson and Campbell or Bar Counsel that Respondent had filed a complaint one day late on his behalf and without his knowledge.  *Id.*

76.     On April 10, 2006, the court dismissed *Micland Company, LLC v.*
*Washington, et al.,* Civil Action No. 05CA006781, for failure to prosecute.  BX 70
at 1.  Mr. Bullock's new counsel filed a motion to vacate the dismissal, to file a
proposed amended complaint, and to extend the time to serve the defendants.  BX
70 at 1.  The court denied the motion on May 15, 2006, stating that the case had to
be dismissed because it had been filed after the statute of limitations had expired.
BX 70 at 15-16.

77.     Due to the late filing of the complaint, Mr. Bullock forfeited the
$17,000 that he paid for the property and lost his ability to obtain the property.
3/19/07 Tr. at 446 (Bullock).  Mr. Bullock also lost the $1,800 he paid to
Respondent, the $300 he paid to Respondent for a title search, and the additional
fees he paid to Jackson and Campbell to learn of the case's status and to continue to
pursue it.  3/19/07 Tr. at 443, 445-50 (Bullock); BX 67 at 1-2.

## COUNT SIX – ANDRE WALKER

78.     Andre Walker is the Principal of an elementary school in Prince
George's County, Maryland.  1/24/07 Tr. at 202 (Walker).  At the 2004 Tax Sale,
Mr. Walker was the highest bidder on a property on C Street, N.E., for which he
paid $7,982.53.  1/24/07 Tr. at 204-05 (Walker); BX 72 at 6.  OTR issued a
Certificate of Sale for Taxes to Mr. Walker for the property dated August 11, 2004.
Tr. at 203-05; BX 72 at 6.  The certificate was a standard tax sale certificate issued
by the District of Columbia.  BX 72 at 6.

79.     Mr. Walker decided to contact Respondent after receiving his
solicitation letter of December 22, 2004.  He called Respondent and they discussed

the legal process over the telephone.  At Respondent's request, Mr. Walker sent

Respondent a check for $1,800 for the representation.  1/24/07 Tr. at 208 (Walker).

Respondent was "very available" to Mr. Walker by telephone before Mr. Walker

sent the check, but Mr. Walker could not reach Respondent after he mailed the

check to him.  1/24/07 Tr. at 208-09 (Walker); BX 75 at 2-3.  Mr. Walker never

received any paperwork from Respondent, including a retainer agreement or

writing setting forth the basis or rate of Respondent's fee.  1/24/07 Tr. at 211

(Walker).

   80. Mr. Walker called Respondent approximately 50 times after March

2005, but Respondent did not take or return his calls.  1/24/07 Tr. at 208-10

(Walker).  At some point, a secretary at Respondent's office told Mr. Walker that

the documents were in the mail or had come back, but Mr. Walker never received

them.  1/24/07 Tr. at 208 (Walker).  Several times, Mr. Walker went to

Respondent's office, but was never able to meet with him.  1/24/07 Tr. at 208, 212

(Walker).

   81. The only time that Mr. Walker was able to reach Respondent by

telephone was some time between July and September of 2005.  1/24/07 Tr. at 209-

10 (Walker); BX 72 at 3.  On that call, Respondent assured Mr. Walker that

everything was fine, that there were no liens on the property, that he had filed the

paperwork, and that a court date had been scheduled.  1/24/07 Tr. at 209, 214

(Walker).  Respondent thereafter did not respond to any calls or letters from Mr.

Walker.  Tr. at 211-13; BX 72 at 4.

82.     Respondent did not file a complaint on behalf of Mr. Walker until September 2, 2005. BX 76 at 3-11. The complaint was based on the standard complaint that Respondent had filed on behalf of several other clients. Although it was filed on September 2, 2005, Respondent falsely dated the complaint August 10, 2005 – the last day before the statute of limitations expired on Mr. Walker's action. BX 76 at 7-8. Although Respondent certified to the court that a title search had been done on the property, he did not attach a title report to the complaint and there is no evidence that a title search was ever performed. BX 76; 1/24/07 Tr. at 214, 217 (Walker); 1/23/07 Tr. at 95 (Cummins).

83.     The check that Respondent wrote the court for the filing fee in Mr. Walker's action (C.A. No. 05CA007319) was returned for insufficient funds, and the filing fee was never paid. BX 10 at 1; BX 6 at 6 (#1201). Respondent never provided Mr. Walker a copy of the complaint in his matter, despite Mr. Walker's repeated requests for documentation. 1/24/07 Tr. at 216-17 (Walker); BX 72 at 4; BX 9 at 3.

84.     Respondent never served any of the defendants, and failed to respond to the motion filed by the District of Columbia to dismiss the action because it had been filed after the one-year limitations period. BX 76 at 1-2, 13-16; 1/23/07 Tr. at 38-39 (Ferguson). By order dated March 16, 2006, the court granted the District's motion to dismiss Mr. Walker's action with prejudice. BX 76 at 16. Respondent never advised Mr. Walker of the motion or notified him of the court's actions. 1/24/07 Tr. at 217-18 (Walker).

85.     From September 2005 onward, Mr. Walker continued to try to reach Respondent by telephone and by visits to his office, but was unsuccessful. Respondent failed to return any of Mr. Walker's calls.  1/24/07 Tr. at 210-13 (Walker).  In December 2005, Mr. Walker filed an ethical complaint against Respondent.  BX 72.  At the time he filed the complaint, Mr. Walker did not know the status of his case.  1/24/07 Tr. at 215 (Walker).  Respondent failed to respond to Mr. Walker's complaint, did not communicate with Mr. Walker or provide him any documents relating to his matter, and failed to refund the $1,800 that Mr. Walker previously sent to him.  BX 77; 1/24/07 Tr. at 218 (Walker).

86.     Respondent had deposited the funds into his attorney trust account on March 11, 2005, and used them for personal expenses before filing an action on Mr. Walker's behalf on September 2, 2005.  BX 2 at 23, 32; BX 3 at 2. Respondent's trust account was overdrawn by more than $3,000 on September 1, 2005, one day before he filed the court action in Mr. Walker's case.  BX 2 at 32. Respondent never sought or received Mr. Walker's permission to use Mr. Walker's $1,800 as an earned fee.  1/24/07 Tr. at 211 (Walker).

87.     Because Respondent filed the complaint after the statutory deadline, Mr. Walker lost the right to obtain title to the property, which was valued at approximately $500,000.  1/24/07 Tr. at 219 (Walker); BX 72 at 5.  Mr. Walker also forfeited the $7,928.53 that he paid for the property, and lost the right to recover the $1,800 he paid for attorney's fees and costs.  1/24/07 Tr. at 219-20 (Walker).  Mr. Walker also paid another attorney $1,500 to learn the status of his matter and attempted to continue to pursue it.  1/24/07 Tr. at 216 (Walker).  Mr.

Walker testified that the entire matter was stressful for him and felt he had been

taken advantage of.  1/24/07 Tr. at 220-22 (Walker).

## COUNT SEVEN – ESTWICK BLACKMAN

88.     Estwick Blackman, Jr. is a resident of the District who is employed

as a Customer Service Representative for Chevy Chase Bank.  Mr. Blackman also

works part-time as a real estate agent.  3/19/07 Tr. at 588 (Blackman).

89.     Mr. Blackman participated in the 2003 Tax Sale for the first time,

and was the highest bidder on six properties, four of which were redeemed by their

owners.  OTR issued Mr. Blackman Certificates of Sale for Taxes for the other two

properties, each of which showed the amount Mr. Blackman paid – $3,188.21 for a

property on V Street, N.E., and $3,750.09 for a property on C Street, N.E.  3/19/07

Tr. at 588-91 (Blackman); BX 82 at 1-2.  Both certificates were dated September 2,

2003 and provided that an action could be brought after January 18, 2004 to

foreclose the right of redemption.  BX 82 at 1-2.

90.     OTR referred Mr. Blackman to Respondent and CII Title for

assistance in filing a court action.  On or about July 16, 2004, Mr. Blackman met

with Respondent.  3/19/07 Tr. at 591-92 (Blackman); BX 78 at 3-5.  At their

meeting, Respondent explained the process to Mr. Blackman and informed him that

if the owners redeemed the properties, Mr. Blackman would get all of his deposits,

fees, and expenses back.  3/19/07 Tr. at 596, 616-18, 623-24 (Blackman).

91.     Respondent provided Mr. Blackman with his standard retainer

agreement, which stated that Mr. Blackman would be charged $1,500 per property

as a flat fee for the representation.  Respondent also gave Mr. Blackman an invoice

that set forth his legal fee of $1,500 per property, plus a filing fee of $130 per property and a publication fee of $240 per property, for a total fee of $3,740 for the two properties. BX 78 at 3-5. Mr. Blackman gave Respondent a check for $3,000 at their initial meeting. 3/19/07 Tr. at 592-93 (Blackman); BX 78 at 5. Respondent deposited the funds into his checking account on August 2, 2004. BX 2 at 17; BX 3 at 1. Respondent never sought or received Mr. Blackman's permission to withdraw these funds, but took the funds to use for his own purposes. By August 6, 2004, Respondent's trust account was overdrawn. BX 2 at 17; 3/19/07 Tr. at 593-94 (Blackman); 3/20/07 Tr. at 833-34 (Anderson).

92.     On the date of their initial meeting, Respondent referred Mr. Blackman to CII Title to perform title searches on the properties. Mr. Blackman paid CII Title an additional fee of $650 to perform the searches. Tr. at 592-93; BX 82 at 3-4.

93.     On July 20, 2004, Respondent filed an action to foreclose the right of redemption on the C Street property, BX 83 at 8-13, and on August 12, 2004, he filed an action to foreclose the right of redemption on the V Street property. BX 84. Following their initial meeting, Mr. Blackman attempted on numerous occasions to learn the status of his matters, but Respondent never took or returned his calls, and never provided the complaints or other documentation to Mr. Blackman. 3/19/07 Tr. at 594-95, 605, 607 (Blackman). In November or December of 2004, Mr. Blackman was finally able to reach Respondent, who informed him that he had filed the actions and told him of the upcoming court dates.

36

94.    In the latter part of 2004 and through 2005, Mr. Blackman continued to call and leave messages for Respondent, but Respondent failed to return them. Mr. Blackman also e-mailed Respondent.  Respondent initially replied to some of Mr. Blackman's e-mails, but by early 2005, he no longer responded to Mr. Blackman's calls or e-mails.  3/19/07 Tr. at 596-97 (Blackman).

95.    On February 11, 2005, Respondent attended a status hearing relating to the V Street property.  BX 84 at 1.  Respondent did not notify Mr. Blackman of the hearing. 3/19/07 Tr. at 605-06.  At the hearing, Respondent filed a Praecipe with the court "dismiss[ing] this case in its entirety."  BX 84 at 15.  Mr. Blackman did not know of and did not consent to the dismissal of the action, nor did Respondent advise him that he had dismissed the case.  3/19/07 Tr. at 606-08, 615, 619-20 (Blackman).

96.    In approximately the second quarter of 2005, Mr. Blackman contacted OTR and they advised him that the property owner had redeemed the V Street property and that he needed to provide documentation to receive a return of his funds.  3/19/07 Tr. at 595-96 (Blackman).  Alma Phillips, who worked for OTR, led Mr. Blackman to believe that the Respondent had collected Mr. Blackman's attorney's fees from the property owner when she advised him that the property had been redeemed.  3/19/07 Tr. at 601-02, 616, 621, 624 (Blackman).

97.    Thereafter, Mr. Blackman contacted Respondent, who informed Mr. Blackman that he would take the necessary steps to ensure that Mr. Blackman would be reimbursed his deposit, and would be refunded or reimbursed his legal fees, for the V Street property.  3/19/07 Tr. at 596, 601 (Blackman).  On November

1, 2005, Respondent provided OTR with a release enabling Mr. Blackman to obtain the return of the deposit, but the release falsely represented that Mr. Blackman had not incurred any legal fees with respect to the V Street property.  BX 82 at 5; 3/19/07 Tr. at 604, 621 (Blackman).  OTR reimbursed Mr. Blackman for the money deposited on the property, but Mr. Blackman never received a refund or reimbursement of his attorney's fees.  3/19/07 Tr. at 598 (Blackman).

98.    In late 2005, Mr. Blackman went to the court and obtained a docket sheet relating to the C Street property.  BX 82 at 7-13; 3/19/07 Tr. at 605 (Blackman).  A status hearing was scheduled for February 1, 2006.  BX 82 at 7. Mr. Blackman again tried but was unable to reach Respondent because his office telephone had been disconnected.  3/19/07 Tr. at 608 (Blackman).  He called the D.C. Bar, which advised him that Respondent had been suspended for non-payment of Bar dues and that the Bar had no forwarding or new address for him.  BX 78 at 2; 3/19/07 Tr. at 599-600, 608, 612-13 (Blackman).

99.    In January 2006, Mr. Blackman filed an ethical complaint against Respondent, stating that Respondent refused to communicate with him and had not refunded the $1,500 fee owed Mr. Blackman with respect to the V Street property. BX 78; 3/19/07 Tr. at 602-04 (Blackman).

100.    At the February 1, 2006 status hearing relating to the C Street property, Mr. Blackman appeared with a new counsel he had hired.  BX 83 at 33. Respondent was present and said he would still represent Mr. Blackman, but Mr. Blackman refused to permit Respondent to do so.  3/19/07 Tr. at 609, 615 (Blackman); BX 83 at 2.

101.    Respondent failed to refund the $3,000 in legal fees that he received from Mr. Blackman for each of the two properties. 3/19/07 Tr. at 598, 610 (Blackman). On December 21, 2006, the Clients' Security Fund notified Mr. Blackman (as well as Respondent) of its determination to reimburse Mr. Blackman $1,500, based on its finding that he had suffered a reimbursable loss due to Respondent's dishonest conduct during the course of the representation in not completing legal work of value. The Fund held in abeyance Mr. Blackman's request for the balance of $1,500 paid to the Respondent regarding the V Street property. BX 86 at 2; 3/19/07 Tr. at 610-11 (Blackman).

## COUNT EIGHT – MICHAEL EDMONDS AND EDITH THRASH

102.    Michael Edmonds is employed by BK Glass Protective Services as a Grounds Security Officer. 3/19/07 Tr. at 400 (Edmonds). Mr. Edmonds and his wife, Edith Thrash, participated for the first time in a Tax Sale in 2004 and were the highest bidders on two properties in Georgetown, one on 27th Street, N.W., and one on 34th Street, N.W. 3/19/07 Tr. at 401-03 (Edmonds); BX 87 at 7-9.

103.    The facts concerning Mr. Edmonds' and Ms. Thrash's matter are similar to the facts involving the other complainants. OTR issued Mr. Edmonds a Certificate of Sale for Taxes for the properties showing the $3,102.84 he had paid. BX 87 at 7-8; 3/19/07 Tr. at 419-21 (Edmonds). Mr. Edmonds received Respondent's form solicitation letter dated December 22, 2004 and set up an appointment to meet with him on May 17, 2005. 3/19/07 Tr. at 404-05 (Edmonds); BX 87 at 6. Although the meeting did not take place, Respondent agreed to represent Mr. Edmonds and Ms. Thrash, and in a letter sent to Respondent on June

30, 2005, Ms. Thrash confirmed that they were retaining Respondent to file actions

for both properties. They enclosed the certificates they had received from OTR.

BX 87 at 5, 7-8; 3/19/07 Tr. at 424 (Edmonds). On or about July 7, 2005,

Respondent sent Mr. Edmonds and Ms. Thrash a client interview form, retainer

agreement, and invoice for legal work. The retainer agreement was Respondent's

standard agreement, and he sought $1,800 for fees and expenses for each case. BX

87 at 15-18; 3/19/07 Tr. at 406-07 (Edmonds). In his cover letter, Respondent also

requested $600 for the title search. BX 87 at 12.

