UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

KHOLKAR VISHVESHWAR GANPAT,
Plaintiff,

Civil Action No. 18-13556 "E" (4)
IN ADMIRALTY

v

EASTERN PACIFIC SHIPPING PTE,
LTD., d/b/a/ "EPS"
Defendant

EXPERT'S WRITTEN REPORT



    I, Captain Jeffrey A. Perlstein, designated expert for the Plaintiff Mr. Kholkar Vishveshwar Ganpat, herewith provide the written report concerning matters on which I am expected to offer testimony and opinions on.

## Contents

Introduction and Summary…………...…………………….…….…..3

Facts…….…...…………………………………………….……….3

Opinion and Conclusion……………………….……………………....5

Experts Qualifications ……………...………….…………………11

Documents Reviewed and Relied Upon ……………………...…….......12

**Introduction and Summary**

Peter Sotolongo of Sotolongo Law retained me to evaluate a critical medical incident on board the M/V Stargate where Mr. Kholkar became critically ill after contracting Malaria. Mr. Kholkar Vishveshwar Ganpat was employed in the capacity of Able Body Seaman.

An Able-Bodied Seaman is a member of the deck department whose duties include:
- steering the ship
- standing lookout
- standing cargo watch
- performing deck and hull maintenance
- being able to respond to any emergency using the ship's firefighting and lifesaving appliances.

The M./V. Stargate is classified as a bulk carrier. A bulk carrier is designed to carry coal, grains, cement, chemicals, and similar cargos that are not packaged in any container. The vast majority of these ships operate in the tramp trade. The ship is chartered for a single voyage or a limited period of time. Frequently, as with any commodity, the cargo is sold en route, and a new discharge destination is determined. These ships can be called to any port, anywhere in the world at any time, and must be provisioned with the appropriate fuel, stores, charts, publications, crew, and medical supplies. Lacking any one of these can render the ship unfit for its intended purpose, in other words – unseaworthy.

**Facts**

The M/V Stargate is owned by Larchep Shipping Inc, with its ships registered in the Republic of Liberia. The M/V Stargate was being managed by EPS (Singapore), with its place of business registered in Singapore.

The M/V Stargate had a crew of 23 persons according to the crew list of 02 May 2017.

The M/V Stargate was in Savannah, Georgia, for five days (April 2 - April 7, 2017). During this time, the ship was awaiting anti-malarial medication for the crew. For unknown reasons, this medication was not delivered. As a result, the ship sailed without those anti-malarial drugs, knowing they were going to a country known for malaria. The ship stopped at Barranquilla, Colombia, on its way to Gabon. The vessel was either at anchor or pier-side in Owendo, Gabon, West Africa, for ten days (May 02 - May 11, 2107). The voyage from Owendo, Gabon, West Africa, to Rio De Janeiro, Brazil, was 11 days (May 11 - May 22, 2017).

The Master of an oceangoing ship not only has the ultimate responsibility for the safety and security of the ship, but also the health and safety of the crew, the cargo, and the marine environment. As the ship owner's representative and effectively the vessel's general manager, the Master's purpose cannot be understated. He ensures that national and international Codes, Conventions, and regulations are observed. Many tasks and duties may be delegated to other officers on board. For example, the Second Mate is traditionally the navigator and Medical Officer. However, irrespective of which jobs are assigned to subordinates, the final responsibility comes

3

back to the Captain to ensure the delegated jobs are performed in accordance with the Companies Safety Management System, National and International Codes, and Conventions.

The International Maritime Organization, located in London, England, and several recognized non-governmental organizations have created a series of Conventions, Codes, rules, and regulations to guide the industry. The four mainstays of the International Maritime Organization are:

- The SOLAS Convention: is an international maritime treaty and is the oldest and considered the most important of all the international conventions concerning the safety of merchant ships. The main objective of this Convention is to specify minimum standards for the construction, lifesaving appliances, firefighting appliances, equipment, and operation of ships. These are the minimum standards with which all ships over 500 Gross Tons must comply.
- The MARPOL Convention: is the international convention for the Prevention of Pollution from Ships. It is the main convention covering the prevention of pollution of the marine environment by ships from operational or accidental causes.
- The STCW Convention: is the international convention to set minimum international training and licensing standards for professional mariners.
- The MLC-2006: The Maritime Labour Convention is a part of the International Labour Organization (ILO). The convention was established to ensure that the rights and needs of the seamen are safeguarded, establishes minimum living, health and working standards, and enables them to get what is rightfully due to them without being exploited.

Ships are required to carry a Ships Medicine Chest in accordance with the requirements of:
- International Labour Organization
- The Maritime Labour Convention – 2006
- The requirements of the flag state
- The Republic of Liberia was the flag state for the M/V Stargate

The World Health Organization states that as a precaution, anti-malarial drugs (Chemoprophylaxis) should be taken before departure to receive protective drug levels. All prophylactic drugs should be taken with unfailing regularities for the duration of the stay in the malaria-risk area. The anti-malaria medication should be continued for four weeks after the last possible exposure to infection since parasites may still emerge from the liver during this period. https://cdn.who.int/media/docs/default-source/travel-and-health/2017-ith-chapter7.pdf?sfvrsn=c962efe6_2

The medical inventory dated 11 March 2017 indicated 72 Mefloquine Tablets on board. The medical inventory dated 22 May 2017 also indicated 72 Mefloquine Tablets on board.

