1      UNITED STATES DISTRICT COURT

2      EASTERN DISTRICT OF LOUISIANA

3

4 KHOLKHAR VISHVESHWAR GANPAT  *  18-CV-13556
             *
5 versus         *  Section E
             *
6 EASTERN PACIFIC SHIPPING PTE, *  March 28, 2022
 LTD., d/b/a EPS      *
7 * * * * * * * * * * * * * * * *

8

9      EVIDENTIARY HEARING BEFORE
10     THE HONORABLE SUSIE MORGAN
      UNITED STATES DISTRICT JUDGE
11

12 Appearances:

13

14 For the Plaintiff:    Lamothe Law Firm, LLC
           BY: RICHARD M. MARTIN JR., ESQ.
15          400 Poydras Street, Suite 1760
           New Orleans, Louisiana 70130
16

17 For the Plaintiff:    Gonzalez P.A.
           BY: ALEJANDRO J. GONZALEZ, ESQ.
18          15715 S. Dixie Highway, Suite 302
           Miami, Florida 33157
19

20 For the Defendant:    Wagner Bagot & Rayer, LLP
           BY: MICHAEL H. BAGOT JR., ESQ.
21          601 Poydras Street, Suite 1660
           New Orleans, Louisiana 70130
22

23 For the Defendant:    Simms Showers, LLP
           BY: JOHN S. SIMMS, ESQ.
24          201 International Circle, Suite 230
           Baltimore, Maryland 21030

25

1  Official Court Reporter:      Toni Doyle Tusa, CCR, FCRR
2                                500 Poydras Street, Room B-275
                                 New Orleans, Louisiana 70130
3                                (504) 589-7778

4

5

6

7
   Proceedings recorded by mechanical stenography using
8  computer-aided transcription software.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              <u>**INDEX**</u>

2                                                           <u>Page</u>

3
    Kholkar Vishveshwar Ganpat
4        Direct Examination By Mr. Gonzalez              15
         Cross-Examination By Mr. Simms                  76
5        Redirect Examination By Mr. Gonzalez            82

6
    Oral Argument
7        Alejandro J. Gonzalez, Esq.                     91
         Richard M. Martin Jr., Esq.                     92
8        J. Stephen Simms, Esq.                          94
         Richard M. Martin Jr., Esq.                    103

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

**<u>MORNING SESSION</u>**

**(March 28, 2022)**

1

2

3          **THE COURT:**  Be seated.

4          **THE DEPUTY CLERK:**  Calling Civil Action 18-13556,

5    *Kholkar Vishveshwar Ganput v. Eastern Pacific Shipping PTE,*

6    *Ltd.*  If counsel could make their appearance for the record.

7                **MR. MARTIN:**  Your Honor, Richard Martin.  I'm here

8    with Alex Gonzales, *pro hac vice*.  We are for the plaintiff.

9    Thank you.

10               **MR. SIMMS:**  Your Honor, good morning.  Steve Simms

11   for the defendant, with Michael Bagot.

12               **THE COURT:**  All right.  I think this is the first

13   time we have met in person.

14               **MR. SIMMS:**  Yes, it is, Your Honor.

15               **THE COURT:**  It's nice to see you.  Thank you.

16               **MR. SIMMS:**  Thank you.

17               **THE COURT:**  Glad to have you here.

18                    All right.  We are here on document 199, which

19   is the plaintiff's request for a preliminary and permanent

20   injunction.

21                    Mr. Martin, we will let you proceed first.  I

22   understand there's one witness today, who is the plaintiff.  Is

23   that correct?

24               **MR. MARTIN:**  That's correct, Your Honor.

25               **THE COURT:**  The defendant has no witnesses.

09:22

1    **MR. SIMMS:**  After Your Honor's ruling, correct,
2    Your Honor.
3    **THE COURT:**  All right.  Mr. Kholkar is appearing by
4    videoconference.  We are going to do the best we can to
5    transcribe his testimony.
6           If there are times when it's difficult to
7    understand him, Mr. Martin, it might be good for you to say,
8    "Was your response X?" and he can say, "Yes," if you understand
9    him better than we are able to.
10           Then after this testimony I would like for
11    you-all to do some argument about the standard with respect to
12    this motion for preliminary and permanent injunction.
13           Let's proceed.
14    **MR. MARTIN:**  Your Honor, Mr. Gonzalez is going to
15    conduct examination of the witness.  What I would like to ask
16    the Court to consider first is a bit of housekeeping on
17    exhibits.  The plaintiff's exhibits, with the exception of the
18    ones that Your Honor struck on Friday -- that would be the
19    transcript of the deposition, the video, and the declaration --
20    all the rest of our exhibits except for 42 -- which is a
21    description of a category and is not an exhibit.  All the other
22    ones are already in the record.
23           I don't know what procedure Your Honor wanted to
24    use for admitting exhibits into the record for the purpose of
25    the injunction hearing, but all of our exhibits -- and at least

09:23

1   half of them are things that have been produced to us or

2   produced to the Court.  All of our exhibits have exhibit

3   numbers and court record document numbers.

4          **THE COURT:**  Ordinarily we don't admit things that are

5   in the record as exhibits.  You can just refer to them in the

6   record.  That would be my preference.

7          **MR. MARTIN:**  Thank you, Judge.  We have given the

8   Court a jump drive which contains copies of all exhibits, and

9   the Court's clerk has a book of them as well.  Should the Court

10   determine that it wants a group of exhibits entered into the

11   record after the hearing is concluded, we can do that, too, in

12   pdf format.

13          **THE COURT:**  Are you intending to use any of these in

14   your examination of the plaintiff?

15          **MR. MARTIN:**  We're not, but we're planning on

16   referring to them during argument.

17          **THE COURT:**  Oh, okay.  All right.  That's fine.

18          **MR. MARTIN:**  Also, Your Honor --

19          **MR. SIMMS:**  Your Honor, if we could just stop at that

20   point.  I think the -- it doesn't matter what I think.  This is

21   an evidentiary hearing.  So to the extent that these exhibits,

22   any of them, whether or not they are in the record, have to be

23   introduced as evidence, they must be.

24          **THE COURT:**  Pleadings are in the record.  At a trial

25   I don't let people introduce pleadings as exhibits.  They are

09:25

1  in the record.  If I want to refer to them, I can.  If you want

2  to refer to them during argument, you can.  I'm not going to

3  introduce documents in the record as exhibits at the hearing.

4  They are already in the record and you-all can refer to them if

5  you need to.

6          **MR. MARTIN:**  Your Honor, to the extent that it

7  matters --

8          **THE COURT:**  Wait.  Let him finish.  He was about to

9  say something.

10          **MR. SIMMS:**  Understood, Your Honor.  I just wanted us

11  to make clear that there's a distinction between something that

12  might be filed in the record -- for example, there are

13  declarations from Mr. Gonzalez that are filed in the record.

14  Does that make them admissible?  No.  They have to be

15  admissible evidence on this evidentiary hearing.

16          **THE COURT:**  Well, if there is something in particular

17  that they use and you want to object to it after their

18  argument, if you want to object to something that they mention

19  because it shouldn't be admissible, why don't you do it then so

20  I will have your argument on the record and I can consider it.

21          **MR. SIMMS:**  Yes, Your Honor.

22          **MR. MARTIN:**  Your Honor, I also note that although

23  the Court has invited us to present oral argument today, we

24  have briefed these issues.  We have made every effort to

25  footnote our argument on paper with references to the record.

8

09:26

1          THE COURT:  Right.  I have reviewed those.

2          MR. MARTIN:  I'm sure, between me and Mr. Gonzalez,

3    we are not going to hit every one of those, but I wanted to

4    reserve our rights to say, "Well, look, we have already

5    identified them on paper."

6               There's one other matter with regard to

7    exhibits.  We have looked at the defendant's exhibit list, and

8    4 through 25 all appear to be merits related and not injunction

9    related.  We would ask that they be excluded similarly to the

10   Court's ruling on our first three.

11              I would also note that for a separate and

12   limited purpose -- that being to show a time line preceding the

13   Indian suit, which I think will be revealed to be important --

14   4 to 11 of the defendant's exhibits, we would want them

15   admitted specially to prove a time line, but not to the extent

16   that they address the merits, which is a matter for another

17   day.

18              Then lastly --

19          THE COURT:  Wait.  Let's stop right there.

20          MR. MARTIN:  Okay.

21          THE COURT:  So the defendant listed some exhibits.

22   Of course, they don't have any witnesses today.  Were you

23   planning to use these in cross-examination?

24          MR. SIMMS:  Your Honor, we are defending against a

25   case that the plaintiff must make.  Right now we are not

09:27

1    planning to admit them.  Also, the defendant did not cross

2    designate these exhibits.  Again, how can they come in?

3             THE COURT:  These are not in the record, the ones you

4    are talking about?

5             MR. MARTIN:  No, I'm not aware that they are.

6             THE COURT:  4 through 11?

7             MR. MARTIN:  Well, 4 through 11 -- as a matter of

8    fact, Your Honor, they probably are in the record because they

9    are probably attached to exhibits in the original complaint

10   because I attached the great majority of those to that original

11   complaint as exhibits, but those are documents -- and we will

12   discuss those.  Whether the Court wants to admit them or not,

13   we are going to discuss them as part of a time line in the

14   Indian suit when the time is appropriate.

15            THE COURT:  What's the relevance of that?

16            MR. MARTIN:  I will tell you, Your Honor.  When

17   Your Honor ruled on the forum non conveniens motion, you noted

18   that it appeared that the motions were filed in sort of a

19   gamesmanship fashion.  I know I'm probably not quoting you

20   exactly.

21                 Here in this case, one year runs between an

22   initial demand letter by our referring counsel in Miami,

23   Mr. Sotolongo.  They know who Mr. Kholkar is, they know where

24   he is from, but there's no injunction suit filed in India.  The

25   suit starts.  They file their motion to dismiss.  A year later,

09:29

1    after Your Honor afforded us discovery, Your Honor ruled and
2    said Captain Bona is not the subject of service.
3            **THE COURT:**  I discussed that in connection with the
4    forum non conveniens.  What does it have to do with today?
5            **MR. MARTIN:**  I'm about to get to it.  One of the
6    critical rulings in this case was when Your Honor said, "I'm
7    not going to dismiss the 12(b)(5) motion.  I'm going to give
8    the plaintiff more time to serve the defendant in Singapore."
9    Of course, ultimately we did that.  That service was upheld by
10   Your Honor.  But if you look at the records that we have
11   attached and the record of the Indian suit and newly produced
12   documents we got Friday, it shows that EPS's directors met
13   right after Your Honor's ruling and decided, "Well, now we are
14   going to go after him in India."  So what I'm suggesting to
15   you --
16           **THE COURT:**  My ruling on jurisdiction?
17           **MR. MARTIN:**  On the 12(b)(5) motion where you said,
18   "Captain Bona, you can't serve him.  Plaintiff, go to
19   Singapore," but at the same time you did not deny their
20   January 5, 2019, motion to dismiss.  That's important because
21   right after the Court decided, "Bona is not a target of
22   service, but I'm not going to grant the motion.  You guys have
23   more time to serve in Singapore" -- which we did.  At that
24   point the records will show they made a decision to go after my
25   client in India.

09:31

1          Mr. Gonzalez will go into that, but it's really

2    interesting to see what they said in their records.  Of course,

3    there are records that have been produced by the defendant that

4    my client has gone to jail.  He is being threatened right now

5    with property seizure.

6          **THE COURT:**  Is this part of your argument that the

7    proceedings in India are vexatious?

8          **MR. MARTIN:**  What I'm saying is they are part of

9    what's been going on here in the sense that it's yet another

10   hurdle that's been erected.  It's a tactic which could not be

11   employed here, but we will show you that it was one where the

12   Indian court was misled about the status of parties.

13         **THE COURT:**  I think you-all are still not focusing on

14   what the issue is today, which is the line of cases in the

15   Fifth Circuit that sets forth what you have to consider to have

16   this kind of injunction.

17         **MR. MARTIN:**  Let me tie it together for the Court

18   right now.  They, instead of coming here to Your Honor, go to a

19   court in India where they misrepresent who is who and do that

20   in the effort to kill this lawsuit here.  If you have to show

21   potential for harm and wrongdoing and those sort of things that

22   would get Your Honor to shut that case down, we have to show

23   you that even the initial approach of these parties plaintiff

24   in the Indian suit was misrepresented to the Court, and we are

25   going to do that.  The proceeding in India took off from there,

09:32

1    an ex parte proceeding with an injunction intended to deprive

2    my client of his rights here, which come first, and we are

3    going to show that.  That's the harm and that's why this Court

4    should enjoin what's going on.

5            THE COURT:  So I guess the answer to my question was

6    you are using this to show it was vexatious or oppressive --

7            MR. MARTIN:  Yes, ma'am.

8            THE COURT:  -- and that is the relevance of it.

9            MR. MARTIN:  Well, it's also we are going to show the

10   harm and we are going to show the other elements.  We aren't

11   just going to stop there.

12           THE COURT:  The cases say this is a special kind of

13   injunction and it gives you a special test for whether or not

14   you should have this kind of injunction, which is inequitable

15   hardship resulting from the foreign suit, the foreign suit's

16   ability to frustrate and delay the speedy and efficient

17   determination of the cause, and the extent to which the foreign

18   suit is duplicative of the litigation in the United States.

19   That's what I'm listening for.

20           MR. MARTIN:  We are prepared to address all those

21   seriatim.  I will do it now if you want me to.

22           THE COURT:  No.  Mr. Kholkar is waiting.  I want to

23   get his testimony and then let you-all argue.

24               Mr. Simms, did you want to say anything before

25   we start?

09:34

1          **MR. SIMMS:**  We will save the response to argument,

2   which this is.

3          **THE COURT:**  Yes.  Okay.

4          **MR. MARTIN:**  Your Honor, I wanted to bring to the

5   Court's attention the new exhibits which we got Friday which

6   are relevant to the injunction proceeding.

7          **THE COURT:**  So the defendant did another production

8   of documents on Friday?

9          **MR. MARTIN:**  We served injunction-related discovery

10  in February.  Within the time line for responding, EPS

11  responded.  We got those documents, I guess, Thursday evening

12  late by email.  At any rate, they were timely.  We got them on

13  Friday, but we did not have them in time to include them in our

14  last brief which we had to file the day before, Thursday.  So,

15  at any rate, we have them now.  Some of them relate directly to

16  Your Honor's hearing.  We will bring those up at the time

17  needed in argument and ask Your Honor to include them in the

18  record.

19         **THE COURT:**  So, Mr. Simms, you agree you produced

20  some additional documents last week?

21         **MR. SIMMS:**  We got a set of production requests and

22  admission requests that were not signed according to 26(g).  We

23  went back to the other side and said, "You need to sign them."

24  EPS responded timely to the properly signed discovery requests.

25         **THE COURT:**  You ought to do it right the first time

09:35

1    even though it's kind of being technical.

2              MR. MARTIN:  I'm sure the electronic signature

3    service was okay.

4              THE COURT:  Okay.  We will deal with that when we get

5    to the argument stage.

6              MR. MARTIN:  Thank you, Your Honor.

7              THE COURT:  Mr. Gonzalez, you are going to sit at

8    your desk and conduct this examination?

9              MR. GONZALEZ:  If Your Honor would like me to take

10   the podium, I could.

11             THE COURT:  No, you're fine.

12             MR. GONZALEZ:  Okay.

13             THE COURT:  Let's see if we can get the Zoom started.

14             THE DEPUTY CLERK:  Could the witness turn his camera

15   on, please.

16             THE COURT:  Mr. Kholkar, can you hear us?

17             THE WITNESS:  Yes.

18                   KHOLKAR VISHVESHWAR GANPAT,

19   having been duly sworn, testified as follows:

20             THE DEPUTY CLERK:  Could you state your name for the

21   record, please.

22             THE WITNESS:  My name is Kholkar Vishveshwar Ganput.

23   My date of birth --

24             MR. GONZALEZ:  We didn't get to date of birth yet.

25

09:37

1                    **DIRECT EXAMINATION**

2    **BY MR. GONZALEZ:**

3    **Q.**   Can you slow down when you are providing your answer.

4    Let's start again for your full name, please.

5    **A.**   My name is Kholkar Vishveshwar Ganput.

6    **Q.**   Thank you.

7              **MR. GONZALEZ:**  Your Honor, if I may?

8              **THE COURT:**  Yes.

9              **MR. GONZALEZ:**  Thank you.

10   **BY MR. GONZALEZ:**

11   **Q.**   Vishu, thank you very much for joining us today.  I know

12   that there seems to be a delay in our questions and your

13   ability to respond.  So even more than during the deposition, I

14   want you to simply pause and hear the entire question.  If you

15   have any issues with that, please -- whether you don't

16   understand or otherwise -- just let us know.  Okay?