   104. Although Mr. Edmonds and Ms. Thrash did not return the signed

retainer agreement until on or about August 30, 2005, Mr. Edmonds continued to

communicate with Respondent by telephone while the documents were exchanged

and Respondent assured Mr. Edmonds that the actions would be filed within the

one year limitations period. 3/19/07 Tr. at 408-09 (Edmonds). On October 4, Ms.

Thrash sent Respondent two checks, one for $3,600 to cover Respondent's legal

fees and costs, and another in the amount of $600 payable to CII Title for the title

search for the two properties. BX 87 at 19-20; 3/19/07 Tr. at 410-11 (Edmonds).

Respondent deposited the $3,600 into his trust account on October 7, 2005. BX 2

at 33; BX 3 at 2. He took and used the funds for his own purposes and, by

November 16, 2005, had only $126.62 left in his account. BX 2 at 34. Respondent

never received permission from the complainants to withdraw any portion of the

funds. BX 87 at 18; 3/19/07 Tr. at 411-12 (Edmonds). The check for $600 sent to

Respondent was also negotiated, but there is nothing to indicate that a title search

was ever done. 3/19/07 Tr. at 410-11 (Edmonds); BX 90 at 6; BX 91 at 6.

105.    After Mr. Edmonds and Ms. Thrash paid Respondent, they heard nothing from him.  3/19/07 Tr. at 412-13 (Edmonds).  Mr. Edmonds telephoned Respondent between 10 and 15 times, but Respondent failed to take or return his calls.  Ms. Thrash sent Respondent numerous e-mails, but Respondent never replied.  3/19/07 Tr. at 413-15 (Edmonds); BX 87 at 4.

106.    In February 2006, Mr. Edmonds and Ms. Thrash filed an ethical complaint against Respondent.  BX 87.  At the time they filed the complaint, they had no understanding of the status of their two matters, including whether Respondent had filed an action or actions on their behalf.  They had last communicated with Respondent several months earlier, and the office number at which they had previously reached him had been disconnected.  BX 87 at 3. Respondent did not contact them after receiving notice of their complaint with Bar Counsel.  3/19/07 Tr. at 418 (Edmonds); BX 88-89.

107.    Respondent filed two complaints on behalf of Mr. Edmonds, both on August 25, 2005, two weeks after the expiration of the statute of limitations.  BX 90; BX 91.  The complaints that Respondent filed were based on the same form complaint that Respondent had filed in earlier actions.  He never provided Mr. Edmonds and Ms. Thrash copies of these complaints.  3/19/07 Tr. at 419, 423 (Edmonds).

108.    Respondent attached falsified certificates to the complaints that he filed with the court.  The certificates each had a different title and date of issuance, set forth an interest rate of 114% per month, and stated that an action could be brought after July 19, 2004, which was before the date of the certificate rather than

six months after, as provided by statute. *Compare* BX 90 at 9 *with* BX 87 at 8 and BX 91 at 9 *with* BX 87 at 7; 3/19/07 Tr. at 421-22 (Edmonds). Respondent falsified the certificates relating to both properties by indicating a different square and lot number. In addition, he listed Richard Baenan (not Robert Nixon) as the property owner for Square 1239, Lot 0868 (the 27th Street property). BX 90 at 9; BX 91 at 9; 3/19/07 Tr. at 424-25 (Edmonds).

109. Respondent gave the court a check for $1,170, to pay the filing fees in these two actions and seven others, that was later returned for insufficient funds. Respondent has never paid the court the amounts owed in filing fees. BX 10. After filing the two complaints with the court, Respondent took no other action in either case except to attend a status hearing on April 5, 2006. At that time, the court dismissed both actions because they had been filed after the limitations period had elapsed. BX 90 at 1; BX 91 at 1. Respondent did not advise Mr. Edmonds or Ms. Thrash of the status hearing or that the actions had been dismissed. 3/19/07 Tr. at 422 (Edmonds).

110. Mr. Edmonds and Ms. Thrash lost their right to obtain the properties and forfeited the $3,102.84 they had paid the D.C. Government. 3/19/07 Tr. at 426 (Edmonds). Mr. Edmonds and Ms. Thrash also lost the $3,600 that they paid Respondent to represent them in their court actions and the $600 they paid for title searches, which were apparently never done. 3/19/07 Tr. at 426-27 (Edmonds). Respondent never communicated with the complainants after he received their checks, totaling $4,200, in October 2005. 3/19/07 Tr. at 428 (Edmonds).

111.  On February 26, 2007, the Clients' Security Fund notified Mr. Edmonds and Ms. Thrash of its determination to reimburse them $3,600.  3/19/07 Tr. at 427-28 (Edmonds).

## COUNT NINE – KEITH DEAN

112.    Keith Dean is a resident of the District of Columbia who is employed as an Engineer for BAE Systems, and also works part-time as a real estate agent.  3/19/07 Tr. at 487-88 (Dean).  Mr. Dean participated in his first Tax Sale in 2002.  3/19/07 Tr. at 488 (Dean).  He was the highest bidder on a property at 1244 Jackson Street, N.E., which he hoped to acquire for new construction. 3/19/07 Tr. at 489 (Dean).

113.  Mr. Dean received a certificate from OTR for the Jackson Street property that shows the amount he paid, $3,154.61.  BX at 15.  He utilized CII Title for the title search, and CII Title referred Mr. Dean to Respondent for further assistance.  Respondent thereafter called Mr. Dean and Mr. Dean agreed to retain Respondent to file an action to foreclose the right of redemption on the Jackson Street property.  3/19/07 Tr. at 493 (Dean); BX 93 at 3.

114.    Mr. Dean never met Respondent, but they spoke on the telephone and later exchanged correspondence.  3/19/07 Tr. at 494 (Dean).  On or about June 30, 2003, Respondent sent Mr. Dean a client interview form, his standard flat fee agreement, and certifications of title search that were to be signed by Mr. Dean before a notary.  BX 93 at 14.  Respondent requested that Mr. Dean send him a check for $2,125 to cover the fees and expenses of his action – $1,200 for attorney's fees, $130 for filing fees, $240 for publication fees, $105 for service on

the D.C. Government, and $450 for service on nine other defendants.  BX 93 at 14.

On or about July 7, 2003, Mr. Dean mailed back the documentation to Respondent,

and mailed Respondent a check in the amount of $2,125.  3/19/07 Tr. at 494-96

(Dean); BX 93 at 3, 7-10, 12-13.  On November 10, 2003, Respondent deposited

the funds into his attorney trust account.  BX 2 at 7; BX 3 at 1.  Respondent,

however, took and used the funds for himself.  On July 30, 2004, Respondent's

trust account was down to $746.06 and, by August 6, 2004, the account was

overdrawn by more than $700.  BX 2 at 17.  Respondent never received the consent

of Mr. Dean to withdraw these funds.  3/19/07 Tr. at 496, 514 (Dean).

115.    After Mr. Dean sent Respondent the paperwork and $2,125 check,

Respondent did not communicate with him.  Of the more than 100 times Mr. Dean

tried to reach Respondent, he was only successful on six occasions.  3/19/07 Tr. at

497-99, 515-16 (Dean).  Respondent failed to take or return most of Mr. Dean's

calls, and did not respond to his e-mails or faxes.  3/19/07 Tr. at 498-99 (Dean).

When Mr. Dean was able to reach Respondent, Respondent stated that he was

working on the case, and told Mr. Dean that he did not have to come to court

because Respondent would "take care of everything."  3/19/07 Tr. at 497-98, 516

(Dean).  Respondent failed to provide Mr. Dean any documents or a copy of the

complaint he had filed.  3/19/07 Tr. at 499-500, 508-09 (Dean).

116.  Respondent had filed an action to foreclose the right of redemption on

the Jackson Street property on July 15, 2003.  BX 95 at 10-22.  Respondent failed

to provide Mr. Dean any information about the status of the action or Respondent's

alleged attempts to resolve it.  In pleadings filed with the Court, Respondent

represented that the parties were attempting to reach a settlement, yet Mr. Dean was never aware of any such discussions and Respondent never consulted him about the terms of any settlement. BX 95 at 37; 3/19/07 Tr. at 509-10 (Dean). Although Respondent knew that the court had dismissed the action in February of 2005 for failure to prosecute, he never advised Mr. Dean that the action had been dismissed or that Respondent was having difficulty serving the defendants. BX 95 at 44-56; 3/19/07 Tr. at 509-11 (Dean). Mr. Dean also was unaware that the court had directed Respondent, in order to reinstate the case, to file an amended complaint or to serve the remaining defendant by May 1, 2005. 3/19/07 Tr. at 510-12 (Dean); BX 95 at 55, 80. On May 12, 2005 the Respondent was mailed an Order stating that Mr. Dean had until August 17, 2005 to serve the remaining defendant with the amended complaint, but the Respondent did not inform Mr. Dean of this issue. BX 95 at 80; 3/19/07 Tr. at 512 (Dean).

117.    Respondent did file a motion and amended complaint in May 2005, but made no effort to serve any of the defendants. At the next status hearing on August 25, 2005, which Respondent attended, the court dismissed Mr. Dean's action for a second time for failure to prosecute. BX 95 at 1. Respondent did not seek to have the case reinstated and never advised Mr. Dean that the case had been dismissed a second time. 3/19/07 Tr. at 512-13 (Dean).

118.    Mr. Dean learned sometime in late 2005 or early 2006 that the property had been sold twice since the 2002 Tax Sale. OTR advised Mr. Dean that he could receive reimbursement, but that the office first needed a release from Respondent. 3/19/07 Tr. at 503-04, 507, 518 (Dean). Mr. Dean reached

Respondent on February 13, 2006, and advised Respondent what he had learned. Respondent told Mr. Dean that he would provide the release, and promised to refund his legal fees by February 27, 2006. 3/19/07 Tr. at 503-04, 508 (Dean); BX 93 at 4; 3/19/07 Tr. at 513-14 (Dean).

119.    Respondent provided the release to OTR, and Mr. Dean was able to receive reimbursement for the deposit he made on the property. BX 93 at 5; 3/19/07 Tr. at 507 (Dean). Although under the statute, Mr. Dean was entitled to his attorney's fees and expenses and OTR confirmed that he should receive his attorney's fees, Mr. Dean never received reimbursement for the funds he paid Respondent. 3/19/07 Tr. at 500, 507-08, 522-23 (Dean). On February 27, 2006, the date that Respondent had promised to reimburse Mr. Dean, his trust account had a balance of $4.06 and his checking account had been closed because of numerous overdrafts. BX 2 at 36; BX 5 at 44. Mr. Dean filed an ethical complaint against Respondent in February 2006, at a time when he had no understanding of the status of his case, and thereafter never heard from Respondent. 3/19/07 Tr. at 512-15 (Dean).

### COUNT TEN –VIOLA HILTON

120.    Viola Hilton is a resident of the District of Columbia who, in 1982, retired from her position at the National Science Foundation. 1/24/07 Tr. at 127-28 (Hilton). In July of 2004, Ms. Hilton and her granddaughter were the highest bidders on three properties, two of which were redeemed shortly after the Tax Sale. 1/24/07 Tr. at 129-31 (Hilton). OTR issued a certificate dated August 11, 2004 to Ms. Hilton for the third property located at 28 Farragut Place, N.W. for which she

paid $4,432.75 at the Tax Sale. 1/24/07 Tr. at 131-32 (Hilton); BX 99 at 1. In November 2004, Ms. Hilton paid an additional $1,490.52 to the D.C. Treasurer for the taxes that had accrued on the Farragut Place property. BX 99 at 2; 1/24/07 Tr. 133 (Hilton).

 121. In December 2004, Ms. Hilton arranged for a title search to be done on the property by J. Frank Mowery & Associates, Inc., for which she paid $300. 1/24/07 Tr. at 132-34 (Hilton); BX 99 at 3-11. Soon thereafter, Ms. Hilton received Respondent's form solicitation letter. 1/24/07 Tr. at 134-35 (Hilton); BX 99 at 12. On or about February 25, 2005, Ms. Hilton, accompanied by her daughter and her daughter's fiancé, met with Respondent at his office at 733 15th Street, N.W., Suite 700. Throughout the meeting, Respondent repeated many of the representations in his solicitation letter, including that if the property owner redeemed, Ms Hilton would receive her money back, including her attorney's fees. 1/24/07 Tr. at 138 (Hilton). At the meeting, Respondent provided Ms. Hilton his standard retainer agreement in which he represented that his fee for the "preparation and representation of an uncontested tax sale redemption foreclosure suit" was $1,800 per property. BX 99 at 13-14. Ms. Hilton signed Respondent's retainer agreement, Respondent provided her with a $1,800 invoice for legal fees and costs, and Ms. Hilton then gave Respondent a bank check, dated February 25, 2005, in the amount of $1,800. BX 99 at 15; BX 100; 1/24/07 Tr. at 138-39 (Hilton).

 122. Respondent deposited the funds into his attorney trust account on March 11, 2005. BX 2 at 23; BX 3 at 1. Respondent took and used for himself the

funds that Ms. Hilton had paid him.  By August 9, 2005, there was less than $100

in his trust account.  BX 2 at 23-30.  By that time, however, the only action that

Respondent had taken on behalf of Ms. Hilton was to file a form complaint that he

never pursued or prosecuted.  He never sought permission from Ms. Hilton to

withdraw and expend the funds she had given him.  1/24/07 Tr. at 143-44, 148

(Hilton).

   123.    After Ms. Hilton gave Respondent a check for $1,800, she never

heard from him again.  1/24/07 Tr. at 140 (Hilton).  By April 2005, Ms. Hilton

began to call Respondent's office repeatedly.  She would leave her name and

telephone number, but Respondent never returned her calls.  1/24/07 Tr. at 140,

142-43 (Hilton).  Ms. Hilton kept a log of some of her unreturned calls to

Respondent in order to document some of her efforts to reach him.  BX 99 at 16-

18.  The log that Ms. Hilton produced does not reflect all the calls she made to

Respondent, none of which were returned.  1/24/07 Tr. at 141-43 (Hilton).

Respondent never wrote to Ms. Hilton and never provided her any documents

indicating that he had worked on her matter.  1/24/07 Tr. at 140-41 (Hilton).

   124.    In January 2006, Ms. Hilton could no longer leave messages for

Respondent because his telephone service had been disconnected.  1/24/07 Tr. at

144-45 (Hilton); BX 99 at 18.  Ms. Hilton then called the Better Business Bureau,

which directed her to the Bar Association, which in turn directed her to the D.C.

Bar.  The D.C. Bar only had the address and telephone number for Respondent that

Ms. Hilton already had.  1/24/07 Tr. at 144-45 (Hilton).

125.    By letter dated March 2, 2006, Ms. Hilton complained to Bar Counsel that she had paid Respondent $1,800, but he had not followed up on her case, causing her to lose the money she paid for the property and her attorney's fees.  BX 97.

126.    Respondent had filed a complaint with the court on July 1, 2005, to foreclose the right of redemption on the property Ms. Hilton purchased at the Tax Sale.  Although he filed the complaint on July 1, 2005, Respondent backdated it to May 15, 2005.  BX 101 at 4-8.  Respondent never provided Ms. Hilton a copy of the complaint or advised her that he had filed it.  1/24/07 Tr. at 148-50 (Hilton); BX 101 at 4-8.

127.    Respondent failed to serve the defendants he named in the complaint, with the exception of the District of Columbia.  BX 101 at 1.  On January 3, 2006, Respondent filed a motion to extend the time for service in the case.  However, the court returned his motion because Respondent attempted to pay the $20 filing fee with a check, despite the court's notice that he no longer had check writing privileges.  BX 101 at 16-18.  Respondent refiled the motion on February 13, 2006, but then did nothing to pursue it, including after the court dismissed the case under Superior Court Civil Rule 4(o) for failure to prosecute. BX 101 at 1.  The court docket sheet reflects that Respondent was present for the status hearing on February 15, 2006, when the court dismissed the matter without prejudice.  *Id.*

128.    Respondent never advised Ms. Hilton that her action had been dismissed.  1/24/07 Tr. at 150 (Hilton).  Ms. Hilton has been retired for 25 years

49

and neither she nor her family are wealthy and, therefore, she has suffered as a result of the approximately $8,000 she lost because of Respondent.  1/24/07 Tr. at 151-52 (Hilton).  Ms. Hilton feels betrayed because of the trust she had placed in Respondent.  1/24/07 Tr. at 152-53 (Hilton).