According to the medical inventory, there was sufficient inventory of Atovaquone-proguanil to be administered for the voyage to Gabon. The Center of Disease Control list Atovaquone-proguanil, doxycycline, mefloquine or tafenoquine as Chemoprophylaxis, which are preventative medications for malaria. https://www.cdc.gov/malaria/travelers/country_table/g.html.

Mr. Kholkar had Plasmodium falciparum malaria. Plasmodium falciparum accounts for most malaria in humans. Plasmodium falciparum malaria is the commonest type in tropical Africa and causes most deaths. (International Medical Guide for Ships 3rd Edition, page 265)

**Opinions and Conclusion**

I have served as a Merchant Marine Officer for over 40 years. I have sailed in the capacity of the medical officer, Chief Officer, and Master throughout my career. I understand the responsibility of these positions. As medical officer I was responsible for maintaining the ships medicine chest, providing for the health and wellbeing of the crew. Be it taking vital signs, diagnosing a illness and dispensing medications, sending a seaman ashore for medical care, or evacuating a sick seaman by United States Coast Guard helicopter. As Chief Officer I was a department head. Being responsible for stability, cargo stowage and maintenance was only a part of the job. I was also responsible for the health and welfare of the men and women in my department. Both physical and mental. As Master I was ultimately responsible for all that went on onboard. I also delegated responsibilities to my subordinates who I entrusted to be professional and competent. As a professional mariner I am horrified by the facts of this case.

I had the opportunity to meet Mr. Kholkar during a Zoom Conference. I have never heard a more compelling and truthful telling of failure in the lawful responsibility of duty of care and welfare to a seaman, of neglect, and abandonment as told by Mr. Kholkar.

During our conversation, Mr. Kholkar stated:
- While the ship was in Gabon, he stood the 0000-0600 and 1200-1800 deck watch.
- Mosquitos were present during the day, but as it got dark, the number of mosquitos increased, and he found himself getting bit, in spite of wearing a full long jumpsuit, helmet, gloves, a hood, and a towel around his neck.
- When he requested mosquito repellent from the Second Mate, he was told, "It wasn't a problem in Abidjan – don't worry about it here."

- 19 May: Mr. Kholkar experienced his first symptoms. He was tired with mild body pain.

- 20 May: Mr. Kholkar was still tired with mild body aches, pain, and fever. He informed the Second Mate/Medical Officer of these symptoms and was told to take medication that Kholkar had.

It does not appear that the Second Mate took his temperature and vital signs throughout the days he was sick on the ship nor made an entry in the medical log.

- 21 May: Still tired with aches, pain, fever, and more thirsty than usual. Mr. Kholkar continued to self-medicate by taking medicine from home. At 2200 he has a very strong fever, chills, and a strong headache. He self-medicates again.

- 22 May: At 0000, Mr. Kholkar goes to the bridge for his wheel watch. He informs the Second Mate in the Captain's presence of how he feels. The Captain sends him below to rest at the end of his watch. At 0800, he turns to for deck work. At 0830, he informs the Bosun that he can no longer work because of "strong headache." He then goes to the

5

Second Mate and reports that he was "very not well, have a strong headache and body ache." He was to again to self-medicate with medicine brought from home.

- 23 May: Not well enough to work. Mr. Kholkar wakes the sleeping Second Mate to tell him "he is still not well and that he requires medicine." Second Mate tells him the medical locker inventory had been sent ashore and that he could not issue any meds, as that would effect the reported inventory. The Second Mate then told him to speak with the Captain. The Captain tells Mr. Kholkar to inform the Second Mate to issue him medicine. Instead of issuing him medicine from the ships medical chest he gives Mr. Kholkar an unknown tablet from his cabin. After 3-4 hours Mr. Kholkar returns to the Second Mate to tell him he is "feeling more bad." Second Mate tells him to see the Third Engineer who gives him two of his own tablets and a sachet of powder. Later that day +/- 1900 (7 pm) Mr. Kholkar returned to the Second Mate and informs him "I am really sick." The Second Mate tells him to get additional medicine from the Able Seaman who has an adjoining cabin.

- 24 May: Mr. Kholkars' symptoms and physical condition considerably worsen. He continues to self-medicate by taking tablets from home and other crewmembers. He states his urine is very yellow. He has nausea, vision problems, is not able to see clearly, and his vision is darker in front of him. He again wakes the Second Mate. The Second Mate takes him to the Captain's office, where Kholkar describes his symptoms. He asks the Captain to "send me to a Doctor as I am fearful for my life." The Captain replies, "He has sent the Company a message about him, but they have not replied." The Captain tells Mr. Kholkar. "That we are far from the dock and to wait until the ship is tied up."

- 25 May: The M/V Stargate shifts from anchorage to the load dock.  Mr. Kholkar approaches the Captain and pleads "we are now in port, please send me to Doctor." The Captain responds that he has not received authorization from the Company to send Mr. Kholkar to the doctor.