17   **A.**   Yes, sir.

18   **Q.**   We will try to go slowly.

19              Is it correct that your region of Goa is having some

20   sort of electrical deficiency?

21   **A.**   Yes, sir.

22   **Q.**   Can you just tell us quickly what that was.

23   **A.**   South Goa electrical department just announced that there

24   is [Zoom audio distortion] --

25   **Q.**   Slow down.  You have to slow down.  You are going too fast

**KHOLKAR VISHVESHWAR GANPAT - DIRECT**

09:38

1  and there is a delay.  Okay.

2  A.    Sorry, sir.

3  Q.    It's okay.  So is it correct to say that there was a

4  regional power outage in your area of South Goa yesterday that

5  is still in effect today?

6  A.    Yes, sir.

7  Q.    As a result, if there is a break in communication, are you

8  able to find another location in which to finish this

9  testimony?

10  A.    Yes, sir.

11  Q.    Okay.  All right.  So, Mr. Kholkar, I'm going to refer to

12  you as "Vishu," if that's okay.  All right.

13  A.    Yes.

14  Q.    Vishu, you've been explained as to why you are here,

15  correct?

16  A.    Yes, sir.

17  Q.    It is that you have been ordered to appear for this

18  hearing, which is an evidentiary hearing, where we are seeking

19  to stay or effectively a permanent injunction on the case that

20  is pending in India, correct?

21  A.    Yes, sir.

22  Q.    Okay.  Now, Vishu, if you are able to tell us a little bit

23  about your relationship with EPS India, is it your

24  understanding that EPS India is a party to the Indian case?

25  A.    Yes, sir.

KHOLKAR VISHVESHWAR GANPAT - DIRECT

09:40

1    Q.    Okay.  Is EPS Singapore also a party to that case in
2    India?
3    A.    Yes, sir.
4    Q.    Okay.  Was EPS India ever your employer?
5    A.    No, sir.
6    Q.    Has EPS India at any point in time employed you, period?
7    A.    Can you repeat that, please, sir?
8    Q.    Sure.  We will move on.
9           Has EPS Singapore been your employer?
10   A.    Yes, sir.
11   Q.    Okay.  How long have you worked for EPS Singapore?
12   A.    I was working for them since 2014 to 2017.
13   Q.    Okay.
14          THE COURT:  Will you repeat what he said.
15          MR. GONZALEZ:  Sure.
16   BY MR. GONZALEZ:
17   Q.    Vishu, is it correct that you said, "I believe I worked
18   for EPS Singapore from 2014 to 2017"?  Is that correct?
19   A.    Yes, sir.
20   Q.    Okay.  Have you ever executed/signed an employment
21   agreement with EPS India?
22   A.    I signed a contract in Mumbai office.
23   Q.    Okay.  Have you ever executed a contract with EPS India?
24   Now, just EPS India.
25   A.    Could you repeat again, sir, please?

KHOLKAR VISHVESHWAR GANPAT - DIRECT

09:42

1    **Q.**    Okay.  So, Vishu, we are going to focus on EPS India so
2    you are not getting confused.  Okay.  EPS India, are you
3    employed by them, you said no.  My next question is:  With EPS
4    India, have you ever signed a contract of employment with EPS
5    India?  Not EPS Singapore.  EPS India.
6    **A.**    No, sir.
7    **Q.**    Can you repeat the answer, please.
8    **A.**    No, sir.
9    **Q.**    No.  Okay.
10            Did EPS India ever control which vessel you went to
11   to work?
12   **A.**    No, sir.
13   **Q.**    Did EPS India ever assign you what types of jobs you had
14   to perform on ships?
15   **A.**    No, sir.
16   **Q.**    Did EPS India ever provide you instructions on how to be
17   an able-bodied seaman?
18   **A.**    No, sir.
19   **Q.**    Did EPS India ever have the chance or ability to move you
20   between vessels?
21   **A.**    No, sir.
22   **Q.**    Okay.  Do you have any relationship with EPS India?
23   **A.**    No, sir.
24   **Q.**    Okay.  So no direct relationship with EPS India; is that
25   correct?

**KHOLKAR VISHVESHWAR GANPAT - DIRECT**

09:44

1   **A.**   Yes, sir.

2   **Q.**   Is that a reason for which you have resisted the case in

3   India that's pending?

4   **A.**   Yes, sir.

5   **Q.**   Now, there is another aspect of this that was relevant and

6   has been part of the record, which is an employment contract.

7   Are you familiar with that Ventnor Navigation, Inc. entity?

8   **A.**   Yes, sir.

9   **Q.**   Where is Ventnor located?  Do you know?

10  **A.**   I think Monrovia, Liberia.

11  **Q.**   Monrovia, Liberia; is that correct?

12  **A.**   Yes, sir.

13  **Q.**   Does Ventnor have offices in India?

14  **A.**   No, sir.

15  **Q.**   Have you worked in a Ventnor office before?

16  **A.**   No, sir.

17  **Q.**   Have you spoken to anyone from Ventnor in any of the times

18  that you worked for EPS Singapore, 2014 to 2017?

19  **A.**   No, sir.

20  **Q.**   Does Ventnor manage any of the vessels that you worked on

21  for EPS Singapore during 2014 to 2017?

22  **A.**   No, sir.

23  **Q.**   Have you ever worked on a Ventnor-owned vessel?

24  **A.**   No, sir.

25  **Q.**   Did Ventnor ever train you on how to be an able-bodied

**KHOLKAR VISHVESHWAR GANPAT - DIRECT**

09:46  1  seaman?

2  **A.**    No, sir.

3  **Q.**    Did EPS India ever train you on how to be an able-bodied

4  seaman?  Either one?

5  **A.**    Yes, sir.

6  **Q.**    Okay.

7  **A.**    Sorry.  Sir, could you repeat.

8  **Q.**    Okay.  Let me rephrase it.  At any point in time did

9  EPS India provide you any type of training on how to be an

10  able-bodied seaman?

11  **A.**    No, sir.

12  **Q.**    You know, it bears the question do you even know anyone

13  who is a Ventnor employee in any capacity?

14  **A.**    No, sir.

15  **Q.**    So let's discuss now EPS Singapore.  Okay.

16  **A.**    Yes, sir.

17  **Q.**    So is it correct that as of 2014 to 2017, you were an

18  EPS Singapore employee?  Correct?

19  **A.**    Yes, sir.

20  **Q.**    So, specifically, when you boarded the Motor Vessel

21  STARGATE in 2016, you were an EPS Singapore employee, correct?

22  **A.**    Yes, sir.

23  **Q.**    Okay.  Did EPS Singapore provide you rules and regulations

24  on how to be an employee for EPS Singapore?

25  **A.**    (No response.)

## KHOLKAR VISHVESHWAR GANPAT - DIRECT

09:48

1    Q.    Do you want me to rephrase the question?  Did you hear the

2    question?

3    A.    Sir, please repeat it.

4    Q.    Sure.  Did EPS Singapore provide you the policies and

5    procedures on how to do your job on the ship?

6    A.    Yes, sir.

7    Q.    Did EPS Singapore provide you the rules and regulations on

8    how to conduct yourself as a seaman aboard a ship?

9    A.    Yes, sir.

10   Q.    Did EPS Singapore hire you?

11   A.    Yes, sir.

12   Q.    Did EPS Singapore provide you with the travel arrangements

13   on where to go to meet a ship?

14   A.    Yes, sir.

15   Q.    Did EPS Singapore operate the vessels that you were on as

16   an able-bodied seaman?

17   A.    Yes, sir.

18   Q.    Did EPS Singapore control your ability to be rehired or

19   not, meaning who is doing the rehiring?  Do you understand the

20   question?

21   A.    Yes, sir.

22   Q.    Okay.

23   A.    As to EPS Singapore, yes, sir.

24   Q.    "As to EPS Singapore, yes, sir."

25            Did EPS Singapore pay you your wages?

**KHOLKAR VISHVESHWAR GANPAT - DIRECT**

09:50

1    **A.**    Yes, sir.

2    **Q.**    Did EPS Singapore specifically assign you in 2016 to the

3    Motor Vessel STARGATE?

4    **A.**    Yes, sir.

5    **Q.**    Okay.  Did EPS Singapore have a right to fire you?

6    **A.**    Yes, sir.

7    **Q.**    Can you provide the Court with an understanding of the

8    vessels that you worked on for EPS Singapore.

9    **A.**    Sir, please rephrase the question.

10   **Q.**    Sure.  What vessels, Vishu, did you work on for

11   EPS Singapore.

12   **A.**    For myself, the first one was INDIAN SOLIDARITY.  The

13   second vessel was --

14   **Q.**    So, first, let me slow it done.  I believe the first one

15   you said was INDIAN SOLIDARITY?

16   **A.**    Yes, sir.

17   **Q.**    What else?

18   **A.**    Yes, sir.  The second one was the DEVONGATE.

19   **Q.**    The second one was -- can you repeat it again.

20   **A.**    The DEVONGATE.

21   **Q.**    DEVONGATE?

22   **A.**    Yes, sir.  Yes, sir.  D-E-V-O-N.

23   **Q.**    G-A-T-E?

24   **A.**    Yes, sir.  G-A-T-E.  DEVONGATE.

25   **Q.**    Okay.  The third?

KHOLKAR VISHVESHWAR GANPAT - DIRECT

09:52

1   **A.**   The third was the Motor Vessel MOUNT HERMON.

2   **Q.**   Motor Vessel MOUNT HERMON?

3   **A.**   Yes, sir.

4   **Q.**   And the last?

5   **A.**   The STARGATE.

6   **Q.**   So the Motor Vessel STARGATE.

7        So, Vishu, continuing with EPS Singapore, no part of

8   your duties for EPS were done in India, correct?

9        **MR. SIMMS:**  Objection.  Leading.

10        **THE COURT:**  Well, I think that's the only way we are

11   going to get through this.  I'm going to give him some leeway.

12        Maybe you can try to rephrase it.

13        **MR. GONZALEZ:**  Sure.

14   **BY MR. GONZALEZ:**

15   **Q.**   You just mentioned the four vessels that you worked on.

16   You talked about your duties and responsibilities.  Now, Vishu,

17   here is the question:  Is there any time that EPS Singapore,

18   you had to do work for them at any point in time that would

19   require your duties to be performed in India?

20   **A.**   Yes, sir.

21   **Q.**   What?  What do you believe were your duties as an

22   able-bodied seaman to be in India?

23   **A.**   Sir, whenever they assign me a vessel, I will join the

24   vessel.

25   **Q.**   Okay.  So --

### KHOLKAR VISHVESHWAR GANPAT - DIRECT

09:54

1          THE COURT:  Say what he said.

2          MR. GONZALEZ:  Oh, I'm sorry.  So other than the time

3    where he had to join a vessel or leave to join a vessel.

4          THE COURT:  Ask him was that his answer.

5    BY MR. GONZALEZ:

6    Q.   Was that your answer?

7    A.   Yes, sir.

8    Q.   Okay.  All right.  So other than the leaving and joining

9    of vessels, as an able-bodied seaman, did your duties that you

10   were working for EPS require you to do anything other than what

11   you just said in India?

12   A.   No, sir.

13   Q.   Okay.  Are you aware of the injunction that has been filed

14   by EPS India and EPS Singapore against you in India?

15   A.   Yes, sir.

16   Q.   Okay.  Do you believe that at any point in time your

17   contracts for employment include a collective bargaining

18   agreement?

19   A.   Please rephrase the question, sir.

20   Q.   Sure.  Do you believe there is a collective bargaining

21   agreement that applies to you as an able-bodied seaman working

22   on the Motor Vessel STARGATE?

23   A.   Yes, sir.

24   Q.   Why?

25   A.   [Zoom audio distortion] in that contract say the terms and

**KHOLKAR VISHVESHWAR GANPAT - DIRECT**

09:56  1  conditions are applicable to --

2  **Q.**   Stop.  Slow down.  Slow down, Vishu.  Let's start again.

3  Okay.

4  **A.**   Yes, sir.

5  **Q.**   So what agreement are you referring to?

6  **A.**   According to the CBA agreement --

7  **Q.**   According to the Indian agreement --

8  **A.**   The CBA agreement, the collective bargaining agreement --

9  **Q.**   Okay.  The collective bargaining agreement is --

10  **A.**   The standard terms and conditions are applicable to

11  seafarers serving on any ship --

12  **Q.**   Okay.  Stop, Vishu.  Stop for one second.  So is it my

13  understanding what you just said was that the terms and

14  conditions of the agreement had the collective bargaining

15  agreement referenced in it?  Correct?

16  **A.**   Yes, sir.

17  **Q.**   Okay.  All right, Vishu.  If we could, what else,

18  according to your understanding, do you believe as to why the

19  collective bargaining agreement applies to you?

20  **A.**   The terms in the contract that this element, standard

21  terms and conditions, is applicable to any seafarer serving

22  upon any ship, the Annex 1 --

23  **Q.**   Okay.  Stop right there.  So is it my understanding that

24  your testimony is that in addition to the terms and standards

25  of the agreement, that you are also listed as serving on the

**KHOLKAR VISHVESHWAR GANPAT - DIRECT**

09:58

1  Annex 1 vessel, which is the Motor Vessel STARGATE?  Is it your

2  testimony today?

3  **A.**   Yes, sir.

4  **Q.**   So, to clarify, it is your understanding that you are a

5  collective bargaining agreement member, a party to that

6  collective bargaining agreement, because the articles of the

7  collective bargaining agreement call for a list of vessels on

8  that agreement that is listed as Annex 1, and the vessel that

9  you are on was listed on that Annex 1?  Correct?  Is that my

10 understanding?  Am I correct?

11 **A.**   Yes, sir.

12 **Q.**   Okay.  Now, to be clear, you mentioned an Indian agreement

13 because it is referenced in the matter that's pending in India

14 as the Mumbai agreement.  Okay.  Let's talk about that real

15 quick.

16        There is no contract that has you as ever executing a

17 contract with EPS India, correct?

18 **A.**   Yes, sir.

19 **Q.**   There is no such thing as a Mumbai agreement; it's just

20 labeled as a Mumbai agreement within the case pending in India.

21 Correct?

22 **A.**   Yes, sir.

23 **Q.**   All right.  My co-counsel brought something to my

24 attention that's worth mentioning in one of the materials that

25 we have submitted in this Court, which is docket entry 251,

KHOLKAR VISHVESHWAR GANPAT - DIRECT

10:00

1   page 17 of 35.  There is a reference here in a paragraph that
2   says, "Plaintiff No. 1 is a private Ltd. company having office
3   in Mumbai."  Again, this is the Indian complaint.  One of the
4   things that's noted is that Employer 1 was the employer, which
5   means employer being EPS India.  There is no such thing as
6   EPS India ever being your employer, correct?
7   A.   Yes, sir.
8   Q.   All right.  So any reference of the agreements or of the
9   case that's pending in India that references any portion that
10  you are an employee of EPS India, that would be incorrect?
11  A.   Yes, sir.
12  Q.   In fact, that would be not true?
13          MR. SIMMS:  Objection.  It's a legal conclusion.
14          THE COURT:  I believe --
15          THE WITNESS:  Yes, sir.
16          THE COURT:  I believe "incorrect" and "not true" are
17  about the same.
18  BY MR. GONZALEZ:
19  Q.   As you understand it, Vishu, is that not true?
20  A.   Yes, sir.
21          THE COURT:  He has already testified they weren't his
22  employer.  I think you should not be repetitive.
23          MR. GONZALEZ:  Okay.  The only reference is that this
24  was actually specific to the injunction that's pending, but I
25  understand, Your Honor, and I will move on.  Thank you.

KHOLKAR VISHVESHWAR GANPAT - DIRECT

10:02    1    BY MR. GONZALEZ:

2    **Q.**    Let's talk about the EPS injunction, specifically how you

3    obtained information about it.  Okay.  So, Vishu, do you know

4    when your lawsuit was filed in the United States?

5    **A.**    Yes, sir.

6    **Q.**    When?

7    **A.**    It was filed in 2018, November, December.

8    **Q.**    November, December of 2018.  Okay.

9    **A.**    2018.  Yes, sir.

10    **Q.**    Okay.  When did you find out that EPS Singapore and

11    EPS India sued you in India?

12    **A.**    It was around March 2020.

13    **Q.**    Okay.  How did you find out?

14    **A.**    One day a man came and he introduced himself as a bailiff

15    from the court.  He told me that a company called EPS India and

16    EPS Singapore had put case on me, so he had come to give me

17    some papers.  I rejected those papers.  He wanted me to sign

18    those papers, and I didn't sign those papers.

19    **Q.**    Stop right there.  I'm sorry.  Just confirming that we

20    understood you.

21        Then what happened, Vishu?  We need to be very

22    careful on long answers.  We need to slow down so that the

23    court reporter can document it.  Okay.  So continue on.