### COUNT ELEVEN – ABRAHAM MITCHUM

129.    Abraham Mitchum is a resident of the District of Columbia and serves as the Pastor for New Jerusalem Temple, where he has worked for the last 15 years.  3/19/07 Tr. at 626-27 (Mitchum).  Mr. Mitchum participated in the Tax Sale for the first time in 2004, and he and his wife were the highest bidders on three properties – two on Minnesota Avenue, N.E., and one on 44th Street, N.E.  3/19/07 Tr. at 627-28 (Mitchum); BX 103 at 10-12.  On August 11, 2004, OTR issued him Certificates of Sale for Taxes, enabling him to bring actions after January 16, 2005 to foreclose the owners' rights of redemption, provided that the actions were brought within one year of the issuance of the certificates.  BX 103 at 10-12; 3/19/07 Tr. at 628 (Mitchum).

130.    Mr. Mitchum received Respondent's form solicitation letter, and met with Respondent on April 22, 2005.  3/19/07 Tr. at 629-32 (Mitchum).  During the meeting, Respondent provided Mr. Mitchum his standard retainer agreement, in which Respondent represented that his fee for the "preparation and representation of an uncontested tax sale redemption foreclosure suit" would be $1,800 per property.  BX 106 at 2-3.  Although Respondent provided Mr. Mitchum with an invoice for fees and expenses totaling $6,000, he made an adjustment of $3,600,

leaving a balance due of $2,400 – $1800 in fees and $600 for expenses.  BX 106 at 1; 3/19/07 Tr. at 632-33 (Mitchum).

131.    Mr. Mitchum gave Respondent a check for $1,800, leaving a balance due of $600.  3/19/07 Tr. at 633-34, 652 (Mitchum); BX 107.  On April 29, 2005, Respondent deposited Mr. Mitchum's check into his trust account.  BX 2 at 25; BX 3 at 2.  Respondent then took and used for himself the funds that Mr. Mitchum had provided, without obtaining Mr. Mitchum's consent.  3/19/07 Tr. at 634, 642, 654 (Mitchum).  By August 9, 2005, the balance in Respondent's trust account was less than $100, despite the fact that Respondent had not filed any actions on Mr. Mitchum's behalf.  BX 2 at 30.

132.    Mr. Mitchum repeatedly attempted to contact Respondent about the status of his case, without success.  Finally, Mr. Mitchum caught Respondent outside his office, and Respondent told Mr. Mitchum that the time had not yet come for the property owners to redeem, and he would be in touch.  3/19/07 Tr. at 635-36 (Mitchum).  Mr. Mitchum's secretary made more than 30 calls to Respondent, but was able to reach him only twice.  3/19/07 Tr. at 635-37 (Mitchum); BX 106 at 4.  On July 8, 2005, Respondent falsely advised her that the court filing date was June 24, 2005.  In fact, Respondent had not filed any actions on behalf of Mr. Mitchum at the time.  BX 106 at 4.  On August 8, 2005, the second time Mr. Mitchum's secretary was able to reach Respondent, Respondent stated he had been out of the office and would provide an update by August 12, 2005.  *Id.*  Respondent refused to take or return all subsequent calls, and would not respond to the secretary's e-mails.  BX 106 at 4; 3/19/07 Tr. at 636-37 (Mitchum).

133.    An owner of one of the properties on Minnesota Avenue sought to redeem the property.  OTR advised Mr. Mitchum to provide proof of the filing of his foreclosure action so that he could be reimbursed for his expenses.  BX 103 at 13-14; 3/19/07 Tr. at 637-38 (Mitchum).  Mr. Mitchum informed Respondent what OTR had instructed, and then Respondent prepared a statement, dated August 30, 2005, that he filed with OTR.  BX 103 at 4-5; 3/19/07 Tr. at 638, 640-41, 643 (Mitchum).  In the statement, Respondent represented that Mr. Mitchum had incurred $504 in expenses and $1,850 in legal fees relating to the property.  BX 103 at 4-5.  Mr. Mitchum actually had paid Respondent $1,800 in fees to litigate all three of the properties at their initial meeting.  Further, on August 30, 2005, Respondent had not filed any actions on behalf of Mr. Mitchum –all three were filed on September 2, 2005 (BX 108 at 4; BX 109 at 4; and BX 110 at 3) – and therefore could not have incurred any filing, service or process fees as he represented in his statement on August 30th.  BX 103 at 4-5.

134.    Around this time, Respondent assured Mr. Mitchum that he would receive reimbursement for his legal fees for the property, and that he would send Mr. Mitchum a check.  3/19/07 Tr. at 640, 646 (Mitchum).  Mr. Mitchum eventually received reimbursement for his deposit on the property, but was never reimbursed for his legal fees.  3/19/07 Tr. at 641-42, 646 (Mitchum).

135.    Respondent did not file complaints with respect to any of Mr. Mitchum's properties until September 2, 2005, which was after the statute of limitations had expired.  BX 108-110.  Nevertheless, when Respondent provided Mr. Mitchum a copy of his August 30, 2005 statement to OTR, Respondent also

provided Mr. Mitchum with the first pages of what purported to be three

complaints that Respondent had filed with the D.C. Superior Court on behalf of Mr.

Mitchum in connection with the three properties.  3/19/07 Tr. at 639-40 (Mitchum);

BX 103 at 6-9.  Each of the documents had what purported to be a stamp of the

D.C. Superior Court showing that the actions had been filed on July 14, 2005.

*Compare* BX 103 at 6-9 *with* BX 108-110.  Each of the falsified documents reflect

the same civil action number which was not the number assigned to any of the

cases filed in September, but rather was the civil action number assigned to another

tax sale case that Respondent had filed on behalf of another client, on July 14,

2005.  *Assefa v. Freeman, et al.,* No. 05CA005700.  BX 111 at 3-12.  As to the

cases actually filed by Respondent on behalf of Mr. Mitchum on September 2,

Respondent backdated each of the complaints to August 10, 2005, one day before

the lapse of the one year period for filing the actions.  BX 108 at 8; BX 109 at 8;

and BX 110 at 7.

    136.    With respect to the Minnesota Avenue property that was to be

redeemed (4700 Minnesota Avenue), Respondent filed a Praecipe with the court in

November 2005, dismissing the action.  BX 110 at 13.  In the Praecipe, Respondent

represented that all fees, costs, and expenses incurred by Plaintiff in the prosecution

of the matter had been paid.  *Id.*  However, Mr. Mitchum had not been reimbursed

his attorney's fees.  3/19/07 Tr. at 640-41 (Mitchum).  Mr. Mitchum was not aware

that Respondent had filed the action or later filed a Praecipe dismissing it.  3/19/07

Tr. at 650-51 (Mitchum).

137.    Respondent failed to serve any of the defendants or otherwise pursue the other two cases.  On April 19, 2006, the date of the first status hearing, the court dismissed the actions with prejudice because they were filed after the expiration of the statute of limitations.  BX 108 at 1; BX 109 at 1; 3/19/07 Tr. at 648-49 (Mitchum).  Respondent did not advise Mr. Mitchum of this development. 3/19/07 Tr. at 645, 648, 651 (Mitchum).

138.    In April 2006, Mr. Mitchum filed an ethical complaint against Respondent.  BX 103.  When he filed the ethical complaint, he was unaware of the status of his two remaining properties, and he sought a refund of his attorney's fees. *Id.*  Respondent never refunded Mr. Mitchum's funds prior to Mr. Mitchum filing a complaint with Bar Counsel.  3/19/07 Tr. at 640-42 (Mitchum).  Mr. Mitchum lost his ability to obtain title to the two unredeemed properties or reimbursement of the funds that he had paid for the properties, totaling $1,111.83, with interest.

## COUNT TWELVE – TONY DATES

139.    Tony S. Dates has been self-employed as a handyman for the last seven years.  Prior to that, Mr. Dates was a mail handler for the United States Postal Service.  3/19/07 Tr. at 451 (Dates).  Mr. Dates participated for the first time in the Tax Sale in 2004 and was the highest bidder on two properties, for which he paid $1,956.13 and $1,000.  3/19/07 Tr. at 452-53 (Dates); BX 113 at 1, 3-4; BX 116 at 1-12.  OTR issued certificates to Mr. Dates for the two properties on August 11, 2004 and August 24, 2004.  BX 113 at 3-4; 3/19/07 Tr. at 453 (Dates).

140.    Mr. Dates received Respondent's standard solicitation letter, and met with him on March 24, 2005, at which time he retained him to file actions with

respect to the two properties. 3/19/07 Tr. at 454-456 (Dates). Mr. Dates gave

Respondent a check for $3,300, representing legal fees of $1,500 for each property,

plus expenses, minus an adjustment, all as set forth in an invoice Respondent

provided to Mr. Dates when they met. However, Respondent did not provide Mr.

Dates with a retainer agreement. BX 113 at 5; BX 116 at 15-16; 3/19/07 Tr. at

456-57 (Dates).

141.    Respondent deposited the funds into his trust account on April 13,

2005. BX 2 at 25; BX 3 at 1. Respondent took and used the funds for himself that

Mr. Dates had paid him without obtaining Mr. Dates' permission to do so. By

August 9, 2005, there was less than $100 in Respondent's trust account. BX 2 at

25-30; 3/19/07 Tr. at 467 (Dates). Also, by that date, Respondent had filed two

form complaints on Mr. Dates' behalf that he never pursued.

142.    Mr. Dates tried to communicate with Respondent on numerous

occasions after their initial meeting, but Respondent did not return his calls.

3/19/07 Tr. at 457-60; 474, 480 (Dates); BX 113 at 1. Finally, in approximately

August 2005, Mr. Dates caught Respondent at his office. 3/19/07 Tr. at 458-460

(Dates). Respondent provided Mr. Dates copies of the title reports for the

properties, which CII Title had done in June 2005. 3/19/07 Tr. at 460-61 (Dates).

He also provided Mr. Dates with a copy of a complaint that Respondent supposedly

had filed on May 31, relating to one of the properties, at S Street, S.E. BX 116 at

18-24. The complaint that Respondent provided to Mr. Dates had not been filed

with the D.C. Superior Court, although it bore a stamp purporting to be the court's.

BX 116 at 18-24; 3/19/07 Tr. at 464-65 (Dates).

143.    Actually, Respondent had filed a complaint for the S Street property with the court on July 1, 2005.  BX 117 at 4-13.  Respondent dated the complaint May 31, 2005, which predated the title report attached to the complaint and which Respondent certified had been performed.  BX 117 at 6, 10.  Respondent did not provide Mr. Dates a copy of the actual complaint he had filed with the court; the only information he provided to Mr. Dates was that the District was attempting to get the property back.  3/19/07 Tr. 464, 467-68, 479-80 (Dates).

144.    Respondent filed another complaint on July 1, 2005 with the court on behalf of Mr. Dates with respect to the property located at B Street, S.E., although he backdated it to May 31, 2005.  BX 118 at 8.  He subsequently refiled the complaint relating to the property on September 15, 2005, more than a month after the statutory deadline for filing the action.  BX 119.  Respondent falsely backdated the second complaint to August 10, 2005.  BX 119 at 7.

145.    Mr. Dates and Respondent agreed to meet on January 24, 2006 at Respondent's new office, but Respondent failed to show up, and did not communicate with Mr. Dates thereafter.  BX 113 at 1; BX 116 at 14; 3/19/07 Tr. at 466, 473-74, 480 (Dates).  On February 15, 2006, Respondent filed a Praecipe with the court in the S Street matter, requesting that the court dismiss the case in its entirety.  BX 117 at 18.  Respondent did not advise Mr. Dates that he had dismissed the action, and Mr. Dates received no information that the property owner had redeemed.  In addition, Mr. Dates had not received any reimbursement for his deposit on the property or his attorney's fees and expenses.  3/19/07 Tr. at 469-70 (Dates).

146.    The actions Respondent filed for the B Street property were also
dismissed.  The court dismissed the first-filed action at a status hearing on February
8, 2006 pursuant to Superior Court Civil Rule 4(o).  BX 118 at 1.  Respondent did
not advise Mr. Dates of the status hearing or the dismissal, and took no steps to
reinstate the action.  3/19/07 Tr. at 470-72 (Dates); BX 118.

147.    In the second-filed case, the court issued an order *sua sponte* on
April 27, 2006 dismissing the case with prejudice because it was filed after the
statute of limitations had expired.  BX 119 at 13.  Respondent did not advise Mr.
Dates that the second action also had been dismissed.  3/19/07 Tr. at 472 (Dates).

148.    In April 2006, Mr. Dates filed an ethical complaint against
Respondent with Bar Counsel.  BX 113.  At the time, he did not know the status of
his two properties.  3/19/07 Tr. at 473 (Dates).

149.    Mr. Dates lost his ability to obtain title to the two properties and
forfeited his deposits, totaling $2,956.13.  BX 113 at 3-4.  Mr. Dates also lost the
$3,300 he had paid to Respondent.  3/19/07 Tr. at 472-74, 481-83 (Dates).

## COUNT THIRTEEN – ANN CARTHERN

150.    Ann Carthern is a Nurse for Walter Reed Army Medical Center,
where she has worked for the past 23 to 24 years.  1/24/07 Tr. at 224 (Carthern).
She participated in the Tax Sale for the first time in 2002.  1/24/07 Tr. at 224-25
(Carthern).  Ms. Carthern was the highest bidder for a property on 2225 Chester
Street, S.E., a vacant lot on which she hoped to build a house.  She paid a deposit of
$2,831.01.  1/24/07 Tr. at 225-27, 246 (Carthern); BX 124 at 14.  Sometime after

July 19, 2002, the date the Tax Sale took place, OTR issued Ms. Carthern a

Certificate of Sale for Taxes for the property.  BX 124 at 14.

151.  Ms. Carthern understood that there was a one year deadline to file an

action and knew she needed a lawyer.  1/24/07 Tr. at 227, 252-53 (Carthern).  Ms.

Carthern eventually contacted CII Title, which referred Ms. Carthern to

Respondent.  1/24/07 Tr. at 254 (Carthern).  Ms. Carthern contacted Respondent,

and met with him on July 11, 2003.  1/24/07 Tr. at 228-30, 254.  At their meeting,

Respondent provided Ms. Carthern his standard retainer agreement setting forth his

fee of $1,200 per property for "preparation and representation of an uncontested tax

sale redemption foreclosure suit."  BX 121 at 4-5; 1/24/07 Tr. at 228-30 (Carthern).

Ms. Carthern signed the retainer agreement and gave Respondent a check for

$1,690 dated July 11, 2003.  BX 121 at 5, 10; 1/24/07 Tr. at 230-31 (Carthern).

The $1,690 was to cover not only the $1,200 fee for the suit, but also the costs that

Respondent represented would be incurred.  BX 121 at 4, 11.

152.    On November 10, 2003, Respondent deposited the funds into his

attorney trust account.  BX 2 at 8; BX 3 at 1.  He then withdrew Ms. Carthern's

funds and used them for himself.  By August 2004, Respondent's trust account was

overdrawn.  BX 2 at 17.  During the time Respondent represented Ms. Carthern, he

never sought permission to take any portion of her payment as an earned fee.

1/247/07 Tr. at 236, 243 (Carthern).

153.  Respondent filed a form complaint for Ms. Carthern's matter on July

15, 2003.  BX 124 at 9-20.  Although Respondent arranged for service on the

District of Columbia, he never served the other defendant named in the action.  BX

124 at 1-2; BX 124 at 25-30.  After Ms. Carthern paid Respondent, she did not hear

from him or receive any documents.  1/24/07 Tr. at 231-32 (Carthern).  She called

his office on several occasions, but generally was unable to reach him.  Respondent

failed to return most of her calls.  1/24/07 Tr. at 231-34 (Carthern).