The Captain has still not contacted Eastern Pacific Shipping in regard to Mr. Kholkars' condition and requesting authorization for medical care. That email was finally sent on the 26th.

- 26 May: On this date there is no visit to Mr. Kholkar from the Second Mate or Captain. The Chief Mate stops by Mr. Kholkars' cabin to inquire as to his condition.  Mr. Kholkar tells him "the Captain refuses to send him to hospital, he has difficulty walking and is in fear for his life." The Chief Mate assures Mr. Kholkar he will speak with the Captain.

- 27 May: Mr. Kholkar has given up on the Captain or Second Mate to take care of him. He has not eaten all day as he is too weak to leave his cabin. Mr. Kholkar has seen no one until the Chief Mate comes to his cabin between 1700 and 1800 hours. He informs him that he is going to hospital. Mr. Kholkar requires physical assistance and is helped by one Seaman to leave the ship to the agents' car. The last thing Mr. Kholkar remembers is seeing the glass doors to enter the hospital. He is in a coma for the next19 days and in the hospital for 76 days.

This time line contradicts the email of the afternoon of 26 May from the Captain to Eastern Pacific Shipping informing them of his condition and requesting their authorization to send him to a Doctor. In addition, the ship is at anchor awaiting a dock. It is a short launch ride from the anchorage to the port and access to the medical care he needs and is entitled to.

Eastern Pacific Shipping states in Defendants answer to Interrogatories. Providing records indicating anti-malarial pills were administered in a controlled manner. There are records of anti-malarial drugs issued up to 18 March 2017. There are no records of anti-malarial medications issued after that date.

The Second Mate/Medical Officer states Mefloquine was given to the crew. If Mefloquine was given to the crew, why did the quantity of Mefloquine not change on the medical inventory?
The medical inventory dated 11 March 2017 indicated several different anti-malarial medications and their quantities. Sufficient quantities were on board the M/V Stargate for each crewmember to receive for the voyage to Owendo, Gabon, West Africa, for the period in port and the necessary period thereafter. The medical inventory dated 22 May 2017 reflects the same medications and quantities as the medical inventory dated 11 March 2017.

The Company's assertion that anti-malarial medication was made available is rendered invalid if the medical chest inventory of anti-malarial drugs is accepted as true and correct as there is no difference in quantities reported between 11 March and 22 May 2017.
Why were anti-malarial medicines not given to Mr. Kholkar if there were sufficient quantities?

Though requested, Eastern Pacific Shipping failed to produce evidence of the dispensing of anti-malarial drugs to Mr. Kholkar after 18 May 2017. Additionally, no medical log substantiating any medications were administered to Mr. Kholkar between departure from Savannah, Georgia, on 07 April and 27 May 2017 has been produced. The medical log book pages that were provided are neither dated nor signed by the Master.

The Ship's Medical Chest at Sea, Chapter 2, pages 2-1, states. Those in command of the vessel are ultimately responsible for ensuring that effective preventive measures are in place. Captain Ivanoschi did not take the proper preventative measures for his crew.

In the first email dated 26 May 2017 from Captain Ivanoschi to Maggie Yuan Fang EPSHIPPING states: "Please be advised that AB Kholkar Vishveshwar claimed 4-5 days already
headache and diffused pain over his entire body…. For the said period, he took different flu medicines from his personal stock and paracetamol and antibiotics from ship stock."
- Medical SOF question No. 6: "When had A/B first reported about his illness."
- Captains answer: On the 25th. May "He reported to myself and claim to having a headache and diffused pain all over his body."
These two statements contradict each other in the timeline of Mr. Kholkar reporting his illness and the medications issued. There was no remark of the Medical Officer performing an exam on Mr. Kholkar nor concern that the ship had just come from a malarial region. Furthermore, the ship was at the pier in Rio De Janeiro with no effort made to send Mr. Kholkar to a Doctor or hospital in spite of his declining condition.

7

I highly suspect the integrity of the Deck Log. There are omissions in Mr. Kholkars medical care and discharge from the ship as required by Liberian Maritime Regulations RML – 108
(e) Official Log Book and Entries. Every Master of such Liberian vessel shall make or cause to be made in the log book entries including, but not limited to, the following:
(iv) The name of every seafarer or apprentice who ceases to be a member of the crew otherwise than by death, with the place, time, manner, and cause thereof.

There are omissions of the deck log, which would be the requirement of any Company Safety Management System, industry best practices, and required for ships under a charter agreement.
- 22 May 2017: there is no entry for arrival.
- 25 May 2017: there are no entries between 0400 when the ship is at anchor and 1200 when the ship is pier side.  There are no entries for gear test, stand by engine, pilot on board, anchor aweigh, tugs in attendance, first line, all fast, gangway down, pilot away, finished with engines, free practique, notice of readiness tendered.
Many deck log book entries are incomplete and illegible.

The Master of the M/V Stargate and Eastern Pacific Shipping cannot deny they were aware that the ship was transiting to a region where there was the active threat of a potentially deadly strain of malaria.

Defendant Eastern Pacific Shipping in its responses and objections to Plaintiff Interrogatories.