24    **A.**    After three or four times, he came to my house --

25    **Q.**    Okay.  Who came to your house, Vishu?

**KHOLKAR VISHVESHWAR GANPAT - DIRECT**

10:04

1  **A.**   The court bailiff.  So the court bailiff came to my house
2  three or four times.
3  **Q.**   Okay.
4  **A.**   One time he called me by telephone and asked me that if
5  I'm ready to accept those papers, then he will come to my
6  house; otherwise, he will not.  I said to him that I will not
7  accept those papers.
8  **Q.**   Were you ever visited by an EPS lawyer?
9  **A.**   Yes, sir.
10  **Q.**   Who?
11  **A.**   The one lawyer who came to my house, what I recall his
12  name was Mr. Rawal.
13  **Q.**   Mr. Rawal?
14  **A.**   Yes, sir.
15  **Q.**   What did the EPS lawyer tell you?
16  **A.**   He came to my house and he told me that the proceedings in
17  the United States of America had been stopped.
18  **Q.**   Stop right there.  So is it my understanding that your
19  testimony is that the EPS lawyer came to your house and told
20  you that your case in the United States was stopped?
21  **A.**   Yes, sir.
22  **Q.**   What else did he say?
23  **A.**   And they want to continue it in India, Goa.  So after I
24  told him, I asked to him that the day previous, the previous
25  day, I had spoken with my U.S. lawyer and they never --

KHOLKAR VISHVESHWAR GANPAT - DIRECT

10:06

1          **THE COURT:**  Tell us what he said.

2    **BY MR. GONZALEZ:**

3    **Q.**   Okay.  So is it my understanding that you told Mr. Rawal,

4    the EPS lawyer, that you were not informed by your U.S.

5    attorneys of any such thing, and that you were still aware of

6    the U.S. case that was pending?  Correct?

7    **A.**   Yes, sir.

8    **Q.**   Okay.  What else happened in your discussions with the EPS

9    lawyer?

10   **A.**   After he showed me his card, and after he told me that he

11   was going to give me some papers.

12   **Q.**   He showed you a card and he was going to show you some

13   papers; is that correct?

14   **A.**   Yes, sir.  He was going to give me some papers.

15   **Q.**   Okay.

16   **A.**   I asked, "What kind of papers?"  Then he said that he will

17   go somewhere to print the copies of it and he will come back.

18   I said okay.

19   **Q.**   So to be clear, he said that he had to print it somewhere

20   and come back with papers, correct?

21   **A.**   Yes, sir.

22   **Q.**   Then what else?

23   **A.**   After, I am thinking, two or three hours he came back with

24   the papers.  I asked him was that -- he told me to accept those

25   papers.  I told him that I'm not going to accept those papers.

**KHOLKAR VISHVESHWAR GANPAT - DIRECT**

10:08   1    He told me that --

2    **Q.**   Okay.  So let me stop here to make sure we are correct.

3    Is it my understanding that your testimony is that once he came

4    back, he was going to present you with papers.  When he arrived

5    you said, "What are those papers?"  He said, "These are the

6    papers that will show you what stopped the case in the U.S.,"

7    at which point you said, "I'm not accepting these papers"?  Is

8    that correct?

9    **A.**   Yes, sir.

10   **Q.**   Okay.  What else happened?

11   **A.**   After one, two times he told me to accept those papers and

12   I refused.  So after that he start walking outside my property,

13   and while walking where I'm going he just kept that bunch of

14   papers inside my property.

15   **Q.**   Let me stop there.  I'm sorry, but I'm going to do it

16   again.  One or two times he came back to the property and he

17   was walking on your property, correct?

18   **A.**   Sir, one or two times he told me to accept those papers

19   and then I refused, he start going back.

20   **Q.**   Okay.  So one or two times he came by for you to accept

21   these papers and you refused, correct?

22   **A.**   I didn't accept those papers.

23   **Q.**   Okay.  So at no time did you accept those papers.  Now,

24   would it be fair to say it was about 15 months after you had

25   filed your lawsuit in the United States when this interaction

KHOLKAR VISHVESHWAR GANPAT - DIRECT

10:10  1  happened?

2  A.   Yes, sir.

3  Q.   Okay.  To be clear, you did not sue EPS India in your case

4  in the United States, correct?

5  A.   Yes, sir.

6  Q.   To your knowledge, you have never accepted these papers,

7  correct?

8  A.   Yes, sir.

9  Q.   Were you threatened to go to jail if you did not accept

10  these papers?

11  A.   Yes, sir.

12  Q.   When?

13  A.   So when I believe again [Zoom audio distortion].  He came

14  to my house.  So then I told him that I'm not going to accept

15  those papers.  Then he told me, sir, that, "If you are not

16  going to accept those papers, then one day I will come and I

17  will affix one," to my door, a letter to my door publically.

18  So if I continue not accepting those papers --

19  Q.   I'm sorry.  Let's go back.  I'm sorry.  I understood you,

20  but it appears that we have to break up your answer.

21        So, Vishu, is it correct that when he came back a few

22  more times with papers that he told you that, "One day I may

23  come here and arrest you for not accepting these papers and for

24  not doing away with your case in the United States"?  Is that

25  correct?

**KHOLKAR VISHVESHWAR GANPAT - DIRECT**

10:12

1  A.    Can I say something, sir?

2  Q.    Yes.

3  A.    So he said to me that he will affix on my door some

4  papers; and if I continue doing this, then one day a court will

5  issue a warrant.

6  Q.    Okay.  Stop right there.  So he said to you that he will

7  leave these papers on your property and on your door; and that

8  if you don't accept those papers, they will issue a warrant for

9  your arrest.  Is that correct?

10 A.    So he told me that he would affix some papers on my door

11 and still I'm not going to the court, one day the court will

12 issue me an arrest warrant.  He just warned me about it.

13 Q.    Okay.  So he essentially warned you that one day there

14 will be a warrant issued for your arrest by the court.  Is that

15 fair to say?

16 A.    Yes, sir.  Correct.

17 Q.    All right.  So tell me, when did he next come to your

18 house?

19 A.    Who?

20 Q.    That would be the EPS lawyer along with a deputy and other

21 police.  Do you remember when that happened?

22 A.    Yes.  It was on 16 March 2021.

23 Q.    So it was on March 16, 2021, correct?

24 A.    Yes, sir.

25 Q.    Okay.  What happened?

## KHOLKAR VISHVESHWAR GANPAT - DIRECT

10:14

1  **A.**   Around 11:00 a.m., morning, a guy came and said -- there

2  was a bailiff and two police officers.  They came --

3  **Q.**   Let me stop you right there.  So around 11:00 in the

4  morning two or three police officers arrived at your house, and

5  what happened?

6  **A.**   And a bailiff.

7  **Q.**   And a bailiff.  Okay.

8  **A.**   So the bailiff told me that an arrest warrant had issued

9  by the court.

10  **Q.**   Let me stop you there.  The bailiff told you that an

11  arrest warrant was issued by the court.  What else?

12  **A.**   Yes, sir.

13  **Q.**   Continue.

14  **A.**   He came to arrest me.  So same time I asked him that, "Can

15  you show me the warrant?"  He told me that he is in very hurry.

16  So after that I told him that, "Just give me 5 minutes.  I will

17  go in wash room and" --

18  **Q.**   Let me stop you there.  So you asked to see the warrant.

19  Did he show you the warrant?

20  **A.**   No, sir.

21  **Q.**   He did not.  Okay.  Did he just tell you that you were

22  under arrest?

23  **A.**   Yes, sir.

24  **Q.**   Okay.  And you believed him?

25  **A.**   Yes, sir.

## KHOLKAR VISHVESHWAR GANPAT - DIRECT

10:16

1   **Q.**   Is it correct that you went inside for 5 minutes to gather
2   your things?  Correct?
3   **A.**   Yes, sir.
4   **Q.**   Is it also your testimony that you went inside your home
5   for 5 minutes to gather your things?  Correct?
6   **A.**   Yes, sir.
7   **Q.**   Then what happened?
8   **A.**   So same time the bailiff warned me that, "Do not try to
9   escape."
10  **Q.**   Okay.  So he warned you not to try to escape.  What else?
11  **A.**   Yes, sir.  I said, "I'm not going to escape."  So he sent
12  one of the police officers at the back door of my house.  Same
13  time this bailiff, he showed the arrest warrant to my wife.
14  **Q.**   Okay.  So let me stop you there.  The police officer
15  accompanied you inside.  The other officer is supposed to have
16  seen or shown the arrest warrant to your wife, correct?
17  **A.**   The one police officer was outside my house, back door of
18  my house.
19  **Q.**   Okay.
20  **A.**   The bailiff showed the arrest warrant to my wife.
21  **Q.**   Okay.  They showed the arrest warrant to your wife.  Okay.
22  Then what happened?
23  **A.**   Told my wife to write down on the paper -- because my
24  father was not at home, so he told me to write on the paper the
25  heading to know that which court had issued me a warrant and

## KHOLKAR VISHVESHWAR GANPAT - DIRECT

10:18  1    where I am going.

2    **Q.**    Okay.  So you told your wife to write down whatever

3    heading was on that warrant so that you could show your father

4    because he was not at home, correct?

5    **A.**    The bailiff told to my wife.

6    **Q.**    Okay.  Now, Vishu what happened?

7    **A.**    Yes, sir.

8    **Q.**    Were you taken into custody by these police officers?

9    **A.**    Yes, sir.

10   **Q.**    It was in front of your wife, correct?

11   **A.**    Yes, sir.  And kid.

12   **Q.**    And child.  Okay.

13           Have you ever been arrested before?

14   **A.**    No, sir.  Never.

15   **Q.**    Have you ever had any problems with the law?

16   **A.**    No, sir.

17   **Q.**    Is this the first time that you had to experience

18   something like this with local authorities?

19   **A.**    Can you repeat that, please, sir?

20   **Q.**    Sure.  Have you ever had to deal with local police at any

21   point in time before this?

22   **A.**    No, sir.

23   **Q.**    So you're now placed in a car and taken from your wife and

24   daughter, and where are you taken to?

25   **A.**    The police officers, they put me in South Goa court.

**KHOLKAR VISHVESHWAR GANPAT - DIRECT**

10:19

1    Q.    They took you to South Goa court.  How far away was that?

2    A.    Sir, it was approximately 28 to 30 kilometers.

3    Q.    28 to 30 kilometers?  Okay.

4          When you arrived, did you have an attorney ready or

5    present?

6    A.    Sir, which attorney you are describing about?

7    Q.    Sure.  Was an attorney given to you?  Did you have an

8    assigned attorney to your case in India?

9    A.    No, sir.

10   Q.    Okay.  So you arrived at a Goa court.  Describe for the

11   Court exactly what you're seeing and experiencing.

12   A.    So the bailiff with two police officers deliver me in the

13   courtroom in front of the judge.

14   Q.    Okay.  So the two police officers bring you into the

15   courtroom before a judge?

16   A.    Yes, sir.  The bailiff informed to the judge that they

17   have brought Vishveshwar Kholkar into court.

18   Q.    They informed the court that they have Vishveshwar

19   Kholkar, correct?

20   A.    Yes, sir.

21   Q.    What happened then?

22   A.    After, honorable judge, she asked me that why I was not

23   accepting the papers.

24   Q.    So at that point the judge asked you why are you not

25   accepting papers, correct?

KHOLKAR VISHVESHWAR GANPAT - DIRECT

10:21

1  A.   Yes, sir.  Yes, sir.

2  Q.   What did you tell the judge?

3  A.   I informed honorable judge that I had never sued EPS India

4  in the United States.

5  Q.   "I have never sued EPS India in the United States"?

6  A.   Yes, sir, but I had filed suit against EPS Singapore.

7  Q.   That you filed a lawsuit against EPS Singapore?

8  A.   In the United States of America.

9  Q.   Okay.  Did they explain to you what a bail was?

10  A.   No, sir.

11  Q.   Did they explain to you what a bond was?

12  A.   No, sir.

13  Q.   Did you have a lawyer to explain it?

14  A.   No, sir.

15  Q.   So who was there for the company, EPS Singapore?

16  A.   What I recall, there were three to four EPS lawyers

17  represented in the courtroom.

18  Q.   So in the courtroom you walked into, you had three to four

19  EPS lawyers, correct?

20  A.   Yes, sir.

21  Q.   What was said at that point by EPS lawyers?

22  A.   So then judge told me that to sign a bond or to take a

23  bail or hire a lawyer.  At that point I said, "I will not do

24  any of this."  So at the same time she told me that, "If you

25  argue with me, then you will go to jail."

**KHOLKAR VISHVESHWAR GANPAT - DIRECT**

10:23

1  **Q.**   Okay.  So let me slow down to make sure it's correct.  So
2  is your testimony that the court informed you that you needed
3  to post a bond, bail, and hire a lawyer, and you said that you
4  would not do any of those things?  Correct?  Is that your
5  testimony?
6  **A.**   Yes, sir.  Yes, sir.
7  **Q.**   Do you have money to pay for your defense in this case in
8  India?  Do you have any money for that?
9  **A.**   No, sir.
10 **Q.**   Okay.  So when you were pulled into that courthouse, you
11 did not have money to hire a lawyer; is that correct?
12 **A.**   Yes, sir.
13 **Q.**   You had no idea what a bail was or a bond, correct?  They
14 didn't explain that?
15 **A.**   Yes, sir.
16 **Q.**   EPS lawyers didn't explain that to you either, correct?
17 **A.**   Yes, sir.
18 **Q.**   Okay.  So at that point when you said, "I am not going to
19 do any of those three things," what happened?
20 **A.**   Honorable judge told me that if you are not listening what
21 judge is saying, then she will send me to jail.
22 **Q.**   Okay.  So the judge said, "Since you are not listening, we
23 are going to send you to jail."  Is that correct?
24 **A.**   Yes, sir.
25 **Q.**   Okay.

KHOLKAR VISHVESHWAR GANPAT - DIRECT

10:25

1    A.    Yes, sir.

2    Q.    At any point in time did she tell you to go outside of the

3    courtroom and to have a conversation with an EPS lawyer?

4    A.    Yes, sir.

5    Q.    Okay.  So you were instructed by the court to go outside

6    of the courtroom and discuss matters of this injunction without

7    the presence of an attorney representing you, correct?

8    A.    Honorable judge told to one of the EPS lawyers to

9    discuss --

10   Q.    Vishu, can you just slow down.  Let's repeat that answer,

11   please.

12   A.    Yes.  I'm really sorry, sir.

13   Q.    That's okay.

14   A.    So honorable judge told one of the EPS lawyers to take

15   Mr. Kholkar outside the courtroom and advise him.

16   Q.    And advise you?  Okay.

17          THE COURT:  I didn't understand.

18   BY MR. GONZALEZ:

19   Q.    Let me clarify.  So the court instructed one of the EPS

20   lawyers to take you outside of the courtroom and advise you,

21   correct?

22   A.    Yes, sir.

23   Q.    Okay.  Then what else?  What happened?

24   A.    So also I want to tell you that the honorable judge

25   offered me one government lawyer, which I rejected because I

**KHOLKAR VISHVESHWAR GANPAT - DIRECT**

10:26  1    refused to pay.

2    Q.    So to be clear, the judge said, "We can appoint you a

3    government-appointed attorney"?

4    A.    Yes, sir.

5    Q.    You said no, correct?

6    A.    Yes, sir.

7    Q.    Okay.  So you went outside of the courtroom with an EPS

8    lawyer.  Who else was there?

9    A.    There were two EPS lawyers.  They came with me and my

10   father, my brother-in-law --

11   Q.    So two EPS lawyers game with you and your father outside.

12   Okay.

13   A.    And my brother-in-law outside the courtroom.

14   Q.    What happened?  I'm sorry.  I didn't get that last answer.

15   Can you repeat that last answer?

16   A.    Yes, sir.  So the two EPS lawyers, me, my father, and my

17   brother-in-law, together we go outside the courtroom.

18   Q.    Okay.  So you, your father, your brother-in-law, and two

19   EPS lawyers go outside the courtroom, correct?

20   A.    Yes, sir.

21   Q.    Okay.  Then what happened?

22   A.    One of the EPS lawyers was talking my language about his

23   company, and he told me and my father that there was no need to

24   bring case in United States of America.