154.    On April 6, 2004, on an occasion when Ms. Carthern was able to

speak to Respondent, he advised her that a hearing was scheduled in the matter for

June 18, 2004.  BX 121 at 10.  Respondent told Ms. Carthern that she should not

attend as that was what she was paying him to do.  1/24/07 Tr. at 231 (Carthern).

In addition, Respondent never advised Ms. Carthern that he was having difficulty

serving one of the defendants.  1/24/07 Tr. at 239 (Carthern).  Rather, Respondent

told her that everything was okay and that he would provide her with the

documents when the case was settled.  1/24/07 Tr. at 232-33, 236 (Carthern).

155.    In or around late January 2005, Ms. Carthern received a letter dated

January 28, 2005 from OTR advising that because the Certificates of Sale for the

2001 and 2002 Tax Sales did not clearly state the date the Certificates were issued,

the Office was providing notice that the one year period for filing would expire on

March 28, 2005.  BX 121 at 3.  Ms. Carthern thereafter went to Respondent's office

and, although he was not there, was able to reach him through his secretary, who

contacted him on his cell phone.  Respondent assured Ms. Carthern that everything

was fine and that she need not worry.  BX 121 at 3; 1/24/07 Tr. at 234 (Carthern).

156.    The last action Respondent had taken in Ms. Carthern's matter was

in June 2004, when he filed a motion to amend the order of publication, which the

court granted on July 6, 2004.  BX 124.  Thereafter, on April 20, 2005, the court

59

dismissed the action, pursuant to Superior Court Civil Rule 4(m), which sets forth

the time limit for service. BX 124 at 1. On May 5, 2005, Respondent filed a

motion to vacate the entry of judgment of dismissal, contending that Mr. Cummins

had been unable to serve the other defendants. BX 124 at 41. Respondent also

advised the court of several contacts with Stephanie Britton "to ensure a full and

complete settlement." BX 124 at 42. Ms. Carthern knew nothing about the

dismissal or these settlement negotiations. 1/24/07 Tr. at 239-40 (Carthern).

157.    On May 12, 2005, the court granted the motion and vacated the

judgment of dismissal. The court further directed plaintiff to file a motion to

amend by June 15, 2005, and scheduled a status hearing for August 3, 2005. The

clerk mailed the order to Respondent's office address. BX 124 at 49-50.

Respondent did not file a motion to amend by June 15, 2005 or anytime thereafter.

BX 124 at 1. The court mailed Respondent another notice on July 18, 2005 for the

status hearing on August 3, 2005. BX 124 at 51. Respondent failed to attend the

hearing. At the hearing, the court noted that the motion to amend was due on June

15 and dismissed Ms. Carthern's action for want of prosecution. Respondent did

not advise Ms. Carthern that her action had been dismissed and took no steps to

reinstate it. BX 124 at 1; 1/24/07 Tr. at 241-42 (Carthern).

158.  During 2005, Ms. Carthern was continuously trying to reach

Respondent, but was unable to do so. On July 5, she finally was able to reach

Respondent, who told her that everything with her matter was okay. 1/24/07 Tr. at

233-36 (Carthern). Ms. Carthern did not learn that her case had been dismissed

until after filing her ethical complaint in May 2006.  1/24/07 Tr. at 241-42, 247 (Carthern).

159.  On May 8, 2006, Ms. Carthern filed an ethical complaint against Respondent with Bar Counsel.  She did not know the status of her matter at that time.  1/24/07 Tr. at 235, 238-39 (Carthern).  OTR advised Ms. Carthern that she could not be refunded the money she paid for the property because her court action was dismissed.  1/24/07 Tr. at 242 (Carthern).  In addition to losing the $2,831.01 she paid for the property, BX 124 at 14, Ms. Carthern lost the $1,690 that she paid to Respondent.  1/24/07 Tr. at 242 (Carthern).

## COUNT FOURTEEN – ROBERT WILEY

160.    Robert Wiley is a resident of the District of Columbia and has been retired since 2004.  3/19/07 Tr. at 566 -67 (Wiley).  Mr. Wiley was the highest bidder on three properties at the 2004 Tax Sale, two of which were redeemed by their owners after the sale.  3/19/07 Tr. at 567-68 (Wiley).  On August 11, 2004, OTR issued a Certificate of Sale for Taxes to Mr. Wiley for the third property, located at the 1100 block of Park Road, N.W.  BX 129 at 2.

161.    In late December 2004, Mr. Wiley received the December 22, 2004 form solicitation letter that Respondent had sent to a number of tax sale purchasers, describing his years of experience in tax sale matters.  3/19/07 Tr. at 570 (Wiley).  Mr. Wiley contacted Respondent, who said that his fee would be $2,100 and that he would need a copy of Mr. Wiley's tax certificate; he also scheduled an appointment to meet Mr. Wiley. 3/19/07 Tr. at 570-71 (Wiley).

162.    On the appointed date, in April 2005, Mr. Wiley was advised by the receptionist that Respondent was in a meeting and that Mr. Wiley should leave his check and paperwork, which Mr. Wiley did.  3/19/07 Tr. at 571 (Wiley).  In their initial telephone conversation, Respondent did not explain how he had calculated his fee of $2,100, but Mr. Wiley understood that it would cover the title search and whatever other steps were necessary to file his action.  Respondent never provided Mr. Wiley a retainer agreement or other writing setting forth the basis or rate of Respondent's fee.  3/19/07 Tr. at 572, 574, 585 (Wiley).

163.    Respondent endorsed the check and deposited it into his trust account on April 29, 2005.  BX 2 at 25; BX 3 at 2.  However, Respondent took the funds and used them for personal expenses.  By August 9, 2005, the balance in Respondent's trust account was less than $100.  BX 2 at 30.  As discussed below, Respondent did not take any steps to pursue Mr. Wiley's matter until September 2005, after the expiration of the statute of limitations.

164.    After receiving and negotiating Mr. Wiley's check, Respondent never communicated with Mr. Wiley or sent him any paperwork.  3/19/07 Tr. at 574 (Wiley).  Mr. Wiley called Respondent on a regular basis after April 2005.  When Mr. Wiley was able to reach Respondent in mid-July, Respondent assured him that he had taken care of everything and that he would send Mr. Wiley documentation.  3/19/07 Tr. at 575 (Wiley).  Months passed without Respondent sending Mr. Wiley the promised documents.  *Id.*

165.    By October 2005, Mr. Wiley had only been able to reach Respondent on one occasion despite leaving numerous messages for him.  During the one telephone call, Respondent advised Mr. Wiley that he was moving his office and would send Mr. Wiley

the paperwork.  3/19/07 Tr. at 575-76 (Wiley).  Respondent never provided Mr. Wiley

any documentation and failed to communicate with Mr. Wiley any further.  Mr. Wiley

tried to contact Respondent from December 2005 to May 2006 on numerous occasions,

but could not reach him and was unable to leave messages because Respondent's voice

mailbox was full.  3/19/07 Tr. at 576-78 (Wiley); BX 126 at 2.

166.    In May 2006, Mr. Wiley filed an ethical complaint against Respondent

with Bar Counsel.  BX 126.  At the time, Mr. Wiley did not know the status of his matter.

However, Respondent had filed a complaint with the court to foreclose the right of

redemption on the property, but did not do so until September 2, 2005, after the one-year

statute of limitations had expired.  BX 130.  Respondent falsely dated the complaint

August 24, 2005, and attached a falsified OTR certificate to the complaint.  BX 130 at 4-

9.  *Compare* BX 129 at 2 *with* BX 130 at 9.  The falsified certificate that Respondent

attached to the complaint had a title and effective date different from the actual certificate

issued to Mr. Wiley.  Further, the falsified certificate, BX 130 at 9, set forth an interest

rate of 114% per month, and stated that an action could be brought after July 19, 2004,

which was before the date of the actual certificate.

167.    In addition to filing a falsified certificate with the court, Respondent

certified in the complaint that a title search had been performed.  BX 130 at 6.

Respondent, however, did not attach a title report to the complaint.  Mr. Wiley has not

seen any documents or evidence that a title search was ever done, and when he asked

Respondent about the search, Respondent failed to respond.  3/19/07 Tr. at 576, 579-80

(Wiley).  Mr. Cummins stated that his company, CII Title, LLC, did not perform a title

search for Mr. Wiley's property.  1/23/07 Tr. at 95 (Cummins).

168.    Respondent never paid the filing fee associated with Mr. Wiley's late-filed complaint.  The check that Respondent gave the court for the filing fee was returned for insufficient funds.  BX 10.  Other than filing the form complaint, which he did after the limitations period, Respondent did nothing to pursue Mr. Wiley's case, including serving any of the defendants.  BX 130 at 1-2.  At the first status hearing on April 12, 2006, the court dismissed Mr. Wiley's action because it was filed beyond the statute of limitations.  BX 130 at 1.  Respondent never advised Mr. Wiley that the court had dismissed the action, although he was present at the hearing.  3/19/07 Tr. at 580-81 (Wiley); BX 130 at 1.

169.    Respondent failed to refund the $2,100 that Mr. Wiley paid him in April 2005.  3/19/07 Tr. at 582 (Wiley).  Mr. Wiley lost the right to obtain title to the property or reimbursement of the purchase price of $1,048.37.  3/19/07 Tr. at 582, 585-86 (Wiley).  On March 7, 2007, the Clients' Security Fund notified Mr. Wiley of its determination to reimburse him and Mr. Lyle, with whom he had purchased the property, $2,100, based on its finding that they had suffered a reimbursable loss due to Respondent's dishonesty in not completing legal work of value for them.  BX 129; 3/19/07 Tr. at 583 (Wiley).

## COUNT SIXTEEN – RAOUL JOHNSON

170.    Raoul Johnson has been employed as a Courier for Federal Express for six years.  3/19/07 Tr. at 349-50 (R. Johnson).  He participated in his first Tax Sale in July 2002 and was the highest bidder ($1,551.48) on property at 4421 9th Street N.W.  3/19/07 Tr. at 350-51 (R. Johnson).  OTR issued Mr. Johnson a Certificate of Sale for Taxes for the property.  BX 144 at 8.

171.    Approximately three months later, Mr. Johnson had a title search done by CII Title.  3/19/07 Tr. at 352 (R. Johnson).  The title company referred Mr. Johnson to the Respondent to handle his legal issues.  3/19/07 Tr. at 352-53, 386-87 (R. Johnson).  At their initial meeting on or about February 21, 2003, Respondent explained the process and stated that he would charge a flat fee to start and complete the process.  3/19/07 Tr. at 354-55 (R. Johnson).  Mr. Johnson understood from the meeting and his own research that if he did not get title to the property he would be reimbursed the deposit he made, with 18% interest on the portion representing the tax deficiency, plus reimbursement of his attorney's fees and other expenses.  He felt it was a "win-win" situation.  3/19/07 Tr. at 380-81 (R. Johnson); BX 144 at 4-5.

172.    Respondent provided Mr. Johnson his standard retainer agreement.  BX 144 at 6-7.  The retainer agreement set forth a fee of $1,200 per property for "preparation and representation of an uncontested tax sale redemption foreclosure suit."  BX 144 at 6-7.  Mr. Johnson paid Respondent $1,700 by check dated February 21, 2003, $500 more than the fee required under the retainer agreement.  BX 136 at 8; 3/19/07 Tr. at 356-57 (R. Johnson); BX 144 at 6-7.

173.    Respondent deposited the funds into his trust account on February 21, 2003.  BX 2 at 1; BX 3 at 1.  He then took and used the funds for himself.  By August 2004, Respondent's trust account was overdrawn, although his representation of Mr. Johnson would not conclude for another 14 months.  BX 2 at 17; BX 145.  Respondent never sought Mr. Johnson's permission to withdraw the funds or any portion thereof, but Mr. Johnson assumed that once he wrote the check, it was Respondent's to cash.  3/19/07

Tr. at 358, 382-83, 397.  Mr. Johnson understood that the fee was for the entire representation.  3/19/07 Tr. at 397.

174.    After Respondent received Mr. Johnson's funds, he never sought to communicate or contact Mr. Johnson.  Initially, Mr. Johnson was able to reach Respondent, but as time went on, Mr. Johnson could not get a hold of him.  Over a period of approximately two years, Respondent returned only one or two of Mr. Johnson's many calls.  3/19/07 Tr. at 360-62, 364-65 (R. Johnson); BX 136 at 1-4.  Mr. Johnson also visited Respondent's office on five to seven occasions, but Respondent was never there.  3/19/07 Tr. at 361-62 (R. Johnson); BX 136 at 3-4.  In a letter to Respondent dated October 19, 2004, Mr. Johnson expressed his dissatisfaction with the manner in which Respondent had treated him.  Respondent failed to reply to the letter.  BX 136 at 5; 3/19/07 Tr. at 364-65 (R. Johnson).

175.    When he filed his initial complaint with Bar Counsel in January 2005, Mr. Johnson had limited information about the status of his matter.  BX 136; 3/19/07 Tr. at 383-84 (R. Johnson).  Mr. Johnson knew that the property owner was seeking to redeem and had paid the back taxes, but Mr. Johnson had not received any reimbursement for his attorney's fees.  3/19/07 Tr. at 363 (R. Johnson); BX 136 at 3-4.

176.    Respondent filed a complaint with the court on behalf of Mr. Johnson on April 28, 2003.  BX 145 at 12-16.  The complaint was the form complaint that Respondent had filed in other actions.  Respondent never provided Mr. Johnson a copy of the complaint or other pleadings, motions, or orders.  3/19/07 Tr. at 360 (R. Johnson).

177.    On August 18, 2003, three days after he was served with process, the property owner, Bernard McIntyre, filed an answer stating that all property taxes had

been paid.  BX 145 at 22.  Respondent filed a motion for reimbursement of Mr.

Johnson's legal fees ten months later, on June 18, 2004.  BX 145 at 24.  By order dated

July 6, 2004, the court allowed $1,200 in fees.  BX 145 at 43.  Following a status hearing

on September 3, 2004 at which the court advised Respondent to file a motion for

judgment, Respondent did so, seeking reimbursement of attorney's fees and expenses.

BX 145 at 5, 36-44.

178.     By order dated February 7, 2005, the court denied the motion, ruling that

the proper form of relief is foreclosure in the event the property owner failed to reimburse

plaintiff for his attorney's fees and expenses.  BX 145 at 45-46.  On March 30, 2005,

Respondent filed a motion for summary judgment seeking to foreclose the right of

redemption.  Upon proper service, the court granted the motion.  BX 145 at 61-64.

179.     Respondent failed to inform Mr. Johnson of the status of his case, or

Respondent's attempt to settle the case.  3/19/07 Tr. 365-67, 388 (R. Johnson); BX 138.

Only when Bar Counsel became involved did Respondent write a letter (to Bar Counsel)

on February 21, 2005, explaining the events.  BX 138.  After Mr. Johnson received a

copy of the letter from Bar Counsel, he tried to contact Respondent, but Respondent did

not take or return his calls.  3/19/07 Tr. at 368 (R. Johnson); BX 139.  In April 2005, Mr.

Johnson renewed his ethical complaint because Respondent still had failed to

communicate with him.  BX 139.

180.     In early July 2005, Mr. Johnson received notice from the court for a

hearing set for September 14, 2005.  BX 144 at 9; 3/19/07 Tr. at 369 (R. Johnson).  Mr.

Johnson decided to give up trying to communicate with Respondent and to go to the

hearing himself.  3/19/07 Tr. at 369 (R. Johnson).

181.    Bar Counsel had sent Respondent four letters requesting him to respond to

Mr. Johnson's renewed complaint – on April 25, May 19, June 15, and June 27, 2005.