- Page 7, Eastern Pacific Shipping states that the Master advised the crew of the risks of malaria in West Africa. Prior to leaving Savannah, the Master had supplies of tonic water, which contains quinine which helps fighting malaria. The Master made tonic water available to all of the crew during the voyage and repeatedly told the crewmembers about the benefits of tonic water.

The Company admits that the Captain recognized the risks of malaria in West Africa. In purchasing that tonic water, he recognized the threat of malaria to his crew in Gabon. The Captain is not a pharmacist who can determine the quantity of quinine in each bottle and what would be a proper amount. It was negligent to issue tonic water in lieu of proper anti-malarial medications which were onboard.

In the Defendant answer to Plaintiff interrogatories, the Company (Eastern Pacific Shipping) states, "Due to the unseasonably dry and cool weather in Gabon at the time, local agents advised that the risk of malaria was low. Anti-malarial pills were therefore not required to be distributed during the voyage to Gabon."

- It was not that there was no risk of malaria. There was an acknowledged risk of malaria in which one crew member of 23, Mr. Kholkar, contracted the plasmodium falciparum malaria. Disregard for his health and value as a human being and criminal inaction by the ships Master nearly cost Mr. Kholkar his life and left him permanently disabled, bereft of the ability to support his family and lead a normal and healthy life.

8

The agent in Gabon stated the risk of malaria was low. However, it is not for the agent in Gabon to determine if chemoprophylaxis (preventative medication) is required. Gabon is a tropical environment on the equator of West Africa and is home to the mosquito, which transmits the deadly plasmodium falciparum malaria. The Ships Masters Medical Guide, The Ships Medicine Chest and Medical Aid at Sea, The World Health Guidelines for malaria, and the Center for Disease Control all recommend preventative medication when traveling to Gabon. The decision to issue chemoprophylaxis for the protection of the crew was the responsibility of the Master and the Master alone.

Defendants answer to Interrogatories states "typically, antimalarial pills would be laid out on the table before lunch or dinner and readily available to all crewmembers, if they wish to take them.
- The Company assertion that anti-malarial medication was made available is rendered false and invalid if the medical chest inventory of anti-malarial drugs is accepted as true and correct as there is no difference in quantities reported in the inventories of 11 March 2017 and 22 May 2017.

The Captain and Second Mate had failed to respond to Mr. Kholkars' repeated request for medical care. It became apparent that Mr. Kholkars' condition was rapidly deteriorating.
- The Captain failed to seek medical advice or to send Mr. Kholkar ashore to a hospital promptly.
- Instead, he supposedly waited for a response and authorization from the Eastern Pacific Shipping, which he did not seek until 26 May.
- This notification to Eastern Pacific Shipping and request to send Mr. Kholkar to a doctor came two days after he was aware of the seriousness of Mr. Kholkars condition and his request for shoreside medical care.

This delay cost Mr. Kholkar his toes and nearly his life.

The Captain willfully violated numerous National Regulations and International Codes and Conventions to include;
- Liberian Maritime Regulations RML-108
  10.296 Masters Duties and Responsibilities
     (1) Masters Authority
     (2) Required Log Books
         (a) Seafarers Medical Care
         (b) Visit Medical Professional
         (d) Medical Log
     (3) Medical Care of Officers and Crew
         (a) Seafarers Medical Care
         (b) Visit Medical Professional
- Liberia Maritime Authority MLC-005
  3. Requirements
     3.1 Medical care on board ship and ashore
         3.1.1
         3.1.2
         3.1.4
         3.1.7

- The Maritime Labour Convention 2006
  Title 4. Health protection, medical care, welfare and social security protection
      Regulation 4.1 – Medical care on board ship and ashore
      Standard A4.1 – Medical care on board ship and ashore

The Second Mate who served as Medical Officer, Captain Ivanoschi, of M./V. Stargate and the management of Eastern Pacific Shipping failed to promptly give Mr. Kholkar the medical care he so desperately needed. Their failure to promptly respond to the medical distress of an ill seaman is negligent, criminal and in violation of The Republic of Liberia Maritime regulations and International Codes and Conventions.

As required by National Law and International Convention no health protection and medical care which could be considered comparable as possible to that which is generally available to workers ashore was ever made available to Mr. Kholkar, either prior to his illness or after the symptoms manifested themselves. For five days while his health continued to decline the ship was either at anchor at Rio De Janeiro of pier side.

The Captain of a ship has overriding authority. He can override any demand made on him in the protection of the ship, the crew, the cargo and marine environment. This non-delegable authority and responsibility is enshrined in;
- The International Safety Management Code
- The International Convention for Safety of Life at Sea
- The Maritime Labour Convention
- The Republic of Liberia Maritime Regulations

Under maritime law, a vessel's owner must provide a sick or injured seaman with prompt and adequate medical care, since delays in getting the proper treatment could make the seaman's condition worse. Ship owners and management companies are negligent in this duty, either by providing substandard medical treatment or unreasonably delaying access to effective treatment. If adequate medical care is not available aboard the vessel, the vessel's owner must act promptly to ensure the stricken seamen get the treatment they need, even if the vessel is hundreds of miles from shore. They may have to employ a variety of means to fulfill their duty to get the seaman this care as soon as possible, including placing the seaman aboard a transfer vessel.
The ship Master failed to exercise reasonable care to ensure that prophylactic anti-Malaria drugs were made available for the ships' crew, including Mr. Kholkar.