25   Q.    Okay.  Stop.  Let me stop you there.  One of the EPS

KHOLKAR VISHVESHWAR GANPAT - DIRECT

10:28

1    lawyers who was speaking spoke to you and your father and said,
2    "There's no reason to have this case in the United States going
3    forward," correct?
4    A.    Yes, sir.
5    Q.    What else did he say?
6    A.    So he told me that, "We can sort it out here, or we can
7    fight this case in Goa, or if you want we can reach a
8    settlement."
9             THE COURT:  What was the last part?
10            MR. GONZALEZ:  Or "we can reach a settlement."
11   BY MR. GONZALEZ:
12   Q.    Okay.  He spoke to you about that outside of the
13   courtroom.  What else happened?
14   A.    After that he told me that -- he gave me an example.  He
15   said to me, "Suppose if you file a lawsuit in Delhi and you are
16   from Goa, then there is no jurisdiction."
17   Q.    So let me break it down.  So the attorney gave you an
18   example saying that if you have a case in New Delhi and you
19   live in Goa, there's no relation between the two; is that
20   correct?  Is that his example?
21   A.    Yes, sir.  He said "jurisdiction," sir.  "There is no
22   jurisdiction."
23   Q.    So he used the word "jurisdiction."  Okay.
24   A.    Yes, sir.
25   Q.    All right.  What else did he tell you?

## KHOLKAR VISHVESHWAR GANPAT - DIRECT

10:30

1  **A.**    So after that I was thinking in my mind, I said, that

2  better court decide that jurisdiction is in line or not is what

3  I said.

4  **Q.**    So you said, "It is not for us to decide whether there's

5  jurisdiction or not."  Is that correct?

6  **A.**    Yes, sir.

7  **Q.**    He is an attorney and you have no attorney.  You're

8  saying, "I would like the judge to make a determination of

9  whether there's jurisdiction or not."  Correct?

10 **A.**    Yes, sir.

11 **Q.**    Then what happened?  Did you come back inside the

12 courtroom?

13 **A.**    After 10 minutes we came back in the courtroom, and the

14 judge was a little busy.

15 **Q.**    So the judge was -- I'm sorry?

16 **A.**    When we arrived inside the courtroom, the judge was a

17 little busy in a hearing.

18 **Q.**    Was a little busy with a hearing.  Okay.

19 **A.**    After, honorable judge said, "What both of you decided?"

20 **Q.**    Okay.  The judge asked what was decided, and she addressed

21 her question to the EPS lawyer, correct?

22 **A.**    To me also and EPS lawyer also asked the question.

23 **Q.**    Okay.  To both EPS lawyers and yourself, and what was

24 said?

25 **A.**    EPS lawyer said that, "We tried to arrive [Zoom audio

**KHOLKAR VISHVESHWAR GANPAT - DIRECT**

10:32

1   distortion] on this case and everything, and he is not ready to

2   listen, also is not ready to sign a bond or make a bail or hire

3   a lawyer."

4   Q.   Let me stop you there.  Let me stop you there.  So the EPS

5   lawyer said to the judge that you did not want to cooperate and

6   that you did not want to drop the lawsuit, correct?

7   A.   Yes, sir.

8   Q.   The EPS lawyer represented to the court that you did not

9   want a bail or a bond; is that correct?

10  A.   Yes, sir.

11  Q.   Did he ever explain to you what a bail or a bond was

12  outside the courtroom?

13  A.   No, sir.

14  Q.   So is that representation to the court accurate?

15  A.   Please rephrase that question.

16  Q.   Sure.  The representation of the fact that you said you

17  did not want a bail or a bond that the EPS lawyer said to the

18  court, is that accurate?  Was that true?  Did you tell him

19  that?

20  A.   No.  When he asked me regarding this, sir, he never

21  asked -- the EPS lawyer never asked me for the bail or nothing.

22  Q.   Okay.  So he never asked you about the bail or bond

23  outside of the courtroom, correct?

24  A.   Yes, sir.

25  Q.   But he represented to the court that you said or denied a

KHOLKAR VISHVESHWAR GANPAT - DIRECT

10:34  1  bail and a bond, correct?

2  **A.**  Yes, sir.

3  **Q.**  So what else happened?

4  **A.**  He told honorable judge that if he not [Zoom audio

5  distortion] with me to the court, then better stand in jail.

6  So the same time the bailiff who came to my house to arrest me,

7  he came in the courtroom and he tells my father that --

8  **Q.**  Okay.  Let's break that up.  Okay.  Vishu, it's okay.  You

9  are doing good.  Just slow down.  Okay.

10      So, Vishu, I understood you to say that one of the

11  police officers that came to arrest you had come into the

12  courtroom and approached your father, correct?

13  **A.**  It was the bailiff, yes, sir.

14  **Q.**  It was the bailiff.  Okay.  So the bailiff --

15  **A.**  Yes, sir.

16  **Q.**  -- that had come to your home now asked your father to go

17  outside?  Okay.  Is that correct?

18  **A.**  Yes, sir.  Yes, sir.

19  **Q.**  Then what happened?  Then what happened?

20  **A.**  My father followed him outside the courtroom and there was

21  one EPS lawyer.  He asked my father that, "Are you the father

22  of Vishveshwar Kholkar?"  My father said, "Yes."  After my

23  father asked him what he told me and "Who are you?" then he

24  didn't answer the question.  He just said, "Go, go," and my

25  father came back inside the courtroom.

**KHOLKAR VISHVESHWAR GANPAT - DIRECT**

10:36

1  **Q.**   Okay.   Then what happened at the time when your father

2  came back into the courtroom?

3  **A.**   Honorable judge, she told me three or four times, more

4  than that, to sign the bond or take a bail or hire a lawyer,

5  which I denied.  After she got a little angry that I'm not

6  listening to her and she said to me that if you are not doing

7  any of these things, then she is going to send me in the jail.

8  **Q.**   Okay.  After she said that if you don't cooperate, she is

9  going to send you to jail, what happened?

10  **A.**   So then my father came to know that I am going to a prison

11  or a jail, same time my father stand and he just said to

12  honorable judge that, "Did my son commit" --

13  **Q.**   Vishu, slow down.  I'm sorry.  I don't mean to interrupt

14  your answer, but if you could start over in your answer and

15  again go slowly.  All right.  The connection is not doing us

16  any favors, so try to go slowly and tell your story.

17  **A.**   Yes, sir.  So my father stands and he said to the judge

18  that, "Did my son do anything that you are sending him to the

19  jail?"  He was a little upset because he had seen that I am

20  going to jail, so he was a little upset.

21  **Q.**   Let me see if I have got this correct.  Your father became

22  upset after the judge indicated what jail you were going to.

23  He spoke up and asked why you were being sent to jail, right?

24  Is that correct?

25  **A.**   Yes, sir.

## KHOLKAR VISHVESHWAR GANPAT - DIRECT

10:39

1   Q.   What jail did they send you to, what jail in particular?

2   A.   The name of the prison was Colvale central jail.

3   Q.   Colvale prison?

4   A.   Central jail.

5   Q.   Who goes to that jail, Vishu, as you understand it?

6   A.   So this jail is for criminals, like, who do murders or who

7   do rapes.

8   Q.   Criminals such as murderers and what else, rapists?

9   A.   It was rapists and all, this jail is for them.

10  Q.   Okay.

11  A.   As I understood, this is for them.

12  Q.   Okay.  When you heard the judge say that, how did you

13  feel?

14  A.   I was very upset and almost get to cry.  I don't know,

15  sir, what to do because I am going to a central jail without

16  doing any crime, nothing wrong I did, and everything is

17  happening in this situation.  I don't know what is going to

18  happen.  I was very upset, sir.

19  Q.   Understood.  I'm assuming everyone understood, but I

20  understood.

21        Vishu, if you can provide us a little bit of just an

22  overview of what happened right after you were taken out of the

23  courtroom and processed.  Okay.  I understand this jail is also

24  pretty far, correct?

25  A.   Yes, sir.

## KHOLKAR VISHVESHWAR GANPAT - DIRECT

10:41

1  **Q.**   So you were in a holding cell for some time, correct?

2  **A.**   Yes, sir.

3  **Q.**   You were taken from this holding cell, correct?

4  **A.**   Please repeat that.

5  **Q.**   Sure.  You were taken from this holding cell and

6  transported to the prison that you were describing before,

7  correct?

8  **A.**   Yes, sir.

9  **Q.**   How long of a drive was that?

10 **A.**   As I remember, sir, it was almost two-hour drive.

11 Two-hour drive.

12 **Q.**   A two-hour drive.  Where were you?  Who took you?  Let's

13 start there.  Who took you over to the prison?

14 **A.**   So when judge ordered to send me to the central jail,

15 after that two police officers changed from that, and the two

16 new police officers from a new police station called Wattala

17 police station.

18 **Q.**   Okay.  So you were in a holding station.  Okay.  You were

19 taken immediately from the court by two or three officers to a

20 holding station, correct?

21 **A.**   Yes, a local police station, sir, named Wattala police

22 station.

23 **Q.**   Okay.

24 **A.**   They took me in that police station and they took me

25 behind the bars.  After that, my father and my brother-in-law

## KHOLKAR VISHVESHWAR GANPAT - DIRECT

10:43

1  came inside the police station.  Same time my father asked one

2  of the police officers that the court has ordered to send

3  Vishveshwar Kholkar to the central jail and why he is bringing

4  to the local police station.

5            THE COURT:  Stop.  Let's stop.  Let's stop.

6            MR. GONZALEZ:  Okay.  Sorry.

7  BY MR. GONZALEZ:

8  Q.   So to be correct, as I understand it, your father and

9  brother-in-law went to the holding cell, the jail, and asked

10 one of the officers if you were going to the central jail and

11 why are you in the jail that's the holding cell; is that

12 correct?

13 A.   Yes, sir.

14 Q.   Then what happened?

15 A.   After, the police officer didn't reply anything.  I was in

16 that jail almost one, one and a half hours.

17 Q.   Okay.  So the police officer didn't say anything, and you

18 were in that cell for about an hour to an hour and a half; is

19 that correct?

20 A.   Yes, sir.

21 Q.   Okay.  Then you were subsequently transported from that

22 jail to the prison, correct?

23 A.   Yes, sir.

24 Q.   Who took you to the prison?

25 A.   One of the police officers told to my brother-in-law that

**KHOLKAR VISHVESHWAR GANPAT - DIRECT**

10:45

1    there is no transport vehicle at that moment to transfer me to

2    the central jail.  So same time my brother-in-law told to that

3    police officer that he can get me and the police officer to the

4    central prison.

5    **Q.**    Let me see if I've got this right.  The officer said to

6    you that there is no transportation to the central jail, so

7    your brother-in-law offered to drive the officer and you to the

8    prison, correct?

9    **A.**    Yes, sir.

10   **Q.**    Okay.

11   **A.**    The vehicle was not available at that time.

12   **Q.**    Okay.

13   **A.**    He told my brother-in-law.

14   **Q.**    So they sent you to the prison.  Okay.  This is the

15   central prison that we discussed.  You have your brother-in-law

16   driving.  You eventually get to this prison where you have

17   murderers and rapists in that prison, right?

18   **A.**    Yes, sir.

19   **Q.**    You enter this prison.  Explain to the judge what you

20   experienced when you walked in there.

21   **A.**    Yes, sir.  So before entering the central jail, the two

22   police officers, they took me for medical in one hospital.

23   **Q.**    Okay.  Stop right here.  Stop.  Vishu, slow down.  I'm

24   sorry, but you need to slow down.

25             So what I understood you to say is that before you

**KHOLKAR VISHVESHWAR GANPAT - DIRECT**

10:47

1    come in, you had two or three officers that escort you to an
2    infirmary or a clinic, correct?
3    **A.**    Yes, sir.  A government hospital.
4    **Q.**    Okay.  We are talking about March of 2020, correct?
5    **A.**    Sir, we are talking about 16 March 2021.
6    **Q.**    2021.  Excuse me.  So you have COVID and, as a result of
7    COVID, they have you go to a clinic before you go into the
8    prison, correct?
9    **A.**    Yes, sir.
10   **Q.**    What do they do?  Describe what exactly happens.
11   **A.**    So before I enter to the hospital, at the entrance of the
12   hospital they are checking COVID tests.
13   **Q.**    They are doing COVID tests, okay, as you come in.  Okay.
14   **A.**    So I was in there with two police officers for about
15   10 minutes and later -- there was a nurse that test and a
16   doctor, one of the -- after testing for COVID told me to wait
17   for 15 minutes for this test to get done.
18   **Q.**    Okay.  So you have to wait in a certain area for
19   15 minutes until you get your COVID results.  Okay.  What else?
20   **A.**    So after they found that I am negative for COVID, they
21   allow me and the two police officers inside the hospital.
22            **THE COURT:**  Wait.  Was he positive?  I couldn't --
23            **MR. GONZALEZ:**  No.
24   BY MR. GONZALEZ:
25   **Q.**    Vishu, you did not say whether or not you were positive or

## KHOLKAR VISHVESHWAR GANPAT - DIRECT

10:49

1  negative in your answer, but were you positive or negative for

2  COVID?

3  **A.**   So I found negative for COVID test.

4  **Q.**   Okay.  Then you were taken by an official to where?

5  **A.**   Inside the hospital and there was one female doctor.  She

6  starts checking me at that point and asking me about any

7  injuries or operations.  I said no to her, and after that she

8  started taking my pressure.

9  **Q.**   Okay.  Let me see if I have this correct to kind of move

10  things along.  She did a regular check of your medical history,

11  correct?

12  **A.**   Yes, sir.

13  **Q.**   She did a brief exam of that.  Did you at any point leave

14  the infirmary to another part of the prison?

15  **A.**   Please repeat, sir.

16  **Q.**   Yes.  Where did you go afterwards?

17  **A.**   After, the female doctor gave me one tablet, and I asked

18  her there what kind of tablet is that.  Then she told me that I

19  am having some high pressure, blood, so just take this pill and

20  I will be normal.  After that she --

21  **Q.**   Okay.  So she gave you a pill because she noticed that

22  your blood pressure was high.  You told her that you did not

23  have high blood pressure.  She said that you need to take it.

24  Correct?

25  **A.**   Yes, sir.  I told the doctor that I never had any problems

KHOLKAR VISHVESHWAR GANPAT - DIRECT

10:51    1    with blood pressure.

2    **Q.**    Vishu, are you somewhat scared of this process right now?

3    **A.**    Yes, sir.

4    **Q.**    Why?

5    **A.**    Sir, because if I don't drop the case in U.S., then they

6    maybe can arrest me again. EPS lawyers can arrest me again.

7    This is what I think, sir and I am scared of.

8    **Q.**    So, Vishu, I think everybody understood that. Vishu, are

9    you telling us all here that you're feeling fear and

10    apprehension in testifying in open court because of what could

11    happen in India?

12    **A.**    Yes, sir.

13    **Q.**    Vishu, do you believe that whatever you say here is going

14    to be used against you in your Indian court case?

15    **A.**    Yes, sir.

16    **Q.**    Last month you were giving a deposition. You were asked

17    by the EPS lawyers here for a deposition. You provided your

18    testimony during that depo. Do you believe that they are going

19    to use that deposition against you in your hearing that's

20    coming up?

21    **A.**    Yes, sir.

22    **Q.**    When is this hearing?

23    **A.**    The next hearing will be on 6th of April 2021.

24        **THE COURT:** What date did he say?

25        **MR. GONZALEZ:** 6th of April 2021.

**KHOLKAR VISHVESHWAR GANPAT - DIRECT**

10:53

1    BY MR. GONZALEZ:

2    Q.    2022, correct?

3    A.    2022.

4    Q.    Yes.  So this coming April 6, correct?

5    A.    Yes, sir.

6    Q.    How many times have you been to the court for this case in

7    India?

8    A.    I think 11 to 12 times.

9    Q.    I'm sorry.  You broke up again.  What is it, Vishu?

10   A.    Sir, I think 11 to 12 times I appeared in the court.

11   Q.    11 to 12 times you have had to go to court.  Okay.

12   A.    Yes, sir.

13   Q.    You hired an attorney, correct?

14   A.    Yes, sir.

15   Q.    You have had to hire an attorney, correct?

16   A.    Yes, sir.

17   Q.    This is a civil case, correct?

18   A.    Yes, sir.

19   Q.    As you understand it, Vishu, what kind of case are they

20   asking -- you're not being convicted by a prosecuting criminal

21   attorney, right, a criminal court?  This is a civil case that

22   is being brought by EPS lawyers, correct?

23   A.    Yes, sir.

24   Q.    So these EPS lawyers are asking the court to hold you in

25   contempt, correct?

KHOLKAR VISHVESHWAR GANPAT - DIRECT

10:54

1   **A.**   Yes, sir.

2   **Q.**   What are they holding you in contempt for?

3   **A.**   I think that when they tried to tell me I did not accept

4   those papers from the bailiff.

5   **Q.**   So if I have this correct, as you understand it, you are

6   being held in contempt because you refused to accept those

7   papers?  That's why they are holding you in contempt, correct?

8   **A.**   Yes, sir.

9   **Q.**   In doing so, do you know how many charges or how many

10  counts EPS lawyers are asking the Court to enforce against you?