BX 140.  On July 11, 2005, Bar Counsel received a letter from Respondent dated July 8,

2005.  BX 141.  In his letter, Respondent made a number of misrepresentations, stating:

a) that he had communicated with Mr. Johnson, kept him up to date on the case, and had

no record of any unreturned calls.  BX 142; 3/19/07 Tr. at 370, 372; b) that his assistant

had sent a letter to Mr. Johnson with an update on his case, which was attached to

Respondent's letter.  BX 142; 3/19/07 Tr. at 371-72.  Mr. Johnson had never received this

letter, which was backdated to February 21, 2005 and was purportedly signed by an

assistant with whom Mr. Johnson had no prior contact.  The letter listed court dates that

do not correspond to those in the court file.  *Id.,* BX 145; and c) that he had not neglected

Mr. Johnson's matter, and had spoken to him on several occasions regarding the case.

BX 142; 3/19/07 Tr. at 366, 371-72, 393.

182.    Mr. Johnson appeared at the court on September 14, 2005, but the hearing

was continued to October 19, 2005.  3/19/07 Tr. at 370, 372, 377 (R. Johnson); BX 145 at

59-60.  At the rescheduled hearing, the court granted the motion for judgment to

foreclose the right of redemption based on the property owner's failure to pay Mr.

Johnson's attorney's fees and expenses, and ordered the Mayor to execute and deliver a

Deed in Fee Simple to Mr. Johnson.  BX 145 at 61-64; 3/19/07 Tr. at 372 (R. Johnson).

183.    Although Respondent told Mr. Johnson that he would provide him a copy

of the court's order and help him take the steps necessary to obtain title to the property,

he never did.  3/19/07 Tr. at 373, 378, 389 (R. Johnson).  Over the next few months, Mr.

Johnson pursued the matter on his own by obtaining the necessary paperwork and taking

the steps necessary to have title to the property transferred to him.  3/19/07 Tr. at 360,

373-74, 381-82 (R. Johnson); BX 144 at 12-13.  Mr. Johnson indicated that he went

through considerable "internal turmoil" as a result of his dealings with Mr. Johnson and

having to pursue the case on his own.  3/19/07 Tr. at 385 (R. Johnson).

### COUNT SEVENTEEN – USE OF TRUST AND CHECKING ACCOUNTS

184.    Respondent opened an attorney trust account at Citibank on February 6,

2003.  BX 2; 3/20/07 Tr. at 818, 820-22 (Anderson).  From February 6, 2003 through

May 31, 2005, Respondent deposited funds into the attorney trust account, including the

funds he received on behalf of the 15 clients who testified at the hearing, BX 3, as well as

other clients who retained Respondent to pursue property tax sale cases.  *Compare* BX 2

(reflecting funds by clients deposited into attorney trust account) *with* BX 9 (list of cases

Respondent filed with D.C. Superior Court on and after August 25, 2005, all of which

were dismissed).  At least $214,912.39 of the $334,482.62 deposited into Respondent's

attorney trust account were funds from clients.  BX 1.  Respondent also made deposits of

cash into his attorney trust account ($11,360), and transferred funds from his business

checking account (hereinafter, "checking account") into his attorney trust account

($1,071.50).  BX 1.  The source of approximately $107,000 in additional funds deposited

into Respondent's attorney trust account could not be determined either because Citibank

produced illegible or no records for a particular transaction reflected in the monthly

statement, or because Bar Counsel was unable to match the payee on a check with the

name of a party in the list of D.C. Superior Court cases in which Respondent was

counsel.  BX 18 at 15-21 (list of cases in which Respondent was counsel); 3/20/07 Tr. at

837 (Anderson).

185.    Respondent used the funds in his trust account to pay his personal and business expenses, beginning on February 7, 2003, the day after he opened the account, and continuing through May 2006.  BX 2 at 1, 35-38.  Among other expenditures, Respondent used funds in his attorney trust account to pay for (1) groceries ($381.53); (2) insurance ($1,098.12); (3) home mortgage payments ($12,911.28); (4) automobile payments ($320.11); (5) federal income taxes and H&R Block ($4,167); and (6) utility payments for gas, electric and telephone services ($4,950).  BX 1; BX 2.

186.    Respondent withdrew $35,750 in cash from his attorney trust account, and wrote himself checks totaling $9,700.  BX 1; BX 2.  Respondent also transferred more than $150,000 from his attorney trust account to the checking account between May 5, 2003 and November 2005.  BX 1; BX 4; see also BX 2 at 3-34; BX 5 at 1-43.  The transfers from the attorney trust account to the checking account, most of which were in round numbers, were done electronically; therefore, there is nothing in the bank records to reflect that any of the transfers were for a particular client matter.  BX 2; BX 5; 3/20/07 Tr. at 818, 827-30, 840-42 (Anderson).

187.    Respondent also used the checking account to pay for personal expenses. Respondent funded the checking account primarily, if not almost entirely, with funds from his attorney trust account.  BX 4; BX 5; 3/20/07 Tr. at 842-47 (Anderson).  Most of the transfers from Respondent's attorney trust account to his checking account occurred when Respondent's checking account was low on funds or overdrawn.  BX 5. Respondent's checking account was overdrawn on numerous occasions, including in June 2003, a month after Respondent opened the account.  BX 5 at 1, see also BX 5 at 3-13, 17-18, 20, 22, 27, 30, 32, 34-35, 37-45.  On February 10, 2006, Citibank closed

Respondent's checking account because it had been overdrawn for more than a month. BX 5 at 45.

188.    By July 2004, Respondent's attorney trust account also was low on funds (*i.e.,* the balance was less than $1,000), and thereafter was overdrawn on a number of occasions, including in August 2004, October 2004, December 2004, January 2005, September 2005, December 2005, March 2006, and May 2006.  BX 2 at 17, 20, 21, 32, 35, 36, 38.

189.    Between late August and mid-September 2005, Respondent wrote six checks payable to the D.C. Superior Court that were returned for insufficient funds.  BX 6; BX 10; 3/20/07 Tr. at 733-34 (Privott).  On or about August 25, 2005, Respondent gave the D.C. Superior court check no. 1193 in the amount of $1,170 drawn on his attorney trust account, BX 6 at 4, to pay the $130 filing fee for nine actions he filed on behalf of tax sale purchasers, including two actions filed on behalf of Mr. Edmonds and one action filed on behalf of Mr. Bullock or Micland Co.  BX 9; BX 10; 3/20/07 Tr. at 724-25 (Privott).  On August 25, 2005, the beginning balance in Respondent's attorney trust account was $1,216.40, but had dropped to $1,086.40 by the end of the day.  BX 2 at 31.  Over the next several days, Respondent withdrew the rest of the funds in his attorney trust account.  BX 2 at 31.  On September 2, 2005, the date the check for $1,170 was presented for payment, Respondent's trust account was overdrawn by more than $2,000. BX 2 at 32; 3/20/07 Tr. at 849 (Anderson).  Respondent's check for $1,170 was returned for insufficient funds.  BX 6 at 4.

190.    The court sent notices to Respondent at both his former and new office addresses requesting him to reimburse the court the filing fees and to pay the $45 return

check fee incurred by the Court.  BX 6 at 3; 3/20/07 Tr. at 717-18 (Privott) Respondent failed to pay the amounts owed or respond to the court's notices.  3/20/07 Tr. at 717-18, 720 (Privott).

191.    Within two weeks of Respondent's providing the D.C. Superior Court the $1,170  check drawn on his attorney trust account that was returned for insufficient funds, Respondent wrote the court five additional checks drawn on his checking account that were returned for insufficient funds.  3/20/07 Tr. at 733 (Privott).  The first check, check no. 1201, was for $10,790 to pay the $130 filing fee in 83 actions that Respondent filed with the D.C. Superior Court on September 2, 2005, including two actions filed on behalf of Mr. Sims, one action on behalf of Mr. Wiley, one action on behalf of Mr. Walker, and three actions on behalf of Mr. Mitchum.  BX 6 at 6; BX 9; BX 10; 3/20/07 Tr. at 724 (Privott).  Although check no. 1201 was to pay the filing fees for the 83 cases Respondent filed on September 2, 2005, Respondent dated the check September 12, 2005.  BX 6 at 6. From September 2, 2005 through September 19, 2005, the date the check was presented for payment, Respondent never had a balance of more than $500 in his checking account. BX 5 at 36-37.  Respondent made five deposits into the account between September 2 and 13, none of which caused the balance to exceed $500.  BX 5 at 36.  Respondent's check for $10,790 (check no. 1201) was returned for insufficient funds.  BX 6 at 6.

192.    Respondent wrote four additional checks for the D.C. Superior Court drawn on his checking account, in September 2005, that were returned for insufficient funds:  (1) Check no. 1202 in the amount of $1,300, dated September 2, to pay the filing fee for 10 cases that Respondent filed on September 2, 2005.  BX 6 at 6; BX 10; 3/20/07 Tr. at 724 (Privott); (2) Check no. 1204 in the amount of $20, dated September 14, 2005,

to pay the fee associated with a motion in a case filed in 2004.  BX 6 at 6; 3/20/07 Tr. at

722 (Privott); (3) Check no. 1205 in the amount of $910, dated September 15, for the

filing fees for seven cases that Respondent filed on September 15, including the case

involving Mr. Dates.  BX 6 at 10; BX 9; BX 10; 3/20/07 Tr. at 722 (Privott); and (4)

Check no. 1206 in the amount of $40, dated September 15, 2005, to pay the fee

associated with motions in two earlier-filed cases, BX 6 at 13; BX 10 at 2; 3/20/07 Tr. at

724 (Privott).

     193.    The court sent Respondent notices with respect to these additional checks,

requesting Respondent to reimburse the court for the amounts owed as well as to pay the

$45 return check fee for each check.  BX 6; 3/20/07 Tr. at 717-18 (Privott).  Respondent

failed to pay the amounts owed or respond to the court's letters.  3/20/07 Tr. at 717-18,

720 (Privott).

     194.    The court later reported Respondent's actions to Bar Counsel.  BX 6;

3/20/07 Tr. at 718 (Privott).  Although Respondent was served with the court's letters, he

made no effort to pay the court.  To date, the court is still owed $14,230 for filing fees

associated with actions or motions that Respondent filed between August 25 and

September 15, 2005, and an additional $270 (6 x $45) for returned check fees.  3/20/07

Tr. at 719, 723-25, 733-34, 737 (Privott).

     195.    The court did not reject the 109 complaints that Respondent filed between

August 25 and September 15, 2005 for failure to pay the filing fees.  *See e.g.*, BX 76;

3/20/07 Tr. at 732-33 (Privott).  However, all 109 cases were eventually dismissed by the

court.  BX 9; 3/20/07 Tr. at 869-72, 878, 880 (Anderson).  The court dismissed 105 of the

109 cases filed by Respondent during this period because they were filed outside the

statute of limitations for failure to prosecute, or both.  BX 9; 3/20/07 Tr. at 871

(Anderson).  The remaining four cases, which included one of Mr. Mitchum's cases,

were dismissed based on Praecipes that Respondent filed with the court.  BX 9.

## LACK OF COOPERATION IN INVESTIGATION

196.    Respondent submitted a response to only one of the 17 matters docketed

for investigation, the one involving Mr. Johnson.  BX 141.  Respondent submitted his

response after receiving four letters from Bar Counsel imploring Respondent to

communicate with his client.  BX 137; BX 138.  In his response to Mr. Johnson's

renewed complaint, Respondent made certain false statements and attached a letter which

he falsely represented had been sent to Mr. Johnson.  See ¶181 above.

197.    With respect to the 16 other matters docketed for investigation,

Respondent failed to submit a response to Bar Counsel, notwithstanding several letters

requesting him to respond and reminding him of his ethical obligation to comply with Bar

Counsel's request for information.  As set forth below, Bar Counsel sent letters to both

Respondent's business and residential addresses requesting a response, and enclosing the

ethical complaints and all attachments submitted by his clients and the court.  Bar

Counsel sent most of the letters to Respondent by certified as well as regular mail and/or

personally served Respondent with the letters and documents.  In addition to sending

Respondent copies of the ethical complaints with requests for a written response, Bar

Counsel served Respondent with subpoenas *duces tecum* in each of the 16 client matters

directing him to deliver his client's file.  The requests for information that the Bar

Counsel sent to Respondent included:

       a.    <u>Ms. Horton and Mr. Mack</u> – BX 32 (letter dated August 8, 2005); BX 33 (letter dated August 25, 2005); BX 15 (letter dated March 23, 2006); BX 35 (subpoena *duces tecum* dated November 28, 2005, personally served by process server).

       b.    <u>Mr. Sims</u> – BX 43 (letter dated September 22, 2005); BX 44 (letter of October 13, 2005); BX 15 (letter of March 23, 2006); BX 48 (subpoena *duces tecum* dated November 28, 2005, personally served by process server).

       c.    <u>Mr. Ware</u> – BX 55; BX 56 (letter and subpoena *duces tecum* dated November 28, 2005, personally served by process server); BX 15 (letter dated March 23, 2006).

       d.    <u>The Jacksons</u> – BX 63; BX 64 (letter and subpoena *duces tecum* dated December 8, 2005, personally served by process server); BX 15 (letter dated March 23, 2006).

       e.    <u>Mr. Bullock</u> – BX 68 (letter dated December 30, 2005); BX 69 (subpoena *duces tecum* dated January 4, 2006, sent by certified mail); BX 15 (letter dated March 23, 2006).

       f.    <u>Mr. Walker</u> – BX 73 (letter dated December 30, 2005); BX 74 (subpoena *duces tecum* dated January 4, 2006, sent by certified mail); BX 15 (letter dated March 23, 2006).

       g.    <u>Mr. Blackman</u> – BX 79 (letter dated February 13, 2006); BX 80 (letter dated March 1, 2006); BX 81 (letter and subpoena *duces tecum* dated March 13, 2006, sent by regular and certified mail and served personally, by Bar Counsel's investigator, on March 22, 2006 (BX 14); 3/20/07 Tr. at 862, 864 (Anderson)); BX 15 (letter dated March 23, 2006).

h.    Mr. Edmonds – BX 88 (letter dated March 1, 2006); BX 89 (letter and subpoena *duces tecum* dated March 13, 2006, sent by regular and certified mail and served personally, by Bar Counsel's investigator, on March 22, 2006 (BX 14)); BX 15 (letter dated March 23, 2006).

i.    Mr. Dean – BX 94 (letter and subpoena *duces tecum* dated March 13, 2006, sent by regular and certified mail and served personally, by Bar Counsel's investigator, on March 22, 2006 (BX 14)); BX 15 (letter dated March 23, 2006).

j.    Ms. Hilton – BX 98 (letter and subpoena *duces tecum* dated March 21, 2006, sent by regular and certified mail and served personally, by Bar Counsel's investigator, on March 22, 2006 (BX 14)); BX 15 (letter dated March 23, 2006).

k.    Mr. Mitchum – BX 104 (letter and subpoena *duces tecum* dated April 27, 2006, sent by regular and certified mail, served personally by a process server on June 16, 2006 (BX 17), and served personally again by Bar Counsel's investigator on June 28, 2006 (BX 20)); BX 105 (letter dated May 15, 2006).

l.    Mr. Dates – BX 114 (letter and subpoena *duces tecum* dated May 9, 2006, sent by regular and certified mail, served personally by a process server on June 16, 2006 (BX 17 ), and served personally again by Bar Counsel's investigator on June 28, 2006 (BX 20)); BX 115 (letter dated May 30, 2006).

m.    Ms. Carthern – BX 122 (letter and subpoena *duces tecum* dated May 18, 2006, sent by regular and certified mail, served personally by a process server on June 16, 2006 (BX 17), and served personally again by Bar Counsel's investigator on June 28, 2006 (BX 20)); BX 123 (letter dated June 6, 2006).

n.    Mr. Wiley – BX 127 (letter and subpoena *duces tecum* dated May 24, 2006, sent by regular and certified mail, served personally by a process server on June 16, 2006 (BX 17), and served personally again by Bar Counsel's investigator on June 28, 2006 (BX 20)); 3/20/07 Tr. at 865-66 (Anderson); BX 128 (letter dated June 7, 2006).

o.    Ms. Penny Johnson – BX 34, Exhibits B-E (letters dated June 16, July 12, July 15, and August 5, 2005, and personally served with letters (and motion) by process server on December 9, 2005 (BX 37); BX 132 (subpoena *duces tecum* dated November 28, 2005, personally served by process server); BX 15 (letter dated March 23, 2006).

p.    Mr. Raoul Johnson – BX 143 (subpoena *duces tecum* dated November 28, 2005, personally served by process server); BX 15 (letter dated March 23, 2006).

q.    D.C. Superior Court Finance Office – BX 7 (letter dated June 16, 2006, served personally by process server, and served personally again by Bar Counsel's investigator on June 28, 2006 (BX 20)).