Eastern Pacific Shipping failed to provide a trained and competent medical officer onboard the M/V Stargate. The medical officer either chose not to perform his job as medical officer and wantonly disregarded the medical needs of Mr. Kholkar, or he failed to recognize that Mr. Kholkars' symptoms after leaving Gabon matched the symptoms of malaria. And once they began to manifest after exposure failed to start treating him as such.

Mr. Kholkars illness became worse due to the Master and ship owner's negligence in failing to provide adequate and prompt medical care.

Eastern Pacific Shipping, through the negligence and malfeasance of the Master of the M/V Stargate and the assigned Second Mate/ Medical Officer breached the general maritime duty to provide a sea-worthy vessel and a safe place to work for Mr. Kholkar.

**Experts Qualifications**

My name is Jeffrey A. Perlstein. I am a 1981 graduate of the State University of New York Maritime College where I received a Bachelor of Science in Marine Transportation, a license from the United States Coast Guard as Third Mate of Steam and Motor Vessels of any Gross Tons upon Oceans and a commission as Ensign in the United States Naval Reserve. During my career I have sailed as Mate and Master on supply boats and towing vessels engaged in rig supply, ocean towing and salvage. Deep sea I have sailed on nearly every class of ship. I have extensive experience as Chief Mate of container ships, on crane ships, roll on-roll off ships, and general cargo ships on which we carried containers. I have served as Master of new build tankers, a passenger ship and a Military Sealift Command Expeditionary Sea Base. I presently hold an active USCG Unlimited Masters License and a United Kingdom Certificate of Equivalent Competency. I am a USCG qualified assessor. I am the Designated Person Ashore and Company Security Officer for a company which operates two general cargo ships in weekly service between Miami, Florida and Nassau, Bahamas. I have written an ISM course in which we do case studies and examine the ISM Code, which I have delivered to an oil major in New Orleans, Louisiana, a yacht company in Fort Lauderdale and provided ISM awareness training to a large yacht. I conduct vessel and facility security audits and write security plans. I am a flag state surveyor for the Cook Islands, Vanuatu, and an Authorized Representative for the Marshall Islands. In this capacity and as an independent auditor and surveyor I conduct audits of their vessels and offices to ensure compliance with national and international shipping regulations and the ISM and ISPS Code and MLC in their offices and onboard their vessels. I retired from the Naval Reserve having attained the rank of Commander. I am a member of the Nautical Institute.

**Documents Reviewed and Relied Upon**

International Safety Management (ISM) Code
- Section 5.2

International Convention for Safety of Life at Sea (SOLAS)
- Chapter V, Regulation 34-1

Maritime Labour Convention – 2006
Title 4. Health Protection, Medical Care, Welfare and Social Security Protection
- Regulation 4.1 – Medical care on board ship and ashore
- Standard A4.1 – Medical care on board ship and shore
- Guideline B4.1.4 – Medical care on board ship and shore; the medicine chest and its contents
- Regulation 4 – 2 Shipowners' liability

Liberia Maritime Regulations RML – 108
9.2.57 Reporting
- (1)(e) Reports of Marine Casualties
10.296 Master's Duties and Responsibilities
- (1) Masters Authority
    - (2)(d), (e) Required Log Books
- (3) Medical Care of Officers and Crew
    - (a) Seafarers Medical Care
    - (b) Visit Medical Professional
    - (c) Standard of competence for Medical First Aid/Medical Care.
    - (d) Medicine Chest

Liberia Maritime Regulations MLC – 005
Purpose
1. Applicability
This notice applies to all ships and seafarers serving on board these ships to which MLC 2006 applies.
3. Requirements
    3.1 Medical care on board ship and ashore
        3.1.1, 3.1.2, 3.1.3, 3.1.4, 3.1.5, 3.1.6, 3.1.7, 3.1.7.7, 3.1.8

The Liberia ship medical chest regulation
World Health Organization International Medical Guide for Ships, 3rd Edition
International Medical Guide for Ships Quantification Addendum', references (g) and (h)
Ships Medicine Chest at Sea, Chapter 2 and Appendix H
The Ships Masters Medical Guide, Third edition
The Ships Medicine Chest and Medical Aid at Sea

The World Health Guidelines for malaria
The Center for Disease Control

Defendant Eastern Pacific Shipping Pte, Ltd. … responses and objections to Plaintiff Kholkar
Vishveshwar Ganpat's ("Plaintiff") Interrogatories
Defendant Eastern Pacific Shipping Pte, Ltd.'s Response to Plaintiff's Requests for Production
Defendant Eastern Pacific Shipping Pte, Ltd.'s  Response to Plaintiff's Requests for Admission
M/V Stargate – Medical SOF – A/B Kholkar Vishveshwar Ganpat (63914)
Complaint for Damages
Deposition of Kholkar Vishveshwar Ganpat, 28 February, 2022
Notes from my Zoom conversation with Kholkar Vishveshwar Ganpat, 01 June 2022
M/V Stargate Deck Log 21 May 2017 to 28 May 2017
Medical Log Book First and Second Part
Medical Inventory 11 March 2017
Medical Inventory 22 May 2017
Anti-malarial Medication Log
Port Calls Since 2013 Redacted
Crew List