11  **A.**   The EPS lawyer told honorable judge that it's 16 times;

12  one, six.

13  **Q.**   One, six; 16 times.  So 16 counts of contempt, correct?

14  **A.**   Yes, sir.  Yes, sir.

15  **Q.**   So, again, if we were to read -- there is an order in

16  December 2020 by the Indian court that is referenced in our

17  pleadings and it says that, again, EPS India has been

18  represented in that proceeding as being an employer of yours.

19  We have asked the question.  You have answered it.  To be

20  absolutely clear, in your understanding and your belief, you

21  are an EPS Singapore employee, correct?

22  **A.**   Yes, sir.

23  **Q.**   Any representation that EPS India has a contractual

24  relationship with you is not true, correct?

25  **A.**   Yes.  Yes, sir.

KHOLKAR VISHVESHWAR GANPAT - DIRECT

10:57

1          **MR. GONZALEZ:**  We want to identify the specific

2    document that we are referring to as docket entry 251, page 17,

3    and that would actually be middle of the page, quotation of

4    December 9, 2020, by the Indian court, paragraph 7.

5    **BY MR. GONZALEZ:**

6    **Q.**   Now, Vishu, let's talk about when you walked into the

7    jail.  You got processed through the clinic.  What was next in

8    that experience for you?  What did you have to endure after

9    that?

10   **A.**   After, from the hospital, two police officers took me to

11   the jail.  I had to stop on the first gate.  I signed some

12   logs.

13   **Q.**   Okay.  So you had to sign some logs along being escorted

14   by two officers.  What else?

15   **A.**   Again, as I recall, sir, I came to the gate.  I signed one

16   paper.

17   **Q.**   Okay.  So you signed the paper that was given to you by

18   the officers.  What else?

19   **A.**   After that, with two police officers I entered in the

20   central jail.  They took me to one room where one of the police

21   officers, a prison police officer, told me to strip, to take

22   off all my clothes.

23   **Q.**   To remove your clothes.  Okay.

24   **A.**   Yeah.  He told me if you are shy, then wrap a towel around

25   my hips and spread your legs.

KHOLKAR VISHVESHWAR GANPAT - DIRECT

10:59

1          THE COURT:  Wait.  What?

2    BY MR. GONZALEZ:

3    Q.    Okay.  So the officer explained that, "If you are shy, I'm

4    going to give you a towel so that you can cover your front, and

5    you need to spread your legs," correct?  Did I get that right?

6    A.    Yes, sir.

7    Q.    What else?  What else did you have to endure?

8    A.    Sir, after I spread my legs and he said okay, he told me

9    to put back my clothes again, so I did so.  After this, two

10   police officers, they took me to one main office of the jail

11   and there was --

12   Q.    So let me stop you there, Vishu, just to be clear.  When

13   you were in the room with that officer, is it my understanding

14   of your testimony that the officer had to do a rectal exam?

15   Correct?

16   A.    Sir, he just told me to wrap a towel around my hips and to

17   spread the legs.  After that, then I spread my legs.  After, he

18   told me to wear the clothes again.

19   Q.    Okay.  Then you went to the other room?

20          THE COURT:  I don't understand.

21          MR. GONZALEZ:  Oh, I'm sorry.

22          THE COURT:  Did he say it was just a strip search or

23   was there a body cavity search?

24          MR. GONZALEZ:  Okay.

25

KHOLKAR VISHVESHWAR GANPAT - DIRECT

11:01  1   BY MR. GONZALEZ:

2   **Q.**   So, Vishu, to be clear, did they have to do a body cavity

3   search, meaning did they actually have you spread your legs and

4   did he have to inspect you and look in your rectum?

5   **A.**   No, sir.  No, sir.

6   **Q.**   Okay.  All right.  He had you spread your legs, and then

7   you were on your way out of the room, correct?

8   **A.**   Yes, sir.

9   **Q.**   Okay.  Then where else did you go?

10  **A.**   The two police officers, they took me to one main office

11  in the jail.

12  **Q.**   Okay.

13  **A.**   As far as I recall, there were two to three police

14  officers.  When I entered in the main office, those two police

15  officers who escorted me to the jail then signed papers, and I

16  think it was a first order.  After that, they made my [Zoom

17  audio distortion] and told me to sign some papers.

18          At certain time I asked one of the police officers,

19  "Are you going to send me in some criminal cell?"  He asked me

20  why.  I told that officer that I am a civil matter.  He told me

21  that a lot of criminals are in the jail, so they will see where

22  to transfer me.  I was really scared of that.  After that they

23  called one of their workers, prison jail workers, and told him

24  to "Transfer him to I-block."

25  **Q.**   Okay.  To what block?

KHOLKAR VISHVESHWAR GANPAT - DIRECT

11:03  1    A.    "I."

2    Q.    I-block.  So eventually you were transferred.  There is no

3    other place to put you.  They had to put you in the I-block.

4    Correct?

5    A.    Yes, sir.

6    Q.    That is with the general public of the prison, correct?

7    A.    Sir, as I understood and that the worker told me that due

8    to COVID situation, any criminals who are going in some [Zoom

9    audio distortion] or something else, for 10 days they had to be

10   in that cell, in those cells.  When they found everything

11   normal, then they will transfer in the --

12   Q.    Sorry.  Just to clarify, as I understand you, due to the

13   fact that these are COVID protocols, they had to send you to

14   this I-block area where everyone that was going to be processed

15   was held, correct?

16   A.    Yes, sir.

17   Q.    Okay.  Then were you escorted into this cell in the

18   I-block?

19   A.    So before I escorted to I-block, the jail worker, he took

20   me in another office where they give me one blanket, one plate,

21   one cup, also he gave me a toothbrush and toothpaste, and he

22   told me to sign the papers.  I gathered all those things and I

23   start to follow the jail worker into the I-block.

24          After I'm dropped off I-block, there was one police

25   officer on the gate, I-block gate.  One police officer was

KHOLKAR VISHVESHWAR GANPAT - DIRECT

11:06

1    there and he spoke with him.  Then police officer allowed me

2    inside the I-block, and he told him to transfer any of the

3    cells.  Then same time I requested to that police, that

4    officer, that please do not send me in some very strong

5    criminals in between --

6              THE COURT:  Please stop.  We are lost on this.

7              MR. GONZALEZ:  I'm sorry.  Okay.

8    BY MR. GONZALEZ:

9    Q.   All right.  Vishu, let's go back.  Let me just rephrase

10   the question.  I will kind of lead you a little bit.  Okay.

11             So, Vishu, is it my understanding that once you were

12   processed, they gave you a plate and some things like a cup and

13   some food, and you proceeded on to the cell?  Correct?

14   A.   Yes, sir.

15   Q.   As I understood it, you had a conversation with an officer

16   there, and you asked if you were going to be placed in a cell

17   with all those people, correct?

18   A.   Very strong criminals, I told him not to transfer me in

19   those cells.

20   Q.   Okay.  All right.

21   A.   After, he took me to No. 4 cell and he started locking the

22   bar, and there was five criminals sleeping there.

23   Q.   Okay.  So are you telling us that as you approached the

24   cell, you saw five inmates in the cell?  Correct?

25   A.   As far as I recall, yes, sir.

## KHOLKAR VISHVESHWAR GANPAT - DIRECT

11:08

1  **Q.**   Okay.  How big of a cell was it?

2  **A.**   Sir, it was 4 to 5 meters in length, approximately, and

3  3 to 4 meters in breadth excluding the bathroom and toilet.

4  **Q.**   So with the bathroom and toilet, 3 to 4 meters wide and 4

5  to 5 meters long, correct?

6  **A.**   Yes, sir.  From what I recall, yes.

7  **Q.**   At what time of the day did you come into the cell?

8  **A.**   Sir, it was 16 March.

9  **Q.**   I'm sorry?

10  **A.**   It was 16 March 2021.

11  **Q.**   No, the 16th is the date.  I'm saying what time of day.

12  By the time you got into the prison and got all booked, you got

13  in there at what time?

14  **A.**   There was not any watch on the wall or anywhere.  From

15  what I think, it was around 2100 hours.

16  **Q.**   Okay.  2100 hours.  They were sleeping on the floor or did

17  they have beds?  Describe that for us, please.

18  **A.**   Sir, I believe the criminals were sleeping on the floor.

19  **Q.**   Okay.  So you're on the floor and you come into the cell.

20  What happens between the officer and an inmate?

21  **A.**   The officer told one of the criminals that, "Allow Kholkar

22  Vishveshwar to enter.  Give him some place to sleep."  The same

23  time one of the inmates said to the police officer that, "We

24  are five here and we are happily sleeping here," so there is no

25  place for me to fit in or to slip in.

**KHOLKAR VISHVESHWAR GANPAT - DIRECT**

11:10

1  **Q.**   Let me see if I have got this.  You're telling us that

2  when he starts to speak with the officer, the inmate says,

3  "There is no room for him to sleep," correct?

4  **A.**   Yes, sir.

5  **Q.**   Then what happens?  The officer did what?

6  **A.**   The officer said to that inmate that, "Only tonight do

7  adjustment because next morning he may go on bail."  I enter

8  into the cell and I was sitting on the floor, and the police

9  officer locked the bars and he went.

10  **Q.**   Okay.  Vishu, at the moment when they left, when they

11  closed those doors in that cell, how did you feel?  Tell us how

12  you were feeling at that moment.

13  **A.**   Sir, I cried almost 15 to 20 minutes.  I was crying and I

14  was unable to think and what is going to happen with me.  That

15  was a very bad day for me.  [Zoom audio distortion] and I left

16  my wife and my child at home and I am in with criminals.  So I

17  was thinking that if I sleep, then what will be next.  That was

18  running in my mind.

19  **Q.**   You fear that as you sit here today -- that's the same

20  feeling you're feeling currently, meaning that since that day

21  you're still under fear or threat of being separated from your

22  family, correct?

23  **A.**   Yes, sir.  Correct.

24  **Q.**   You fear that they are also trying to seize your property,

25  correct?

**KHOLKAR VISHVESHWAR GANPAT - DIRECT**

11:13    1    A.    Yes, sir.

2    Q.    They are also threatening to put you in jail for not

3    dropping this lawsuit?

4    A.    Yes, sir.

5    Q.    When you spent the night in prison, what was the first

6    thing that happened in terms of how did you have to use the

7    restroom?  Tell us about that experience of that particular

8    prison and how you experienced it.

9    A.    Sir, I was very thirsty and I told one of the inmates

10    that, "Is there anywhere to drink water?"  Then he told me

11    that, "Go in bathroom.  There is a tap.  You can open the tap

12    and you can drink that water."  After that, I told him that I

13    was very surprised.  I told him that it is a bathroom.  He told

14    me that this bathroom is utilized to have a bath or washing

15    clothes and also to drink water.  So I took my cup -- because I

16    was thirsty, so I took my cup, I opened that tap, and I fill my

17    cup and I drink that water.  I was very depressed at that time.

18    Q.    Understood.  So what happened in the morning?

19    A.    So in the morning, 6:00 a.m., we all woke up and one of

20    the inmates informed me that, "This is the time where you here

21    to take a cup and you have to go outside the cell and take a

22    pee."  After I wake up, one of the workers in the jail, jail

23    workers, he came to me and he told me that, "Today is your

24    hearing, 17 March 2021," to be ready for the hearing.

25    Q.    Okay.  Now, did you sleep that night, Vishu?

KHOLKAR VISHVESHWAR GANPAT - DIRECT

11:16  1  **A.**   So when I tried to sleep, a lot of mosquitoes were there.

2  I wear jeans and a T-shirt.  So I was sleeping on the floor and

3  there was mosquitoes biting.  So I was really scared that -- I

4  suffered from malaria and I just saved my life.  So, again, if

5  I were to catch malaria, then it will be very dangerous for me.

6  One time Brazilian doctors told me that, "Next time if you are

7  infected with malaria, it will be very dangerous for you."

8          **THE COURT:**  I didn't understand that.

9          **MR. GONZALEZ:**  Yes.

10  BY MR. GONZALEZ:

11  **Q.**   Let me see if I can rephrase it and see if this is

12  correct, Vishu.  So that night while you were in the jail, you

13  were not able to sleep and you saw a lot of mosquitoes

14  everywhere.  You were concerned about malaria because you have

15  been told that if you get malaria again that you have a very

16  good chance of dying; is that correct?

17  **A.**   Sir, he didn't say dying.  He told me that, "It will be

18  very dangerous for your health."

19  **Q.**   Okay.  So it would be very dangerous for your health,

20  correct?

21  **A.**   A lot mosquitoes bite me in the jail cell.

22  **Q.**   Okay.  You broke up again.  Vishu, can you repeat.

23  **A.**   A lot of mosquitoes, they bite me on my toes and on my

24  ankles.

25  **Q.**   Okay.  So mosquitoes were biting your toes and your

**KHOLKAR VISHVESHWAR GANPAT - DIRECT**

11:18  1    ankles, correct?

2    **A.**    Yes, sir.  Yes, sir.  I hardly slept that night, sir.

3    **Q.**    Can you repeat.  I'm sorry.  You broke up.

4    **A.**    Sir, I hardly slept that night.

5    **Q.**    You hardly slept that night.  Okay.

6           The next morning were you transported out of the

7    prison and told that you were going to court?

8    **A.**    Yes, sir.

9    **Q.**    Okay.  How did they transport you to court?

10   **A.**    There is a police bus, a central jail bus, and in that bus

11   all the criminals are there to go for their hearing.

12   **Q.**    Did you have to go in the bus with all those prisoners?

13   **A.**    Yes, sir.

14   **Q.**    Okay.  You were transported to what court?

15   **A.**    Sir, I was transported to the South Goa court, the same

16   court who ordered me to go to prison.

17   **Q.**    Okay.  So you were transported from the prison in this

18   prison bus back to the South Goa court, correct?

19   **A.**    Yes, sir.

20   **Q.**    How long was the drive, you said?

21   **A.**    Sir, transport, two or two and half hours.

22   **Q.**    Okay.  Two to two and a half hours to get to the South Goa

23   court.  So when you got to the South Goa court, Vishu, what

24   happened when you got there?

25   **A.**    Two police officers, they settled me in that court.  When

**KHOLKAR VISHVESHWAR GANPAT - DIRECT**

11:20

1    my name came, then the judge started looking at me.  So same

2    time I just raised my hand and the judge said, "What?"  I

3    requested to the honorable judge that, "Ma'am, is it possible

4    to sign a bond?"  At same time EPS lawyer say in mocking style

5    that, "Look, now he is ready.  After spending a night in jail,

6    he is ready to sign a bond."

7    Q.   Let me see if I have got this correct, Vishu.  So when you

8    walk in, you raise your hand and ask the judge for a bond, at

9    which point an EPS lawyer is mockingly saying, "Look, he spent

10   one night in prison and now he wants a bond."  Is that correct?

11   A.   Yes, sir.

12   Q.   That's what happened?

13   A.   Yes, sir.

14   Q.   Okay.  Then what happened, Vishu?

15   A.   So after that, honorable judge told me that I have lose

16   the time of signing a bond.  She told me either -- you have to

17   apply for a bail, and to apply for a bail I have to hire a

18   lawyer.

19   Q.   Okay.  Let me stop you there.  At which point the judge

20   says, "You don't have a chance at a bond anymore.  You have to

21   do one of two things.  You have to get bail and you have to get

22   an attorney."  Correct?

23   A.   Yes, sir.

24   Q.   Okay.  What did you ask the judge for?

25   A.   So I requested of judge that give me some time to see a

## KHOLKAR VISHVESHWAR GANPAT - DIRECT

11:22

1  lawyer.  Same time the judge told me that, "Do it quickly."  So
2  same time my brother-in-law, he called one of his lawyer
3  friends, and that lawyer friend give him some other lawyer's
4  number.  So when my brother-in-law called that lawyer, he told
5  him that he is unavailable, so he gave him --
6  **Q.**  Let me see if I have got this, Vishu.  The judge told you
7  that you could not wait, you had to get a lawyer now, and so
8  your brother-in-law started to make some arrangements.  He
9  called initially to another attorney.  He was not available.
10 That was a lawyer friend, correct?
11 **A.**  Yes, sir.
12 **Q.**  Eventually you found a lawyer there, and he is your
13 current attorney that is representing you in these proceedings,
14 correct?
15 **A.**  Yes, sir.
16 **Q.**  Okay.  Now, what was explained to your attorney at that
17 time when you were there, what was told?
18 **A.**  Sir, my attorney was not having any idea regarding my
19 case, so he quickly prepared some documents.  He stand in front
20 of the honorable judge and he informed the judge that he is
21 going to apply for a bail for me.
22 **Q.**  Okay.  So he explained to you what a bail was and he
23 explained the need of getting bail.  At that point you were
24 relying on this attorney to give you that information, right?
25 **A.**  Yes, sir.