198.    Respondent stipulated that he received all letters and subpoenas set forth above and that the Bar Counsel never received responses from Respondent to the letters or subpoenas.  3/20/07 Tr. at 794-95, 802-06 (Spears).  With respect to most of the letters and subpoenas, Bar Counsel sent copies to Respondent at more than one address and/or on more than one occasion.  Nevertheless, Respondent failed to submit a response to any of Bar Counsel's letters set forth above, and failed to deliver his clients' files as directed in the subpoenas *duces tecum*.  See BX 41, 53, 61, 66, 71, 77, 85, 93, 92, 102, 112, 120,

125, 131, 135, 146, 11; 3/20/07 Tr. at 740-43, 748-49 (Spears); see also 3/20/07 Tr. at

863-64 (Anderson).

199.    Bar Counsel filed a motion with the Board seeking an order compelling

Respondent to respond to the ethical complaint filed by Ms. Horton.  BX 34.  Respondent

did not respond to the motion.  BX 41.  By order dated December 5, 2005, the Board

granted the motion and ordered Respondent to respond to the ethical complaint within 10

days.  BX 36.  Respondent did not comply with the Board's order, and failed to respond

to Ms. Horton's ethical complaint.  BX 41.

200.    Bar Counsel filed motions with the Court seeking an order directing

Respondent to comply with Bar Counsel's subpoenas *duces tecum*.  Bar Counsel attached

to the motions copies of the subpoenas previously served on Respondent and proof of

service.  3/20/07 Tr. at 750-52, 759 (Spears); BX 135.  Respondent did not reply to the

motions and, in three separate orders, the Court ordered Respondent to produce all the

documents and files described in Bar Counsel's subpoenas within 10 days of the Court

order.  BX 13 (Court order dated February 28, 2006, ordering Respondent to comply with

subpoenas in BDN 167-05, 169-05, 229-05, 325-05, 385-05, 390-05, 418-05, and 419-

05); BX 16 (Court order dated May 22, 2006, ordering Respondent to comply with

subpoenas in BDN 51-06, 73-06, 76-06, and 86-06); BX 27 (Court order dated November

27, 2006, ordering Respondent to comply with subpoenas in BDN 155-06, 175-06, 183-

06, 184-06, and 202-06, and other matters).  Bar Counsel reminded Respondent of his

obligation to comply with the Court orders, all of which were personally served on

Respondent by a process server (after being mailed to him by the Court).  BX 15; BX 28-

28A.

201.    Respondent did not comply with the Court orders and did not produce any documents to Bar Counsel.  3/20/07 Tr. at 750-52, 759 (Spears); see also 3/20/07 Tr. at 868 (Anderson).

202.    Bar Counsel also requested Respondent to account for all the funds that he had received from or on behalf of the clients who had filed ethical complaints and provide proof that he (1) had reimbursed these clients for unearned fees and paid them the funds to which they were entitled, and/or (2) had filed the necessary paperwork with the D.C. Government so that they could obtain their funds.  BX 15.  Respondent failed to respond to Bar Counsel's request.  BX 135.

203.    When Bar Counsel submitted the Petition and Specification of Charges against Respondent, Bar Counsel filed a verified motion with the Board requesting that it petition the Court for an order temporarily suspending Respondent pursuant to D.C. Bar Rule XI, § 3(c), because he posed a substantial threat of serious harm to the public.  BX 18.  Bar Counsel served the motion on Respondent by regular and certified mail on June 27, 2006, BX 18 at 14, 22 and personally on June 28, 2006.  BX 19; 3/20/07 Tr. at 864-65 (Anderson); 3/20/07 Tr. at 754-55 (Spears).  The Board granted Bar Counsel's motion by order dated July 19, 2006.  BX 22. [1]

204.    On July 21, 2006, Bar Counsel petitioned the Court on behalf of the Board for an order that would suspend Respondent immediately because he posed a substantial threat of serious harm to the public.  The Court granted the motion, which Respondent did not oppose, by order dated August 16, 2006.  BX 24.  In its order of August 16, 2006,

---

[1] Respondent did not file a substantive response to Bar Counsel's motion to the Board, but after the deadline for a response, filed a motion for an extension of time to respond without any indication as to when he would respond.  BX 21 at 1-2.  By order dated July 18, 2006, the Board denied Respondent's request for an extension of time.  BX 21 at 7-8.

the Court suspended Respondent, effective immediately. The Court also directed

Respondent to disclose to the Board and Bar Counsel within 10 days the identity of all

accounts in which he maintained funds subject to Rule 1.17(a), and advised Respondent

of the requirements of D.C. Bar Rule XI, § 14, relating to suspended and disbarred

attorneys. BX 24. The Court mailed copies of its order to Respondent, and a process

server personally served Respondent with the order on August 29, 2006. BX 25; 3/20/07

Tr. at 757 (Spears).

205. Respondent failed to provide information to the Board or Bar Counsel

concerning any Rule 1.17 accounts. Respondent also failed to comply with the Board's

subsequent order dated November 3, 2006, directing Respondent to provide this same

information. BX 26; BX 135; 3/20/07 Tr. at 807-08 (Spears). Respondent further

violated the Court's order of interim suspension and the rules of the Court and Board

applying to suspended attorneys by failing to notify clients and opposing counsel of his

suspension and withdraw as counsel in pending court matters. *See e.g.*, BX 29

(Respondent's fax to Mr. Cummins of December 15, 2006, listing open cases, including

that of Penny Johnson); 1/23/07 Tr. at 101-08 (Cummins); BX 134 (court docket sheet

and pleadings in Penny Johnson case reflecting Respondent never sought to withdraw

after suspension); 1/23/07 Tr. at 40-41 (Ferguson); 1/24/07 Tr. at 75-76, 105 (Cummins;

when he testified on January 23, 2007, Mr. Cummins was still getting calls from

Respondent's clients, some of whom were not yet aware of Respondent's suspension).

## CREDIBILITY FINDINGS

206. Bar Counsel's witnesses were credible. They all testified in a

straightforward manner about their dealings with Respondent. Although all of the client

witnesses were clearly upset and deeply affected by their dealings with Respondent, they did not come across as vindictive or otherwise biased in their testimony. They remembered substantial details, and some had maintained notes reflecting on their communications with or attempts to communicate with Respondent. Their answers to questions were persuasive in tone and substance, and were generally corroborated by other testimony and documents provided in the case. Respondent made comments at the conclusion of the hearing but did not testify. We do not consider his comments as evidence, since Bar Counsel did not have an opportunity to cross examine him.

## CONCLUSIONS OF LAW

**A.    Rule 8.4(c) – Dishonesty and Fraud (Counts One Through Fourteen and Count Seventeen (Court))**

Rule 8.4(c) of the D.C. Rules on Professional Conduct makes it professional misconduct for a lawyer to engage in "conduct involving dishonesty, fraud, deceit or misrepresentation." The term "dishonesty" encompasses fraudulent, deceitful, or misrepresentative behavior. It also encompasses conduct evincing a lack of "honesty, probity or integrity in principle; [a] lack of fairness and straightforwardness." *In re Shorter*, 570 A.2d 760, 767-68 (D.C. 1990) (*per curiam*) quoting *Tucker v. Lower,* 434 P.2d 320, 324 (Kan. 1967). "Fraud" is a "generic term which embraces all the multifarious means . . . resorted to by one individual to gain an advantage over another by suggestions or by suppression of the truth." *In Re Shorter*, 570 A.2d at 768 quoting 37 C.J.S. *Fraud* § 1 (1943). "Concealment or suppression of a material fact is as fraudulent as a positive direct misrepresentation." *Andolsun v. Berlitz School of Languages*, 196 A.2d 926, 927 (D.C. 1964).

Respondent provided a solicitation letter to many of the clients who testified.  He also met with the vast majority of them.  In the letters and meetings, he informed them that they would be reimbursed 100% of their legal fees and costs if the property owner redeemed.  The Certificates of Sale for Taxes provided by OTR also informed the buyers that they were entitled to reimbursement of their costs and fees in the event of redemption of the property.  Respondent's clients also understood that if they filed suit within the statutory period, and the owner subsequently redeemed, they would be entitled to reimbursement of their deposits.  Accordingly, Respondent's clients should not have suffered any financial loss through the tax sales – they would either receive complete reimbursement of funds expended, plus interest, or they would obtain title to the properties.  Nevertheless, with the exception of Raoul Johnson, Respondent's clients did not receive reimbursement of their legal fees and costs, totaling more than $39,000.  Many, including clients Sims, Bullock, Walker, Edmonds, Hilton, Mitchum, Dates, Carthern, and Wiley, also lost their rights to the properties, their deposits paid to the District – which totaled more than $47,500 – and the other expenses they incurred in the tax sale process.

These losses were the fault of Respondent.  Respondent engaged in dishonest and fraudulent behavior from the moment he solicited or met these clients until the end of his contacts with them.  Upon opening his law office in the District in early 2003, Respondent began to market his services to tax sale purchasers, initially through CII Title's marketing materials, BX 144 at 4-5, and later through his own solicitation letter.  He provided false information to prospective clients about his experience in tax sale cases, representing that he had handled more than 100 cases, BX 38 at 3, when he had

only handled 75 as of the end of December 2004.  He also represented to tax sale purchasers that if they retained him, he would give them and their matters individualized care and attention, BX 144 at 4-5, BX 38 at 3, but when he received their monies he barely paid attention to them or their cases at all.

Once a client paid Respondent a flat fee for his services, he deposited the money into his trust account and thereafter expended the funds for his own needs, usually having done little or no work for the client.  Most of the cases had not been completed and many had not even begun at the time he expended the funds.  When clients tried to contact Respondent as the months passed to find out about the status of their cases, Respondent would rarely take their calls or call them back, and if he did, then he would falsely reassure them – or simply lie to them – about the status of their cases.  After Respondent failed to protect his clients' interests, leading them to forfeit their deposits and lose the right to reimbursement of their attorney's fees and costs, Respondent did not pay back the attorney's fees and costs he had collected from them as stated in his retainer agreement.

By late 2003, Mr. Cummins was receiving numerous calls from Respondent's clients about Respondent's failure to communicate with them.  By 2004, Mr. Cummins received such calls "almost on a weekly basis."  1/23/07 Tr. at 74-75 (Cummins).  Despite his inability, or unwillingness, to handle his existing matters in a competent manner, Respondent continued to solicit and take on new client matters.  Generally, Respondent did no more than file form complaints, many of which were untimely.

By August 2004, Respondent had a negative balance, -$744.24, in his trust account.  He had spent all of the client funds he had deposited into the account, including those of clients Ware, Blackman, Edmonds, Dean, Carthern, and R. Johnson.  BX 3; BX

2 at 17.  As to these clients, with the exception of Mr. Johnson, the court either dismissed the actions that Respondent filed for failure to prosecute, or Respondent dismissed the actions without his clients' knowledge or consent.  None of these clients received the attorney's fees and expenses to which they were entitled before the property owner could redeem, and none received an order foreclosing the right of redemption.  Mr. Johnson's case was completed in large part due to the efforts of Mr. Johnson himself, who filed Bar Counsel complaints to learn the status of his matter, and who attended all court proceedings in person to make sure the process moved forward.

Respondent sent out his solicitation letter in December 2004, at a time when he had no funds left in his trust account.  BX 2 at 20.  Respondent received funds from eight clients who testified in this matter (as well as many others), and then began to spend the funds for his own purposes.  By the end of August 2005, having done little work on behalf of his clients, he nevertheless had expended all the monies they had given him.  Even when he did file form complaints, most were filed after the statute of limitations had expired, and he failed to pursue any of the cases, all of which the Court dismissed.

Respondent was well-aware that he was failing to pursue his clients' interests appropriately.  He filed untimely complaints in late August and September 2005, back-dating a number of them.  In some instances, he attached to the complaints falsified certificates with issuance dates later than the dates on the actual certificates issued to his clients.  Respondent failed to provide his clients with pleadings or other information concerning the status of their cases, and failed to let them know that their cases had been dismissed.

Respondent engaged in numerous acts of dishonesty and fraud concerning the individual clients in this matter, and the Court, as follows:

1.    <u>Ms. Horton</u>:  Respondent falsely represented to Ms. Horton that he filed complaints on her behalf; falsely backdated the one complaint that he eventually filed; refused to advise Ms. Horton or her new counsel of the action that he had filed, and did not withdraw from the representation, resulting in the court later dismissing the action for failure to prosecute; and he never disclosed to Ms. Horton that the action he had filed on her behalf was dismissed.  (Findings of Fact, ¶¶ 1-18).

2.    <u>Mr. Sims</u>:  Respondent falsely represented to Mr. Sims that his cases were in the system; falsely backdated the complaints that he eventually filed with the court, which he filed after the one-year deadline had expired, and attached false certificates to the complaints; provided Mr. Sims falsified and backdated copies of complaints and falsified motions that bore fraudulent court stamps; and never disclosed to Mr. Sims that he had filed his actions after the one-year deadline and that the Court had dismissed them on that basis.  (Findings of Fact, ¶¶ 19-41).

3.    <u>Mr. Ware</u>:  Respondent dismissed Mr. Ware's action relating to one of the properties without Mr. Ware's knowledge or consent and without collecting the attorney's fees and expenses that were due to Mr. Ware under the statute (or Respondent collected them for himself without reimbursing Mr. Ware); falsely assured Mr. Ware he was working on his other matter and then dismissed certain claims and later the entire action without advising Mr. Ware that he had done so, and without collecting the fees and expenses due (or Respondent collected them himself without reimbursing Mr. Ware); and falsely represented to the Court, when dismissing Mr. Ware's action, that all amounts due

on the property had been paid, when Mr. Ware had not yet received any payments. (Findings of Fact, ¶¶ 42-60).

4.      <u>The Jacksons</u>:  Respondent falsely claimed to the Jacksons that he would refund their monies, but could not do so until he provided a release to OTR;  prepared releases that had no purpose other than to put off the Jacksons who were in his office seeking the return of their funds; and repeated his false representation to the Jacksons that he would refund all their money, when apparently he had no intention of doing so, as evidenced by his withdrawal of all funds from his trust account shortly after making one $1,000 payment to the Jacksons.  (Findings of Fact, ¶¶ 61-67).

5.      <u>Mr. Bullock</u>:  Respondent backdated the complaint that he filed with the Court, which he filed after the one-year deadline had expired, and never disclosed to Mr. Bullock that he had filed his complaint after the deadline and that the Court had dismissed it on that basis.  (Findings of Fact, ¶¶ 68-77).

6.      <u>Mr. Walker</u>:  Respondent falsely represented to Mr. Walker that a complaint had in fact been filed, and that a court date had been scheduled; falsely backdated the complaint he later filed with the Court, which he filed after the one year deadline had expired; and never disclosed to Mr. Walker that he had filed his complaint after the deadline and the court had dismissed it on that basis.  (Findings of Fact, ¶¶ 78-87).

7.      <u>Mr. Blackman</u>:  Respondent dismissed one of Mr. Blackman's cases several months after it was filed without obtaining Mr. Blackman's consent, and without collecting the attorney's fees and expenses that were due to Mr. Blackman under the statute (or Respondent collected them for himself without reimbursing Mr. Blackman);

filed a certification with OTR falsely representing that Mr. Blackman had not incurred any legal fees, which he had; and failed to disclose his suspension to Mr. Blackman and, when confronted by Mr. Blackman about his suspension, falsely claimed that he could still represent him.  (Findings of Fact, ¶¶ 88-101).