Dr. Bernardo S. Campos hospital attendance and care report 10/08/2017
Admission Record V.M. Salgacar Hospital 12/08/2017
Disability Report V.M. Salgacar Hospital 17/08/2017
Discharge Summary V.M. Salgacar Hospital 23/08/2017
Admission Record V.M. Salgacar Hospital 24/04/2018
Discharge Summary V.M. Salgacar Hospital 28/04/2018
Diagnosis Dr. Edwin M. Arujo, Orthopedic Surgeon 6/4/21
Declaration of Dr. James M. Losito, D.P.M 04/04/2108
Declaration of Dr. Arthur M. Fournier, M.D. 31/03/2018
Letter to U.S. Embassy Dr. Arthur M. Fournier, M.D. 01/04/2022

I reserve the right to alter my opinion should additional information be discovered and provided.

Respectfully Submitted Without Prejudice,

_____                          Date: 06 July 2022

Captain Jeffrey A. Perlstein

13

JEFFREY A. PERLSTEIN
721 NW 77th Avenue  Plantation, Florida 33324-1446
(954) 249-0818                    email: jeff@safeshipservice.com

---

I am a professional mariner with more than thirty years' experience in the maritime industry, both afloat and ashore. Having sailed as department head aboard ships with American and multinational crews as well as union and non-union crews. I consider myself a team player but work equally well independently.

Operating a maritime consultancy, I am a Cook Islands and Republic of Vanuatu flag state surveyor, an ISM/ISPS/MLC, and towing vessel Subchapter-M auditor. My services include on and off hire surveys, warranty surveys, safety inspections, casualty investigations and petroleum loss prevention of tankers pier side and supertankers lightering offshore. I perform vulnerability assessments and write security plans for vessels and port facilities. I am a contractor instructor for the largest privately owned maritime school in the United States, additionally I work as a daily surveyor for the National Cargo Bureau. I have written a Company management system under the Subchapter-M inspected towing vessel regulations and the vessel security plan. Under Sub.-M, I serve as Company DPA/CSO for an operator of tugs, barges and a dredge. I have worked as a longshoreman, operating ships gear, loading and discharging break bulk, Ro-Ro and container ships. I am a USCG Qualified Assessor and MCA designated instructor and examiner providing instruction and training onboard ship and in port facilities. I have performed crew training aboard yachts, tugs and passenger vessels and have trained port workers in Hazmat and port facility security awareness. Sailing as Safety Officer aboard passenger ships, I was responsible for all aspects of onboard training and safety. I have provided training from individuals and small groups all the way to auditoriums of several hundred crew. Part of my responsibilities was the development and implementation of standardized training programs for compliance with the U.S. Coast Guard and International Maritime Organization regulations. I have participated in U.S.C.G. mid-period and C.O.I. inspections, SOLAS and A.B.S. inspections and initial passenger ship inspection for foreign flag passenger ships operating in U.S. waters. Shipyard repair programs, major hull conversions, and acceptance sea trials. I have written training curriculum which have been approved by the National Maritime Center. I support maritime attorneys in providing subject matter expertise in the areas of piloting, the COLREGS, vessel navigation and ship handling. The use of mooring equipment and ground tackle. Vessel stability, cargo handling and stowage.  The opening and closing of hatches and holds, ramps and side ports and watertight doors. Hull preservation and maintenance and safe work practices. Operation of vessel survival craft including life rafts, lifeboats and free fall lifeboats. Stevedoring, the operation of ships gear to include container gantries, booms, cranes and associated lifting appliances. Passenger vessel safety. HAZMAT and enclosed space entry. Pilot boarding arrangements. Ocean towing, Ship and Facility security. Implementation and compliance with our domestic laws and international codes such as CFR's, STCW, SOLAS, ISM, ISPS, MARPOL, MLC, IMDG Code and Subchapter–M inspected towing vessel regulations. I hold a HUET training certificate which allows me to travel offshore by helicopter to conduct audits and inspections.

I have served as Mate and Captain of ocean towing and salvage vessels engaged in towing ships, barges, and oil rigs.  I have provided support for research vessels working on cable retrieval and repair, anchor handling, hydrographic surveys, and operations with warships

Jeffrey A. Perlstein
Page Two

_____

and aircraft. While serving as Chief Mate, my vessel successfully salvaged the Nigerian Navy Corvette Erin Omi from the beach outside of Lagos, Nigeria and the towing-supply vessel Acadian Defender from the jetties of the Escravos River, Nigeria. While serving as Captain, my salvage tug extricated the cruise ship Royal Viking Sky from coral reefs outside of Puerto Plata, Dominican Republic. Deep sea, I have served on ocean tugs, towing supply vessels, tween deck freighters, Ro-Ro's, geared and non-geared container ships, bulk carrier, tankers, crane ships, passenger ships, and a surveillance vessel.