**KHOLKAR VISHVESHWAR GANPAT - DIRECT**

11:24

1    **Q.**   As you sit here today, you have had, what, 12 different
2    hearings, correct?
3    **A.**   Yes, sir.
4    **Q.**   And all of these happened to be approximately 25 months
5    after them finding out of the lawyers in the United States and
6    15 months after you filed a lawsuit in the United States,
7    correct?
8    **A.**   Yes, sir.
9    **Q.**   As you sit here today, what is your understanding of what
10   the Indian court proceedings, EPS in particular, is asking to
11   do to you?
12          **MR. SIMMS:**  Objection.  Asked and answered.  I think
13   that's the third time.
14          **THE COURT:**  I'm not sure.  I think he is talking
15   about the ultimate goal of the law enforcement.
16          **MR. GONZALEZ:**  Let me clarify.
17   BY MR. GONZALEZ:
18   **Q.**   Now, you have 16 different criminal contempts.  We talked
19   about that.  Let's be specific with regard to what EPS is
20   asking the Court.  Okay.  They are asking the Court to hold you
21   criminally and send you back to jail, right?
22   **A.**   Yes, sir.
23   **Q.**   They are asking that you abandon the U.S. lawsuit,
24   correct?
25   **A.**   Yes, sir.

KHOLKAR VISHVESHWAR GANPAT - DIRECT

11:26

1  Q.  They are asking you to relinquish or do away with any
2  rights that you may have under the collective bargaining
3  agreement?
4  A.  Yes, sir.
5  Q.  They are threatening your freedoms, correct?
6  A.  Yes, sir.
7  Q.  They are threatening your safety by being placed in a jail
8  like the one that you have already been, correct?
9  A.  Yes, sir.
10 Q.  They are threatening your separation from your family,
11 your wife, and your kid, correct, your daughter?
12 A.  Yes, sir.
13 Q.  They are taking away your family's unity, your family's
14 ability to be together, correct?
15 A.  Yes, sir.
16 Q.  Essentially, they want to strip you down and take all of
17 your dignity away?
18         THE COURT:  Mr. Gonzalez, this is more like argument.
19         MR. GONZALEZ:  Okay.
20         THE COURT:  I want facts.
21         MR. GONZALEZ:  Okay.
22 BY MR. GONZALEZ:
23 Q.  Are they also asking to take your property?
24 A.  Yes, sir.
25 Q.  You have heard EPS lawyers asking a court to take your

**KHOLKAR VISHVESHWAR GANPAT - DIRECT**

11:28    1    property; is that correct?

2    **A.**    Yes, sir.  On last hearing this month, on 7th, EPS lawyer

3    requested honorable judge, and after he told honorable judge

4    that he is just saying that [Zoom audio distortion] --

5    **Q.**    Vishu, as you testified just now, it is my understanding

6    that you said that in the last hearing the EPS lawyers

7    presented their case to the judge as to why you should be

8    convicted of these 18 counts of criminal contempt -- or 16,

9    excuse me, and also that the next hearing is when the judge

10    will hear your side and render a decision.  Is that your

11    understanding?

12    **A.**    As I understood, yes, sir.

13    **Q.**    Okay.  Vishu, do you believe that the collective

14    bargaining agreement gives you the right to hold EPS Singapore

15    accountable for any acts that they did to you?

16    **A.**    Yes, sir.

17    **Q.**    Explain how and why.

18    **A.**    So I have read and as I understood that the company agree

19    [Zoom audio distortion] --

20    **Q.**    Vishu, I want you to slow down.  Please repeat your

21    answer, but do me a favor and go slowly.

22    **A.**    Sorry, sir.

23    **Q.**    That's okay.

24    **A.**    As I read and as I understood, I remember that it says if

25    the company is ignoring the medical conditions of any

**KHOLKAR VISHVESHWAR GANPAT - DIRECT**

11:31

1  seafarer -- it says if any seafarer is in problem or he needs
2  medical attention and the company is ignoring, then seafarer
3  can go [Zoom audio distortion] --
4  **Q.**  Vishu, let's break it down this way.  If I'm having a hard
5  time understanding you, I'm sure many others are going to have
6  the same problem.
7         So is it your understanding that EPS's collective
8  bargaining agreement with the union, the ITF, applies to you?
9  Correct?
10  **A.**  Yes, sir.
11  **Q.**  It is your understanding that the collective bargaining
12  agreement that addresses the vessel that you were on applies to
13  you as a seafarer working on that ship, correct?
14  **A.**  Yes, sir.
15  **Q.**  Okay.  There is a part of that contract that's specific
16  that says that if they fail -- EPS Singapore.  EPS.  If they
17  break any part of the agreement, that you have the right "to
18  take such measures against the company as may be deemed
19  necessary to obtain redress," do you remember --
20  **A.**  Yes, sir.
21  **Q.**  Is that what you understand?
22         **MR. GONZALEZ:**  So for purposes of the record,
23  Your Honor, he is referring to "Breach of the Agreement,"
24  Section 33.  That's 33.1.
25

KHOLKAR VISHVESHWAR GANPAT - DIRECT

11:33

1  BY MR. GONZALEZ:

2  Q.  Vishu, with regard to the collective bargaining agreement,

3  that is your understanding, that in fact you are covered by

4  this agreement, correct?

5  A.  Yes, sir.

6  Q.  Before you filed a lawsuit in the United States, do you

7  remember having your lawyers -- myself included and Peter

8  Sotolongo in Miami, we actually communicated with other EPS

9  lawyers in Miami.  Do you remember that?

10       MR. SIMMS:  Objection.  Hearsay.  There is a bunch of

11  hearsay in this, and that's way out of there.

12       THE COURT:  Yes.  I don't think this witness knows

13  the facts about this.  I don't know --

14       MR. GONZALEZ:  I agree.

15       THE COURT:  -- where you are going --

16       MR. GONZALEZ:  That's fine.

17       THE COURT:  -- where you are headed.  You have had

18  him about two hours.

19       MR. GONZALEZ:  I'm good, yes.  One second, please.

20            Vishu, give me one second, please.

21       THE WITNESS:  Yes, sir.

22  BY MR. GONZALEZ:

23  Q.  Vishu, let's clarify a couple of things with regard to the

24  STARGATE, the vessel that you were on in December of 2016 into

25  2017.  Okay.  What is the flag of the STARGATE?

KHOLKAR VISHVESHWAR GANPAT - DIRECT

11:35

1   A.   That's a Liberian vessel.

2   Q.   Okay.  How do you know that?

3   A.   So when I signed one contract in India, Mumbai, on the

4   contract it says Ventnor Navigation, Liberia, Monrovia.  Also

5   on the ship [Zoom audio distortion] --

6   Q.   Vishu, just to be clear, is "Liberia" or "Monrovia"

7   written on the back of the vessel of the STARGATE?

8   A.   Yes, sir.  Yes, sir.

9   Q.   On the stern of the vessel?

10  A.   Yes, sir.

11  Q.   How about all of the other vessels that you worked on for

12  EPS Singapore?  Where are they from?

13  A.   Liberia, sir.  Monrovia.

14  Q.   Okay.  So the four vessels that you talked about before

15  are all Liberian-flagged vessels, correct?

16  A.   Yes, sir.  As per my understanding, yes, sir.

17  Q.   Do you know if the ship STARGATE had a Liberian owner or

18  whether it was EPS Singapore?  Do you know?

19  A.   Sir, can you rephrase the question, please?

20  Q.   Sure.  Do you know if the owner of the STARGATE was a

21  Liberian company?

22  A.   No, sir.

23          THE COURT:  Was the answer he doesn't know?

24          MR. GONZALEZ:  No, he doesn't know.

25

KHOLKAR VISHVESHWAR GANPAT - DIRECT

11:37    1    BY MR. GONZALEZ:

2    **Q.**    Vishu, is it your answer that you don't know or is it that

3    the answer is no, it's not a Liberian-owned vessel?

4    **A.**    Sir, it's not a Liberian-owned vessel.

5    **Q.**    Okay.  Who do you believe owns that vessel STARGATE?

6    **A.**    Sir, EPS Singapore.

7    **Q.**    EPS Singapore has a list on its collective bargaining

8    agreement which has the STARGATE, correct?

9    **A.**    Yes, sir.

10    **Q.**    Okay.  Vishu, I know that we have talked about a

11    collective bargaining agreement between EPS and a union, but is

12    it your understanding that there is no specific contract

13    between EPS Singapore and you, no employment contract?

14    **A.**    Sir, please rephrase the question.

15    **Q.**    Sure.  I understand that we have talked about the EPS

16    collective bargaining agreement --

17         **THE COURT:**  I think he said he was employed -- I

18    think you have confused him.  He already testified he thought

19    EPS Singapore was his employer.

20         **MR. GONZALEZ:**  His employer, but this question is

21    regarding his contract.  I want to be very specific with a

22    contract.

23         **THE COURT:**  So you're asking him whether he signed a

24    contract --

25         **MR. GONZALEZ:**  Contract.

KHOLKAR VISHVESHWAR GANPAT - DIRECT

11:39

1      THE COURT:  -- with EPS Singapore?

2      MR. GONZALEZ:  Correct.

3  BY MR. GONZALEZ:

4  Q.   So, Vishu, let me see if I can phrase this clearly.  Did

5  you ever sign a contract specific between you and

6  EPS Singapore, an employment contract?

7  A.   Yes, sir.

8  Q.   Which --

9  A.   Sir, EPS has a requirement to sign me that contract before

10  joining EPS Singapore's vessel.

11  Q.   So it is your belief that Ventnor, the contract that you

12  are referring to with Ventnor, is EPS?  That's what you

13  believe?  You believe that that is an employment contract that

14  you signed with EPS?  Is that your understanding?

15  A.   Yes, sir.

16      THE COURT:  All right.  I think we have done enough.

17  That's long enough.  We are going to take a 10-minute break.

18          Mr. Kholkar, we are going to take a break for

19  10 minutes.  If you would please come back --

20          I'm assuming that the defense has some

21  cross-examination.

22      MR. SIMMS:  Yes, Your Honor.

23      THE COURT:  We are going to take a 10-minute break,

24  and then you please come back and sit back down at the camera.

25      MR. GONZALEZ:  Vishu, just turn off your microphone.

**KHOLKAR VISHVESHWAR GANPAT - CROSS**

11:41

1          THE COURT:  The Court is adjourned for 10 minutes.

2          (Recess.)

3          THE COURT:  Is the witness back?  Mr. Kholkar?  We

4  can see you now.

5               Any cross-examination?

6                    **CROSS-EXAMINATION**

7  BY MR. SIMMS:

8  Q.   Vishu, we were just talking about the collective

9  bargaining agreement --

10         THE COURT:  Pull your microphone a little bit closer.

11  Thank you.

12         MR. SIMMS:  Okay.

13  BY MR. SIMMS:

14  Q.   Vishu, we were just talking about the collective

15  bargaining agreement.  You could sue EPS Singapore in Goa on

16  those claims, right?

17         MR. GONZALEZ:  Objection.  Asking for a legal

18  opinion.

19         THE COURT:  Sustained.

20         THE WITNESS:  Can I say something?

21         THE COURT:  Mr. Kholkar, if there's an objection,

22  don't answer the question is the bottom line.

23  BY MR. SIMMS:

24  Q.   So is Mr. Arsekar your lawyer in the Goa case?

25  A.   Yes, sir.

**KHOLKAR VISHVESHWAR GANPAT - CROSS**

11:55

1  Q.   You're paying for Mr. Arsekar, aren't you?

2         MR. GONZALEZ:  Form.

3         THE WITNESS:  Yes, sir.

4  BY MR. SIMMS:

5  Q.   Since Mr. Arsekar has been your lawyer, you have not gone

6  back to prison, correct?

7  A.   Yes, sir.

8  Q.   Now, in the case in Goa, have you asked Mr. Arsekar to

9  file any appeals to challenge the orders of the Goa court?

10  Have you asked him to do that?

11         MR. GONZALEZ:  Objection.  Once again, asking for

12  attorney-client, absolutely.

13         THE COURT:  You could ask him if he has filed an

14  appeal, Mr. Simms.

15         MR. SIMMS:  Okay.  I will ask it that way.

16  BY MR. SIMMS:

17  Q.   Vishu, have you filed or has your lawyer filed any appeals

18  of orders of the Goa court?

19  A.   My lawyer that is Mr. Arsekar, he is fighting -- he is

20  still trying to defend all that --

21         THE COURT:  Wait.  You have to slow down,

22  Mr. Kholkar.  Start again and speak slowly.

23         THE WITNESS:  Sorry, ma'am.  My lawyer that is

24  Mr. Arsekar, he is trying to defend that same contempt of

25  court.  My lawyer is trying on that.

KHOLKAR VISHVESHWAR GANPAT - CROSS

11:57

1   BY MR. SIMMS:

2   Q.   All right.  Has your lawyer filed any appeals of the Goa

3   court's orders?

4            MR. GONZALEZ:  Objection.  Asked and answered.

5            THE COURT:  Isn't that what you just asked him?

6            MR. SIMMS:  He talked about a defense, filing a

7   defense in the Goa court.  I'm asking about appeals.

8            THE COURT:  I think all of this is legal questions

9   that he apparently does not understand and isn't able to

10  answer, so I think you should move on.

11           MR. SIMMS:  All right.

12  BY MR. SIMMS:

13  Q.   Vishu, tell us about your schooling.  What schooling do

14  you have?

15  A.   I am 12th at the Goa Board of Education.

16           THE COURT:  Please repeat your answer.

17           THE WITNESS:  I am 12th by the Goa Board of

18  Education.

19           THE COURT:  Did you say that you went to the 12th

20  grade in Goa?

21           THE WITNESS:  Yes, ma'am.

22  BY MR. SIMMS:

23  Q.   Your father is a former police officer, isn't he?

24  A.   Yes, sir.

25  Q.   Your father gave you advice about how to respond to the

**KHOLKAR VISHVESHWAR GANPAT - CROSS**

11:59    1    court in Goa, didn't he?

2            **MR. GONZALEZ:**  Objection.

3            **THE COURT:**  Overruled.  I don't know why it's

4    relevant, actually, but --

5    **BY MR. SIMMS:**

6    **Q.**   Hasn't he given you advice about the court in Goa?

7            **MR. GONZALEZ:**  Objection.

8            **THE COURT:**  Overruled.  Let's try to get through

9    this.

10               What was the answer?

11           **THE WITNESS:**  He tell me sometime how is the court

12    and how to say in the court.

13    **BY MR. SIMMS:**

14    **Q.**   So you have claims against EPS --

15           **THE COURT:**  Mr. Simms, distinguish between EPS India

16    and Singapore in your questions.

17           **MR. SIMMS:**  Yes.  Okay.

18    **BY MR. SIMMS:**

19    **Q.**   You have claims against EPS Singapore.  Did you bring the

20    claim in the United States so you would make more money in the

21    claim than you could make in India?

22    **A.**   The money, also responsible of social justice, it is

23    better, and so I have -- based on what I have heard a lot and

24    because of EPS Singapore I have lost all of my clothes and I

25    have lost [Zoom audio distortion].  So whatever EPS Singapore

KHOLKAR VISHVESHWAR GANPAT - CROSS

12:01

1    was having a chance to order malaria tablets in the

2    United States of America [Zoom audio distortion] then they

3    failed.  They failed to order those malaria tablets to protect

4    me.  Also, they failed to fill those tablets before and after

5    [Zoom audio distortion].  This is what I think is the correct

6    place for this case.

7    Q.    Well, the South Goa court is about an hour from your

8    house, correct?

9    A.    Yes, sir, depending upon the traffic.

10   Q.    EPS Singapore is right there present in the South Goa

11   court, isn't it?

12              MR. GONZALEZ:  Form.

13              THE WITNESS:  [Zoom audio distortion] present in the

14   court.  So they are saying that one from EPS Singapore and

15   other lawyer is from EPS India.

16   BY MR. SIMMS:

17   Q.    Okay.  You have been in the Goa court 12 or 13 times in

18   this case, correct?

19   A.    I said I recall, sir, 11 to 12 times.

20   Q.    Okay.  You have had the chance to bring your claims

21   against EPS Singapore in the Goa court all of those times,

22   haven't you?

23              MR. GONZALEZ:  Form.  Asking for a legal conclusion.

24   Legal question.

25              THE COURT:  I think those are legal questions.  He

## KHOLKAR VISHVESHWAR GANPAT - CROSS

12:03    1    doesn't know.  He is not a lawyer.  Sustained.

2    **BY MR. SIMMS:**

3    **Q.**    Mr. Arsekar came to represent you in March of 2021?

4    **A.**    From 17th of March 2021, Mr. Harshad Arsekar came in the

5    court.