8.    <u>Mr. Edmonds</u>:  Respondent falsely backdated the complaints that he filed with the Court, which he filed after the one year deadline had expired, and attached falsified certificates to the complaints that bore a date later than the date on the certificates OTR had issued to Mr. Edmonds; and never disclosed to Mr. Edmonds that he had filed his complaints after the deadline and that the Court had dismissed them on that basis.  (Findings of Fact, ¶¶ 102-111).

9.    <u>Mr. Dean</u>:  Respondent falsely assured Mr. Dean that he was taking care of his matter, without disclosing that the Court had dismissed it for failure to prosecute; failed to advise Mr. Dean that the Court again had dismissed his action for failure to prosecute because Respondent had failed to serve the defendants with an amended complaint; and falsely represented to Mr. Dean that he would reimburse him the funds he was owed within a matter of days, when at the time he had less than $4 in his trust account and his checking account had been closed because of numerous overdrafts. (Findings of Fact, ¶¶ 112-119).

10.    <u>Ms. Hilton</u>:  Respondent falsely backdated the complaint that he filed on behalf of Ms. Hilton, and never advised Ms. Hilton that the Court dismissed her case at the first scheduling hearing because he had failed to prosecute it.  (Findings of Fact, ¶¶ 120-128).

11.    <u>Mr. Mitchum</u>:  Respondent falsely represented to Mr. Mitchum's secretary that he filed complaints on June 25, 2005; provided Mr. Mitchum copies of what purported to be the cover pages of complaints stamped by the Court, which he knew were falsified documents that reflected false dates and case numbers; falsely backdated the complaints that he eventually filed with the Court, which he filed after the one-year deadline; filed a Praecipe dismissing one of the actions without Mr. Mitchum's knowledge or consent, and falsely represented to the Court that all fees and expenses had been paid to Mr. Mitchum; and never disclosed to Mr. Mitchum that he had filed the other actions after the deadline and that the court had dismissed them on that basis. (Findings of Fact, ¶¶ 129-138).

12.    <u>Mr. Dates</u>:  Respondent falsely represented to Mr. Dates that he had filed actions on his behalf, when he knew he had not done so, and provided him a copy of what purported to be a pleading, but was actually a falsely dated complaint that bore a forged court stamp; falsely backdated the complaints that he later filed with the court; dismissed one of Mr. Dates' cases several months after filing it without advising Mr. Dates or obtaining Mr. Dates' consent; collected the attorney's fees and expenses due Mr. Dates by statute (or collected them for himself instead of reimbursing Mr. Dates); and never advised Mr. Dates that the other actions he filed with the Court were dismissed for failure to prosecute and as time-barred. (Findings of Fact, ¶¶ 139-149).

13.    <u>Ms. Carthern</u>:  Respondent falsely assured Ms. Carthern that everything was alright with her case when he had taken no action in the matter; failed to disclose to Ms. Carthern that her case had been dismissed for failure to prosecute; and did not advise

Ms. Carthern that the Court dismissed her action a second time for failure to prosecute and that he had taken no further steps to reinstate it. (Findings of Fact, ¶¶ 150-159).

14.    <u>Mr. Wiley</u>: Respondent falsely backdated the complaint that he filed with the court, which he filed after the one-year deadline, and attached a falsified certificate to the complaint that bore a date later than the date on the certificate OTR issued to Mr. Wiley; and never disclosed to Mr. Wiley that he had filed his complaint after the deadline and that the Court had dismissed it on that basis. (Findings of Fact, ¶¶ 160-169).

15.    <u>R. Johnson</u>: Respondent falsely represented to Bar Counsel, Mr. Johnson, and the Court that he had been attempting to settle Mr. Johnson's matter; falsely represented to Bar Counsel and Mr. Johnson that he had been communicating with Mr. Johnson about his matter, and presented a falsified letter that he knew had not been sent to Mr. Johnson. (Findings of Fact, ¶¶ 170-183).

16.    <u>Court Finance Office</u>: Respondent wrote numerous checks, including six to the D.C. Superior Court, and made other withdrawals from his accounts, when he knew he did not have sufficient funds in his account to cover the checks or withdrawals. (Findings of Fact, ¶ 184-195).

The Committee finds by clear and convincing evidence that Respondent committed a number of dishonest and fraudulent acts against his clients and the Court in violation of Rule 8.4(c) (Counts One through Fourteen and Seventeen). Respondent intentionally misrepresented to his clients the status of their cases on numerous occasions. He failed to inform his clients that their cases had been dismissed and that he had expended all the funds that he received from them and would not repay them or take steps to ensure they would be reimbursed. He attempted to defraud the Court and his

clients by falsifying pleadings and documents to make it appear that his filings were

timely. *See In re Schneider*, 553 A.2d 206 (D.C. 1987) (deliberate falsification of

documents is a dishonest act). More broadly, after obtaining his clients' funds, he

expended the funds rather than utilizing them for the purposes for which they were

intended, and did virtually no work for them. He attempted to hide these facts by

avoiding his clients, or falsely reassuring them, for long periods of time. He also

provided filing fees to the court at a time when he knew he had insufficient funds in his

account to cover the fees. These actions constitute both dishonesty and fraud under the

Rules of Professional Conduct.

**B.    Rule 8.4(b) – Criminal Fraud and Theft (Counts One Through Fourteen and Count Seventeen (Court))**

Rule 8.4(b) states that "[it] is professional misconduct for a lawyer to commit a

criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as

a lawyer in other respects." Here, Bar Counsel has charged Respondent with having

committed two crimes in violation of the rule – fraud and theft.

### i. Fraud

D.C. Code § 22-3221 defines criminal fraud in the second degree as "a scheme or

systematic course of conduct with intent to defraud or to obtain property of another by

means of a false or fraudulent pretense, representation, or promise."

The Committee finds by clear and convincing evidence that Respondent violated

Rule 8.4(b) by committing criminal fraud. First, Respondent convinced his clients that

they should use his services, and represented to them that he would see their matters

through to completion. After obtaining their money, he not only failed to represent them

as promised, but he falsely assured them that their matters were on track. He did not tell

them that, in fact, he had not filed their cases or he had filed them in an untimely manner.

Nor did he tell them that their cases had been dismissed.  Respondent's

misrepresentations and omissions were intended to hide the fact that he had expended his

clients funds while doing little or no work for them, and further to hide that they would

not receive reimbursement for their fees, expenses, or deposits.  Respondent's entire

course of conduct once he received his clients' funds evinced an "intent to defraud" under

the statute.

Respondent also engaged in criminal fraud when he provided the court more than

$14,000 in checks when he knew that he did not have sufficient funds in his accounts to

cover the checks.  Respondent had negative balances in both his trust and checking

accounts during most of September 2005, when the checks payable to the court were

presented for payment.  BX 2 at 32; BX 5 at 36-37.  Respondent made deposits to his

trust account shortly before or at the time he wrote checks to the Court, including $10

into his trust account on August 23, 2005, which brought the balance to $787.40.  BX 2 at

31.  The balance increased thereafter, but only because four checks had been returned for

insufficient funds.  *Id.*  After the funds were re-deposited, Respondent then withdrew all

of the funds, causing the account to be overdrawn before the court presented his check for

payment.  With respect to his checking account, Respondent made several deposits but

none resulted in increasing the balance to even $500.  Accordingly, when Respondent

wrote checks on this account totaling more than $12,000, he knew that he had insufficient

funds to cover them.  BX 5 at 36-37.  *See In re Pierson*, 690 A.2d 941 (D.C. 1997)

(conduct constituted criminal act where Respondent passed bad check knowing she had

insufficient funds in her account to cover it); *In re Smith*, 655 A.2d 315 (D.C. 1995)

(issuance of worthless check violated DR 1-102(A)(3), which prohibited criminal conduct involving moral turpitude that adversely reflects on lawyer's fitness to practice).

**ii.** **Theft**

The D.C. theft statute, D.C. Code § 22-3211(b), provides that a person commits the crime of theft "if that person wrongfully obtains or uses the property of another with the intent 1) to deprive the other of a right to the property or a benefit of the property; or 2) to appropriate the property to his or her own use or to the use of a third person."

The Committee finds by clear and convincing evidence that Respondent committed theft by wrongfully using the funds entrusted to him for costs associated with the filing and prosecution of the tax sale actions. The Committee does not find, however, that Respondent's use of the attorney's fees his clients provided to him for handling their matters constitutes theft under § 22-3211(b).

In certain instances, when Respondent received funds from his clients, those funds were earmarked for costs and expenses associated with the filing of their complaints. Respondent and his clients understood that these funds were to be used for specific purposes. There is no evidence to the contrary. Accordingly, when Respondent nevertheless used the funds for his own purposes, and did not seek his clients' permission to do so or immediately replenish the funds, he violated the theft statute and Rule 8.4(b) (Counts Two, Four, Five, and Eight).

The same cannot be said for the attorney's fees Respondent received from his clients. As to those fees, in each case they were a "fixed fee" or retainer for the purpose of Respondent representing the client through the conclusion of the case. Nothing in the retainer agreement or the conversations between the Respondent and his clients addressed

the issue of who the funds belonged to or when Respondent could use the funds.

Moreover, there is no evidence that, at the time Respondent obtained the funds, he

intended to abscond with the monies without doing meaningful work for his clients.

While the clients testified that they believed the funds belonged to them until earned

(with the exception of R. Johnson, who testified that he believed the funds belonged to

Respondent), the clients' subjective beliefs are not controlling.  Indeed, in *In re Mance,*

BDN 241-04 (BPR July 28, 2006) the Board found that in flat fee arrangements such as

the ones at issue here, the fees are the lawyer's upon receipt and are not considered an

advance or unearned fees within the meaning of Rule 1.15(d).

The cases cited by Bar Counsel on this issue are distinguishable.  In *In re Slattery*,

767 A.2d 203 (D.C. 2001), Respondent withdrew and used over $10,000 from a furniture

fund held by an Irish fraternal organization.  Unlike here, in *Slattery* there was no

question that the funds taken by the respondent were earmarked for a particular purpose

and did not belong to him.  He had no authority whatsoever to withdraw the funds for his

own use.  Similarly, in *In re Gil*, 656 A.2d 303 (D.C. 1995), Respondent was given

power of attorney to transfer funds from a father's account to his daughter's account.

Respondent then diverted over $50,000 of the money to his personal account, knowing

that he had not been given permission to do so.

## C.    Rule 1.15(a) and (d) -- Commingling and Intentional Misappropriation (Counts One through Fourteen, all clients except P. Johnson and R. Johnson, and Count Seventeen)

Rule 1.15(d), as amended effective January 1, 2000, provides that "[a]dvances of

unearned fees and un-incurred costs shall be treated as property of the client pursuant to

[Rule 1.15(a)] until earned or incurred unless the client consents to a different

arrangement."  Rule 1.15(a), in turn, requires that client funds be held "separate from the lawyer's own property" and that complete records of the account be "kept by the lawyer…preserved for a period of five years after termination of the representation."

### i.    Misappropriation

The Committee finds by clear and convincing evidence that Respondent violated Rule 1.15(d) by taking and using for his own purposes, funds that his clients had advanced for specific costs associated with the representation that Respondent never incurred or paid.  (Counts Two, Four, Five and Eight).  The Committee finds that there is insufficient evidence to establish that Respondent misappropriated the attorneys' fees provided to him.

Respondent collected funds at the outset of the representations to pay the filing fees, publications fees, title search fees, and other costs of the actions.  He did not use those funds for their intended purposes, but instead took the funds for himself soon after depositing them into his trust account, and before he sought to file actions on behalf of his clients.  Respondent never sought or obtained the consent of his clients to use these funds for his personal expenses.

Of the funds Respondent received from Mr. Sims, $1,340 was specifically designated to pay certain costs associated with the court action, including $260 for filing fees, $480 for publication fees, and $600 for title searches.  BX 42 at 7.  Respondent did not incur these expenses as agreed to, but rather expended the funds for himself.  Before Respondent untimely filed the two form complaints, he had spent all the funds in his trust account, including the $1,340 advanced by Mr. Sims.  BX 2 at 28.  Respondent never

paid the filing fees or publication fees in Mr. Sims' matter but gave the Court a bad check, which is still delinquent.[2]  Nor did Respondent perform or pay for title searches.

Respondent also misappropriated the un-incurred costs that he received from 1) Mr. Bullock.  Respondent received $370 from Mr. Bullock to pay the filing fee ($130) and publication fee ($240) that Respondent appropriated for himself.  When Respondent filed the action, there was no money in the account to pay the filing fee or publication fee.  Respondent gave the Court a bad check for the filing fee that was never paid; 2)  the Jacksons.  Respondent received $2,010 from the Jacksons to pay filing fees, publications fees, and title search fees.  Respondent appropriated the funds for himself and did not file any actions on behalf of the Jacksons; 3) Mr. Edmonds.  Respondent received $740 from Mr. Edmonds to pay filing fees ($260) and publication fees ($480), that Respondent appropriated for himself .  When Respondent filed the actions, there were no funds left in the account to pay for the filing or publication fees.  Respondent gave the Court a bad check for the filing fees, which was never paid.  Respondent's unauthorized taking of client funds advanced for un-incurred costs constitutes misappropriation under Rules 1.15(a) and (d).

The monies clients provided to Respondent for court costs were clearly earmarked for that purpose.  By using these monies for himself rather than preserving them for their intended purpose, Respondent clearly misappropriated the funds.

---

[2] As the court files in evidence reflect, the court enters an order for publication when a complaint to foreclose the right of redemption is filed.  Although the court issues the order, it is the responsibility of the plaintiff to have it published and to pay the costs associated with the publishing.  *See* D.C. Code § 47-1375.  Normally, when a plaintiff complies with the notice of publication requirement, the plaintiff will file an affidavit with the court stating the order was published.  *See* BX 40 at 1.  No affidavits were filed in any of the actions that Respondent filed on behalf of the clients who testified in this case.  In the case of each of these clients, Respondent had appropriated for himself the $240 publication fee per property that he had collected from the client before he had filed the complaint.

The same cannot be said, however, for attorney's fees.  In each case, Respondent and his client agreed to a flat fee for his services.  This amount was to cover Respondent's fees for the duration of the representation.  However, there was nothing contained in the retainer agreements, nor was there any testimony, indicating that the parties had explicitly communicated about whether the funds belonged to Respondent or the client upon receipt and deposit.

Rule 1.15(d) states, in pertinent part, that "[a]dvances of unearned fees and un-incurred costs shall be treated as property of the client . . . until earned or incurred unless the client gives informed consent to a different arrangement."  Thus, where a client has advanced monies to his/her attorney, the attorney cannot treat the property as his/her own until he/she has earned the funds by undertaking the work requested.  The situation is different, however, in the case, as here, where the parties have agreed to a "flat fee" for services to be performed in the future.  In this instance, the arrangement "constitutes an agreement and understanding between the lawyer and the client that the fees are to be the lawyer's upon receipt and that they are not '[a]dvances of unearned fees" within the meaning of D.C. Rule 1.15(d)."  *In re Mance,* BDN 241-04, (BPR July 28, 2006).

The Committee finds a distinction between the advances of unearned fees and the advances of un-incurred costs.  In the case of un-incurred costs that are explicitly earmarked, there was a plain understanding between the parties that the monies would be used for a particular purpose.  Respondent could not believe that the advances of un-incurred costs were given to him to use as he wished.  In the case of a "flat fee" arrangement, however, *In re Mance* and the cases upon which it relies make clear that an

attorney may use a flat fee provided to him upon receipt.  Therefore, we cannot say that Respondent's use of the flat fees in this case constitutes misappropriation.

### ii.    <u>Commingling</u>

We find by clear and convincing evidence that Respondent violated Rule 1.15(a) by failing to hold his clients' funds separately from his own.  The trust account records show that in addition to making a number of cash deposits into his trust account, Respondent transferred funds from his checking account to his trust account.  BX 1.  Respondent also used the funds in his trust account indiscriminately to pay his personal and business expenses, which can "result in a loss of the identity of the funds.  Our rules require not only that the client funds not be mingled with those of the attorney, but also that their identity be preserved."  *See In re Choroszej*, 624 A.2d 434, 439 (D.C. 1992) (concurring opinion).