I have served as Master of a 16,000 GT passenger ship, a series of 26,000 GT, 350,000 bbl. new build tankers, and an 824,000 bbl. VLCC.  My collateral duties have filled the billets of Ship Security Officer, Force Protection Officer, and Chemical, Biological and Radiological Defense Officer.

It was my privilege to participate in Operation Just Cause, Operations Desert Shield, Storm and Sortie, and Operation Iraqi Freedom.


EDUCATION
- 1981 B.S. Marine Transportation, SUNY Maritime College at Fort Schuyler
- 1980 A.A. Rockland Community College

LICENSES
- U.S.C.G. Master of Steam or Motor Vessels of Any Gross Tons, Upon Oceans
- United Kingdom M.C.A. Certificate of Equivalent Competency

MILITARY SERVICE
- Commander, U.S.N.R., Ret.

FEE SCHEDULE and RETAINER AGREEMENT

Captain Jeffrey A. Perlstein                                    Jeff@SafeShipServices.com
SafeShip Services, LLC                                         (954) 249-0818

Client Name:   Sotolongo Law
               44 West Flager Street., Suite 1700
               Miami, FL 33130

The purpose of this agreement is to procure the services of Captain Jeffrey A. Perlstein, Expert
Witness, in relation to the case of KHOLKAR v. EASTERN PACIFIC SHIPPING PTE. LTD

The Expert Witness shall provide services for The Client (or Attorney) as an independent
professional. Payment to The Expert Witness is not dependent upon the findings which The
Expert Witness renders, nor on the outcome of any legal action, mediation, arbitration, or the
amount or terms of any settlement of the underlying legal cause, nor any contractual arrangement
between The Client (or Attorney), or any other party.

Qualifications: The Client (or Attorney) has had the opportunity and obligation to investigate and
verify The Expert Witness's credentials, and hereby agrees that The Expert Witness is qualified to
perform the services described in this contract.

Engagement Fee: At the time of the execution of this agreement, The Client (or Attorney) shall
tender to The Expert Witness a retainer engagement fee in the amount of $2,500 dollars. Billings
for services performed or expenses incurred shall be charged against this retainer engagement fee
until such time as it is exhausted. The Client (or Attorney) shall not identify this expert witness
as either a testifying or non-testifying expert until such time as the retainer fee has been paid.
Fees in excess of the advanced retainer shall be billable as set forth below on a monthly basis.

Fees: The fees and expenses incurred for services provided by The Expert Witness are per the
attached Fees and Expense Schedule:

Date: _____          Signature: _____

                               On behalf of:

Date: 13 May 2019              Signature: _____
                                                    Jeffrey A. Perlstein

## FEE SCHEDULE and RETAINER AGREEMENT

Captain Jeffrey A. Perlstein                         Jeff@SafeShipServices.com
SafeShip Services, LLC                               (954) 249-0818


**Retainer Fee:**                                                                    $2,500.00
Is payable in advance and will be charged against until it is depleted, or until
the completion of the engagement for expert witness work, at which time the
retainer will be reflected as a credit on the final billing for all fees and expenses.

**Sworn Deposition:**                                                                $220.00/hr.
Attendance at court or other specified location to assist Client, testify as an
expert witness, or while waiting at court or other specified location for an
opportunity to testify or assist Client, a minimum of four hours.

**Hourley Rate:**                                                                    $220.00/hr.
Will be used to compute charges for time worked and tasks performed;
including but not limited to inspections or surveys, document review, research,
write reports or opinions, conferences, telephone calls, receiving or sending
and exhibit preparation.

**Deposition by opposing Council:** When compelled to be deposed by opposing
Council, payment of minimum sworn deposition rate of four hours and round trip
travel and expenses are to be paid prior to start of deposition.

**Portal to portal hourly rate:**                                                    $75.00/hr.
Will be used to compute charges for time expended traveling from office portal
to destination portal. Agreed maximum of 5 hours to be billed unless change
agreed to in advance.

**Expenses:**
Unless mutually agreed in writing, you agree expenses will be determined and paid as shown below:

**Travel by Air, Vessel or Train:** The actual cost of an unrestricted round-trip ticket for economy or coach,
and any costs incurred because of necessary ticket cancellation or change.

**Travel by Personal Car:** Standard IRS mileage rate of 55 cents per mile incurred during the entire trip.

**Car Rental:** The actual cost of a mid-sized rental car, plus any associated expenses like parking, tolls or
fuel.

**Lodging:** The actual cost of a single room and any costs incurred because of a cancellation or change.

**Meals:** The actual cost of meals and tip incurred while traveling.

**Other Expenses:** Document printing, administrative tasks, exhibit preparation or production, and any
other reasonable costs. I will try to obtain in advance your approval for anything unusual.