6    **Q.**    Okay.  He will represent you at the upcoming hearing in

7    April, correct?

8    **A.**    Sir, Mr. Avdhut Arsekar will come.

9    **Q.**    Now, it's correct, isn't it, that EPS United States

10    lawyers are paying Mr. Arsekar?  Is that correct?

11            **MR. GONZALEZ:**  Nope.

12            **THE WITNESS:**  So when I was not having money, sir, my

13    EPS lawyers gave me some money, and from that I try to pay

14    Mr. Arsekar.

15            **THE COURT:**  What was the answer?  Mr. Kholkar, is

16    your answer that the EPS United States lawyers are paying

17    Mr. Arsekar?

18            **MR. GONZALEZ:**  Form.  I don't believe that question

19    was properly phrased.

20                I think you said "EPS" lawyers rather than his

21    attorneys in the U.S.

22            **MR. SIMMS:**  Your U.S. lawyers, you're right.

23            **THE COURT:**  So is the question withdrawn?

24            **MR. SIMMS:**  Let me get it right, Your Honor.

25

KHOLKAR VISHVESHWAR GANPAT - REDIRECT

12:05

1  BY MR. SIMMS:

2  **Q.**    Vishu, your U.S. lawyers have paid Mr. Arsekar, correct?

3  **A.**    Sir, when I was not having money, I requested to my U.S.

4  lawyers and they gave me some money and I hired Mr. Arsekar.

5  I'm paying it.

6  **Q.**    Okay.  Are you paying for Mr. Arsekar now yourself?

7  **A.**    Yes, sir.

8          **MR. SIMMS:**  Thank you.

9          **THE COURT:**  No further questions?

10          **MR. SIMMS:**  No, Your Honor.

11          **THE COURT:**  Any redirect?

12                      **REDIRECT EXAMINATION**

13  BY MR. GONZALEZ:

14  **Q.**    Vishu, we will take up right where we left off, though.

15  Vishu, is it fair to say that you are paying your attorney in

16  India because of the monies that have been provided to you by

17  your U.S. lawyers?

18  **A.**    Yes, sir.

19  **Q.**    Okay.  Vishu, do you remember being asked a question about

20  being in court 12 times in India?  Do you remember that

21  question?

22  **A.**    Kindly repeat that, please.

23  **Q.**    Sure.  It was a question that was asked by EPS's lawyer

24  just now that was essentially that did you ever ask or hear

25  them tell the judge that they were properly in Singapore,

**KHOLKAR VISHVESHWAR GANPAT - REDIRECT**

12:08    1   meaning EPS.

2         **MR. SIMMS:** Objection.

3         **MR. GONZALEZ:** Oh, okay. Excuse me. I will withdraw

4   that. I will withdraw that. Hold on. I'll repeat it. I'll

5   repeat it. I apologize. Just having some communication

6   issues.

7   **BY MR. GONZALEZ:**

8   **Q.** The 12 times that you have been before it in India, have

9   the EPS lawyers told the court that EPS Singapore has been

10   served with papers?

11         **MR. SIMMS:** Objection. Hearsay. Relevance. Beyond

12   the scope.

13         **THE WITNESS:** No, sir.

14         **THE COURT:** I guess you can ask him if he has heard

15   them say that, but --

16   **BY MR. GONZALEZ:**

17   **Q.** Vishu, you have been present in court those 12 times.

18   Have you heard the EPS lawyers saying that jurisdiction has

19   been resolved in the U.S. courts?

20   **A.** No, sir.

21   **Q.** Are you aware if the EPS lawyers have provided the court

22   with a copy of the order that indicates that jurisdiction has

23   been obtained on EPS Singapore?

24         **MR. SIMMS:** Objection. Foundation.

25         **THE COURT:** I am sustaining the objection. I think

12:09    1    we have gone about as far as we can on this.  We are now into

2    things this witness can't testify about.

3                MR. GONZALEZ:  I gotcha.

4                THE COURT:  Mr. Kholkar, we are now going to have

5    some argument from the lawyers.  You are welcome to stay online

6    and listen if you would like to.  Would you like to do that?

7                THE WITNESS:  Yes, ma'am.

8                THE COURT:  We will just proceed with argument by the

9    attorneys.

10                Why don't you-all argue from where you are so

11    Mr. Kholkar can see you on the Zoom call.

12                Now, Mr. Martin, do you want to --

13                MR. MARTIN:  Your Honor, as I mentioned at the outset

14    of the proceedings, we received --

15                THE COURT:  You need a microphone.  You-all switch.

16    Are you going to argue about why you have met the requirements

17    for getting the injunction?

18                MR. MARTIN:  Mr. Gonzalez is going to present that

19    argument.

20                THE COURT:  What are you going to argue about?

21                MR. MARTIN:  I'm talking about documents which we

22    want added to the record which we got which deal, we think,

23    with the injunction issue, but we didn't get them until Friday.

24    We had to file our brief on Thursday, so we could not include

25    these.  We would have.

12:11

1          **THE COURT:**  Okay.

2          **MR. MARTIN:**  These are documents produced by EPS to

3    us.

4          **THE COURT:**  All right.  Do you have a copy of those

5    for me so I can see?

6          **MR. MARTIN:**  I do.

7          **MR. SIMMS:**  Your Honor, just to put an objection in,

8    first --

9          **THE COURT:**  Stay seated since you-all need to talk

10   into the microphone.

11         **MR. SIMMS:**  Your Honor, to put in an objection, the

12   court's orders were very clear about the requirement to

13   complete discovery by the deadlines that the Court set.

14   Discovery was not complete.  These weren't listed in the

15   exhibit lists.  That's the objection, the Court's orders.

16         **MR. MARTIN:**  Let me help Mr. Simms with that one.

17   The Court's order said we had to file a witness and exhibit

18   list on Thursday the 24th.  We did.  We scrupulously adhered to

19   the Court's order.  This discovery, which was injunction

20   related, was delivered to us about 9:00 p.m. at night

21   Thursday evening.

22              Now, they could have been sent to us earlier in

23   the day.  They weren't.  They were sent to us after our witness

24   and exhibit lists and also our reply brief were filed per

25   Your Honor's scheduling order.  These things come to our office

12:12    1    Friday morning at 8:30.  "Well, look what's here."

2            THE COURT:  Do you have a copy to hand to me right

3    now?

4            MR. MARTIN:  I absolutely do.  They are responses to

5    requests for production, responses to requests for admission,

6    and documents.

7            THE COURT:  We don't usually put pleadings in.  Is

8    what you are trying to introduce are the documents?

9            MR. MARTIN:  Yes, Your Honor, plus there are portions

10    of the pleadings which admit certain things that they did,

11    actions that they took in connection with initiating the Indian

12    lawsuit.  That's the subject of some of our discovery.

13            THE COURT:  Tell me specifically what you think is

14    relevant.

15            MR. MARTIN:  Your Honor, in that group of documents,

16    there are board meeting minutes where they talk about filing a

17    lawsuit.  There is one power of attorney in India being given

18    by Captain Bhasin to lawyers, and interestingly enough it

19    speaks in terms of even including criminal penalties against

20    Mr. Kholkar.

21            I will note that there is a second power of

22    attorney which for some reason was not produced.  It's the one

23    that the board of directors in Singapore gave in India.  We

24    presume it's similar to the one that EPS India gave, but for

25    some reason we didn't get a copy of it.  I know we can go this

12:14

1   route with Magistrate Judge Douglas, but to save a lot of time,
2   it's something that Your Honor really needs to see, and they
3   should produce it to the Court right way.

4           THE COURT:  The first one I see is a power of
5   attorney re: Mr. Kholkar Vishveshwar Ganpat, Eastern Pacific
6   Shipping India, appointing Mr. Raghunath Ghose to expedite its
7   power of attorney.

8           MR. MARTIN:  In there they talk about pursuing
9   Kholkar for all matters including going after him for criminal
10  sanctions.

11          THE COURT:  Who is this person?

12          MR. MARTIN:  Mr. Bhasin is an officer of EPS India.
13  There are two documents that Your Honor should be interested
14  in.  The first is this power of attorney from EPS India which,
15  as you will recall the testimony, has zero contractual
16  relationship or job relationship with the plaintiff.  That's
17  EPS India authorizing a suit against a man they have no
18  dealings with.

19          THE COURT:  They authorized this Mr. Ghose to pursue
20  a suit --

21          MR. MARTIN:  Yes, ma'am.

22          THE COURT:  -- in India?

23          MR. MARTIN:  In India.

24          THE COURT:  Is Mr. Ghose their employee?

25          MR. MARTIN:  Mr. Bhasin is on the board of directors

88

12:16

1    of EPS India, which is 99.99 percent owned by EPS Singapore.

2    He is their creature.  In there he is authorizing a lawsuit

3    where EPS India appears as a plaintiff knowing full well that

4    they have no relationship whatsoever to the plaintiff and, as

5    I've been banging the drum, no standing at all to sue him for

6    anything.

7         THE COURT:  What does that have to do with what's in

8    front of me today?  We know that they filed a suit against him

9    in India.  That's not in dispute.

10        MR. MARTIN:  Your Honor, I guess the point I'm trying

11   to make is when you have absolutely no standing, no right, no

12   claim, and you file a suit anyway, that is --

13        THE COURT:  Does this say, "We don't have any

14   standing or any right against him, but we want you to file a

15   suit anyway"?

16        MR. MARTIN:  The testimony today from Mr. Kholkar and

17   the very employment agreements that are at issue demonstrate

18   that fact independently.

19        THE COURT:  That's not in this power of attorney.

20        MR. MARTIN:  They are not going to admit that, Judge.

21        THE COURT:  Your client says, "I didn't have any

22   relationship."  I don't see what authorizing him to file suit

23   has to do with it.

24        MR. MARTIN:  I can explain that, Judge.  Bear with me

25   just a second.  I will explain it.  There were a series of

12:17

1    corporate resolutions which are part of those exhibits.  They

2    are also in the record as there are 40 annex documents to I

3    believe it's the original complaint.  38, 39, 40, one of those

4    are authorizations by the board of directors in Singapore to

5    institute a suit and also for the corporate cousin, EPS India,

6    to do the same thing.

7                What these are, the first one is a power of

8    attorney by EPS India authorizing a lawyer to go after my

9    client.  There's another one, which they haven't produced,

10   which is the same sort of power of attorney from EPS Singapore

11   also authorizing an Indian attorney to go after my client.  The

12   point we are driving at is they don't have any basis for doing

13   it.

14           THE COURT:  These powers of attorney and resolutions

15   don't say that.  They don't say, "We know we don't have any

16   right, but we are still going to sue him."  That would be more

17   of a smoking gun, but I don't even know what relevancy --

18           MR. MARTIN:  I agree, and nobody is going to say that

19   in a power of attorney.  When you look, Your Honor, at the very

20   first paragraph of the Indian court complaint for damages, it

21   represents that there's a contractual relationship between

22   EPS India and Mr. Kholkar.  That is an absolute falsehood.

23           THE COURT:  Have you got that in front of you?  Tell

24   me where it says that in the power of attorney.

25           MR. MARTIN:  It doesn't say it in the power of

12:19

1    attorney.  It says it in the lawsuit that they filed.

2            THE COURT:  Okay.  That's not this power of attorney.

3    That's something different.

4            MR. MARTIN:  Your Honor, all I'm doing is saying that

5    power of attorney authorized them to file a lawsuit which

6    started with a falsehood.  That's how all this started.

7            THE COURT:  All right.  Let's move on.  You-all can

8    respond to whether that should be admissible.

9            MR. MARTIN:  There's a document also that was not

10   produced.  It's a power of attorney from EPS Singapore

11   authorizing a lawsuit which made the representations that I've

12   just cited to, Your Honor.

13           THE COURT:  Is it basically the same form as this

14   one?

15           MR. MARTIN:  They haven't given it to us.

16           THE COURT:  Okay.

17           MR. MARTIN:  We don't know why.

18           THE COURT:  You would not expect it to say, "We don't

19   have any cause of action, but we are authorizing you to do this

20   anyway."  As you said, they are not going to do that.

21           MR. MARTIN:  Well, no, I don't expect it to say that,

22   but the proof is in what is filed, because I would represent to

23   you that whatever the Indian lawyers filed had to be reviewed

24   by corporate counsel.  They are the people that are starting

25   this anyway.

12:20

1          THE COURT:  Okay.  All right.  Let's hear

2     Mr. Gonzalez' argument.

3               Is Mr. Kholkar just off camera?

4          MR. GONZALEZ:  Yes.  First of all, I want to first

5     thank you, Your Honor, for your time.  We have been here for

6     some time, but I also -- on behalf of my co-counsel but more

7     importantly Mr. Vishu Kholkar, I know that this is a big day

8     for him and he appreciates greatly this opportunity.

9          THE COURT:  Pull your microphone a little closer.

10          MR. GONZALEZ:  Sure.

11          THE COURT:  Thank you.

12          MR. GONZALEZ:  As we do.  Your Honor, I'm going to go

13     through some materials in terms of a brief chronology.  You

14     already are fully aware of it.

15          THE COURT:  Please do not.  I've spent more time here

16     than I really planned today, and I don't need a chronology of

17     the case.  I remember.

18          MR. GONZALEZ:  Yes.

19          THE COURT:  What I want is argument about what the

20     standard is and whether it's been met.

21          MR. GONZALEZ:  Okay.  We are going to focus on just

22     the issue of --

23          MR. MARTIN:  Use the microphone.

24          MR. GONZALEZ:  Okay.  So, Your Honor, as noted in our

25     brief, there's been a number of issues that have been brought

12:22

1    up.  The brief really comes down to what are the four --

2    there's a two-part test.  Obviously, we have the burden of

3    showing that, one, there's a substantial likelihood of success

4    on the merits.  Your Honor already made those issues --

5        **THE COURT:**  Look, I said last week -- maybe you were

6    not on the phone.  Have you read the cases that you cited in

7    your brief --

8        **MR. GONZALEZ:**  Yes, Your Honor.

9        **THE COURT:**  -- Fifth Circuit cases?

10        **MR. GONZALEZ:**  Yes.

11        **THE COURT:**  They talk about that this is a special

12    kind of injunction, and so I don't think you do have those four

13    requirements.  You better hope you don't.  That's not the test.

14    They talk about vexatious and oppressive and whether it's

15    duplicative, but this is not a regular injunction.

16        **MR. GONZALEZ:**  If Your Honor will allow us just a

17    two-minute break, that's all we ask.  Thank you.

18        **MR. MARTIN:**  Your Honor, if the Court is inquiring

19    about the two-part test, I can answer that.  If the Court is

20    inquiring about the duplicative nature of the litigation, I can

21    answer that as well.

22        **THE COURT:**  I have done everything I can do to tell

23    you-all that's what I think the issue is.  I don't know what

24    else to do.

25        **MR. MARTIN:**  Your Honor, I am a blind pig finally

12:24    1    finding a truffle.  I apologize for delaying things.

2    THE COURT:  You don't have to repeat for me what's in

3    your brief.  You are not required to make an argument.  I read

4    your brief.  You covered these cases.  I don't think you need

5    to.

6    MR. MARTIN:  All right.  They concede this is the

7    same facts, same litigation in their briefs.  They concede

8    that.

9    THE COURT:  All right.  I read that in your brief,

10    where you pointed to the things that they had said.

11    MR. MARTIN:  We have indicated in our brief and in

12    argument that we have made that there was no basis for the

13    litigation in India.  Therefore, that by itself should be

14    grounds for relief here.

15    We will also argue that this action was taken in

16    India in response to Your Honor not granting their Rule

17    12(b)(5) motion.  Literally within a month of Your Honor

18    saying, "Plaintiff, go serve in Singapore," they had to come up

19    with another idea.  Their board of directors meetings minutes

20    and the actions they took in immediate response followed right

21    on the heels of Your Honor saying, "I'm not going to grant your

22    motion."

23    THE COURT:  Bad faith or whatever motivation is not

24    one of the factors.  That's it.  You made your argument in your

25    brief.  You did a good job in the brief.  I read it.  You can

12:25

1 sit down.

2           Mr. Simms, do you want to make an argument about

3 whether these factors have been met?

4           MR. SIMMS:  Your Honor, they haven't been.

5           THE COURT:  Pull your microphone closer.

6           MR. SIMMS:  We are talking about the *Kaepa* case.

7           THE COURT:  Yes.

8           MR. SIMMS:  We are also talking about the *Unterweser*

9 factors.

10           THE COURT:  The what factors?

11           MR. SIMMS:  The *Unterweser* factors --

12           THE COURT:  Oh, okay.

13           MR. SIMMS:  -- which are repeated in *Kaepa* and in

14 *Karaha*.