### D.    **Rules 1.1(a) and (b) – Incompetent Representation – (Counts Two, Five, Six, <u>Seven, Eleven, Twelve, Thirteen, and Fourteen)</u>**

Rule 1.1(a) requires a lawyer to provide competent representation, which requires not only the legal knowledge and skill, but also the "thoroughness and preparation" reasonably necessary for the representation.  Rule 1.1(b) requires the lawyer to serve the client with the skill and care commensurate with that generally afforded clients by lawyers in similar matters.  The comments to Rule 1.1 reiterate that competent representation includes "adequate preparation, and continuing attention to the needs of the representation to assure that there is no neglect of such needs."  Comment [5] to Rule 1.1.  Comment [5] further provides that "[t]he required attention and preparation are determined in part by what is at stake."

Filing an action within the one year statutory period is critical in tax sale matters. Failing to do so precludes the tax sale purchaser from obtaining the property and recovering fees and costs incurred. All of Respondent's clients were aware of the deadline and the necessity of filing an action, which was set forth in the certificates they received and is why they reached out to Respondent. Respondent represented that he was experienced in this area of the law. BX 38 at 3. Nevertheless, in the case of seven of his clients (Sims, Bullock, Walker, Edmonds, Mitchum, Dates, and Wiley), Respondent filed a form complaint after the expiration of the one year deadline. He then did nothing to pursue the matters, all of which were dismissed by the Court. As to Ms. Carthern, Respondent filed the form complaint before the one year deadline, but failed to pursue it and, subsequently, it was dismissed twice for failure to prosecute. We find by clear and convincing evidence that Respondent failed to handle his clients' matters with the ordinary care and skill that is expected of competent counsel, and violated Rules 1.1(a) and 1.1(b).

**E.      Rule 1.2 – Objectives of Representation (Counts Three and Twelve)**

Rule 1.2 requires the lawyer to abide by his client's decision concerning the objectives of the representation and to consult with the client as to the means by which they are to be pursued. The Committee finds by clear and convincing evidence that Respondent violated this rule regarding his representation of Mr. Ware (Count Three) and Mr. Dates (Count Twelve).

Respondent did not consult with these clients or others after he took their funds. He did not provide his clients copies of any pleadings, including the complaints filed, and did not advise them of the status of their cases or the actions he was taking with respect

thereto. As to Mr. Ware, Respondent dismissed one of his actions without consulting Mr. Ware ahead of time, which was contrary to Mr. Ware's interests. Before the Court dismissed Mr. Ware's other actions for failure to prosecute, Respondent dismissed the complaint as to three of the defendants, once again without consulting with Mr. Ware. Mr. Ware did not consent to or understand why Respondent had taken these actions. Respondent did not consult with Mr. Ware concerning the means by which the objectives in the case were to be pursued, and thus violated Rule 1.2.

As to Mr. Dates, Respondent had filed a timely complaint in the case of Mr. Dates' S Street property, but filed a Praecipe dismissing the action seven and half months after it was filed. He did so without consulting Mr. Dates or obtaining his consent, which Mr. Dates certainly would not have given, since the dismissal was contrary to his interests. By failing to consult with Mr. Dates concerning the means by which the objectives in the case were to be pursued, Respondent violated Rule 1.2.

**F.    Rule 1.3 – Diligence and Zeal – (Counts One through Fourteen and Sixteen)**

Rule 1.3 states as follows:

(a) A lawyer shall represent a client zealously and diligently within the bounds of the law.

(b) A lawyer shall not intentionally:

(1) Fail to seek the lawful objectives of a client through reasonably available means permitted by law and the disciplinary rules; or

(2) Prejudice or damage a client during the course of the professional relationship.

(c) A lawyer shall act with reasonable promptness in representing a client.

The Committee finds by clear and convincing evidence that Respondent failed to represent his clients zealously or with reasonable promptness, intentionally failed to seek

their lawful objectives, and prejudiced them during the course of the relationship.  As to Rules 1.3(a) and (c), Respondent either failed to file actions, filed them in an untimely manner, and/or failed to diligently pursue matters, leading to the dismissal of cases or other prejudice, as to clients Horton, Sims, Ware, the Jacksons, Bullock, Walker, Blackman, Edmonds, Dean, Hilton, Mitchum, Dates, Carthern, Wiley, and R. Johnson.

As to Rule 1.3(b), the Court has ruled that "[n]eglect ripens into an intentional violation when the lawyer is aware of his neglect of the client matter, or the neglect is so pervasive that the lawyer must be aware of it."  *In re Lewis,* 689 A.2d 561, 564 (D.C. 1997).  Respondent failed to pursue his clients' matters and caused them substantial harm.  Many of the clients lost not only the funds they had paid to Respondent, but also, the money that they had paid to the District for the properties and all rights they had with respect to the properties.  They received no benefits from Respondent's representation of them.  We have little difficulty finding that Respondent's lack of care and acts prejudicial to his clients was intentional, in that Respondent was on notice from his clients' messages and calls of the need for him to communicate with them and to act on their cases.  He failed to do so, and largely abandoned their matters.

## G.    Rules 1.4(a) and (b) – Communications – (Counts One through Fourteen and Sixteen)

Rules 1.4(a) and (b) state:

(a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.

(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

There is substantial evidence that Respondent violated these rules, and the Committee finds by clear and convincing evidence that he did so.  After receiving his

clients' funds, Respondent never called or wrote to his clients to keep them abreast of the status of their cases. He did not take or return their phone calls. He ignored their e-mails and letters. On the rare occasions, when his clients were able to reach him on the telephone or meet with him in person, he falsely reassured them of the status of, and informed them he was taking care of their cases. Respondent did not provide copies of complaints or other pleadings to his clients and, when he did, in many instances, the documents were falsified. Clients generally learned of the disposition of their matters only after obtaining new counsel, going to the court themselves, or filing a complaint with Bar Counsel. With the exception of Mr. Johnson, Respondent did not communicate whatsoever with his clients even after they filed complaints with Bar Counsel.

We agree with Bar Counsel that Respondent's failure to communicate with his clients is aggravated by the fact that in his solicitation letter he induced many of his clients to retain his services on the basis that he believed in "building relationships," "giv[ing] personal attention to each client," "tak[ing] the time to answer your calls, [and] devote the necessary time it takes to help you understand the process…." BX 38 at 3. These representations were false and Respondent plainly violated the mandates of Rule 1.4.

**H.**     **Rule 1.16(d) – Surrendering Papers, Property (Counts One to Fourteen)**

Rule 1.16(d) requires that, in connection with the termination of a representation, the lawyer must take timely steps to protect the client's interests, including surrendering papers and property to which the client is entitled and refunding any advance payment of a fee that has not been earned. Respondent failed to comply with his obligations under Rule 1.16 in that he has failed to surrender his clients files even after being ordered to do

so by the Court, and has failed to refund the advances of fees and costs that he received from his clients, none of which he earned.

Many of Respondent's clients asked him for the paperwork in their matters, to no avail. In those instances where successor counsel requested the files, Respondent still failed to provide them. Even after Bar Counsel served Respondent with a subpoena *duces tecum* directing him to produce his client files for each of the fourteen clients, as well as for P. Johnson and R. Johnson, Respondent did not do so. These acts, alone, constitute a violation of Rule 1.16(d).

Respondent's failure to refund the monies that he received from his clients as fees and costs that he did not earn constitutes a separate violation of this provision. *See In re Hallmark*, 831 A.2d 366, 372 (D.C. 2003) (lawyer violated Rule 1.16(d) when he failed to refund fees paid for particular tasks that a lawyer never performed). None of the fourteen clients received any benefit from the limited work that Respondent did in their matters and all were entitled to a full refund of the amounts they paid Respondent. This is especially true because had Respondent engaged in actual and timely representation of his clients, they would have at least had all of their costs and attorneys' fees returned. Instead, they lost substantial sums, including in most instances their deposits, fees, and costs. Respondent did nothing to protect his clients' interests and thus failed to earn his fees. The total of the fees and costs that Respondent failed to return is $36,930.

Respondent can be found in violation of Rule 1.16(d) even though we have not found theft and misappropriation regarding Respondent's taking of the attorney's fees for his own use. In *In re Mance,* the Board found that the fact that the retainer was treated as the lawyer's property did not negate the requirement under Rule 1.16(d) that a lawyer

return to the client any unearned portion of the fees.  We find by clear and convincing evidence that Respondent did not earn any portion of the fees provided to him, but nevertheless did not return any of those fees to his clients (with the exception of $1,000 refunded to Ms. Jackson), and thus violated Rule 1.16(d).

## I.    Rule 1.5(b) – Communicating Fees in Writing (Counts Three, Four, and Fourteen)

Rule 1.5(b) requires the lawyer to provide his client a fee agreement or other writing setting forth the basis or rate of the lawyer's fee before or within a reasonable time after commencing the representation.  The comments to Rule 1.5 provide that although the lawyer is not required to recite all factors that underlie the basis of the fee, he must explain "those that are directly involved in its computation."  Comment [1].  The Committee finds that Respondent violated Rule 1.5(b) by failing to provide any writing explaining the computation of his fee to Mr. Ware, Ms. Jackson, and Mr. Wiley.

Respondent asked Mr. Ware to bring a check for $3,815 to their meeting, which he did.  At their meeting, Respondent did not explain or provide to Mr. Ware any writing showing how he calculated the amount of his fee.  Similarly, Respondent asked Mr. Wiley to bring a check for $2,100 to their meeting.  When Mr. Wiley came to Respondent's office with the check, Respondent did not meet with him.  Mr. Wiley left his check for Respondent, which Respondent later negotiated.  Respondent never explained to Mr. Wiley, in writing or over the telephone, how he calculated his fee.

Respondent did provide the Jacksons with an invoice at their initial meeting setting forth legal fees of $4,500.  BX 65 at 10.  Respondent did not, however, explain in his invoice what the legal fee was to include or how it was calculated.  The invoice did

not provide his clients with sufficient information to understand the basis or rate of the legal fees or how they were calculated.

**J.**   **Failure to Cooperate with Bar Counsel, the Board, and Court**

    **1.**   **Rule 8.1(b) and 8.4(d) – All Counts**

Rule 8.1(b) provides in pertinent part that "a lawyer . . . in connection with a disciplinary matter shall not . . . knowingly fail to respond reasonably to a lawful demand for information from . . . [a] disciplinary authority."  A member of the D.C. Bar has "an affirmative duty to respond to the legitimate inquiries of Bar Counsel during the course of a disciplinary investigation."  *In re Wright*, 702 A.2d 1251, 1255 (D.C. 1997); *see also* D.C. Bar Rule XI, § 8(a) "An attorney under investigation has an obligation to respond to Bar Counsel's written inquiries in the conduct of an investigation, subject to constitutional limitations."  The Committee finds by clear and convincing evidence that Respondent violated this provision.

Bar Counsel made several lawful requests for information in each of the 17 matters, and made lawful requests for Respondent's client files in 16 matters. Respondent was well-aware that he was under investigation and knew of Bar Counsel's inquiries, having been personally served with letters and/or subpoenas in each of the 17 matters at issue.  He failed to submit responses in 16 of the 17 matters, and the one response he submitted, in connection with Mr. Johnson's complaint, contained knowingly false representations and included a falsified document.  In fact, Respondent completely failed to cooperate with Bar Counsel in this matter, never answering the Specification of Charges, and refusing to respond to the ethical complaints of his clients or the Finance

Office of the D.C. Superior Court.  In addition, he failed to comply with Court orders requiring him to turn over his client files.

Rule 8.4(d) provides that "[i]t is professional misconduct for a lawyer to engage in conduct that seriously interferes with the administration of justice."  Comment [3] to Rule 8.4 states that "[t]he majority of cases brought under the rule involve a lawyer's failure to cooperate with Bar Counsel.  A lawyer's failure to respond to Bar Counsel's inquiries or subpoenas may constitute misconduct…."  The Court repeatedly has held that a lawyer's failure to respond to legitimate inquiries of Bar Counsel in the course of a disciplinary matter seriously interferes with the administration of justice.  *See e.g., In re Steinberg,* 864 A.2d 120 (D.C.  2004); *In re Beller*, 802 A.2d 340 (D.C. 2002).  Here, Bar Counsel's investigation was delayed and made far more difficult as a result of Respondent's failure to cooperate with its inquiries and subpoenas.  The Committee finds by clear and convincing evidence that Respondent violated Rule 8.4(d).

### 2.    Rule XI § 2(b)(3) – (Counts One to Ten and Fifteen to Seventeen)

Rule XI, § 2(b)(3) provides that "[f]ailure to comply with any order of the Court or the Board issued pursuant to [Rule XI]" shall be grounds for discipline.  The Committee finds by clear and convincing evidence that Respondent violated this rule.

When Bar Counsel filed the Specification of Charges, Respondent had not complied with the Board's order in the Horton matter, BX 36, and had not complied with Court orders directing him to produce documents and files described in several Bar Counsel subpoenas.  BX 13; BX 16.  Even after Respondent was served with the Specification of Charges, he continued to ignore the orders of the Board and the Court. The Court ordered him to produce additional documents and client files to Bar Counsel,

and ordered his suspension from the practice of law, triggering certain notice and reporting requirements, including those set forth in the Court's order. BX 26. Respondent's misconduct is aggravated by his failure to abide by these additional orders.

## RECOMMENDED SANCTION

The Hearing Committee finds that the appropriate sanction is disbarment. The Committee has considered the facts and circumstances of this case, including: 1) the nature and seriousness of the misconduct; 2) the prejudice, if any, to the client which resulted from the misconduct; 3) whether the conduct involved dishonesty or misrepresentation; 4) the presence or absence of violations of other ethical rules; 5) whether the lawyer has prior discipline; 6) whether the lawyer acknowledged his wrongful conduct; and 7) any circumstances in mitigation or aggravation of the misconduct. *In re Jackson*, 650 A.2d 675, 678-79 (D.C. 1994). The Court has stated that the discipline imposed, although not intended to punish the lawyer, should serve to maintain the integrity of the legal profession, protect the public and courts, and deter future or similar misconduct by the respondent-lawyer and other lawyers. *In re Hutchinson*, 534 A.2d 919, 924 (D.C. 1987).

The scope of Respondent's wrongdoing, including the number of instances of dishonesty, misrepresentations, and gross incompetence and negligence in the handling of client matters, over a course of several years, is breathtaking. Respondent took clients' funds to which he was not entitled, altered documents and filed them with the court, lied to his clients about the status of their cases, failed to communicate and respond to his clients' inquiries, and refused to comply with valid subpoenas and/or orders issued by Bar Counsel, the Board, and the Court. He further submitted checks to the court knowing

that he had insufficient funds in his trust account to cover them. We take into account the number of serious ethical violations perpetrated, the lengthy time over which the wrongdoing occurred, and the number of clients prejudiced by Respondent's conduct, among other factors, in determining that disbarment is the appropriate sanction. Moreover, this sanction is consistent with sanctions imposed in similar cases. *See, e.g., In re Austin*, 858 A.2d 969 (D.C. 2004); *In re Rivlin*, 856 A.2d 1086 (D.C. 2004); *In re Asher*, 772 A.2d 1161 (D.C. 2001); *In re Adams*, 579 A.2d 190 (D.C. 1990). While Respondent had not previously been disciplined in the District of Columbia (prior to his suspension relating to the activities involved in this case), we do not find this to be an important factor, especially since Respondent had not been practicing in the District for long before he began to engage in the wrongful conduct at issue here.

We find that, should Respondent ever be considered for Reinstatement, as a condition of such reinstatement, Respondent should be required to make restitution to his former clients or to the Clients' Security Fund to the extent that the Fund reimbursed his clients, with interest at the statutory rate. The total amount is $36,930, representing the amounts he received and deposited into his trust account.

AD HOC HEARING COMMITTEE

ERIC L. YAFFE, CHAIR

SUZANNE KRAMER

RONALD DIXON, ESQ.

Date:    October 12, 2007