<u>Expert History</u>                                   <u>Captain Jeffrey A. Perlstein</u>

<u>2018</u>

Case name: Christine Lord v. Maurice Maccario
Case number: 20-2017-CA-007966-XXXX-MB
1615 Forum Pl 4th Floor
West Palm Beach, FL 33401
For Plaintiff

    A woman was detailing a yacht made fast to a pier in a marina, when the boat she was
working on was struck by another vessel. While attempting to dock at a nearby slip the
operator fell against the throttle, losing control of his vessel. His boat violently struck the
yacht the detailer was working on, causing the boat detailer to fall back from the boat
onto the concrete dock. As a result she suffered a TBI.  Provided expertise in industry
standards for the use of fall protection and work practice for those who detail yachts.

<u>2017</u>

Case name: Krug et al v. Celebrity Cruises, Inc.
Case number: 1:16-cv-22810-RNS
Mitchell Sanchez, LLC
One Galleria Boulevard Suite 2121
Metairie, LA 70001
For Plaintiff, Summary judgment.

    Cruise ship passenger severely injured in fall while participating in shipboard activity.
Provided opinion on running aboard ship, crew training and supervision, stop work
authority.  Requirements of crew training and standard operating procedures as required
by the ISM Code.  Sworn deposition taken by opposing council.

<u>2016</u>

Case name: Caroline Hinkle Crouch, individually and as the Personal Representative of the
Estate of Harlan P. Crouch II. v. Liberty Pride Corporation and Liberty Maritime Corporation.
Case number: 2:2015cv00974
Tabak, Mellusi & Shisha LLP
29 Broadway Suite 2311
New York, NY 10006
For Plaintiff, Case settled.

    Second mate serving on US flag ro-ro was killed when the "gator" he was operating
drove off an unguarded, improperly lighted ramp cover.  Provided expertise in ro-ro ship

operations, ISM code, safety management systems, reviewed Companies safety management system in regard to vessel operational checklists, change of watch check lists.  Company policy on cargo hold lighting while work is being performed, crew training, near miss reporting and relevant industry guidelines I reviewed safety meeting reports and focused on the Companies failure to follow its own Safety Management System, the failure to foster a safety culture and the Companies responsibility and failure to ensure a safe work environment.

<u>2015</u>

Case name: Morgan, Kendrick v. MV Trans Shanghai, et al
Case number: 2:14-cv-01336-NJB-KWR
Richard J. Fernandez, Esq.
3000 West Esplanade Avenue, Ste. 200
Metairie, LA 70002
For Plaintiff, report written, case settled

> Third party contractor locked and injured in cargo hold.  Provided expertise in the operation of hatches, cargo hold fumigation, SOP's.

Case name: Boquin v. MB4
Brais, Brais & Rusak
100 N. Biscayne Blvd., Ste. 800
Miami, FL. 33132
305-416-2901
For Plaintiff, vessel survey, case settled

> Vessel grounded after leaving channel, crewmember injured.  Provided expertise on vessel navigation and navigation equipment. Conducted vessel inspection.

Case name: Craddock, Marc & Jill v. Adam J. Gordon, et al
Case number: 14-027775-DVW
Brais, Brais & Rusak
100 N. Biscayne Blvd., Ste. 800
Miami, FL. 33132
305-416-2901
For Plaintiff, case settled

> Diver struck by cigarette boat. Provided expertise on Rules of the Road. Florida state statute regarding diving.

Case name: Nace vs. Martinelli and Johnston
Case number: 13-CA-001048NC
Brais, Brais & Rusak
100 N. Biscayne Blvd., Ste. 800
Miami, FL. 33132
305-416-2901
For Plaintiff, case settled

      Charter yacht grounded after being navigated out of channel. Provided expertise on Rules of the Road, vessel navigation and navigation equipment. Vessel dynamics when on plane vs. displacement mode. Sworn deposition taken by opposing council.


<u>2013</u>

Case name: Jimmy J. Sciurba versus Bisso Towboat Co., Inc
Civil Action No 13-742, in the U. S. District
Court, for the Eastern District of Louisiana, Judge Africk, and Magistrate Knowles
Client: Captain Greg Daley
Richard J. Fernandez, Esq.
3000 West Esplanade Avenue, Ste. 200
Metairie, LA 70002
For Plaintiff, report written case settled

      Crew member suffered lead poisoning while performing hull maintenance.  Provided research on the use of lead based paints in the maritime work place, federal guidelines and requirements in the use of lead based paints.  Personal protective equipment requirements.


<u>2011</u>

Case name: Spencer Brooks versus Cal Dive International, Inc.,
Case Number: No 2012-35015, 129th Judicial District Court, Harris County, Texas,
Client: Captain Greg Daley
Charles Mouton  Esq
For defendant, report written case settled

Crew member injured while performing deck maintenance.  Provided guidance in deck maintenance procedures, tools used and personal protective equipment.

2007

BOWRON, LATTA & WASDEN, P.C.
Abe L. Philips, Jr.
Post Office Box 16046
Mobile, Alabama  36611
Phone:  251-344-5151
For defendant, report written case settled

Crewmember fell while opening hatches while underway. Wrote opinion on casualty aboard Apex Marine bulk carrier. Areas of expertise; opening jacking hatches, bulk cargo (grain), fumigation. Requirement of opening hatches at sea to allow residual aromatic agent to outgas prior to arrival.