15           The first one to look at is whether, in

16 *Unterweser*, there's going to be a frustration of policy of the

17 forum issuing the injunction.  Let's look at the unusual nature

18 of this case.  Unlike *Kaepa*, unlike any of the other cases that

19 have come up, here we have the South Goa court issuing the

20 injunction.  So we are hearing, "Well, there's no cause of

21 action by EPS India."  That's not anything that's been brought

22 up in the South Goa court.  There's not been a challenge to

23 that.  There's not been a hearing on that.  As a matter of

24 fact, the South Goa court is very content to exercise its

25 jurisdiction, which it has done in March of 2020.

12:27

1          So here is the first court issuing an
2    injunction, and what the plaintiff is asking you to do is to
3    accept their collateral attack of the injunction instead of
4    their appealing in the Goa court, responding with a motion to
5    dismiss, asserting this --
6          **THE COURT:**  What I'm being asked to do is and all I
7    could do is enjoin EPS Singapore from proceeding in the
8    South Goa court.  I'm not issuing an injunction to the court in
9    the South Goa case.
10          **MR. SIMMS:**  One of the foundations of the request
11    that's coming from the plaintiff's side is that the action in
12    Goa is improper.  What they are asking the Court to do is to
13    override its policy that this Court does not issue collateral
14    orders for foreign proceedings.
15          So, number one, does the foreign action
16    frustrate a policy of the forum issuing the injunction?  No, it
17    doesn't.  The Court also has observed the almost nonexistent
18    connections between this case and the plaintiff's allegations,
19    including the most recent ones which accuse EPS -- pick either
20    one -- of bad acting in the Indian court.  There is not policy
21    in this Court to entertain this injunction to stop a case that
22    is going forward an hour away from Mr. Kholkar's place of work
23    where EPS Singapore and EPS India have submitted to
24    jurisdiction.
25          **THE COURT:**  I know you know that the *Kaepa* case

12:29    1    followed those two earlier cases in 1996.  It had a fuller
         2    explanation of the policy and the attitude of the
         3    Fifth Circuit, and that has then been -- for example, in 2020,
         4    the *MWK Recruiting v. Jowers* case reiterated those same policy
         5    considerations, the same tests.  I think that's a good bet for
         6    you to assume that is the test that I will apply.
         7            MR. SIMMS:  *MWK Recruiting*, the court of appeals
         8    wrote at 564-65:  "Reliance on the logical relationship test,
         9    therefore, lowers the bar for antisuits injunctions, rendering
        10    them commonplace.  That result is contrary to our precedent."
        11            THE COURT:  Right.  I understand what I'm supposed to
        12    apply is to determine whether the litigation pending in
        13    South Goa is the same as what's pending here.  I am to
        14    determine whether they involve the same or similar legal bases
        15    or identical claims.
        16            MR. SIMMS:  That's under *Kaepa*.  That's correct,
        17    Your Honor.
        18            THE COURT:  That's what I will do.
        19            MR. SIMMS:  Legal similarities.
        20            THE COURT:  So do you think they are?  How do you
        21    think the claims are different?
        22            MR. SIMMS:  One thing that the plaintiff's side has
        23    harped on is that EPS India has no rights at all.  Well, it's
        24    different because we are talking about Indian law, and
        25    EPS Singapore was required as a matter of an act of parliament

12:31

1    of India to appoint a local subsidiary for the hiring of Indian

2    seamen and also to take care of their welfare.  So it was

3    EPS India that was responsible for taking care of Mr. Kholkar

4    in Brazil, for getting him back home, for administering the

5    medical treatment that Mr. Kholkar says was insufficient and

6    that has, as a matter of Indian law, promised to be liable for

7    any judgment that is entered against the actual employer.

8             THE COURT:  You think that relieves EPS Singapore of

9    responsibility?

10            MR. SIMMS:  A completely different question.  The

11   question is:  Are the legal proceedings here and in Goa

12   identical?  They aren't.

13            THE COURT:  In Goa, is this right:  There are claims

14   by EPS Singapore and there are also claims by EPS India?

15            MR. SIMMS:  Yes, Your Honor.

16            THE COURT:  All right.  I'm just talking about the

17   EPS Singapore claims.  Do those have the same or similar legal

18   bases as the claims that are pending here?

19            MR. SIMMS:  The plaintiff here, of course, is

20   insisting that the Jones Act applies.

21            EPS Singapore says:  No, the Jones Act does not

22   apply.  Indian law applies.  The employment agreement applies;

23   not the CBA standing alone, the employment agreement.  EPS

24   India is asserting the rights of Ventnor and that the result is

25   the damages are limited to $120,860.

12:33

1          THE COURT:  Isn't that exactly what we are arguing

2    about here, also about whether the Jones Act applies or the

3    employment agreement or something else?

4          MR. SIMMS:  Here we are certainly arguing about the

5    Jones Act, but that would never come up in India.

6          THE COURT:  You just said that that's what's

7    happening in India.  The issue is, for EPS Singapore, it's

8    arguing that it doesn't apply.  Here in this case the plaintiff

9    is arguing it does.  It just seems like the flip sides of the

10   same issue.

11         MR. SIMMS:  The argument in India, Your Honor, is

12   limited to the employment agreement because that's what Indian

13   law focuses on.

14         THE COURT:  The argument is that that's what applies.

15         MR. SIMMS:  Yes, Your Honor.

16         THE COURT:  Okay.  For that to apply, you have to be

17   arguing that the Jones Act does not apply.  If this were

18   litigated in India, then I guess there still would be this

19   argument about what law applies.  They probably apply different

20   laws just like we do.

21         MR. SIMMS:  There's a choice of law in both places,

22   but the EPS point is that the choice in law in India is clear.

23   There's been no attempt in India to bring up any Jones Act

24   claim, not even as a defense.

25         THE COURT:  Well, they haven't made any

12:34

1    counterclaims.  If this had to proceed there, I assume they

2    would.

3                MR. SIMMS:  What the Court needs to look at is, also,

4    back to the *Unterweser* factors, is the suit vexatious or

5    oppressive.  Now, we heard a lot of unfortunate things about

6    the consequences of Mr. Kholkar's decisions.

7                Let's say that the Court had a witness that was

8    supposed to come to this Court, Your Honor.  I think you know

9    where we are going on this.  He made the choice -- the son of a

10   police officer, offered a public defender -- to ignore the

11   court's orders, to snub the bailiff numerous times.  I think he

12   said it was six or seven.  Then he comes into the court and the

13   judge orders him to post a bond or have a lawyer and he says

14   no.  What, then, should a court do?

15               First, it's not this Court's job to second-guess

16   the judge in Goa, but there's been no claim that the judge was

17   without jurisdiction to do that.  There's been no attempt to

18   appeal that judge's decision.  Since Mr. Ganpat hired a lawyer

19   or one was hired for him, he has not gone back to jail.  The

20   lawyer has shown up 13 times and at a court that's an hour away

21   from where he is.

22               There is no vexatiousness or oppression.  The

23   only vexatiousness or oppression that's been factually argued

24   was the consequence of Mr. Kholkar's own decisions.

25               The third point, threaten the Court's in rem or

12:36

1    quasi in rem jurisdiction, that's not at issue here.

2                    Then, four, cause prejudice or offend other

3    equitable principles, the central equitable principle here is

4    whether we are talking about money or something else, and

5    that's what we are talking about.  We are talking about money.

6    We are talking about whether the employment agreement

7    limitations and the collective bargaining agreement limitations

8    apply, $120,000, or we are talking about a much larger claim.

9    That's what it is.  There is no equitable principle involved.

10   If -- "if" -- the Jones Act applied, if it did, he could argue

11   that it did in India.  He could argue that.  He hasn't done

12   that.

13                   As far as prejudice goes, well, there have been

14   13 hearings, 13 in-person hearings in the Goa court where

15   Mr. Kholkar could have advanced his case, could have decided to

16   do that, not what he did, which was to say, "Sorry, Court, I'm

17   not listening to you."  There is not prejudice on an equitable

18   basis.  The only difference is how much money he is going to

19   get.  That's not an equitable consideration.

20                   So those are the *Unterweser* as applied in *Kaepa*.

21   Just to look at *Kaepa* on its focus on vexatious and oppressive,

22   *Kaepa* says to determine vexatious or oppressive, number one,

23   look at the inequitable hardship resulting from the foreign

24   suit.  What inequitable hardship are we talking about?  We are

25   not.  We are talking about a difference in money.  That's what

12:38

1  it is, not inequitable hardship.

2          Again, it's not up to this Court to decide

3  whether the Indian court is fair or unfair, but the hardship

4  that has happened is that Mr. Kholkar decided to ignore the

5  Indian court's orders.  That's the only hardship that's been

6  presented.  In fact, I think if you look at the other hardship

7  that we are balancing out, how EPS -- both of them are in Goa.

8  They have shown up.  They have counsel.  There's a number of

9  Indian seamen that can be called in Goa.  This is recalling the

10  forum non conveniens motion, but it's not inequitable or

11  oppressive for Mr. Kholkar to show up an hour from his house

12  and come to court, which he has done 13 times.

13          Number two, the foreign suit's ability to

14  frustrate and delay the speedy and efficient determination of

15  the cause, well, again there's already been 13 hearings in Goa.

16  This is the first one where we have had Mr. Kholkar in person

17  spread out over -- I don't know how many miles it is --

18  20,000 miles of electrons.  That's probably conservative.  It's

19  not going to delay, if we have parallel proceedings, the speedy

20  and efficient determination of the cause.  We have witnesses in

21  India that can be called.  Mr. Kholkar can be called.

22          When we take a substantive deposition of

23  Mr. Kholkar, how in the world is that going to happen?  Is he

24  going to have to come here?  Are we going to have to go there?

25  He can come into the court in Goa and be cross-examined just

1    like all the other Indian witnesses.

2              The other *Kaepa* point on vexatious and

3    oppressive is, again, the legal similarities, and we have

4    talked about those.

5              *Karaha Bodas* is important, too, because in

6    *Karaha Bodas* the Fifth Circuit did consider the injunction

7    factors.  One, for a permanent injunction, which is what we are

8    talking about here, supported by the evidence -- which it's

9    not -- the plaintiff or the movant for the injunction has to

10   show that they will succeed on the merits.  They haven't shown

11   this at all under the *Kaepa* or *Unterweser* factors.

12         **THE COURT:**  In that case they do mention the four

13   requirements, but then in the next paragraph they say that this

14   is "a foreign antisuit injunction, a particular subspecies."

15         **MR. SIMMS:**  Yes.

16         **THE COURT:**  "The suitability of such relief

17   ultimately depends on considerations unique to antisuit

18   injunctions."

19         **MR. SIMMS:**  Ultimately, but not solely.

20         **THE COURT:**  Well, I think that's pretty much what

21   they mean, ultimately.

22         **MR. SIMMS:**  I'll just refer the Court to that.

23         **THE COURT:**  Thank you.

24         **MR. SIMMS:**  One final point, Your Honor, too.  The

25   timing, we have heard a lot about the timing.  Your Honor wrote

12:42

1   in *Howard v. Crull*, 438 F. Supp. 3d 711, 714, in 2020:  "In the

2   absence of valid service of process, proceedings against a

3   party are void."

4           The Supreme Court in *Murphy Brothers*,

5   526 U.S. 344, 350:  "Before a court may exercise personal

6   jurisdiction over a defendant, the procedural requirement of

7   service of summons must be satisfied."

8           The plaintiff's side is bringing up, "Well,

9   which happened first?  We filed our suit in 2018."  Well,

10  undisputed, it wasn't until 2021 that service was completed,

11  and under these two precedents it's void.  There is no personal

12  jurisdiction.  So there was nothing that made it untoward for

13  EPS to do exactly what it has done.

14          **THE COURT:**  All right.  Thank you.

15          Brief rebuttal.

16          **MR. MARTIN:**  I will get right to the point, Judge.

17  Your Honor inquired of Mr. Simms whether there was an

18  identicality of facts or issues.  I would invite the Court's

19  attention to record document 142-2, page 42, paragraph 30,

20  where EPS states:  "The pendency of the U.S. proceedings and

21  the proceedings before this Honorable Court on the same cause

22  of action would undoubtedly be multiplicity of proceedings."

23  That's what they are telling the Indian court.  It's the same

24  facts.

25          In document 204-1, at page 1, EPS wrote,

12:44

1    quote -- this is in one of their briefs to the Court:

2    "Litigation involving the same facts has been proceeding for

3    over a year and a half in the South Goa court."  It's the same

4    case and they know it.

5              THE COURT:  They are talking about it is not the same

6    facts.  It has to be the same bases.  That sounds very familiar

7    to me when they are talking about the same thing is pending

8    there as here.

9              MR. MARTIN:  Also, Your Honor, there were comments by

10    defense counsel that, "Well, the Indian court is going to be

11    held up.  Everybody lives close by."  That court is still just

12    in an injunction phase.  They are nowhere near a trial in that

13    case.  You have a November trial date, Your Honor.

14              THE COURT:  I think neither case has gotten very much

15    into the merits, it appears to me.

16              MR. MARTIN:  Another thing --

17              THE COURT:  This one we do have a trial date.

18              MR. MARTIN:  We do.  One thing that keeps slipping

19    through all the arguments, we were told by defense counsel look

20    at the seafarers' agreement.  It specifies at paragraph 26 that

21    you use the law of the flag.  Mr. Kholkar testified that's a

22    Liberian ship, Liberian flag.  Okay.  So that would mean that

23    not the law of India, but the law of Liberia would have to be

24    applied, whether it's in India or here.

25              Now, we don't think this case belongs in India

12:45

1    because there aren't any meaningful contacts there, but we keep
2    coming back to the same point.  It's Liberia, which is American
3    general maritime law or Jones Act and general maritime law,
4    which has been our position.  That's where we are.

5         We have shown, I believe, what's going on in
6    India and why.  Whether they have been honest with the court --
7    I don't blame the Indian court at all.  They can only deal with
8    what is presented to them.  I think they are probably as fair
9    and upstanding a court as anywhere in the world, using the
10   British legal system.  I don't blame them, but I do blame EPS.

11        We are not here to enjoin the Indian court.  The
12   relief we have requested is that Your Honor order EPS, the
13   defendant who has been properly served, to cease and desist.
14   They own EPS India 99.99 percent.

15        **THE COURT:**  The only party I have here is
16   EPS Singapore, so I guess I'm not sure about -- I've been
17   envisioning that what you are asking for is an injunction
18   against EPS Singapore.

19        **MR. MARTIN:**  Yes, ma'am, the parent.

20        **THE COURT:**  I don't know what that means about
21   EPS India.

22        **MR. MARTIN:**  That may be a bridge we have to cross
23   next.  EPS India, as Your Honor knows from the testimony and
24   from the documents, has no relationship with Mr. Kholkar
25   whatsoever except a deal it made separately with the Indian

12:47

1   government to repatriate seafarers.  Well, we know here they

2   are exclusively EPS Singapore seafarers, but that agreement is

3   with the Indian government, not with Mr. Kholkar.

4   EPS Singapore does not have a direct contract with my client,

5   nor does EPS India.

6        **THE COURT:**  I haven't studied all the pleadings in

7   the suit in India, so I don't know what that court would do,

8   whether it would make any difference if EPS Singapore is no

9   longer a party but EPS India is.  I don't know what difference

10  it would make.

11       **MR. MARTIN:**  Judge, I can't predict what the Indian

12  court would do.  If you look at all the pleadings, it all

13  refers to the standing of the owner of EPS Singapore is a

14  shipping magnate and his reputation and, gosh, they wanted to

15  take -- they had a huge settlement demand.  I've never seen

16  settlement demands put in pleadings before, but they have been

17  used here.

18            It's that sort of thing.  It's all focused on

19  EPS Singapore.  If Your Honor enjoins them, I do not know what

20  EPS India would have left in the Indian court because, in order

21  to get relief, my client has to have done something to them.

22  He hasn't sued them.  He hasn't breached a contract.  He has no

23  relationship with them.

24       **THE COURT:**  I don't know how that would all work out.

25       **MR. MARTIN:**  That's not for me to say.

12:48  1          **THE COURT:**  Okay.  Thank you all.  I appreciate it.

2    Nice to see you.

3          **MR. MARTIN:**  Thank you for your time and patience for

4    all the years.

5          **THE COURT:**  Court is adjourned.

6          **THE DEPUTY CLERK:**  All rise.

7          (Proceedings adjourned.)

8                              * * *

9                       <u>**CERTIFICATE**</u>

10         I, Toni Doyle Tusa, CCR, FCRR, Official Court

11   Reporter for the United States District Court, Eastern District

12   of Louisiana, certify that the foregoing is a true and correct

13   transcript, to the best of my ability and understanding, from

14   the record of proceedings in the above-entitled matter.

15

16

17                        <u>*/s/ Toni Doyle Tusa*</u>
                         Toni Doyle Tusa, CCR, FCRR
18                       Official Court Reporter

19

20

21

22

23

24

25